# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD BROWN SR., BARBARA BROWN, PAULA RICH, REGINA BROWN, MINDYLOU PARESI, JANET G. PARESI, ALEXANDRA VANDENBROEK, ELIZABETH SANTINA PARESI, SANTINA CARTISSER, TERRY PARESI, DANA MARIE BERNHARDT, MARY LEE WISE, E.P., by and through his next friend Dana Marie Bernhardt, and MARY HEATHER WISE, | **COMPLAINT UNDER THE ANTI-TERRORISM ACT (18 U.S.C. § 2333)**<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | No. 19-cv-11876 |
| National Bank of Pakistan, | |
| Defendant. | |

Ryan R. Sparacino
  (pro hac vice motion forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
Ryan.sparacino@sparacinopllc.com

Tejinder Singh
  (SDNY Bar No. TS0613)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel:  202.362.0636
Fax: 866.574.2033
tsingh@goldsteinrussell.com

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ......................................................................1

II.    THE PARTIES ........................................................................................4

   A.    Plaintiffs............................................................................................4

   B.    The Defendant ..................................................................................8

III.   JURISDICTION AND VENUE ...............................................................8

IV.   FACTUAL ALLEGATIONS ...................................................................9

   A.    The Camp Chapman Attack ..............................................................9

   B.    The Terrorist Organizations that Committed the Camp Chapman
        Attack.............................................................................................12

       1.    Al-Qaeda.................................................................................13

       2.    Pakistani Taliban ....................................................................15

       3.    The Relationship between al-Qaeda and the Pakistani Taliban..........18

   C.    National Bank of Pakistan's Knowing Provision of Material Support
        to the Terrorists that Committed the Camp Chapman Attack.................21

       1.    National Bank of Pakistan's Customer, Hafiz Khan...........................21

       2.    National Bank of Pakistan's Role and Knowledge.............................26

CLAIMS FOR RELIEF ....................................................................................39

   First Claim for Relief (Aiding and Abetting) ......................................................39

   Second Claim for Relief (Conspiracy)..................................................................41

   Third Claim for Relief (Violation of 18 U.S.C. § 2339A)...................................42

   Fourth Claim for Relief (Violation of 18 U.S.C. § 2339B) ................................43

PRAYER FOR RELIEF .....................................................................................44

Plaintiffs, by their attorneys, allege the following:

## I.      NATURE OF THE ACTION

1.      This is an action under the Anti-Terrorism Act, 18 U.S.C. § 2333(a) and (d), brought on behalf of the families of Americans killed in a suicide bombing that occurred on December 30, 2009 at CIA Forward Operating Base Chapman in the Khost province of Afghanistan (the "Camp Chapman Attack").

2.      The Camp Chapman Attack was jointly planned, authorized, and committed by al-Qaeda, which had been designated a foreign terrorist organization ("FTO") by the U.S. government; by the Tehrik-i-Taliban Pakistan ("TTP" or "Pakistani Taliban"), which collaborated with al-Qaeda in Pakistan and would be designated an FTO several months later; and by the Haqqani Network, which was part of the Taliban and designated an FTO in 2012. Each terrorist group played an important role in the commission of the Camp Chapman Attack.

3.      Before and after the Camp Chapman Attack, a terrorist financier named Hafiz Muhammad Sher Ali Khan ("Hafiz Khan") sent tens of thousands of dollars from the United States to Pakistani Taliban operatives and fighters, for the purpose of supporting the Pakistani Taliban in its terror campaigns. For these transfers, Hafiz Khan was tried and convicted by the United States government of providing material support to terrorists and terrorist organizations, and of conspiring to do so. His conviction was upheld on appeal.

4.      The evidence at Hafiz Khan's trial showed that he supported the Pakistani Taliban in word and deed. In myriad recorded statements, Hafiz Khan praised the Pakistani Taliban and al-Qaeda, and wished death on Americans, especially those fighting in Afghanistan. But Hafiz Khan did more than talk. He also funneled money, including U.S. dollars, from the United States to Pakistan for the benefit of the Pakistani Taliban. Members of Hafiz Khan's family, including one of his sons, his daughter, and his grandson, were known or suspected to be affiliated with the Pakistani Taliban. And Hafiz Khan's "madrassa" (a religious school) was likewise a sanctuary for the Pakistani Taliban and its supporters. A confidential human source reported to the FBI that the madrassa displayed a banner stating "Death to America," and Hafiz Khan himself bragged that children from his madrassa had gone on to receive terrorism training to fight and kill Americans in Afghanistan.

5.      The evidence at Hafiz Khan's trial also directly implicated the defendant in this case, the National Bank of Pakistan ("NBP"). Hafiz Khan maintained at least two U.S. dollar accounts in Pakistan with NBP, which were used to fund the Pakistani Taliban. At Hafiz Khan's instructions, NBP would transfer money from his United States accounts to those Pakistani accounts to make funds available to individuals who facilitated the purchase of weapons by the Pakistani Taliban, and who provided cash to Pakistani Taliban fighters. Hafiz Khan

2

also used the NBP accounts to fund his madrassa. The use of the NBP accounts was critical to Hafiz Khan's terrorist financing activities. For example, when an informant posing as a Pakistani Taliban sympathizer asked Hafiz Khan to give him money to take to the Pakistani Taliban, Khan responded, "No, I do not give this way. . . . I send it through my bank."[1] In light of Hafiz Khan's well-established links to the Pakistani Taliban, and the suspicious nature of the transactions he made, NBP would have known that the dollars Hafiz Khan was sending through his bank accounts were for the purpose of supporting the Pakistani Taliban's terrorism.

6.      By providing funds to a terrorist organization that committed the Camp Chapman Attack, through Hafiz Khan and/or others, NBP violated the Anti-Terrorism Act's primary and secondary liability provisions. The Anti-Terrorism Act is deliberately phrased broadly to create civil liability for anybody who provides—directly or indirectly—material support to violent terrorists and terrorist organizations who kill Americans. Terrorists need financial conduits to carry out violent attacks, and NBP supplied them. Accordingly, NBP is liable to the victims of the Camp Chapman Attack and their families.

---

[1] *See* Trial Transcript, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 835, at 42 (S.D. Fl. 2013) (hereinafter "*Khan* Trial Transcript") (testimony of FBI Special Agent Michael Ferlazzo, recounting recorded conversation that occurred on Sept. 19, 2010).

## II.    THE PARTIES

### A. Plaintiffs

7.      On December 30, 2009, a suicide bomber perpetrated the Camp Chapman Attack, killing nine people. Despite their heroic efforts to stop the attack, Harold Brown, Jr., a former Army officer, Dane Paresi, a former Green Beret, and Jeremy Jason Wise, a former Navy SEAL, were killed. Their family members are Plaintiffs in this case.

### The Harold Brown Jr. Family

8.      Harold Brown Jr. served in Afghanistan as a U.S. government employee serving in the Central Intelligence Agency. On December 30, 2009, Mr. Brown died from injuries sustained in the Camp Chapman Attack.

9.      Mr. Brown was a national of the United States at the time of the attack and his death.

10.     As a result of the attack, Mr. Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for their own injuries and for the damages Mr. Brown sustained.

11.     Plaintiff Harold Brown Sr. is the father of Mr. Brown. He is a national of the United States.

4

12.     Plaintiff Barbara Brown is the mother of Mr. Brown. She is a national of the United States.

13.     Plaintiff Paula Rich is the sister of Mr. Brown. She is a national of the United States.

14.     Plaintiff Regina Brown is the sister of Mr. Brown. She is a national of the United States.

15.     As a result of the death of Mr. Brown, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brown's society, companionship, and counsel.

**The Dane Clark Paresi Family**

16.     Dane Clark Paresi served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Paresi died from injuries sustained in the Camp Chapman Attack.

17.      Mr. Paresi was a national of the United States at the time of the attack and his death.

18.     As a result of the attack, Mr. Paresi was injured in his person and/or property. The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for their own injuries and for damages Mr. Paresi sustained.

19.     Plaintiff MindyLou Paresi is the widow of Mr. Paresi. She is a national of the United States.

20.     Plaintiff Janet G. Paresi is the mother of Mr. Paresi. She is a national of the United States.

21.     Plaintiff Alexandra VandenBroek is the step-daughter of Mr. Paresi. She is a national of the United States. Alexandra VandenBroek lived in the same household as Mr. Paresi for a substantial period of time and considered Mr. Paresi the functional equivalent of a biological father.

22.     Plaintiff Elizabeth Santina Paresi is the daughter of Mr. Paresi. She is a national of the United States.

23.     Plaintiff Santina Cartisser is the sister of Mr. Paresi. She is a national of the United States.

24.     Plaintiff Terry Paresi is the brother of Mr. Paresi. He is a national of the United States.

25.     As a result of the death of Mr. Paresi, each member of the Paresi Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Paresi's society, companionship, and counsel.

6

**The Jeremy Jason Wise Family**

26.     Jeremy Jason Wise served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Wise died from injuries sustained in the Camp Chapman Attack.

27.      Mr. Wise was a national of the United States at the time of the attack and his death.

28.     As a result of the attack, Mr. Wise was injured in his person and/or property. The Plaintiff members of the Wise Family are the survivors and/or heirs of Mr. Wise and are entitled to recover for their own injuries and the damages Mr. Wise sustained.

29.     Plaintiff Dana Marie Bernhardt is the widow of Mr. Wise. She is a national of the United States.

30.     Plaintiff Mary Lee Wise is the mother of Mr. Wise. She is a national of the United States.

31.     Plaintiff E.P., by and through his next friend Dana Marie Bernhardt, is the minor step-son of Mr. Wise. He is a national of the United States. E.P., by and through his next friend Dana Marie Bernhardt, lived in the same household as Mr. Wise for a substantial period of time and considered Mr. Wise the functional equivalent of a biological father.

7

32.     Plaintiff Mary Heather Wise is the sister of Mr. Wise. She is a national of the United States.

33.     As a result of the death of Mr. Wise, each member of the Wise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Wise's society, companionship, and counsel.

**B. The Defendant**

34.     Defendant is the National Bank of Pakistan, headquartered in Karachi, Pakistan.

35.     NBP has at least two branches in the United States. One is located at 100 Wall St., 21st Floor, New York, NY 10005. The other is at 1875 Connecticut Ave. N.W., Washington, DC 20009.

**III.   JURISDICTION AND VENUE**

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338, as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

37.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) because NBP will be served here. It is also proper pursuant to 28 U.S.C.§ 1391.

38.     NBP is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), to Section 2(a)(6) of the Justice Against Sponsors of Terrorism Act,

Pub. L. No. 114-222, 130 Stat. 852 (2016), to N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because, as explained in more detail below, the violations in this case involved sending U.S. dollars from the United States to bank accounts in Pakistan for the purpose of financing terrorism.[2]

## IV.   FACTUAL ALLEGATIONS

39.    The factual allegations in this Complaint are based on information and belief after consulting authoritative sources about the events described herein, including mainstream news publications, reports by knowledgeable experts, and government sources.

### A. The Camp Chapman Attack

40.    On December 30, 2009, a suicide bomber named Humam Khalil al-Balawi ("Balawi") attacked a secret CIA base in the Khost Province of Afghanistan known as Camp Chapman. Balawi posed as an informant willing to provide information about high-value al-Qaeda targets in Pakistan. Upon gaining entry to the base, he detonated a suicide vest, murdering nine people, seven of whom were American. Six others were seriously injured. The Camp Chapman

---

[2] *See, e.g.*, *Khan* Trial Transcript, Doc. 836, at 17 (testimony of Special Agent Ferlazzo recounting an instance in which a bank transfer to the branch in Pakistan had been held up, and Hafiz Khan had inquired with the NBP branch in Washington, D.C. about the status).

9

Attack was the largest attack on the CIA since the 1983 bombing of a Marine compound in Beirut, Lebanon.[3]

41.     Balawi acted as an agent of a terrorist syndicate that included three prominent and violent terrorist organizations: al-Qaeda, the Pakistani Taliban, and the Haqqani Network.[4]

42.     Al-Qaeda authorized the Camp Chapman Attack. Specifically, Sheikh Saeed al Masri, al-Qaeda's number three leader at the time and a member of al-Qaeda's leadership, authorized the attack.[5]

43.     The Pakistani Taliban helped plan and execute the attack by providing financial and logistical support. That support was coordinated by Hakimullah Mehsud, the leader of the Pakistani Taliban, who appeared in a video released after the fact together with Balawi to take credit for "arranging" the attack.[6] Balawi also

---

[3] The events surrounding this attack are chronicled in a book, Joby Warrick, *The Triple Agent: The al-Qaeda Mole Who Infiltrated the CIA* (2012) (hereinafter "Warrick, *Triple Agent*").

[4] Nick Schifrin, *Al Qaeda Claims Responsibility for CIA Base Bombing*, ABC News (Jan. 6, 2010), https://abcnews.go.com/Blotter/al-qaeda-claims-responsibility-cia-base-bombing/story?id=9498684; Mark Sappenfield, *CIA Agents Killed in Afghanistan Were in Taliban's Backyard*, Christian Science Monitor (Dec. 31, 2009), https://www.csmonitor.com/USA/Military/2009/1231/CIA-agents-killed-in-Afghanistan-were-in-Taliban-s-backyard; Bruce Riedel, *Deadly Embrace: Pakistan, America, and the Future of the Global Jihad* 99-100 (2011) (hereinafter "Riedel, *Deadly Embrace*").

[5] Warrick, *Triple Agent* at 154; *see also* Bruce Riedel, *Three Is the Loneliest Number*, Foreign Policy (2010), https://foreignpolicy.com/2010/06/02/three-is-the-loneliest-number-2/.

[6] Lee Ferran, *Taliban Releases Image of 'Martyred' Leader Hakimullah Mehsud*, ABC News (Nov. 4, 2013), https://abcnews.go.com/Blotter/hakimullah-mehsud-taliban-releases-image-martyred-leader/story?id=20780493.

10

trained at a Pakistani Taliban camp in North Waziristan.[7] And the U.S. State Department determined that Pakistani Taliban leader Qari Hussain, who was "one of TTP's top lieutenants and serves as the trainer and organizer of the group's suicide bombers," is "believed to have trained" Balawi before the Camp Chapman Attack.[8]

44.     For its part, the Haqqani Network provided substantial assistance to its al-Qaeda and Pakistani Taliban terrorist partners in the Camp Chapman Attack, including the al-Qaeda suicide bomber, Balawi, who triggered the suicide vest. On information and belief, the Haqqani Network provided key support for the Camp Chapman Attack, including but not limited to intelligence and logistical support. The Taliban has publicly taken responsibility for the attack.

45.     Statements by al-Qaeda and the Pakistani Taliban confirmed that the attack was retaliation against the CIA for drone strikes that had killed (among others) Baitullah Mehsud, who was at the time leader of the Pakistani Taliban.

46.     Through their collaborative effort, al-Qaeda, the Pakistani Taliban, and the Haqqani Network jointly committed the Camp Chapman Attack, through their agent Balawi.

---

[7] Warrick, *Triple Agent* at 150.

[8] U.S. Dep't of State, *Terrorist Designation of Tehrik-E Taliban (TTP) Leader Qari Hussain* (Jan. 20, 2011), https://2009-2017.state.gov/r/pa/prs/ps/2011/01/155030.htm.

### B. The Terrorist Organizations that Committed the Camp Chapman Attack

47.    Since the U.S.-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians there. This case focuses on al-Qaeda and the Pakistani Taliban, which worked in concert and shared resources, personnel, and operational plans. Given such coordination, a former CIA official and senior White House advisor called the resulting terrorist superstructure a "syndicate," composed of al-Qaeda, the Pakistani Taliban, the Taliban (including the Haqqani Network), and several other allied terrorist groups.[9] In fact, Osama bin Laden himself conceived of al-Qaeda as the leader of a broad coalition of terrorists across Pakistan and Afghanistan.[10]

48.    These terrorists used indiscriminate violence against American service members and civilians alike to achieve political ends. The syndicate's primary goal was to affect U.S. foreign policy and expel coalition personnel from Afghanistan. Syndicate members also used violence and intimidation to further their longstanding domestic political agenda of imposing a severe form of Islamic law throughout Pakistan and Afghanistan.

---

[9] Riedel, *Deadly Embrace* at 1.

[10] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Wash. Exam'r (July 4, 2011), https://www.washingtonexaminer.com/weekly-standard/the-al-qaeda-taliban-connection.

49.     None of the terrorists identified below adhered to the Geneva Conventions or the law of war. They refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.

### 1. Al-Qaeda

50.     Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on destroying the United States.

51.     Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group with the capability of launching attacks around the world. Osama bin Laden declared war on the United States in a published fatwa (religious decree) in 1996.[11] In 1998, he declared a global jihad calling on all Muslims to kill Americans at any opportunity.[12]

52.     On August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks attacked the U.S. embassies in Kenya and Tanzania, killing more than 200

---

[11] Anne Stenersen, *Al-Qaida in Afghanistan* 62-63 (2017); *Osama bin Laden,* Counter Extremism Project, https://www.counterextremism.com/extremists/osama-bin-laden (last visited Dec. 27, 2019); National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 48 (2004), *available at* https://govinfo.library.unt.edu/911/report/ 911Report.pdf (hereinafter "*9/11 Commission Report*").

[12] *9/11 Commission Report* at 47; Stenersen, *Al-Qaida in Afghanistan* at 71.

13

people and wounding more than 5,000 others. The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan.[13]

53.     As a result of these and other terrorist attacks, the U.S. State Department designated al-Qaeda as an FTO on October 8, 1999.[14] Knowingly providing material support to an FTO is a crime. 18 U.S.C. § 2339B(a)(1).

54.     On September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands.[15] A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93.[16]

55.     The United States demanded that the Taliban turn over bin Laden, and the Taliban refused. A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.[17]

56.     In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq.[18] Followers of the Taliban school of thought had previously viewed suicide attacks as taboo, but al-Qaeda convinced

---

[13] Stenersen, *Al-Qaida in Afghanistan* at 76.

[14] U.S. Dep't of State, *Foreign Terrorist Organization, Designations by the Secretary of State*, (Oct. 8, 1999), https://2001-2009.state.gov/s/ct/rls/rpt/fto/2682.htm.

[15] *9/11 Commission Report* at 285-311.

[16] *Id.* at 10-14.

[17] *Id.* at 332-334; Stenersen, *Al-Qaida in Afghanistan* at 177.

[18] Dan Eggen & Susan Schmidt, *Bin Laden Calls Iraqis to Arms*, Wash. Post (Feb. 12, 2003), https://www.washingtonpost.com/archive/politics/2003/02/12/bin-laden-calls-iraqis-to-arms/564a5029-9e49-4e2a-bbe2-0a626f9afc70/.

them they were religiously permissible.[19] With al-Qaeda's encouragement – and training – the number of such suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005 and more than 100 in 2006.[20] Al-Qaeda also paid the families of suicide bombers in Afghanistan.[21]

57.    Although Osama bin Laden is now dead, the United States and its coalition partners are still fighting al-Qaeda to this day.

### 2.  Pakistani Taliban

58.    The Pakistani Taliban, also known as Tehrik-i-Taliban Pakistan or TTP, is a Sunni Islamic terrorist organization that was formally created in 2007, based in the Federally Administered Tribal Areas of Pakistan, and organized to advance a radical terrorist agenda in Afghanistan and Pakistan.

59.    The Pakistani Taliban consisted of Taliban supporters and sympathizers in Pakistan who decided to form their own terrorist group to partner with other terrorist groups, like Al-Qaeda, in order to carry out terrorist attacks in Afghanistan and Pakistan in support of their terrorist agenda. At all times, the

---

[19] Brian Glyn Williams, *Mullah Omar's Missiles: A Field Report on Suicide Bombers in Afghanistan*, Middle East Policy Council (2008), https://mepc.org/journal/mullah-omars-missiles-field-report-suicide-bombers-afghanistan; Rohan Gunaratna and Syed Adnan Ali Shah Bukhari, *Militant Organisations and Their Driving Forces*, *published in Pakistan – Consequences of Deteriorating Security in Afghanistan* at 38-39 (2009), https://www.foi.se/rest-api/report/FOI-R--2683--SE.

[20] Seth G. Jones, *Pakistan's Dangerous Game*, 49 Survival 15, 23 (2007), http://www3.carleton.ca/csds/docs/Jones%20Pakistan.pdf.

[21] *Id.* at 23.

Pakistani Taliban espoused a radical, violent Islamist ideology that emphasized violent attacks against the perceived enemies of Islam, including Americans in the region.[22]

60.     Since its formation, the Pakistani Taliban has emphasized violent jihad against NATO forces in Afghanistan as one of the terrorist group's core objectives.[23] The organization notoriously employs kidnapping, murder, beheadings, improvised explosive devices and suicide bombings in pursuit of its objectives.[24] This includes paying compensation to the families of suicide bombers, and providing treatment to injured fighters, which creates incentives for people to join the Pakistani Taliban's cause.[25]

61.     From its inception, the Pakistani Taliban was a formidable terrorist threat on both sides of the Afghan/Pakistan border. As described in a January 2008 profile of TTP published by the Combating Terrorism Center at West Point:

> The organizational strength, military strategy and leadership quality of the Taliban in Pakistan's tribal territories has qualitatively improved during the last few years. At the time of the U.S.-led military campaign in Afghanistan in late 2001, allies and sympathizers of the

---

[22] Hassan Abbas, *A Profile of Tehrik-i-Taliban Pakistan*, CTC Sentinel Vol. 1, Issue 2 at 1 (Jan. 2008) ("*TTP Profile*").

[23] *TTP Profile* at 2.

[24] *Khan* Trial Transcript, Doc. 833, at 106 (testimony of FBI Special Agent Ferlazzo); *Khan* Trial Transcript, Doc. 839, at 134 (testimony of Saifullah Khan, a militia leader who fought the Pakistani Taliban); *Khan* Trial Transcript, Doc. 840, at 150-51 (testimony of expert Khurum Iqbal).

[25] *Khan* Trial Transcript, Doc. 840, at 152-54 (testimony of Khurum Iqbal).

Taliban in Pakistan were not identified as "Taliban" themselves. That reality is now a distant memory. Today, Pakistan's indigenous Taliban are an effective fighting force and are engaging the Pakistani military on one side and NATO forces on the other.[26]

62.     The TTP was first led by Baitullah Mehsud, a jihadist who hailed from the South Waziristan Agency in Pakistan and followed "the fanatic Talibanized version of Islam," under which his stated view was that "only jihad can bring peace to the world."[27]

63.     On or about August 5, 2009, the TTP's first leader, Baitullah Mehsud, was killed by a CIA drone strike in Pakistan.[28] On information and belief, the U.S. government executed the drone strike against Mehsud because of the key role he played in the TTP's campaign of terror against Americans and coalition partners in Afghanistan.

64.     As noted above, the Pakistani Taliban retaliated for Mehsud's death by participating in the Camp Chapman Attack. In May of 2010, the Pakistani Taliban also attempted to carry out a car bombing in Times Square, which failed.

---

[26] *TTP Profile* at 1.

[27] *TTP Profile* at 3.

[28] Declan Walsh, *Air Strike Kills Taliban Leader Baitullah Mehsud*, The Guardian (Aug. 7, 2009).

The bomber in that case received training and resources from the Pakistani Taliban as he attempted to murder Americans on U.S. soil.[29]

65.     On September 1, 2010, the U.S. State Department designated the Pakistani Taliban as an FTO.[30] It remains designated as such to this day. As the government explained in Hafiz Khan's trial, however, "just because the Pakistani Taliban was not formally designated as a foreign terrorist organization . . . until that date, September 1, 2010, does not mean the group suddenly became violent on that day."[31] Instead, the group engaged in "extreme violence during 2008, 2009, and the first part of 2010"—the entire time the funds at issue in this case were being transferred.[32]

### 3.  The Relationship between al-Qaeda and the Pakistani Taliban

66.     As their coordination in the authorization, planning, and commission of the Camp Chapman Attack illustrates, al-Qaeda and the Pakistani Taliban are closely allied as parts of an overarching terrorist syndicate in the region.[33]

---

[29] U.S. Dep't of Justice, *Faisal Shahzad Indicted for Attempted Car Bombing in Times Square* (June 17, 2010), https://www.justice.gov/opa/pr/faisal-shahzad-indicted-attempted-car-bombing-times-square.

[30] U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/.

[31] *Khan* Trial Transcript, Doc. 833, at 29-30 (government's opening statement).

[32] *Id*. at 30.

[33] Riedel, *Deadly Embrace* at 100.

67.    John Brennan (then the chief counterterrorism advisor to the President, and later director of the Central Intelligence Agency) commented in 2010 that the Pakistani Taliban "is closely allied with al-Qaeda. They train together, they plan together, they plot together. They are almost indistinguishable."[34] Others have described the Pakistani Taliban as a "franchise" of al-Qaeda that gives al-Qaeda operational support in Pakistan.[35]

68.    More specifically, the Pakistani Taliban provided a critical safe-haven for both al-Qaeda and the Afghan Taliban in parts of South Waziristan Agency as early as 2007.[36] The Pakistani Taliban also trained al-Qaeda terrorists operating in Afghanistan. For example, TTP leader Qari Hussain helped provide training to Balawi for the Camp Chapman Attack.[37]

69.    The State Department has agreed with these assessments. In its order designating the Pakistani Taliban as an FTO, the State Department blamed the Pakistani Taliban and al-Qaeda for the Camp Chapman Attack and noted that "TTP and al-Qa'ida have a symbiotic relationship; TTP draws ideological

---

[34] Kathleen Hennessey, *N.Y. Bomber has al Qaeda tie, White House Says*, SFGate (May 10, 2010), https://www.sfgate.com/news/article/N-Y-bomber-has-al-Qaeda-tie-White-House-says-3264841.php.

[35] Ayesha Siddiqa, *Pakistan's Counterterrorism Strategy: Separating Friends from Enemies*, 34 Wash. Quarterly 149, 153 (2011).

[36] *TTP Profile* at 3.

[37] U.S. Dep't of State, *Terrorist Designation of Tehrik-E Taliban (TTP) Leader Qari Hussain* (Jan. 20, 2011), https://2009-2017.state.gov/r/pa/prs/ps/2011/01/155030.htm.

guidance from al-Qa'ida, while al-Qa'ida relies on TTP for safe haven in the Pashtun areas along the Afghan-Pakistani border. This mutual cooperation gives TTP access to both al-Qa'ida's global terrorist network and the operational experience of its members. Given the proximity of the two groups and the nature of their relationship, TTP is a force multiplier for al-Qa'ida."[38]

70.     Expert witnesses likewise testified that al-Qaeda and the TTP are ideologically and operationally very close. Thus, "Al-Qaeda's ideology is to wage global jihad against America and its allies, and TTP fully subscribed to that ideology. TTP also believes in fighting against the U.S. and its allies anywhere in the world they find the chance, so that is the ideological link, and [the] operational link is also very strong."[39]

71.     As further confirmation of these organizations' close ties, after Osama bin Laden was brought to justice, "Pakistani Taliban militants allied with al Qaeda [] vowed to avenge bin Laden's killing."[40]

72.     This matters because it means that, in the time frame relevant to the allegations in this Complaint, providing support to the Pakistani Taliban

---

[38] U.S. Department of State, *Designations of Tehrik-e Taliban Pakistan and Two Senior Leaders* (Sept. 1, 2010), https://2009-2017.state.gov/r/pa/prs/ps/2010/09/146545.htm.

[39] *Khan* Trial Transcript, Doc. 840, at 113 (testimony of Khurum Iqbal).

[40] Haji Mujtaba, *Militants target check post in Pakistan's N. Waziristan*, Reuters (May 26, 2011), https://www.reuters.com/article/us-pakistan-blast/militants-target-check-post-in-pakistans-n-waziristan-idUSTRE74P2Q820110526.

necessarily meant assisting al-Qaeda as well. The organizations planned together, trained together, shared resources, and attacked together. Any support to the Pakistani Taliban enabled that organization to facilitate terrorist attacks against Americans in Afghanistan, executed by either the Pakistani Taliban or, as in the Camp Chapman Attack, a joint operation between the Pakistani Taliban, al-Qaeda, and other components of the syndicate.

### C. National Bank of Pakistan's Knowing Provision of Material Support to the Terrorists that Committed the Camp Chapman Attack

#### *1. National Bank of Pakistan's Customer, Hafiz Khan*

73.    Hafiz Khan lived for approximately six decades in the Swat Valley in Pakistan before moving to Miami, Florida, where he became a U.S. citizen. From Florida, Hafiz Khan transferred funds to Pakistan for the purpose of supporting the Pakistani Taliban. In 2011, a federal grand jury indicted Hafiz Khan and others for providing and conspiring to provide material support to terrorists in violation of 18 U.S.C. §§ 2339A, and 2339B. After a 29-day jury trial, Hafiz Khan was convicted of all counts and sentenced to twenty-five years in prison. His conviction was upheld on appeal.

74.    In recorded conversations that took place in 2009 and 2010, Hafiz Khan repeatedly declared that he supported both the Pakistani Taliban and al-Qaeda, including in their fight against the United States. In a conversation with

21

his grandson, Alam Zeb, who was himself "associated with the Taliban,"[41] Hafiz

Khan referred repeatedly to "our Shagirdan [Taliban]."[42] He hoped that "Allah

[would] make all the Taliban victorious over [the Americans], victorious over the

whole world."[43] Upon hearing that the Afghan Taliban had killed four American

soldiers in Afghanistan, Hafiz Khan declared that "[t]hey should kill four thousand

more."[44] He hoped that a thousand Americans would die every month.[45] Upon

hearing that the Taliban had shot down an American helicopter in Afghanistan,

Hafiz Khan hoped that Allah would "bring death to 50,000 of them."[46] Upon

hearing that the Pakistani Taliban had killed ten Christians, Hafiz Khan

commented that he was "getting happy," and hoped that the American general in

Afghanistan, "along with all his companions, may get eliminated at the hands of

the Taliban."[47] Upon hearing the prediction that another terrorist attack would take

place in the United States, he exclaimed, "Oh Allah, may it be! Oh Allah! Oh

Allah! May Allah paralyze all their powers."[48] And he commented, after hearing

---

[41] *Khan* Trial Transcript, Doc. 835, at 54-55 (recording of conversation dated Sept. 20, 2010).

[42] *Khan* Trial Transcript, Doc. 833, at 166 (recording of conversation dated Sept. 19, 2009).

[43] *Khan* Trial Transcript, Doc. 837, at 165 (recording of conversation dated July 24, 2010).

[44] *Khan* Trial Transcript, Doc. 833, at 199 (recording of conversation dated Aug. 23, 2010).

[45] *Khan* Trial Transcript, Doc. 833, at 191 (recording of conversation dated July 5, 2010).

[46] *Khan* Trial Transcript, Doc. 833, at 200-202 (recording of conversation dated Sept. 22, 2010).

[47] *Khan* Trial Transcript, Doc. 837, at 193 (recording of conversation dated Aug. 16, 2010).

[48] *Khan* Trial Transcript, Doc. 833, at 187 (recording of conversation dated June 27, 2010).

news of an attempted bombing in New York, that "[t]hese al-Qaeda people are awesome people."[49] He hoped that Allah would destroy the Americans so they would "all die with this desire [to capture Osama bin Laden unfulfilled]."[50]

75.     Hafiz Khan specifically condoned the use of suicide bombings—as long as those bombings targeted government and military personnel. He called for suicide bombings by the Pakistani Taliban.[51] He specifically endorsed an attack in the Pakistani legislature.[52] And when Hafiz Khan heard that the Pakistani Taliban had carried out a suicide bombing at a public market, he opined that "this should be done at the government places" instead.[53]

76.     Hafiz Khan supported the Pakistani Taliban in at least two ways. First, he sent funds to the Pakistani Taliban, using his accounts at the National Bank of Pakistan to facilitate the transfers. Hafiz Khan would raise money in the United States from donors, family, or his own work. He would deposit those funds in his accounts in the United States, send them to his accounts in Pakistan, and then either instruct the NBP branch in Pakistan to permit third parties to make

---

[49] *Khan* Trial Transcript, Doc. 833, at 210 (recording of conversation dated July 1, 2010).

[50] *Khan* Trial Transcript, Doc. 833, at 196 (recording of conversation dated Aug. 16, 2010).

[51] *Khan* Trial Transcript, Doc. 833, at 209 (recording of conversation dated Aug. 22, 2009).

[52] *Khan* Trial Transcript, Doc. 833, at 154-55 (recording of conversation dated Aug. 12, 2009).

[53] *Khan* Trial Transcript, Doc. 833, at 207 (recording of conversation dated Oct. 9, 2009).

23

withdrawals, or would give pre-signed checks to those third parties to make

substantial withdrawals from the accounts at the branch. Those third parties either

were members of the Pakistani Taliban or used the money for the Pakistani

Taliban's benefit to acquire weapons and provide medical treatment to injured

fighters.

77.     The government demonstrated that Hafiz Khan arranged for the

following transactions to deliver money to the Pakistani Taliban and its agents:[54]

    a.  On August 13, 2008, a Pakistani Taliban sympathizer named Ali

        Rehman, who provided guns and money to the Pakistani Taliban,[55]

        obtained $10,000 from one of Hafiz Khan's NBP bank accounts.

    b.  On January 22, 2009, Rehman obtained another $10,000 from one of

        Hafiz Khan's NBP bank accounts.

    c.  On March 25, 2009, Rehman obtained another $10,000 from one of

        Hafiz Khan's NBP accounts.

    d.  On December 3, 2009, Alam Zeb, who is Hafiz Khan's grandson and

        associated with the Pakistani Taliban, withdrew $2,300 from one of

        Hafiz Khan's NBP accounts. The evidence showed that at least some

---

[54] *See* Superseding Indictment, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 103, at 7-10 (S.D. Fl. 2013). At trial, the government introduced bank records and recorded conversations to substantiate all of these transfers.

[55] *Khan* Trial Transcript, Doc. 834, at 107 (recording of conversation dated Aug. 3, 2010).

of this money went to Noor Muhammad, an injured Pakistani Taliban fighter.[56]

    e.  On November 10, 2010, Rehman obtained $5,000 from one of Hafiz Khan's NBP accounts.

78.    These transfers were part of, and helped fuel, a sophisticated financial and terrorist infrastructure that had been developed over a significant period of time. With this infrastructure in place, Hafiz Khan's transfers to the Pakistani Taliban could easily enable attacks, including the shootings and suicide bombings that Hafiz Khan had hoped for.[57]

79.    The second way in which Hafiz Khan supported the Pakistani Taliban was through his "madrassa," a religious school he owned in the town of Galoch, in the Swat Valley.[58] Hafiz Khan bragged that his madrassa had produced children who had gone to Afghanistan to kill Americans.[59] Indeed, the madrassa displayed a

---

[56] *Khan* Trial Transcript, Doc. 834, at 132-35 (testimony of Special Agent Ferlazzo).

[57] *Khan* Trial Transcript, Doc. 841, at 86-87 (expert testimony documenting the low prices of guns and explosives in the region); Ann Wilkens, *Suicide Bombers and Society: A Study on Suicide Bombers in Afghanistan and Pakistan* 15-16 & n.14 (2011), *available at* https://www.foi.se/rest-api/report/FOI-R--3058--SE (describing the low price of suicide bombs).

[58] *See* Government's Sentencing Memorandum, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 802, at 27 (S.D. Fl. 2013) (explaining that the madrassa hosted Pakistani Taliban preachers, was a place where the Pakistani Taliban slept, was shut down by the Pakistani Army due to suspected terrorist links, and sent children to learn from a Pakistani Taliban leader how to kill Americans in Afghanistan).

[59] *Khan* Trial Transcript, Doc. 835, at 50 (conversation recorded on Aug. 28, 2010).

banner which read "Death to America."[60] The madrassa also provided shelter and

other support for members of the Pakistani Taliban.[61] In the summer and autumn of

2009, the Pakistani Army closed and occupied Hafiz Khan's madrassa because

they suspected it to be engaged in terrorist activity, including sheltering Hafiz

Khan's son, Ikram Khan, a Pakistani Taliban commander, and other Pakistani

Taliban.[62] The madrassa was also funded, in part, by money transferred by Hafiz

Khan back to Pakistan through his NBP U.S. dollar accounts. Although Hafiz

Khan left Pakistan before the period relevant to this Complaint, he exercised

significant control over the madrassa from afar.[63]

### 2. National Bank of Pakistan's Role and Knowledge

80.     NBP played a crucial role in allowing the Pakistani Taliban to receive

U.S. dollars from Hafiz Khan. As Hafiz Khan's own defense counsel explained,

money "would go into the National Bank of Pakistan in the United States," and

"then it would go over to Pakistan and someone would take it out at that end."[64]

The government stated that Hafiz Khan had at least two U.S. dollar-denominated

---

[60] *Khan* Trial Transcript, Doc. 854, at 74 (testimony of Special Agent Ferlazzo).

[61] *Khan* Trial Transcript, Doc. 835, at 55-57 (Special Agent Ferlazzo recounting conversation recorded on Sept. 20, 2010).

[62] *Khan* Trial Transcript, Doc. 836, at 59, 63 (Special Agent Ferlazzo testifies that the Army occupied the madrassa in August 2009 and is there until at least October).

[63] *Khan* Trial Transcript, Doc. 835, at 46-47 (testimony of Special Agent Ferlazzo).

[64] *Khan* Trial Transcript, Doc. 845, at 90 (questions between defense counsel and defense summary witness).

bank accounts with NBP, with account numbers ending in 451 and 522, that received money from the United States and disbursed it to support the Pakistani Taliban.[65] During trial, Ali Rehman also referred to an account ending in 540.[66]

81.     We know that Hafiz Khan's transactions were suspicious because they triggered the United States government's investigation, which ultimately led to Hafiz Khan's conviction for providing support to terrorists and terrorist organizations.[67] The government noted the "complicated methods" Hafiz Khan used, and inquired further to find material support for terrorists.[68]

82.     In facilitating these suspicious transfers to the Pakistani Taliban, NBP acted knowingly. The bank has robust "know your customer," anti-money laundering, and terrorist-finance policies and procedures that would have compelled it to investigate Hafiz Khan's transfers before permitting them. Those policies required the bank to detect, prevent, and block transactions that even *could* have a link to terrorism financing efforts. In this case, that investigation would

---

[65] *Khan* Trial Transcript, Doc. 834, at 108-09 (testimony of Special Agent Ferlazzo).

[66] *Khan* Trial Transcript, Doc. 847, at 37 (testimony of Ali Rehman).

[67] *See* U.S. Dep't of Justice, *Six Individuals Charged for Providing Material Support to the Pakistani Taliban* (May 14, 2011), https://www.justice.gov/opa/pr/six-individuals-charged-providing-material-support-pakistani-taliban ("This investigation was initiated by the FBI in conjunction with the JTTF based upon a review of suspicious financial transactions and other evidence.").

[68] Government's Response in Opposition to Defendant Irfan Khan's Motion for Revocation of Detention Order, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 67, at 4 (S.D. Fl. 2011).

27

have revealed the truth: that Hafiz Khan was supporting the Pakistani Taliban. Indeed, as set forth in greater detail below, NBP had even more reason to be suspicious than the U.S. government, because it was able to observe Hafiz Khan's actions from a much closer vantage point. NBP accordingly could not have made the transfers, except knowingly.

83.   As evidence of NBP's knowledge and complicity, its staff were personally involved in Hafiz Khan's transactions. Ali Rehman, who was indicted by the United States for providing material support to the Pakistani Taliban, and was described by Hafiz Khan as his contact who purchased guns for the Pakistani Taliban, made multiple withdrawals of amounts up to $10,000 each from Hafiz Khan's NBP accounts. Rehman testified in Hafiz Khan's trial that in order to withdraw this money, Rehman had to physically travel to NBP's branch in Mingora. There, Rehman provided a check signed by Hafiz Khan to the bank manager. The bank manager had been instructed by Hafiz Khan already to pay out money on the check, but Rehman was still required to sign the check himself, and the bank manager would physically give the money to Rehman.[69] Hafiz Khan testified to the same effect, averring that the reason the manager personally supervised the transfers was to prevent fraud.[70] Thus, NBP bank managers were

---

[69] *Khan* Trial Transcript, Doc. 847, at 37-38 (testimony of Ali Rehman).

[70] *Khan* Trial Transcript, Doc. 850, at 96-97 (testimony of Hafiz Khan).

interacting personally with both Hafiz Khan and with Rehman in connection with illegal transfers in order to ensure that the transfers happened as Hafiz Khan intended them to.

84.    A similar interaction occurred when Hafiz Khan released funds to Alam Zeb, an associate of the Pakistani Taliban. Hafiz Khan called the branch manager of NBP's branch in Deolai, Pakistan, to instruct him to release the funds to Zeb, who picked up the funds in person from the manager himself.[71]

85.    NBP would also have noticed that the bank transfers and withdrawals were unusual and suspicious. NBP's "Policy Manual on Anti Money Laundering," which on information and belief was in effect during the 2008 to 2010 period, noted that the U.S. "State Department cites the following examples as indications of terrorist financing," and listed behavior that Hafiz Khan engaged in, including "[u]se of multiple personal and business accounts to collect and funnel funds to a small number of foreign beneficiaries," "[b]eneficiaries are located in a problematic foreign jurisdiction," and "[s]tated occupations of those engaging in transactions that are not commensurate with the level of activity."

86.    These criteria were triggered in Hafiz Khan's case. Hafiz Khan had at least two NBP accounts in Pakistan, and used them to distribute significant funds

---

[71] *See Khan* Trial Transcript, Doc. 834, at 118-19 (conversation recorded Nov. 24, 2009).

to Pakistani beneficiaries, primarily Rehman, who was neither a relation nor a business associate of Hafiz Khan's, which would have raised concerns about the purpose of the transfers.

87.    All of the beneficiaries lived in or near an extremely "problematic" jurisdiction: the Swat Valley. NBP would have known that during the relevant time period, the Pakistani Taliban was extremely active in the Swat Valley area. Hundreds of attacks had occurred in the region starting in 2007,[72] and the Pakistani Army was cracking down on the insurgency in Swat, so NBP would have known that the Pakistani Taliban needed funds, and that any financial support for the Pakistani Taliban in Swat would likely translate directly into violence in the region—whether the money was used for explosives, guns, training, treatment, or compensation.

88.    Hafiz Khan's "stated occupation"— which NBP knew based on "know your customer" verification all NBP branches were required to complete— was not commensurate with the funds he transferred to NBP branches in Pakistan. Although Hafiz Khan was an imam of a mosque, a relatively low-paid position that earned him "close to $3,000" per month,[73] he regularly made transfers of $10,000

---

[72] *Khan* Trial Transcript, Doc. 840, at 209-11, 841, at 9 (expert testimony about outbreak of TTP terrorism in Swat Valley from 2007 through 2008, extending into 2009).

[73] *Khan* Trial Transcript, Doc. 842, at 65 (testimony of Anwar Ansari).

to Ali Rehman. This significant disparity between Hafiz Khan's income and the size of his transfers would have raised suspicion.

89.    Indeed, the amounts transferred raised red flags even independent of Hafiz Khan's occupation. NBP's internal policies in effect from at least 2005 through 2010 required NBP staff to review transactions involving an amount of 500,000 Pakistani rupees or more and screen them for any indicia of suspicious activity. Between 2008 and 2010, transactions of $10,000 U.S. dollars would have significantly exceeded 500,000 Pakistani rupees.

90.    Khan's transactions also involved an unusual process, *i.e.*, the use of pre-signed checks. The State Bank of Pakistan's "Examples of Suspicious Transactions," in effect from 2004 on, specifically identified "[f]requent withdrawal of large amounts by means of cheques" as inherently suspect.[74] Similarly, NBP's own internal policy manuals noted that State Bank of Pakistan's "Regulation M-5 of Prudential Regulations for Corporate / Commercial Banking require for paying special attention to all complex, unusually large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose and their reporting to State Bank of Pakistan." Hafiz Khan's

---

[74] *See* BPD Circular No. 20 of 2004, June 16, 2004, *available at* http://www.sbp.org.pk/bpd/2004/C20.htm, and Appendix I, Section 3(iii), *available at* http://www.sbp.org.pk/bpd/2004/annx_c20.pdf.

scheme to transfer funds in $10,000 increments to Ali Rehman by use of multiple checks fit that pattern precisely.

91.     NBP staff in the area would also have known that members of Hafiz Khan's family were suspected of Pakistani Taliban affiliation. For example, multiple Pakistani police reports from the 2008 period identified Hafiz Khan's son Ikram Khan (AKA Ikramul Haq) as a Pakistani Taliban member.[75] These Pakistani police reports specifically identified Ikram Khan as the son of Hafiz Khan, and indicated that Ikram Khan participated in and was "wanted" for at least five terrorist attacks, including multiple Pakistani Taliban attacks, between 2008 and 2009. Thus, both Hafiz Khan and Ikram Khan were identified in documents that would have cast suspicion on any significant funds transfers by Hafiz Khan into Pakistan.

92.     Witnesses who lived in the area had observed Ikram Khan in 2008 armed and accompanying a Pakistani Taliban commander named Motabar Khan, who was arrested and detained by the Pakistani Army in September 2009.[76] In

---

[75] *See Khan* Trial Transcript, Doc. 844, at 200 (testimony of Ikram Khan); *see also* Shamim Shahid, *Man Arrested in Miami Is Wanted in Pakistan Too!*, Pakistan Today (May 16, 2011), https://www.pakistantoday.com.pk/2011/05/16/man-arrested-in-miami-is-wanted-in-pakistan-too/.

[76] *See Khan* Trial Transcript, Doc. 835, at 17 (recording of Hafiz Khan identifying Motabar Khan as a Pakistani Taliban commander); *Khan* Trial Transcript, Doc. 839, at 131-32 (testimony of Saifullah Khan that Motabar and Ikram were observed together and both armed with guns, and that the "entire area" knew that Motabar was a Pakistani Taliban commander); *Khan* Trial

addition to being a well-known Pakistani Taliban commander, Motabar Khan had preached in Hafiz Khan's madrassa.[77]

93.     During the 2008 to 2009 period, the bank's anti-money laundering policies required it to investigate suspicious persons or people named by the police as potentially involved in terrorism. Given Ikram Khan's close association with his father—as noted in police reports from the geographic area where NBP had multiple branches—NBP would have known to look for suspicious transactions from Hafiz Khan.

94.     NBP staff would also have known that some of Hafiz Khan's transfers of U.S. dollars to multiple Pakistani accounts were for the purpose of funding his madrassa, which was itself a form of material support to the Pakistani Taliban. On information and belief, NBP's policies required NBP staff to identify the purpose for Hafiz Khan's remittances, both when Hafiz Khan initiated the transfers and when the recipient took cash directly from the NBP branch managers.

95.     Any fund transfers through NBP branches for the purpose of funding Hafiz Khan's madrassa would raise terrorism finance red flags with the NBP branch managers who approved them. First, madrassas in general raise heightened

---

Transcript, Doc. 845, at 35 (U.S. Attorney noting that Motabar was arrested by the army in or around Sept. 2009).

[77] *Khan* Trial Transcript, Doc. 854, at 201-02 (U.S. Attorney alludes to recorded conversation showing that Motabar Khan preached at Hafiz Khan's madrassa).

concerns, which is why NBP's anti-money laundering rules treat them as "high risk" and require heightened diligence. That is for good reason. Experts have explained that the vast majority (90%) of suicide bombers from Swat Valley studied in madrassas.[78] This specific madrassa was even more suspicious. Hafiz Khan himself admitted that children from his madrassa had gone on to learn to kill Americans in Afghanistan. And Hafiz Khan's madrassa had been closed and occupied by the Pakistani Army for approximately three months in 2009 due to suspicion of its involvement with the Pakistani Taliban. To be more specific, the madrassa was shut down because Ikram Khan and a well-known Pakistani Taliban commander were associated with it.[79] NBP would have been attuned to these risks before and while it processed Hafiz Khan's transactions.

96.     As a Pakistani bank with considerable familiarity with the country and its particular terrorism financing risks, NBP would also have known that the Pakistani Taliban, in particular, is adept at raising money from foreign supporters. As the government's expert witness testified at Hafiz Khan's trial, the Pakistani Taliban has a "robust support network" in other countries, including the United

---

[78] *Khan* Trial Transcript, Doc. 840, at 182 (testimony of Khurum Iqbal).

[79] *Khan* Trial Transcript, Doc. 839, at 122-26 (explaining the reasons the Pakistani Army shut down and occupied the madrassa).

34

States.[80] Thus, NBP would have been on the alert for money transfers going to the Pakistani Taliban.

97.     It also was common knowledge in the area at the time that the Pakistani Taliban and al-Qaeda were closely aligned and collaborating with each other. Accordingly, NBP would have known that by facilitating fund transfers to the Pakistani Taliban, it was also assisting al-Qaeda.

98.     NBP also knew to be attentive to concerns about the behavior of its customers because it was in legal proceedings in France on money laundering charges (NBP was convicted and fined 200,000 euro by French authorities in December 2008).

99.     Separately, in August 2008, the Hong Kong Monetary Authority cited NBP for numerous deficiencies in its Hong Kong branch's anti-money laundering and terrorist finance practices. According to leaked bank examination documents, NBP took steps to substantially strengthen its anti-money laundering and terrorist finance policies and procedures after August 2008. According to a Pakistani press report, "National Bank said it had sent its reply to the Hong Kong Monetary

---

[80] *Khan* Trial Transcript, Doc. 840, at 204.

Authority in September [2008] and since it did not receive any observation or refutation to the response, it implies that it is satisfied with the response.[81]

100.   Thus, during the period prior to the Camp Chapman Attack, NBP was focused on the terms and proper implementation of the policies and procedures that applied to Hafiz Khan's high-value, complex transactions through multiple NBP accounts for the benefit of his madrassa, and Taliban-associated family and non-family members.

101.   In light of the fact that Hafiz Khan's money actually was flowing to the Pakistani Taliban, and in light of all of the clear warning signs to that effect, on information and belief, plaintiffs allege that NBP's personnel transferred funds for Hafiz Khan knowing that the funds would aid the Pakistani Taliban—and by extension al-Qaeda.

102.   Moreover, as set forth above, although these transfers were part of NBP's commercial banking business, they are not properly regarded as routine or innocuous. Instead, they followed patterns of suspicious behavior that were recognizable to prosecutors, bank regulators, and to NBP itself. And the purpose of the transfers was to provide illegal support to the Pakistani Taliban at a time when

---

[81] PakTribune, *NBP Faces Second Monetary Scandal* (Feb. 11, 2009), http://paktribune.com/news/NBP-faces-second-monetary-scandal-211275.html.

the organization was engaged in extreme violence—an act that violates U.S. criminal law and cannot ever properly be regarded as routine.

103.    The transfers identified in this Complaint were significant enough, and close enough in time to the Camp Chapman Attack, to have been a substantial factor in causing that attack. As the United States explained in the criminal case against Hafiz Khan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."[82] The money NBP sent to the Pakistani Taliban filled that need, contributing significantly to the Pakistani Taliban's ability, together with its terrorist syndicate partners, to commit the Camp Chapman attack. As the government observed, "money in Pakistan, especially Swat, goes a long way, particularly when used to purchase arms in the markets on the Afghan-Pakistan border and when sent in the form of valuable U.S. dollars."[83] Moreover, in addition to weapons and training, "financial support . . . to injured Taliban fighters and their families, was just as important in promoting the Pakistani Taliban's violent campaign."[84] Indeed, it does not take much money "to make violence possible in that part of the world or to make it

---

[82] Transcript of Arraignment, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 31, at 19 (S.D. Fl. 2011).

[83] Government's Trial Brief, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 613, at 22 (S.D. Fl. 2013).

[84] *Khan* Trial Transcript, Doc. 833, at 48-49 (government's opening statement).

worthwhile for a fighter to leave his or her family behind knowing they will be aided by money from America."[85] That is all the more true because the Pakistani Taliban already had a sophisticated terrorist infrastructure that allowed it to deploy these funds for maximum violent effect.

104.   By facilitating transfers of U.S. dollars to the Pakistani Taliban, NBP thus performed an essential role in supporting, aiding and abetting, and conspiring with the Pakistani Taliban and its partner al-Qaeda.

105.   Based on the fact that NBP transferred funds to the Pakistani Taliban for Hafiz Khan, it is likely that discovery will provide evidentiary support for the allegation that NBP made additional fund transfers transfers (for Hafiz Khan or others) to individuals known to be associated with the Pakistani Taliban and/or al-Qaeda and/or the Haqqani Network in the time period before the Camp Chapman Attack. Any such transfers, which also form a basis for liability under this Complaint, would independently render NBP liable under the Anti-Terrorism Act for injuries caused by the Camp Chapman Attack.

---

[85] *Khan* Trial Transcript, Doc. 833, at 48 (government's opening statement).

## CLAIMS FOR RELIEF

### First Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(d) <u>for Aiding and Abetting al-Qaeda, a Foreign Terrorist Organization</u>

106.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

107.   Plaintiffs were all injured by the Camp Chapman Attack, which was an act of international terrorism as defined by 18 U.S.C. § 2331(1).

108.   The Camp Chapman Attack was committed, planned, and authorized by al-Qaeda, an organization that had been designated an FTO as of the date of the attack. As set forth above, al-Qaeda participated in Balawi's recruitment and training, participated in the planning of the attack, and authorized the attack.

109.   The Pakistani Taliban also committed the attack by training Balawi, who acted as an agent for the Pakistani Taliban, Al-Qaeda, and their syndicate partners.

110.   NBP aided and abetted the person who committed the Camp Chapman Attack by providing tens of thousands of dollars to the Pakistani Taliban in the lead-up to the attack by facilitating fund transfers from Hafiz Kahn and/or others.

111.   NBP was generally aware that by providing funds to the Pakistani Taliban, it was playing a supporting role in the syndicate's terrorist scheme to kill

coalition forces—a goal that the Pakistani Taliban and al-Qaeda notoriously shared and jointly pursued.

112.   As alleged above, NBP provided funds to the Pakistani Taliban knowingly.

113.   The assistance NBP provided was substantial because the amount of money involved was significant, NBP was physically present in the region, it had a culpable state of mind, and the duration of the assistance was multiple years.

114.   The Camp Chapman Attack was the foreseeable result of the Pakistani Taliban and al-Qaeda's joint scheme to attack coalition forces, and it caused plaintiffs' injuries.

115.   In enacting and amending the Anti-Terrorism Act, Congress has repeatedly stressed its objective to create civil liability for anybody who knowingly provides material support (especially money), directly or indirectly, to foreign terrorists who injure or kill Americans.

116.   NBP should accordingly be held liable for civil aiding and abetting under 18 U.S.C. § 2333(d).

**Second Claim for Relief**

**Civil Liability Under 18 U.S.C. § 2333(d)**
**for Conspiring with al-Qaeda, a Foreign Terrorist Organization**

117.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

118.   NBP entered into a conspiracy with Hafiz Khan, the transferees who received Hafiz Khan's money in Pakistan, the Pakistani Taliban, al-Qaeda, and the Haqqani Network to join the syndicate's terrorist campaign.

119.   As explained above, al-Qaeda, the Pakistani Taliban, and the Haqqani Network conspired to carry out a terror campaign targeting coalition forces in Afghanistan. Hafiz Khan and his transferees joined that conspiracy by providing funds to it. And NBP joined the conspiracy by facilitating the fund transfers that provided the Pakistani Taliban with resources to fulfill its role in the conspiracy.

120.   NBP knew that the objective of the conspiracy between these sophisticated terrorist organizations was to facilitate terrorist attacks, including attacks against coalition forces.

121.   The Camp Chapman Attack was a foreseeable act in furtherance of this conspiracy that caused plaintiffs' injuries.

122.   In enacting and amending the Anti-Terrorism Act, Congress has repeatedly stressed its objective to create civil liability for anybody who knowingly

provides material support (especially money), directly or indirectly, to foreign terrorists who injure or kill Americans.

123.   NBP should accordingly be held liable for conspiracy under 18 U.S.C. § 2333(d).

### Third Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(a) for
### Providing Material Support to Terrorists in Violation of 18 U.S.C. § 2339A

124.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

125.   NBP provided material support or resources to the Pakistani Taliban in violation of 18 U.S.C. § 2339A by transferring U.S. dollars from the United States to the Pakistani Taliban's recipients knowing that those funds would be used in preparation for or in carrying out one or more violations of enumerated predicate offenses, including 18 U.S.C. §§ 844(f) (destroying federal property), 930(c) (homicide in the course of attacking a federal facility), 956 (conspiracy to kill, kidnap, maim, or injure individuals, or to damage property, in a foreign country), 1114 (killing a federal officer, employee, or member of the armed forces), 1361 (destruction of federal property), and 2332 (killing or assaulting a United States national outside the United States).

126.   The transfer of U.S. dollars to notorious terrorists in this context constitutes an act of international terrorism, because it involves an act that is

dangerous to human life, is apparently intended to influence the policy of a

government by intimidation or coercion or affect the conduct of a government by

mass destruction, assassination, or kidnapping, and transcends national boundaries.

127.   NBP's actions proximately caused plaintiffs' injuries by providing the

Pakistani Taliban and al-Qaeda with the type of funds necessary to carry out the

Camp Chapman Attack.

128.   NBP should accordingly be held liable under 18 U.S.C. § 2333(a).

**Fourth Claim for Relief**

**Civil Liability Under 18 U.S.C. § 2333(a) for
Providing Material Support to Terrorist Organizations
in Violation of 18 U.S.C. § 2339B**

129.   Plaintiffs repeat and re-allege each and every allegation of the

foregoing paragraphs as if fully set forth herein.

130.   As stated above, NBP knew that al-Qaeda and the Pakistani Taliban

were essentially indistinguishable, and therefore knew that by providing resources

to the Pakistani Taliban, it was functionally providing resources to al-Qaeda.

131.   At the time, al-Qaeda had already been designated an FTO by the U.S.

State Department. NBP would have known this, or would have known that

al-Qaeda engaged in terrorism.

43

132.   By providing the funds anyway, NBP violated 18 U.S.C. § 2339B, which prohibits knowingly providing any material support or resources, whether directly or indirectly, to a designated FTO.

133.   The provision of funds to violent terrorists waging armed conflict against U.S. forces is an act of international terrorism as defined in 18 U.S.C. § 2331(1).

134.   NBP's actions proximately caused plaintiffs' injuries by providing the Pakistani Taliban and al-Qaeda with the type of funds necessary to carry out the Camp Chapman Attack.

135.   NBP should accordingly be held liable under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against NBP and in favor of all plaintiffs for compensatory damages (including for physical and emotional pain and suffering, loss of society, companionship, comfort, advice, and counsel, and economic loss) in amounts to be determined at trial;

(c) Enter judgment against NBP and in favor of plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

44

(d) Enter judgment against NBP and in favor of plaintiffs for any and all costs

sustained in connection with the prosecution of this action, including

attorney's fees, pursuant to 18 U.S.C. § 2333;

(e) Pre-judgment interest, as authorized by law; and

(f) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Respectfully submitted,

*/s/Tejinder Singh*

| | |
|---|---|
| Ryan R. Sparacino | Tejinder Singh |
| (pro hac vice motion forthcoming) | (SDNY Bar No. TS0613) |
| SPARACINO PLLC | GOLDSTEIN & RUSSELL, P.C. |
| 1920 L Street, NW, Suite 535 | 7475 Wisconsin Ave., Suite 850 |
| Washington, DC 20036 | Bethesda, MD 20814 |
| Tel: 202.629.3530 | Tel: 202.362.0636 |
| Ryan.sparacino@sparacinopllc.com | Fax: 866.574.2033 |
| | tsingh@goldsteinrussell.com |

Dated: December 27, 2019