# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD BROWN SR., BARBARA BROWN, PAULA RICH, REGINA BROWN, MINDYLOU PARESI, JANET G. PARESI, ALEXANDRA VANDENBROEK, ELIZABETH SANTINA PARESI, SANTINA CARTISSER, TERRY PARESI, DANA MARIE BERNHARDT, MARY LEE WISE, E.P., by and through his next friend Dana Marie Bernhardt, MARY HEATHER WISE, CHARLES E. ADKINS, VELVET L. ADKINS, SHEILA G. GOOD, JOSE ALEMAN, STEPHANIE HAGER, BRIANNA N. BENSON, FREDERICK C. BENSON, BEVERLY MILLS, D.L.B., by and through his next friend Susan Brodeur, E.L.B., by and through her next friend Susan Brodeur, JOYCE A. BRODEUR, LAWRENCE A. BRODEUR, SUSAN BRODEUR, JANICE HARRIMAN BRYANT, S.L.B., by and through his next friend Janice Harriman Bryant, AUGUST CABRERA, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M.G.C., by and through his next friend August Cabrera, R.X.C., by and through his next friend August Cabrera, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, JD PROSSER, GLORIA DIANE TRELFA, ARTHUR CAMPBELL, AUDREY CAMPBELL, TINA MARIE CAMPBELL, KARMA CHISHOLM, GLENN CHISHOLM, LINDA REYNOLDS, JUDITH SARA DARROUGH, ROBERT CHARLES DARROUGH, B.C.D., by and through his next friend Kelli Dodge, KELLI DODGE, P.A.D., by and through her next | **AMENDED COMPLAINT UNDER THE ANTI-TERRORISM ACT (18 U.S.C. § 2333)**<br><br>JURY TRIAL DEMANDED<br><br><br>No. 19-cv-11876 |

friend Kelli Dodge, VANESSA MARIE
ANZURES, BRIAN EDWARD ELLIS,
JULIE ANN ELLIS, VICTOR RAYMOND
ELLIS, CHARLES ESSEX, MARION RUTH
HOPKINS, JUDITH ROWE GENTZ,
EMMITT DWAYNE BURNS, JANICE
CARUSO, PATRICIA GOINS, PAUL
EDWARD GOINS III, DANA RAINEY,
L.C.D., by and through his next friend
Bridgett L. DeHoff, DANIEL GRIFFIN,
MATT GRIFFIN, SHAWN PATRICK
GRIFFIN, SHEILA RISTAINO, CAROL
GRIFFIN, CARLOS BENJAMIN GROSS
PANIAGUA, FELICIA GROSS PANIAGUA,
SOCORRO GROSS PANIAGUA, CARLOS
BENJAMIN GROSS RIOS SR., JERRY
HARDISON, JUSTINA HARDISON,
TERESA HARDISON, ALEX HENIGAN,
BARCLAY KAMALESON, CADE
KAMALESON, CEDRIC PAUL
KAMALESON, NICOLE KAMALESON,
SUNDERRAJ MARK KAMALESON,
KEVIN KING, STEPHANIE ANN MILLER,
ABBY KNAPP-MORRIS, K.K., by and
through her next friend Abby Knapp-Morris,
L.A.E.L.B., by and through her next friend
Natasha Buchanan, NATASHA
BUCHANAN, S.L.L.B., by and through her
next friend Natasha Buchanan, DOUGLAS A.
LANDPHAIR, JEAN S. LANDPHAIR,
MEREDITH LANDPHAIR, HOLLY LAU
ABRAHAM, DAVID WILLIAM HAALILIO
LAU, ALEXANDER LAU, HAMIDE LAU,
K.L., by and through his next of friend David
William Haalilio Lau, LEROY WINGKIT
LAU JR., M.L., by and through her next friend
David William Haalilio Lau, VIVIAN
PERRY, MICHELLE LEE
RAUSCHENBERGER, JAMMIE JOANN
SMITH, C. RICHARD LOONEY, MARTHA

LOONEY, KATHLEEN MCEVOY,
MICHELLE ROSE MCEVOY, PATRICK
CHARLES MCEVOY, JANICE H.
PROCTOR, LUANN VARNEY, MISTY
MARIE BARCLAY, ALEXANDER LEE
MITTLER, CRISTINE MITTLER, TERRY
MITTLER, JOYCE L. TURNER, GABRIEL
NEGRON, JOSE NEGRON, MARIBEL
NEGRON, MARVIN NEGRON
MARTA TORRES, DERRICK ANTHONY
DAVIS, AMANDA NEWMAN, DONALD
EDWARD NEWMAN SR., BRANDON
NICHOLS, CYNTHIA NICHOLS,
DOUGLAS NICHOLS, MICHELLE HOCK,
RANEE MASSONI, JORDAN PLUNK,
JUSTIN T. PLUNK, GLENDA WILLARD,
BLAINE A. REDDING, ANGEL R.
ROLDAN, LIESELOTTE R. ROLDAN,
MATTHIAS P. ROLDAN, SAMANTHA G.
ROLDAN, CHRISTOPHER J.
ROSEBROCK, ALEX JASON ROZANSKI,
JOAN M. SMEDINGHOFF, MARK T.
SMEDINGHOFF, MARY BETH
SMEDINGHOFF, REGINA C.
SMEDINGHOFF, THOMAS
SMEDINGHOFF, JAN MARIE HURNBLAD
SPARKS, ERIK SPARKS, GARRY LEE
SPARKS, JANE SPARKS, ZACHARY
DOUGLAS SPARKS, LISA MARTINUSEN,
MARIE SENTINA MIELKE, ANNETTE
SPEHAR, JACOB LOUIS SPEHAR, LUKE
SPEHAR, PATRICK SPEHAR, ERIN
NICOLE GOSS, TRECIA BROCK HOOD,
WENDY SHEDD, FREDDIE DEWEY
SUTTON, HARRIET SUTTON, SUMMER
BREANNE SUTTON, DIANE TIMONEY,
GREGORY TIMONEY, RYAN GREGORY
TIMONEY, ANTHONY CURTIS WHITE,
A.E.W., by and through his next friend
Anthony Curtis White, JENNIFER LYNN

WHITE, LAURA WHITE, MARK
ANTHONY WHITE, Z.L.W., by and through
his next friend Anthony Curtis White,

Plaintiffs,

v.

NATIONAL BANK OF PAKISTAN,

Defendant.

Ryan R. Sparacino
 (pro hac vice)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
Ryan.sparacino@sparacinopllc.com

Tejinder Singh
 (SDNY Bar No. TS0613)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202.362.0636
Fax: 866.574.2033
tsingh@goldsteinrussell.com

# TABLE OF CONTENTS

NATURE OF THE ACTION ......................................................................1

THE PARTIES..........................................................................................10

JURISDICTION AND VENUE ...............................................................11

FACTUAL ALLEGATIONS ...................................................................15

   I.       The al-Qaeda Terror Syndicate ...............................................15

       A.      Al-Qaeda .......................................................................17

       B.      Taliban and the Haqqani Network ...............................18

       C.      Pakistani Taliban .........................................................36

       D.      Lashkar-e-Taiba...........................................................44

       E.      Jaish-e-Mohammed .....................................................56

       F.      Kabul Attack Network .................................................63

   II.      National Bank of Pakistan Knowingly Provided Material and Substantial Support to Terrorists and Terrorist Organizations ...............66

       A.      National Bank of Pakistan Provided Material Support to Members of the al-Qaeda Terror Syndicate and Their Agents ...........66

       B.      National Bank of Pakistan Acted With the Requisite Scienter for Primary and Secondary Liability....................................................82

       C.      National Bank of Pakistan's Assistance to the al-Qaeda Terror Syndicate Was Substantial, and Caused Terror Attacks ..................119

       D.      National Bank of Pakistan's Assistance to the al-Qaeda Terror Syndicate Had a Substantial Nexus to the United States .................124

   III.    Al-Qaeda Committed, Planned, and/or Authorized the Terrorist Attacks That Injured Plaintiffs. ...............................................................131

       A.      The Camp Chapman Attack (December 30, 2009)...........................132

       B.      The al-Qaeda / Taliban / Kabul Attack Network Attacks (June 7, 2010 through January 14, 2019)...........................................134

   IV.    The Plaintiffs .......................................................................168

       A.      The Camp Chapman Attack Plaintiffs .............................................168

       B.      The al-Qaeda / Taliban / Kabul Attack Network Attack Plaintiffs ...........................................................................................172

CLAIMS FOR RELIEF ..........................................................................238

PRAYER FOR RELIEF ..........................................................................244

Plaintiffs, by their attorneys, allege the following:

## NATURE OF THE ACTION

1.      This is an action under the Anti-Terrorism Act ("ATA") as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(a) and (d), brought on behalf of Americans injured and the families of Americans killed in a series of terrorist attacks in Afghanistan from the end of 2009 through early 2019. The attacks were perpetrated by members of a syndicate of terrorist organizations led by al-Qaeda—referred to in this Amended Complaint as the "al-Qaeda Terror Syndicate" or the "Syndicate."

2.      The attacks were committed by the Taliban, which was designated a Specially Designated Global Terrorist ("SDGT") in 2002, and which includes the Haqqani Network, itself designated a Foreign Terrorist Organization ("FTO") in 2012, and were planned, authorized, and/or committed by al-Qaeda, an FTO since 1999.[1]

---

[1] Designated FTOs are organizations that the United States has determined engage in terrorist activity that threatens the security of U.S. nationals or the national security of the United States. It is a federal felony to knowingly provide material support to an FTO. An SDGT designation is issued pursuant to Executive Order 13224, as amended—an order that was issued in response to the September 11, 2001 attacks. SDGT status is reserved for individuals and organizations that the Office of Foreign Assets Control ("OFAC") finds have committed or pose a risk of committing acts of terrorism, or who provide support or otherwise associate with terrorists and terrorist organizations. An SDGT designation results in a freeze of all of the designee's assets in the United States, and prohibits U.S. persons from dealing with the designee.

3.      Some of the attacks were joined or supported by one or more additional members of the al-Qaeda Terror Syndicate. These additional members include Lashkar-e-Taiba ("LeT" or "LT"), a Pakistani terrorist organization that was designated an FTO in 2001, which helped al-Qaeda recruit suicide bombers; Jaish-e-Mohammed ("JeM"), a Pakistani terrorist organization that was designated an FTO in 2001, which helped al-Qaeda recruit suicide bombers and also made so-called "martyr payments" to terrorists and the families of slain terrorists; and the Tehrik-i-Taliban Pakistan ("TTP" or "Pakistani Taliban"), which was designated an FTO in 2010, and which played a significant role in the attack on CIA Forward Operating Base Chapman. The Syndicate also used joint operational cells that fused al-Qaeda, Taliban (including the Haqqani Network), and LeT operatives in Kabul and the surrounding provinces, which joint cells the Department of Defense labeled the Kabul Attack Network.

4.      The defendant National Bank of Pakistan ("NBP") knowingly provided financial support for the al-Qaeda Terror Syndicate by knowingly providing banking services to several notorious terrorist groups and terrorist fundraisers. NBP helped at least three significant customers funnel substantial sums to the Syndicate, thereby enhancing its ability to carry out terrorist attacks, including the attacks that injured Plaintiffs.

5.      The first NBP customer is a terrorist operative and financier named Hafiz Muhammad Sher Ali Khan ("Hafiz Khan"), who, starting at least as early as 2008, and into 2010, sent tens of thousands of dollars from the United States to Pakistani Taliban terrorists for the purpose of supporting al-Qaeda and the Pakistani Taliban in terror campaigns. For these transfers, Hafiz Khan was tried and convicted by the United States government of providing material support to terrorists and terrorist organizations, and of conspiring to do so. His conviction was upheld on appeal.

6.      The evidence against Hafiz Khan's showed that he was committed to terrorism in word and deed. Hafiz Khan did not just support the Pakistani Taliban, he *was* Pakistani Taliban. As the F.B.I.'s informant recounted, "I asked him on a recorded conversation if he was Taliban and he said yes. It's right there on the tape."[2] Consistent with his allegiance, in myriad recorded statements, Hafiz Khan praised the Pakistani Taliban and al-Qaeda, and wished death on Americans, especially those fighting in Afghanistan. But Hafiz Khan did more than talk. He also funneled money U.S. dollars from the United States to, and for the benefit of, the Pakistani Taliban. Members of Hafiz Khan's family, including one of his sons, his daughter, and his grandson, were known or suspected to be members of the

---

[2] Dawn, *FBI Informant Recalls How Miami Imam Was Caught* (Mar. 10, 2013).

Pakistani Taliban. And Hafiz Khan's "madrassa" (a religious school) in the Swat Valley in Pakistan (a known al-Qaeda and Pakistani Taliban stronghold) was likewise a sanctuary for the Pakistani Taliban and its supporters. A confidential source reported to the FBI that the madrassa displayed a banner stating "Death to America," and Hafiz Khan himself bragged that children from his madrassa had gone on to receive terrorism training with the leader of the Pakistani Taliban to fight and kill Americans in Afghanistan.

7.     The evidence against Hafiz Khan also directly implicated NBP. Hafiz Khan maintained at least one NBP bank account in the United States and at least two U.S. dollar accounts in Pakistan with NBP, which were used to fund the Pakistani Taliban. At Hafiz Khan's instructions, NBP would transfer money from his United States NBP account to his Pakistani accounts to make funds available to individuals who facilitated the purchase of weapons by the Pakistani Taliban, and who provided cash to Pakistani Taliban terrorists. Hafiz Khan also used his U.S. and Pakistani NBP accounts to fund his madrassa, which provided additional support to the Pakistani Taliban.

8.     The use of the NBP accounts was critical to Hafiz Khan's terrorist activities. For example, when an informant posing as a Pakistani Taliban

sympathizer asked Hafiz Khan to give him money to take to the Pakistani Taliban, Khan responded, "No, I do not give this way. . . . I send it through my bank."[3]

9.      In light of Hafiz Khan's well-established links to the Pakistani Taliban, and NBP banking policies that marked his transactions as suspicious, NBP knew that the dollars Hafiz Khan was sending through his NBP accounts were for the purpose of supporting the Pakistani Taliban's terrorist activities. Moreover, the U.S. government represented that Hafiz Khan's NBP accounts in Pakistan were open as late as May 2012, *a year after* he was arrested and indicted for providing material support to the Pakistani Taliban.

10.     NBP also knew that any support for the Pakistani Taliban was the same as support for al-Qaeda and the al-Qaeda Terror Syndicate. As explained in greater detail below, these organizations were closely connected and shared resources as a matter of course.

11.     The second terrorist NBP customer is James Alexander McLintock ("McLintock"), referred to in the popular press as the "Tartan Taliban."[4] According to the U.S. Treasury Department, starting no later than August 2009—

---

[3] *See* Trial Transcript, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 835, at 42 (S.D. Fl. 2013) (hereinafter "*Khan* Trial Transcript") (testimony of FBI Special Agent Michael Ferlazzo, recounting recorded conversation that occurred on Sept. 19, 2010).

[4] McLintock has various aliases, including Al Rashidi, Yaqoob or Yaqub Mansoor, Qari, and al-Scotlandi. For simplicity, this Amended Complaint will refer to McLintock as "McLintock," and use brackets to substitute McLintock for his aliases in quoted materials when necessary.

and likely before then—McLintock raised and transferred hundreds of thousands of dollars to terrorists for the purpose of supporting their terror campaigns. McLintock and the sham charity the Treasury Department stated he "controlled" as its "president, CEO, and chairman," the Al-Ramah Welfare Organisation ("RWO"), were named as SDGTs by the United States government in 2016 for their role in funding al-Qaeda and other terrorist organizations.

12.    It has long been public knowledge that McLintock and RWO have close ties to terrorist organizations. According to the Treasury Department's press release, issued contemporaneously with the SDGT designation on March 31, 2016, RWO is "a front organization for al-Qaida that has been used to finance al-Qaida, the Taliban, [LeT], and other Afghan extremist groups. Outside of RWO, James McLintock has also personally supported multiple terrorist groups."

13.    This support was extensive. McLintock provided funds, including U.S. dollars, and resources such as materials for explosive devices and training in how to make such devices, to al-Qaeda, LeT, and the Taliban for years, and claimed to a government source that he financially supported 3,500 terrorists in Pakistan and 1,000 in Afghanistan.

14.    NBP played a critical role in McLintock's terrorist fundraising operation. From at least 2010 until at least late 2016 (months after the Treasury Department's designation), McLintock maintained RWO's account at NBP and

used the account to funnel cash from foreign donors to terrorist operatives in Pakistan and Afghanistan. He advertised those accounts on RWO's website to solicit donations and to give RWO an air of legitimacy. NBP permitted all of this even though McLintock had repeatedly been arrested (as early as 2001), in Pakistan and the United Kingdom, on suspicion of terrorism and was well-known to the world as the "Tartan Taliban."

15.     Given the nature and notoriety of McLintock's and RWO's connection to the terrorist groups in the al-Qaeda Terror Syndicate, and the pattern of their financial transactions, NBP was aware of its role providing banking services—through McLintock and RWO—to support the Syndicate's terrorist activities.

16.     The third terrorist NBP customer is Al-Rehmat Trust ("ART") and its key operative and fundraiser Ghulam Murtaza ("Murtaza"). ART is a front for the al-Qaeda affiliate, Jaish-e-Mohammed ("JeM") which the U.S. designated as an FTO on December 26, 2001. ART was known to be a front or alter-ego for JeM, and was itself designated an FTO on November 4, 2010. Nevertheless, from at least early 2007 to early 2014, ART was able to publicly seek donations in its own name and Murtaza's name—and to advertise Murtaza's bank account at NBP as a destination for those donations. Contemporaneous press accounts indicate that Murtaza continued to maintain and manage an NBP account for ART into 2016.

The funds in this account flowed to JeM and ART, which notoriously helped al-Qaeda recruit suicide bombers, and also made so-called "martyr payments" to injured terrorists and the families of slain terrorists. These martyr payments were a critical incentive for suicide bombing attacks.

17.     As alleged in detail below, NBP's actions were committed knowingly because the bank had robust Know Your Customer ("KYC"), Anti-Money Laundering ("AML") and Counter Terrorist-Finance ("CTF") policies in place—many of which were legally compelled—and under these policies it knew the nature of these customers and their transactions, and understood the linkages between the transactions and terrorism. Indeed, NBP understood that such transactions were prohibited precisely because they facilitate terrorist violence. Furthermore, NBP knew that by participating in terrorist fundraising, it was aiding terrorist organizations in their campaign of violence against Americans in Afghanistan.

18.     NBP's assistance to the al-Qaeda Terror Syndicate was also substantial, in every sense of the word. From 2007 through at least 2016, the bank provided at least a million dollars to Syndicate members, despite clear red flags that alerted NBP to the nature of these transactions. Multiple authoritative government sources have emphasized time and again that any material contribution

to members of the Syndicate facilitates their violent agenda. The amount of assistance NBP provided was more than enough to cause the attacks in this case.

19.    NBP's support was also substantial in the qualitative sense. Policies the world over are designed to make it impossible for terrorists to access legitimate banking resources, all in an effort to choke off funding to these organizations. NBP subverted these policies by lending its good name to terrorist financing transactions, giving them an air of legitimacy and thereby making it easier for terrorist fundraisers and operatives to solicit funds from donors worldwide. Moreover, by using its network of banks, including most importantly its U.S. branches capable of clearing U.S. dollar transactions, NBP provided security and stability to terrorist financing transactions, ensuring that the money reached the terrorist organizations that NBP's customers were trying to fund and supported attacks that those customers wanted to see.

20.    By knowingly providing funds and financial services to terrorist organizations that authorized, planned, or committed the attacks in this case, NBP violated the ATA's primary and secondary liability provisions. Congress sought to combat terrorism by creating civil liability for anybody who provides—directly or indirectly—material support to violent terrorists and terrorist organizations that kill Americans. The legislature was especially concerned with stopping the flow of funds to terror groups, which need financial conduits and infrastructure to carry out

violent attacks. NBP violated the law by knowingly supplying these very conduits and infrastructure. Accordingly, NBP is liable to the victims of the attacks and their families.

## THE PARTIES

21.    Plaintiffs are 168 individuals, comprising American nationals injured and the family members of American nationals killed in terrorist attacks planned, authorized, and/or committed by FTO members of the al-Qaeda Terror Syndicate in Afghanistan. The attacks are described in Parts III and IV, *infra*. The Plaintiffs are listed in Part IV, *infra*.

22.    Defendant is the National Bank of Pakistan, headquartered in Karachi, Pakistan.

23.    NBP is majority-owned by the State Bank of Pakistan ("SBP"). As of December 31, 2019, SBP held 1,599,845,728 shares of NBP, accounting for 75.2 percent of NBP's share capital. The Federal Government of Pakistan separately owns and holds 0.29 percent of NBP's share capital. NBP's certification under the USA PATRIOT Act, filed with the U.S. government and posted on its website, states that "Foreign Bank has no owner(s) except as set forth below."[5] The certification lists SBP as the only "owner" who "directly or indirectly, (a) owns,

---

[5] National Bank of Pakistan, Certification Regarding Correspondent Accounts for Foreign Banks, at 3 (2017), https://www.nbp.com.pk/pac/PatriotActCertification.pdf.

controls, or has power to vote 25 percent or more of any class of voting securities or other voting interests of Foreign Bank; or (b) controls in any manner the election of a majority of directors (or individuals exercising similar functions) of Foreign Bank."[6]

24.    NBP has had a branch in the United States since at least the mid-1960s. NBP currently has one New York branch office. NBP's USA PATRIOT Act certification states that "National Bank of Pakistan is a resident of the United States at the following street address: 100 Wall Street N.Y. 10005."[7] NBP has a second branch at 1875 Connecticut Ave. N.W., Washington, DC 20009.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338, as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

26.    In its first motion to dismiss, NBP challenged this Court's subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604. This statute does not apply because NBP does not meet the definition of a "foreign state" set forth in 28 U.S.C. § 1603(a). NBP claimed that it

---

[6] *Id.*

[7] *Id.* at 4.

11

qualifies as an "agency or instrumentality" of a foreign state—but NBP does not

meet the requirement that it be "an organ of a foreign state or a political

subdivision thereof," or that a "majority of [its] shares or other ownership interest

is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b).

NBP is not an organ of the state and its employees are not government employees;

it is instead an ordinary commercial bank in Pakistan, with a significant

international presence. Moreover, the Federal Government of Pakistan does not

directly own a majority of NBP's shares. Instead, as of December 31, 2019, the

Federal Government of Pakistan owned only 0.29% of NBP's shares. The majority

owner of NBP is instead SBP, which is itself a corporation separate from the

government, but owned by the Federal Government of Pakistan. This means that

SBP is an instrumentality of a foreign state, and NBP is owned by that

instrumentality. It is well-settled that entities that are only indirectly owned by a

foreign state (because they are owned by an instrumentality that is in turned owned

by the state itself) are not themselves agencies or instrumentalities that can claim

sovereign immunity. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003)

("A corporation is an instrumentality of a foreign state under the FSIA only *if the

foreign state itself* owns a majority of the corporation's shares.") (emphasis added);

*id*. at 474 (holding that "indirect subsidiaries" of a foreign state are "not

instrumentalities . . . under the FSIA"). Accordingly, the Foreign Sovereign Immunities Act does not shield NBP from this Court's jurisdiction.

27.    Even if the Foreign Sovereign Immunities Act did apply to NBP, NBP's conduct would fall within the exception for actions that are based on the commercial activities of a foreign state set forth in 28 U.S.C. § 1605(a)(2). This is so because NBP's United States commercial activities (including transactions initiated here and transactions cleared through NBP's New York branch) form the core of the allegations against NBP. These commercial activities were the means by which NBP provided critical assistance to terrorist organizations, and NBP has no immunity from this Court's jurisdiction in an action based upon such misconduct.

28.    NBP is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because, as explained *infra* ¶¶ 303-319, NBP's conduct had a substantial nexus to the United States and to New York, including the transfer of U.S. dollars from the United States to bank accounts in Pakistan for the purpose of financing terrorism. Indeed, NBP's U.S. presence was both central and essential to NBP's role in financing terrorism, as the New York branch facilitated donations from around the world to terrorists in Pakistan and knowingly ignored U.S. designations that would have stopped the transactions entirely.

29.     Moreover, NBP entered the United States voluntarily, has maintained branches here for decades, and has claimed the benefit of United States law by initiating legal actions in this Court and the Supreme Court of New York. NBP has also purposefully availed itself of U.S. jurisdiction to commit its tortious acts, including the processing of financial transactions for the terrorists that injured Plaintiffs through its New York branch.

30.     As a bank with multiple branches in the United States, NBP is also charged with knowledge of United States law, including the Congressional finding, incorporated in Section 2(a)(6) of JASTA, that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities."

31.     Jurisdiction in this venue is also appropriate because jurisdiction exists as to NBP's terrorist customers discussed herein, who purposefully directed their conduct at the United States by targeting Americans and American foreign policy in Afghanistan. NBP conspired with these customers to facilitate the maintenance of accounts and transfers of funds that supported these terrorist attacks. *See infra* ¶¶ 320-323, 821-827.

32.    Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) because NBP has an agent here (its branch). It is also proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

33.    The factual allegations in this Amended Complaint are based on information and belief after consulting authoritative sources about the events described herein, including mainstream news publications, reports by knowledgeable experts, government sources, and confidential informants.

34.    The ensuing Parts describe: (1) the terrorist organizations in the al-Qaeda Terror Syndicate that perpetrated the attacks that injured Plaintiffs; (2) NBP's knowing provision of substantial support to these organizations; (3) the terrorist attacks; and (4) the Plaintiffs and their injuries.

## I.    The al-Qaeda Terror Syndicate

35.    Since the U.S.-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians there. This case focuses on al-Qaeda and its affiliates, which worked in concert and shared resources, personnel, and operational plans. Given such coordination, the consensus view of the U.S. government at the time was that America was threatened by the resulting terrorist superstructure a

"syndicate" composed of al-Qaeda, the Pakistani Taliban, the Taliban, LeT, and other allied terrorist groups.[8] *See infra* ¶¶ 342-346.

36.    Indeed, the existence of a terrorist syndicate was contemplated by Osama bin Laden himself, who conceived of al-Qaeda as the leader of a broad coalition of terrorist organizations across Pakistan and Afghanistan.[9]

37.    The al-Qaeda Terror Syndicate used indiscriminate violence against American service members and civilians alike to achieve political ends. The Syndicate's primary goal was to affect U.S. foreign policy and expel coalition personnel from Afghanistan. Syndicate members also used violence and intimidation to further their longstanding domestic political agenda of imposing a severe form of Islamic law throughout Pakistan and Afghanistan.

38.    None of the members of the al-Qaeda Terror Syndicate adhered to the Geneva Conventions or the law of war. They intentionally did not wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.

---

[8] Bruce Riedel, *Deadly Embrace: Pakistan, America, and the Future of the Global Jihad* 1 (2011).

[9] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda-Taliban Connection*, Wash. Exam'r (July 4, 2011).

## A. Al-Qaeda

39.     Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on destroying the United States.

40.     Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group with the capability of launching attacks around the world.

41.     Osama bin Laden declared war on the United States in a published fatwa (religious decree) in 1996.[10] In 1998, he declared a global jihad calling on all Muslims to kill Americans at any opportunity.[11]

42.     On August 7, 1998, al-Qaeda suicide bombers in explosives-laden trucks attacked the U.S. embassies in Kenya and Tanzania, killing more than 200 people and wounding more than 5,000 others.

43.     The United States responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan.[12]

---

[10] Anne Stenersen, *Al-Qaida in Afghanistan* 62-63 (2017); Counter Extremism Project, *Osama bin Laden* (last visited June 4, 2020), https://www.counterextremism.com/extremists/osama-bin-laden; National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 48 (2004) (hereinafter "*9/11 Commission Report*").

[11] *9/11 Commission Report* at 47; Stenersen, *Al-Qaida in Afghanistan*, *supra* note 10, at 71.

[12] Stenersen, *Al-Qaida in Afghanistan*, *supra* note 10, at 76.

44.    As a result of these and other terrorist attacks, the U.S. State Department designated al-Qaeda as an FTO on October 8, 1999.[13] It remains designated as such to this day.

45.    On September 11, 2001, al-Qaeda attacked the World Trade Center in New York and the Pentagon, killing thousands.[14] A third attack, possibly aimed at the White House, was thwarted by passengers aboard United Flight 93.[15]

46.    The United States demanded that the Taliban turn over bin Laden, and the Taliban refused. A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.[16] Thereafter, bin Laden and his Syndicate allies reconstituted their efforts to one of a joint jihad against Americans in support of the Taliban's efforts in Afghanistan.

47.    Al-Qaeda's leadership role in the Syndicate and its role in the attacks at issue in this case is described in greater detail in Part III, *infra*.

### B. Taliban and the Haqqani Network

48.    The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters who had expelled the Soviet Union from

---

[13] U.S. Dep't of State, *Foreign Terrorist Organization, Designations by the Secretary of State*, (Oct. 8, 1999), https://2001-2009.state.gov/s/ct/rls/rpt/fto/2682.htm.

[14] *9/11 Commission Report* at 285-311.

[15] *Id.* at 10-14.

[16] *Id.* at 332-334; Stenersen, *Al-Qaida in Afghanistan*, *supra* note 10, at 177.

18

Afghanistan. In July 2002, President George W. Bush amended Executive Order 13224 to designate the Taliban and its leader Mohammed Omar as Specially Designated Global Terrorists.[17] In doing so, President Bush terminated President Clinton's Executive Order 13129, which had observed that the Taliban had "de facto control over the territory of Afghanistan,"[18] finding instead that the situation "has been significantly altered given the success of the military campaign in Afghanistan."[19] President Bush found that the Taliban's designation was necessary to guard against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."[20]

49.    Even before that designation, which followed the September 11 attacks and the beginning of Operation Enduring Freedom, the U.S. government considered the Taliban a terrorist group and never recognized it as the government of Afghanistan. Pakistan, Saudi Arabia, and the United Arab Emirates alone recognized the Taliban as the government following its capture of Kabul in 1996; no other country followed suit.

50.    Following its capture of Kabul, the Taliban continued to focus on terrorism and imposing strict Sharia law, rather than rebuilding the country. As the

---

[17] *See* Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[18] Exec. Order No. 13,129, 64 Fed. Reg. 36,759, 36,760 (July 7, 1999).

[19] Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[20] *Id*.

Assistant Secretary of State for South Asian Affairs Christina Rocca testified, the

Taliban demonstrated "no desire to provide even the most rudimentary health,

education, or other social services expected of any government. Instead, they have

chosen to devote their resources to waging war on the Afghan people, and

exporting instability to their neighbors."[21]

51.     After 1996, the government of President Rabbani retained

Afghanistan's seat at the United Nations, despite repeated attempts by the Taliban

to gain U.N. recognition. The United States opposed the Taliban's attempts to gain

recognition from the United Nations.

52.     Within weeks of the September 11 attacks, the United Arab Emirates

and Saudi Arabia severed diplomatic relations with the Taliban. Shortly thereafter,

the U.S. military launched Operation Enduring Freedom and quickly expelled the

Taliban from much of Afghanistan. By November 2001, Pakistan withdrew its

diplomatic recognition of the Taliban, leaving the Taliban with no international

recognition.

53.     Around the same time, in November 2001, the United Nations met in

Bonn, Germany to discuss the future of Afghanistan. The Bonn Conference

included delegates from multiple Afghan groups, but not the Taliban. The

---

[21] *Afghanistan's Humanitarian Crisis: Is Enough Aid Reaching Afghanistan?*: Hr'g Before S. Comm. On Foreign Relations, Subcomm. On Near East & South Asian Affairs, S. Hr'g 107-235, at 18 (Oct. 10, 2001) (statement of Christina Rocca, Asst. Sec'y, South Asia, Dep't of State).

delegates agreed to an interim government led by Hamid Karzai and called for international peacekeepers to provide security.

54.    The United States recognized the interim government in Afghanistan on December 22, 2001. It re-opened the American Embassy in Kabul on January 17, 2002.

55.    Hamid Karzai was elected President of the Afghan Transitional Administration in June 2002 by the *loya jirga*, a traditional Afghan assembly of tribal leaders, which did not include any members of the Taliban. President Karzai addressed the U.N. General Assembly as the President of Afghanistan in September 2002. In December 2002, the U.N. Security Council recognized "the Transitional Administration as the sole legitimate Government of Afghanistan, pending democratic elections in 2004" and reaffirmed its "commitment to assist the Transitional Administration in its efforts to ensure security, prosperity, tolerance and respect for human rights for all people of Afghanistan, and to combat terrorism, extremism and narco-trafficking."[22]

56.    In May 2003, the United States declared an end to major combat operations in Afghanistan, with Secretary of Defense Donald Rumsfeld marking the beginning of "a period of stability and stabilization and reconstruction

---

[22] U.N. Security Council Resolution 1453 (Dec. 24, 2002).

activities."[23] NATO assumed command of the ISAF in August, and in October the U.N. Security Council expanded the ISAF's mandate to allow it "to support the Afghan Transitional Authority and its successors in the maintenance of security."[24]

57.     A special constitutional *loya jirga* approved a new Constitution for the new Islamic Republic of Afghanistan on January 4, 2004. The Taliban did not participate. Under the new Constitution, in October 2004, the Afghan people elected President Karzai to a five-year term as president. The Taliban threatened to disrupt that election by attacking polling places.

58.     The U.S. military and ISAF continued to operate in Afghanistan at the invitation of the Afghan government. On May 23, 2005, President Bush and President Karzai issued a Joint Declaration of the United States-Afghanistan Strategic Partnership in order to strengthen "Afghanistan's long-term security, democracy and prosperity," which provided for continued U.S. military operations in Afghanistan.[25] In September 2005, the Minister for Foreign Affairs of Afghanistan told the United Nations that Afghanistan "welcome[d] the prospect of ISAF continuing to operate in Afghanistan until our Security Forces are fully able

---

[23] *Rumsfeld: Major Combat Over in Afghanistan*, CNN (May 1, 2003).

[24] U.N. Security Council Resolution 1510, ¶ 1 (Oct. 13, 2003).

[25] Joint Declaration of the United States-Afghanistan Strategic Partnership, 1 Pub. Papers 853 (May 23, 2005).

to provide security to our nation."[26] The U.N. Security Council reauthorized the

ISAF later that month.[27]

59.     On December 26, 2007, Congress enacted a law declaring that, for

purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act, . . . the

Taliban shall be considered to be a terrorist organization."[28] As a State Department

official explained, the U.S. government treats the Taliban "as a Foreign Terrorist

Organization for immigration purposes."[29]

60.     At all relevant times, the U.S. government viewed the Taliban as a

terrorist group, not as the legitimate armed force of any nation.

61.     Although the Taliban had local chapters throughout Afghanistan, it

operated as a top-down hierarchy through which the Quetta Shura (the seat of

Taliban political power) and the Peshawar Shura (the seat of its so-called

"military" power) exerted command and control over rank-and-file Taliban

fighters. The degree of control exerted by Taliban leadership is also evident in the

---

[26] Letter from Secretary-General to the President of the Security Council, U.N. Doc. S/2005/574, at 2 (Sept. 12, 2005).

[27] U.N. Security Council Resolution 1623 (Sep. 13, 2005).

[28] Consolidated Appropriations Act of 2007, § 691(d), Pub. L. No. 110-161, 121 Stat. 1844, 2365.

[29] U.S. Dep't of State, *Senior Administration Officials on the Terrorist Designation of the Haqqani Network* (Sept. 7, 2012).

results of the February 2020 U.S.-Taliban agreement.[30] Since that agreement,

entered into by Taliban leadership, Taliban rank-and-file fighters throughout the

country have complied with leadership's directive to desist from all large-scale

attacks on U.S. forces.

62.     The Taliban's principal goal has long been to expel Americans from

the country and undermine the democratically elected government of Afghanistan.

To that end, the Taliban began ramping up attacks on U.S. forces during the mid-

2000s. The Taliban also began to use new attack types during this timeframe,

including suicide bombings. For example, the Taliban committed six suicide

bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings

also more than doubled between 2005 and 2006.

63.     In 2008 and 2009, the growing Taliban-led insurgency attacked U.S.

forces throughout Afghanistan, with a particular emphasis on the southern

provinces, especially Helmand and Kandahar. In 2009, responding to the Taliban's

growing threat, U.S. Marines launched counterinsurgency operations focused on

"restoring government services, bolstering local police forces, and protecting

civilians from Taliban incursion."[31] The Taliban, in turn, responded with escalating

---

[30] Agreement For Bringing Peace To Afghanistan Between The Islamic Emirate Of Afghanistan which is not recognized by the United States as a state and is known as the Taliban and the United States of America (Feb. 29, 2020).

[31] Council on Foreign Relations, *Timeline: The U.S. War in Afghanistan: 1999 – 2020* (last visited June 4, 2020), https://www.cfr.org/timeline/us-war-afghanistan.

violence. By 2010, the Taliban's power and influence was growing, and it had regained much of the territory it had lost after September 11.

64.    The Taliban often attacked American military forces, contractors, and Afghan forces. But it also targeted civilian aid workers and non-governmental organizations. In recent years, the Taliban has increased attacks on civilians by placing explosives in public locations and using suicide bombers. It routinely used improvised explosive devices ("IEDs") that included passive detonation devices that would be triggered by any nearby movement (including by civilians). It has also used civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces. In doing so, the Taliban would have violated the laws of war if it was subject to them, and did not comply with the Geneva Conventions. It neither wore uniforms nor otherwise distinguished its fighters from civilians. It conscripted children into committing attacks. The Taliban also regularly targeted teachers, children, doctors, and clerics. And it engaged in widespread kidnapping and torture in an effort to intimidate its enemies.

65.    In addition, the Taliban summarily executed Afghan civilians without a trial if they were suspected of aiding the Coalition. According to a Taliban *fatwa* (an authoritative religious decree), "[d]uring the attack by America, if any Muslim—regardless of whether they are Afghan or non-Afghan—cooperates with

25

the infidels, or if he helps and spies for them, then that person will be just like the foreign invaders and killing him becomes mandatory."[32]

66.     The Taliban carried out the terrorist attacks that killed or injured the Plaintiffs in this case. To effectuate those attacks, it employed a number of different terrorist tactics. Most prominently, the Taliban relied heavily on IEDs, including Explosively Formed Penetrators ("EFPs"), designed to destroy American armored vehicles and inflict heavy casualties. Many Plaintiffs, or their family members, were killed or injured by a Taliban-planted IED or EFP.

67.     The Taliban also has attacked U.S. forces and U.S. government contractors using suicide bombers with increased frequency. Many Plaintiffs, or their family members, were killed or injured in Taliban suicide-bomber attacks. For example, Army SGT Andrew R. Looney, whose family members are Plaintiffs, was killed on June 21, 2010, when a Taliban suicide bomber detonated her bomb at a checkpoint SGT Looney was manning. *See infra* ¶¶ 647-654.

68.     The Taliban also employed insider attacks carried out by members of the Afghan Army. According to an August 2012 statement by Mullah Omar, Taliban terrorists "cleverly infiltrated in the ranks of the enemy according to the

---

[32] Alex Strick Van Linschoten & Felix Kuehn, *Resolution and Fatwa of a Big Gathering of Clerics* in The Taliban Reader: War, Islam and Politics (2018).

plan given to them last year."[33] He similarly encouraged Afghan officers to "defect and join the Taliban."[34] These attacks took place in all areas of Afghanistan, and the Taliban regularly claimed responsibility for them.[35] Many Plaintiffs in this case, or their family members, were killed or injured in Taliban-insider attacks. For example, Air Force Lieutenant Colonel Frank D. Bryant, Jr. and Major David L. Brodeur, whose family members are Plaintiffs, were killed in an insider attack committed by the Taliban (including the Haqqani Network), and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. *See infra* ¶¶ 445-463.

69.    The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is part of the Taliban and is closely allied and interdependent with al-Qaeda.

70.    On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.[36]

---

[33] Bill Roggio, *Mullah Omar Addresses Green-on-Blue Attacks*, Long War J. (Aug. 20, 2012).

[34] *Id.*

[35] *See* Bill Roggio, *2 More ISAF Troops Wounded In Latest Green-On-Blue Attack*, Long War J. (Aug. 13, 2012).

[36] U.S. Dep't of State, *Country Reports on Terrorism 2017*, at 294 (2018).

27

71.    The United States previously designated multiple Haqqani leaders as Specially Designated Global Terrorists. On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."[37] In 2010 and 2011, the U.S. Treasury Department designated three other members of the Haqqani family—Nasiruddin, Khalil Al-Rahman, and Badruddin—as fundraisers and commanders of the Haqqani Network. By February 2014, the U.S. State Department and the U.S. Treasury Department had designated fourteen leaders in the Haqqani Network under Executive Order 13224.

72.    The Haqqani Network began supplying weapons to the Taliban in the mid-1990s, when the Taliban was in its infancy. It has operated as part of the Taliban since approximately 1995, when its founder Jalaluddin Haqqani swore allegiance to the Taliban. Jalaluddin Haqqani was the Minister of Tribal Affairs for the Taliban until the U.S. invasion.

73.    The Haqqani Network was especially active in the southeastern parts of Afghanistan, particularly in the Paktia, Paktika, and Khost ("P2K") Provinces. It also developed a significant presence in the surrounding Provinces of Kabul,

---

[37] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008).

Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in those areas. Sirajuddin Haqqani explained in 2010 that the Haqqani Network is "assigned by the Islamic Emirate in the southeastern front of Afghanistan (Paktia, Khost, Paktika) and we have mujahideen members who are carrying out jihad in the north (provinces in northern Afghanistan) and in the south (provinces in southern Afghanistan), and they are operating under the Amirs of the provinces they are under."[38]

74.    The Taliban's terrorist commanders and shadow governors in the P2K area are often members of the Haqqani Network. As the U.S. State Department explained when it announced the designation of Mullah Sangeen Zadran as a Specially Designated Global Terrorist, Sangeen Zadran served as the "Shadow Governor for Paktika province, Afghanistan and a commander of the Haqqani Network, a Taliban-affiliated group."[39] Similarly, Abdul Aziz Abbasin is a "key commander in the Haqqani Network" who simultaneously functions as the broader

---

[38] Bill Roggio, *Taliban Cooperation With al Qaeda 'Is At The Highest Limits' – Siraj Haqqani*, Long War J. (Apr. 15, 2010).

[39] Press Release, U.S. Dep't of State, *Designation of Haqqani Network Commander Sangeen Zadran* (Aug. 16, 2011).

Taliban organization's shadow governor for the Orgun District in Paktika Province.[40]

75.    The Haqqani's influence is not limited to the southeastern provinces. There is also significant overlap between the broader leadership of the Taliban and the Haqqani Network. Sirajuddin Haqqani (Jalaluddin's son and successor) has been a member of the Taliban's governing council since at least 2010. Since 2015, he has been the Deputy Emir of the Taliban, which is the second in command in the Taliban's leadership.

76.    In particular, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. After September 11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government. In October 2001, a purported Jihadist publication (as published online) described Jalaluddin as the "chief of the Taliban army."[41] Indeed, in an interview with Sirajuddin published by Gulf News UAE, the interviewer identified Jalaluddin as "the commander-in-chief of the Taliban's southern military command"—akin to the Taliban combat chief—"[and] Mullah

---

[40] Bill Roggio, *US Adds 5 al Qaeda, Taliban, Haqqani Network, And IMU Facilitators To Terrorist List*, Long War J. (Sept. 29, 2011).

[41] Karachi Jasarat, *Chief of Taliban Army Contacts Jamaat-i-Islami Chief* (Oct. 11, 2001).

Omar's top military strategist and commander."[42] As for his son, Sirajuddin is now Deputy Emir of the Taliban and oversees its terrorist operations throughout the country.

77.     Similarly, according to Brigadier General Charles H. Cleveland, the chief spokesman for U.S. and NATO forces in Afghanistan, as of 2016 Sirajuddin Haqqani "increasingly runs the day-to-day military operations for the Taliban, and, we believe, is likely involved in appointing shadow governors."[43]

78.     In 2016, the *New York Times* reported that, according to a senior Taliban commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban field commanders throughout Afghanistan, including outside the Haqqani Network's area of particular influence in the southeast.[44] According to the commander, all field commanders had to contact Sirajuddin Haqqani for permission before launching a terrorist offensive.

79.     The Haqqani Network also influenced Taliban decisions about which types of attacks to employ. The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it. The Haqqani

---

[42] Aslam Khan, *Taliban Leader Warns of Long Guerilla War*, Gulf News UAE (Oct. 20, 2001).

[43] Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan, Officials Say*, N.Y. Times (May 7, 2016).

[44] *Id.*

Network also was involved in the rising number of Taliban-insider attacks—which strategically undermined relations between U.S. and Afghan forces. By 2007, Army Lieutenant Colonel Dave Anders, the director of operations for Combined Joint Task Force-82, explained that "Siraj[uddin Haqqani] is the one dictating the new parameters of brutality associated with Taliban senior leadership" employing "[k]idnappings, assassinations, beheading women, indiscriminate killings and suicide bombers."[45]

80.   The Haqqani Network's influence within the broader Taliban organization is not limited to planning and authorizing attacks. Even outside of the Haqqani's traditional stronghold, its members often commit attacks alongside other Taliban terrorists. For example, in early 2009 the Haqqani Network was operating in the southern provinces of Helmand and Kandahar. A spokesman for the Taliban reportedly confirmed that the Haqqani Network was operating in "Kandahar as well as nearby Helmand province to provide training, support—particularly in bomb-making—and to carry out attacks."[46]

81.   In 2013, "[a] combined force in . . . Kandahar . . . arrested a Haqqani network facilitator who managed supply routes from [Kandahar City] to other provinces" and was "also . . . believed to have been instrumental in the acquisition

---

[45] Bill Roggio, *Targeting Taliban Commander Siraj Haqqani*, Long War J. (Oct. 20, 2007).

[46] Murray Brewster, *Fanatical Taliban Wing Moves Into Kandahar*, Star (Feb. 8, 2009).

and distribution of lethal aid to Haqqani fighters for attacks against Afghan and coalition forces."[47] And a successful 2017 Taliban attack in Kandahar against the United Arab Emirates ambassador to Afghanistan was attributed to the Haqqani Network.

82.     Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban.[48] The Taliban, for its part, has rejected claims that the Haqqani Network is a separate entity from the Taliban.[49]

83.     The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After September 11, the Haqqanis provided sanctuary to bin Laden after he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerrilla war to reclaim our pure land from infidels" and stated that "Osama bin Laden . . . [is] safe and sound and carrying out [his] duties."[50]

---

[47] U.S. Dep't of Defense, *Afghan, Coalition Forces Kill Insurgents in Logar Province* (Feb. 20, 2013).

[48] *See* Bill Roggio, *US Military Searches For Kabul Attack Network Members*, Long War J. (Apr. 27, 2016).

[49] *See* Bill Roggio, *Taliban Call Haqqani Network A 'Conjured Entity'*, Long War J. (Sept. 9, 2012).

[50] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War*, Gulf News UAE (Oct. 21, 2001).

84.     The Haqqani Network's close relationship with other terrorist groups has helped to develop the modern terrorist Syndicate operating in Afghanistan. In furtherance of that goal, the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism abroad. Senior Haqqani Network officials also have publicly indicated that the Haqqani Network and al-Qaeda are one.[51] And in July 2008, Jalaluddin Haqqani's son—18 year old Muhamman Omar Haqqani—was killed alongside a top al-Qaeda commander in southeast Afghanistan. The Haqqani Network also maintains training camps and safe houses that have been used by al-Qaeda and Taliban operatives.

85.     More recently, Sirajuddin Haqqani has welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban.[52] According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council.[53] U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.[54] And when the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a Specially Designated Global

---

[51] *See* Bill Roggio, *An Interview With Mullah Sangeen*, Long War J. (Sept. 17, 2009).

[52] Roggio, *Taliban Cooperation*, *supra* note 38.

[53] *Id*.

[54] Hindustan Times, *Al Qaeda Very Active In Afghanistan, Preparing for Attacks* (Apr. 14, 2016) ("The Taliban's current deputy commander, Siraj Haqqani, is head of the Haqqani Network and al Qaeda's top facilitator in Afghanistan, according to US officials.").

Terrorist, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[55] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.[56]

86.    The Haqqani Network is often considered the most radical part of the Taliban. Like the Taliban, it relies on terrorist attacks—including suicide bombings, IED and EFP attacks, insider attacks, and complex attacks—rather than open combat.[57] The Haqqani Network routinely would violate the laws of war if it were subject to them, and it does not comply with the Geneva Conventions.

87.    Many Plaintiffs, or their family members, were killed or injured in attacks by the Haqqani Network. For example, the Haqqani Network and al-Qaeda committed the attack that shot down a Chinook helicopter on August 6, 2011, killing Navy SEAL Special Warfare Operator Chief Petty Officer Darrik C. Benson, Army Chief Warrant Officer 2 Bryan J. Nichols, and Navy SEAL Special Warfare Petty Officer 2nd Class Nicholas P. Spehar, whose families are plaintiffs in this case. *See infra* ¶¶ 436-444, 697-705, 767-778.

---

[55] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[56] *See, e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Department Targets Key Haqqani Network Leaders* (Feb. 5, 2014).

[57] Bill Roggio, *Haqqani Network Promotes Suicide, IED Attacks, and Ambushes In 'Caravan of Heroes'*, Long War J. (Apr. 10, 2015).

88.     The Haqqani Network also participated in the attack on Forward Operating Base Chapman that killed seven Americans on December 30, 2009, including Harold Brown, Jr., Dane Clark Paresi, and Jeremy Jason Wise, whose family members are Plaintiffs in this case. *See infra* ¶¶ 326-332, 392-418.

## C. Pakistani Taliban

89.     The Pakistani Taliban, also known as Tehrik-i-Taliban Pakistan or TTP, is a Sunni Islamic terrorist organization that was formally created in 2007, based in the Federally Administered Tribal Areas of Pakistan, and organized to advance a radical terrorist agenda in Afghanistan and Pakistan.

90.     The Pakistani Taliban consisted of Taliban supporters and sympathizers in Pakistan who decided to form their own terrorist group to partner with other terrorist groups, like al-Qaeda, in order to carry out terrorist attacks in Afghanistan and Pakistan in support of their terrorist agenda. At all times, the Pakistani Taliban espoused a radical, violent Islamist ideology that emphasized violent attacks against the perceived enemies of Islam, including Americans in the region.[58]

91.     Since its formation, the Pakistani Taliban has identified violent jihad against NATO forces in Afghanistan as one of the terrorist group's core

---

[58] Hassan Abbas, *A Profile of Tehrik-i-Taliban Pakistan*, CTC Sentinel, Vol. 1, Issue 2, at 1 (Jan. 2008) ("*TTP Profile*").

objectives.[59] The organization notoriously employs kidnapping, murder, beheadings, improvised explosive device attacks and suicide bombings in pursuit of its objectives.[60] This includes paying compensation to the families of suicide bombers, and providing treatment to injured terrorists, which creates incentives for people to join the Pakistani Taliban's cause.[61]

92.     From its inception, the Pakistani Taliban was a formidable terrorist threat on both sides of the Afghan/Pakistan border. As described in a January 2008 profile of TTP published by the Combating Terrorism Center at West Point:

> The organizational strength, military strategy and leadership quality of the Taliban in Pakistan's tribal territories has qualitatively improved during the last few years. At the time of the U.S.-led military campaign in Afghanistan in late 2001, allies and sympathizers of the Taliban in Pakistan were not identified as "Taliban" themselves. That reality is now a distant memory. Today, Pakistan's indigenous Taliban are an effective fighting force and are engaging the Pakistani military on one side and NATO forces on the other.[62]

---

[59] *TTP Profile* at 2.

[60] *Khan* Trial Transcript, Doc. 833, at 106 (testimony of FBI Special Agent Ferlazzo); *Khan* Trial Transcript, Doc. 839, at 134 (testimony of Saifullah Khan, a militia leader who fought the Pakistani Taliban); *Khan* Trial Transcript, Doc. 840, at 150-51 (testimony of expert Khurum Iqbal).

[61] *Khan* Trial Transcript, Doc. 840, at 152-54 (testimony of Khurum Iqbal).

[62] *TTP Profile* at 1.

93.     The TTP was first led by Baitullah Mehsud, a jihadist who followed "the fanatic Talibanized version of Islam," under which his stated view was that "only jihad can bring peace to the world."[63]

94.     On or about August 5, 2009, Baitullah Mehsud was killed by a CIA drone strike in Pakistan.[64] The U.S. government executed the drone strike against Mehsud because of the key role he played in the TTP's campaign of terror against Americans and coalition partners in Afghanistan.

95.     The Pakistani Taliban retaliated for Mehsud's death by participating in the Camp Chapman Attack. In May of 2010, the Pakistani Taliban also attempted to carry out a car bombing in Times Square, which failed. The bomber in that case received training and resources from the Pakistani Taliban as he attempted to murder Americans on U.S. soil.[65]

96.     On September 1, 2010, the U.S. State Department designated the Pakistani Taliban as an FTO.[66] It remains designated as such to this day.

---

[63] *TTP Profile* at 3.

[64] Declan Walsh, *Air Strike Kills Taliban Leader Baitullah Mehsud*, The Guardian (Aug. 7, 2009).

[65] U.S. Dep't of Justice, *Faisal Shahzad Indicted for Attempted Car Bombing in Times Square* (June 17, 2010).

[66] U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/.

97.    As the government explained in Hafiz Khan's trial, however, "just because the Pakistani Taliban was not formally designated as a foreign terrorist organization . . . until that date, September 1, 2010, does not mean the group suddenly became violent on that day."[67] Instead, the group engaged in "extreme violence during 2008, 2009, and the first part of 2010"—the entire time the funds at issue in this case were being transferred to it.[68]

98.    As their coordination in the authorization, planning, and commission of the Camp Chapman Attack illustrates, al-Qaeda and the Pakistani Taliban are closely allied as parts of an overarching terrorist Syndicate in the region.[69]

99.    John Brennan (then the chief counterterrorism advisor to the President, and later director of the Central Intelligence Agency) commented in 2010 that the Pakistani Taliban "is closely allied with al-Qaeda. They train together, they plan together, they plot together. They are almost indistinguishable."[70] Others have described the Pakistani Taliban as a "franchise" of al-Qaeda that gives al-Qaeda operational support in Pakistan.[71]

---

[67] *Khan* Trial Transcript, Doc. 833, at 29-30 (government's opening statement).

[68] *Id*. at 30.

[69] Riedel, *Deadly Embrace*, *supra* note 8, at 100.

[70] Kathleen Hennessey, *N.Y. Bomber has al Qaeda tie, White House Says*, SFGate (May 10, 2010).

[71] Ayesha Siddiqa, *Pakistan's Counterterrorism Strategy: Separating Friends from Enemies*, 34 Wash. Quarterly 149, 153 (2011).

100.    More specifically, the Pakistani Taliban provided a critical safe-haven for both al-Qaeda and the Afghan Taliban in parts of South Waziristan Agency (a hilly region in northwest Pakistan, along the Afghan border) as early as 2007.[72] TTP leader Qari Hussain helped al-Qaeda train the suicide bomber who carried out the Camp Chapman Attack.[73]

101.    The State Department has agreed with these assessments. In its order designating the Pakistani Taliban as an FTO, the State Department assigned responsibility to the Pakistani Taliban and al-Qaeda for the Camp Chapman Attack and noted that "TTP and al-Qa'ida have a symbiotic relationship; TTP draws ideological guidance from al-Qa'ida, while al-Qa'ida relies on TTP for safe haven in the Pashtun areas along the Afghan-Pakistani border. This mutual cooperation gives TTP access to both al-Qa'ida's global terrorist network and the operational experience of its members. Given the proximity of the two groups and the nature of their relationship, TTP is a force multiplier for al-Qa'ida."[74]

102.    Expert witnesses have likewise testified that al-Qaeda and the TTP are ideologically and operationally very close. Thus, "Al-Qaeda's ideology is to wage

---

[72] *TTP Profile* at 3.

[73] U.S. Dep't of State, *Terrorist Designation of Tehrik-E Taliban (TTP) Leader Qari Hussain* (Jan. 20, 2011).

[74] U.S. Dep't of State, *Designations of Tehrik-e Taliban Pakistan and Two Senior Leaders* (Sept. 1, 2010).

global jihad against America and its allies, and TTP fully subscribed to that ideology. TTP also believes in fighting against the U.S. and its allies anywhere in the world they find the chance, so that is the ideological link, and [the] operational link is also very strong."[75]

103.   As further confirmation of these organizations' close ties, after Osama bin Laden was brought to justice, "Pakistani Taliban militants allied with al Qaeda [] vowed to avenge bin Laden's killing."[76]

104.   Similar statements connecting the Pakistani Taliban and al-Qaeda appeared in the press during the relevant period. As a sampling:

- *APS Diplomat News Service, January 2008*: "Al-Qaeda and the Pakistani Taliban, together with their extremist allies, want to disrupt the political process…."[77]

- *Deutsche Presse-Agentur, February 2008*: "Pakistani militant commanders, who also profess to being Taliban, continue to operate in the country's tribal areas and provide refuge for al-Qaeda leaders … Pakistani Taliban militants and their al-Qaeda allies are blamed for launching dozens of suicide bombings across [Pakistan] in the past 13 months that have killed more than 1,000 people."[78]

- *Gulf News, March 2008:* "Disparate militants bands in Pakistan are increasing co-ordination in their insurgency … Suicide bombers have killed

---

[75] *Khan* Trial Transcript, Doc. 840, at 113 (testimony of Khurum Iqbal).

[76] Haji Mujtaba, *Militants target check post in Pakistan's N. Waziristan*, Reuters (May 26, 2011).

[77] APS Diplomat News Service, *The Tribal Experiment in Pakistan*, 2008 WLNR 25283794 (Jan. 21, 2008).

[78] Deutsche Presse-Agentur, *3RD ROUNDUP: Pakistani envoy to Kabul feared kidnapped* (Feb. 11, 2008).

hundreds of people over the past year, striking in all of the country's main cities and killing opposition leader Benazir Bhutto on December 27. … Retired Brigadier Mahmood Shah, a former chief of security in the ethnic Pashtun border lands, said peace deals with the militants in their border hub of Waziristan had backfired. The militants, known as Pakistani Taliban, are inspired by the Afghan Taliban and draw many of their fighters from the disenchanted youth of the ethnic Pashtun tribes. They are also allied with Al Qaeda. Shah said the Pakistani Taliban have been doing most of the fighting though he saw the hand of Al Qaeda behind sophisticated suicide attacks…"[79]

- *Reuters News, May 2008*: "Baitullah Mehsud, a leader of the Pakistani Taliban and an al Qaeda ally, pulled out of a peace deal with Islamabad … after it refused to withdraw the army from tribal lands. Mehsud has been accused of a wave of suicide attacks that have rocked Pakistan since mid-2007, including one that killed former prime minister Benazir Bhutto in December."[80]

- *Mirror (UK), September 2008*: "Pakistani Taliban and their al-Qaeda allies have unleashed a wave of bomb attacks over the past year, killing hundreds of people."[81]

- *The Nation (Pakistan), September 2008*: "Although neither Taliban nor Al-Qaeda has claimed responsibility for Saturday's hotel bombing, officials and experts said the scale of the blast and its high-profile target were hallmarks of Al-Qaeda and its Taliban allies. Suspicion has fallen on al-Qaeda or the Pakistani Taliban in the blast."[82]

- *Hindu, September 2008*: "The attack on the high-security Marriott hotel had greater symbolic significance. The truck laden with 1000 kg of explosives that suicide attackers rammed into the high-security Marriott hotel in Pakistan's capital Islamabad on September 20, 2008 demolished a major

---

[79] Gulf News, *Militants are regrouping* (Mar. 12, 2008).

[80] Sayed Salahuddin, *Afghans back Pakistan's plan of talks with Taliban*, Reuters News (May 3, 2008).

[81] Mark Ellis, *Taliban fire on Pakistan leader's car*, Mirror (UK), 2008 WLNR 16685958 (Sept. 4, 2008).

[82] Maqsood Tirmizi, *Dinner plan change saved top leadership*, The Nation (Pakistan), 2008 WLNR 18136390 (Sept. 22, 2008)

42

power symbol, prompting many to call it 'Pakistan's 9/11.' … No one has claimed responsibility but the attack is assumed to be work of Pakistani Taliban (closely allied with Al-Qaeda) who have strongholds in the country's north-west bordering Afghanistan."[83]

- *International Herald Tribune, November 2008*: "Bajaur provides access south to Peshawar, one of the nation's major cities that is under threat from the Taliban. And it offers a land bridge to more settled parts of Pakistan, like the Swat Valley to the east, where the army also is struggling to contain the Taliban. The fight is now a test of a strength between the army and Tehrik-i-Taliban, the umbrella group of Pakistani Taliban, which is allied with Al Qaeda …."[84]

- *Reuters, February 2009*: "A U.S. missile attack killed at least 25 al Qaeda-linked militants in a Pakistani tribal region … Waziristan is the power base of Baituallah Mehsud, leader of the Pakistani Taliban and an al Qaeda ally … Frustrated over what it sees as Pakistan's failure to stem the flow of al Qaeda and Taliban militants from its lawless tribal regions into Afghanistan, the United States stepped up cross-border attacks last year."[85]

- *Reuters, March 2009*: "Two high profile guerrilla attacks in Lahore in the space of a month have heightened fears of Islamist militancy engulfing Pakistan, despite U.S. promises of support for the year-old civilian government. … Al Qaeda'S FRIENDS Pakistan's leaders know al Qaeda is encouraging a Taliban insurgency in Pakistani tribal lands bordering Afghanistan, and seeking to destabilise the Muslim nation of 170 million people. Pakistani Taliban leader Baitullah Mehsud, an al Qaeda ally based in the South Waziristan tribal region, claimed responsibility on Tuesday for the assault on the police school, which killed eight cadets."[86]

- *Reuters, April 2009*: "Militant violence has surged in nuclear-armed Pakistan since mid-2007, with numerous attacks on the security forces and

---

[83] Beena Sarwar, *Was that Pakistan's 9/11?*, Hindu, 2008 WLNR 18015924 (Sept. 23, 2008).

[84] Jane Perlez, *Pakistani Army faces a determined enemy; Near Afghan border, the battle is fierce*, International Herald Tribune (Nov. 12, 2008).

[85] Reuters News, *UPDATE 3-U.S. missile strike kills 25 militants in Pakistan* (Feb. 14, 2009).

[86] Simon Cameron-Moore, *ANALYSIS-Lahore attacks heighten fears for fate of Pakistan* (Mar. 31, 2009).

government and Western targets. The violence has raised fears about the year-old civilian government's ability to stand up to al Qaeda and their Pakistani Taliban allies based in lawless enclaves on the Afghan border."[87]

- *Reuters, April 2009*: "A suicide car-bomber blew himself up at a security post in northwest Pakistan on Wednesday, killing nine policemen and three civilians, police said. The bomber set off his explosives as he pulled up at a police post in Charsadda, a town near the main northwestern city of Peshawar, said senior town police officer Riaz Mohammad. … There was no claim of responsibility but Pakistani Taliban militants, allied with al Qaeda and based in pockets of lawless territory on the Afghan border, have carried out numerous such attacks over the past two years."[88]

105.    Al-Qaeda's and the Pakistani Taliban's close coordination matters because it means that, in the time frame relevant to the allegations in this Amended Complaint, providing support to the Pakistani Taliban necessarily meant assisting al-Qaeda as well. The organizations planned together, trained together, shared resources, and attacked together. Any support to the Pakistani Taliban enabled that organization to facilitate terrorist attacks against Americans in Afghanistan, executed by either the Pakistani Taliban or a joint operation of the al-Qaeda Terror Syndicate.

### D. Lashkar-e-Taiba

106.    "The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both

---

[87] Kamran Haider, *Pakistani investigators make "significant" arrests*, Reuters News (Apr. 1, 2009).

[88] Reuters News, *Suicide bomber attacks police station in Pakistan, 12 dead* (Apr. 15, 2009).

sides of the border. Its key affiliates include the Afghan and Pakistani Taliban, the Haqqani Network, and Lashkar-e-Taiba."[89]

107.    Lashkar-e-Taiba, also known as LeT or LT, means "Army of the Pure," and was founded in Pakistan in the early 1990s. Since its inception, the group has been engaged in terrorist activities, causing the United States to designate it as an FTO on December 26, 2001—and to subsequently renew that designation and to expand it to include LeT's aliases and affiliates.

108.    At all relevant times, LeT was known to be a terrorist group that targeted Americans in Afghanistan for attack. As one terrorism scholar observed, "[w]hen viewed from the perspective of the United States, it is safe to say that LeT has long undermined U.S. interests in the global war on terror" and "threaten[ed] U.S. soldiers and civilians in Afghanistan."[90]

109.    At all relevant times, LeT has been led by Hafiz Saeed, "a very public figure in Pakistan" who was known for "advocat[ing] a truly extreme vision" as the "head of one of the world's most dangerous terrorist organizations."[91]

---

[89] Lauren McNally & Marvin G. Weinbaum, *A Resilient al-Qaeda in Afghanistan and Pakistan*, MEI Policy Focus 2016-18, at 4 (Aug. 2016).

[90] Ashley J. Tellis, *The Menace That Is Lashkar-e-Taiba*, Carnegie Endowment for International Peace Policy Outlook (2012).

[91] Bruce Riedel, *Hafiz Saeed, Pakistani Extremist with a $10 Million Price on his Head, is al Qaeda's Ally*, Brookings (Apr. 3, 2012).

110.    Saeed was well known in Pakistan for his specific affiliation with al-Qaeda founders Abdullah Azzam and Osama bin Laden. As a former senior U.S. official explained:

> Saeed and Azzam were close partners with Osama bin Laden in the 1980s. Azzam was the intellectual guru who created the modern Islamic extremist movement. One former head of the Mossad, Israel's top intelligence service, told me that Azzam should properly be seen as the "father of the global jihad." Saeed stayed in close contact with bin Laden until his death a year ago, according [to] the material found in the al Qaeda leader's hideout in Abbottabad, Pakistan. Saeed openly mourned bin Laden in a bitter eulogy the Friday after the SEALs delivered justice to bin Laden.[92]

111.    "Over the last two and a half decades, [Al-Qaeda Core] has maintained close working relationships" with LeT, which is "hardly surprising, since some of al-Qaeda's top lieutenants have long used South Asia as an operational hub."[93] "Al-Qaeda ties with LeT go back to the anti-Soviet war. One of LeT's founders, Abdul Rehman Sareehi, had close ties with both Abdullah Azzam and Osama bin Laden," and LeT therefore has a long history of providing "material and logistical support to individual al-Qaeda members."[94]

112.    As an example of LeT's closeness with al-Qaeda, when the Clinton Administration retaliated against al-Qaeda camps in Afghanistan in 1998 in

---

[92] *Id*.

[93] The Soufan Center, *Al-Qaeda in the Indian Subcontinent: The Nucleus of Jihad in South Asia*, at 12 (2019).

[94] *Id*. at 14.

response to the African embassy bombings, our Tomahawk missiles missed Osama bin Laden (the target) but did "kill many LeT operatives and trainers who had been bivouacked in these facilities."[95]

113.   "LeT began contributing to al-Qaeda's global jihad against the United States and its allies after 9/11."[96] "As al-Qaeda operatives fled Afghanistan in the wake of the U.S. counter-attack, LeT's leadership directed its members to provide safe haven in Pakistan for some and to facilitate emigration to the Middle East or other safe destinations for others. The group arranged fake passports, safe houses, guards and fixers, and provided medical support for Arabs wounded during the U.S. invasion."[97]

114.   As the insurgency targeting Americans in Afghanistan "gained strength in 2005-2006, … [LeT] began facilitating access" to Afghanistan for LeT members to fight under al-Qaeda and the Taliban's banner.[98] One terrorism scholar explained LeT's close operational ties with al-Qaeda, the Taliban, and the Haqqani Network as follows::

> [L]ike al-Qaeda, LeT has demonstrated a remarkable ability to forge coalitions with like-minded terrorist groups. These alliances are most clearly on display within South Asia, where, in addition to al-Qaeda, LeT cooperates with other militant groups, such as the Afghan

---

[95] Tellis, *Menace*, *supra* note 90.

[96] Stephen Tankel, *Lashkar-e-Taiba: Past Operations and Future Prospects*, at 1 (2011).

[97] *Id*. at 16.

[98] *Id*. at 6.

Taliban, in the areas of recruiting, training, tactical planning, financing, and operations. … In Pakistan, LeT cooperates actively with the Afghan Taliban … and also coordinates operations against Afghanistan with al-Qaeda and the Haqqani Network.[99]

115.   As LeT ramped up its support for jihad targeting Americans in Afghanistan, it continued to target Indians and Westerners for attack in India. Perhaps most infamously, LeT carried out the 2008 Mumbai attacks. Ten LeT members carried out a dozen coordinated shooting and bombing attacks lasting four days across Mumbai, killing at least 160 innocents (including 6 Americans). The attacks focused on international hotels, a busy railway station, and a café popular with tourists.

116.   "Approximately one year after Mumbai, U.S. President Barack Obama wrote a letter to his Pakistani counterpart, President Asif Ali Zardari, in which he specifically mentioned LeT as one of the militant groups against which the government should act. A chorus of U.S. diplomats, security officials and military officers reiterated this call for action, pressuring Pakistan publicly as well as privately to move against LeT."[100]

117.   After the Mumbai attacks, LeT decided "to lay low when it came to operations against India." Instead, it grew its presence in al-Qaeda's Afghan

---

[99] Tellis, *Menace*, *supra* note 90.

[100] Tankel, *Lashkar-e-Taiba*, *supra* note 96, at 1.

strongholds of Nangarhar, Nuristan, Kunar and Laghman ("N2KL") and P2K

Provinces, as well as Kabul and the strategically crucial provinces around Kabul in

which the Kabul Attack Network committed attacks. "This served a dual purpose:

The Afghan front provided a pressure release valve, while the influx of

Lashkar-e-Taiba members yielded additional intelligence to the security

establishment about the militant state of play across the border. This practice of

encouraging the group's participation in Afghanistan continues: enabling it to

wage jihad against U.S. and Afghan forces, as well as to launch occasional attacks

against Indian interests; and putting its members in a position to gather intelligence

on other groups."[101]

118.   Collaboration between LeT and its al-Qaeda, Taliban, and Haqqani

Network partners in the Syndicate "was centered on the jihad in Afghanistan" and

"included the joint recruitment and infiltration of fighters into Afghanistan; sharing

safe houses and resources, including weapons, explosives and information; and

joint training and fighting in Afghanistan."[102]

119.   As the U.S. government repeatedly recognized, LeT played a vital

role in al-Qaeda's "syndicate" throughout the period relevant to this case.

---

[101] Stephen Tankel, *Ten Years After Mumbai, the Group Responsible Is Deadlier than Ever*, War on the Rocks (Nov. 26, 2018), https://warontherocks.com/2018/11/ten-years-after-mumbai-the-group-responsible-is-deadlier-than-ever/.

[102] Tankel, *Lashkar-e-Taiba*, *supra* note 96, at 19.

Terrorism scholars drew a similar conclusion. For example, in February 2010, one scholar observed that "[t]oday," al-Qaeda and LeT "cooperate on training and recruitment for the Afghan jihad against coalition forces, equipping fighters and infiltrating them across the Durand Line separating Pakistan and Afghanistan."[103] Similarly, in March 2012, another scholar noted that "[w]ith recruitment, fundraising, and operations extending to Afghanistan, Iraq, Central Asia, Europe, Africa, and Australia, LeT has rapidly become a formidable global threat. Today, LeT has close ties with al-Qaeda in Pakistan and supports the Afghan Taliban's military operations."[104]

120.    As a "key affiliate[]" of al-Qaeda,[105] LeT provided critical support to the al-Qaeda Terror Syndicate by sourcing foreign fighters, including Pakistanis and others from outside Afghanistan, for purposes of the fighters receiving training by al-Qaeda in order to be ultimately deployed in Afghanistan on behalf of the joint al-Qaeda/Taliban (including Haqqani Network) cells operating in the key provinces there. In this way, al-Qaeda leveraged its historical relationship, and religious doctrinal affinity, with LeT to find a partner whom it can trust to find the right terrorist "talent" for purposes of being trained by al-Qaeda to commit attacks

---

[103] Stephen Tankel, *The Long Arm of Lashkar-e-Taiba* at 1-2, Wash. Inst. for Near East Policy, Policy Watch # 1361 (Feb. 17, 2010).

[104] Tellis, *Menace*, *supra* note 90.

[105] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 4.

in Afghanistan. LeT's "lane" in this Syndicate effort is "Pakistani and foreign talent recruitment" from madrassas and other social networks controlled by LeT operatives and LeT fronts throughout Pakistan.

121.   LeT, and its front organizations, also provide essential logistical support to facilitate the operation of al-Qaeda-run training camps in Waziristan by providing funding, safe houses, travel support, and recruits, for the camps.

122.   An example of LeT's logistical support for the network of al-Qaeda camps in Waziristan occurred in 2005, when several al-Qaeda suspects "traveled to work in JuD relief camps after [and earthquake in Pakistan] before making their way to militant training camps in Waziristan."[106] "This was not the first or the last time that LeT was believed to have acted as a gateway organization to al-Qaeda. It is an article of faith among the American and British security establishments that the group has played this role on numerous occasions."[107]

123.   LeT's direct support of al-Qaeda was an essential component of the latter's fundraising and recruiting efforts in the Afghan-Pakistan region. As two terrorism scholars explained:

> [LeT] has a particularly strong relationship with al-Qaeda, with some reports predicting that LeT could become "the next al-Qaeda." Al-Qaeda has utilized LeT safehouses while in Pakistan, and LeT has proven to be the strongest ideological ally of al-Qaeda in the region.

---

[106] Tankel, *Lashkar-e-Taiba*, *supra* note 96, at 1.

[107] *Id.*

51

LeT has also been among the groups working with al-Qaeda to carry out operations in Afghanistan. LeT has become known for "technological sophistication, [broad] global recruiting and fundraising network, its close ties to protectors within the Pakistani government, and the fact that it is still a less high-profile target of Western intelligence," all of which afford [LeT] an advantage over nationally-focused groups in the region.[108]

124.    LeT was uniquely well positioned to source terrorist talent for

al-Qaeda and its allies because LeT, like the terrorist group Lebanese Hezbollah,

built an extensive social welfare infrastructure that served the express purpose of

identifying suitable candidates for terrorist indoctrination, as well as generally

improving the terrorist group's reputation and capacity for attracting new recruits.

LeT's "standing" in certain Pakistani circles thus "heightened its ability to raise

money for missionary outreach and to recruit members from other sects, who were

promptly converted upon joining. In other words, its militancy and missionary

activities reinforced one another."[109]

125.    While LeT helped source thousands of fighters for the joint

al-Qaeda/Taliban (including Haqqani Network) cells in Afghanistan, as described

above, LeT—alongside its ally, JeM—also played the key role in sourcing nearly

all of the suicide bombers who were ultimately trained by al-Qaeda and deployed

as suicide attackers on behalf of the joint al-Qaeda/Taliban (including Haqqani

---

[108] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 10-11 (internal citations omitted).

[109] Tankel, *Lashkar-e-Taiba*, *supra* note 96, at 5.

Network) cells operating in N2KL, P2K, and the Kabul Attack Network-related Provinces. "[R]ecruitment for suicide bombings conducted by other groups" was a particular "LeT specialty."[110] LeT and JeM furnished every suicide bomber who was ultimately trained to become an al-Qaeda operative and used in every suicide bombing attack in this case other than the Camp Chapman attack.

126.   LeT terrorists do not openly participate in attacks in Afghanistan under LeT's banner. Instead, LeT terrorists were (and remain) embedded alongside the relevant Taliban and al-Qaeda terrorists who committed attacks together as part of joint al-Qaeda/Taliban cells in Afghanistan. This was an operational manifestation of al-Qaeda's syndicate strategy, which facilitated the efficient embedding of LeT terrorists in the terrorist cells that were of greatest importance to the shared al-Qaeda/Taliban enterprise. As terrorism scholar Stephen Tankel explained:

> Lashkar need not take the lead role in order for its training apparatus and transnational networks to be used against the US or its Western allies. Indeed, the current threat to Western interests comes from a conglomeration of actors working in concert. Notably, working as part of a consortium provides cover for [LeT], since shared responsibility makes it easier for Lashkar to conceal its fingerprints. One could imagine a scenario in which would-be Western jihadis looking to fight in Afghanistan linked up with a facilitator connected with Lashkar to access a training camp in territory controlled by the Haqqani Network where al-Qaeda convinced them to launch a terrorist attack in a

---

[110] Tellis, *Menace*, *supra* note 90.

Western country and Lashkar trainers provided some of the instruction.[111]

127.   LeT terrorists were sometimes dual-hatted, meaning that they were operatives working on behalf of two (or more) jihadist groups. James McLintock, for example, was a triple-hatted operative of al-Qaeda, LeT, and the Taliban. LeT and al-Qaeda terrorists were often dual-hatted, as LeT was the Pakistani jihadist group that most closely adhered to al-Qaeda's interpretation of Islam.

128.   **Nangarhar, Nuristan, Kunar and Laghman Provinces (N2KL).** LeT terrorists forward-deployed terrorists to the N2KL Provinces to provide embedded support to the joint al-Qaeda/Taliban cells in the N2KL Provinces. LeT fighters "turned up in Kunar and Nuristan provinces in Northeastern Afghanistan, where LeT had historical connections."[112] In N2KL, "[a]lthough [LeT] did not have a substantial footprint in terms of manpower, its members were among the most proficient in terms of small-unit tactics, so even a small number of men could have an impact."[113] As one think tank observed in 2011:

> LeT involvement in Afghanistan has picked up since 2006. LeT members apparently trained at camps in Kunar and Nuristan provinces in the 1990s but did not fight alongside the Taliban at that time. In the last four years, however, as the Taliban has regained influence in Afghanistan, the LeT has supported the insurgents by recruiting, training, and housing fighters and facilitating their infiltration into

---

[111] Stephen Tankel, *Storming the World Stage: The Story of Lashkar-e-Taiba* 266 (2011).

[112] Tankel, *Lashkar-e-Taiba*, *supra* note 96, at 18.

[113] *Id*. at 19.

Afghanistan from the tribal areas of Pakistan. LeT fighters were also likely part of the group that attacked a U.S. outpost in Wanat, Afghanistan in 2008 that killed nine U.S. soldiers.[114]

129.   LeT's numbers in Kunar Province were so extensive that the joint al-Qaeda-Taliban cells were ordinarily augmented by LeT terrorists. As a result, every attack in Kunar Province alleged herein was jointly committed by al-Qaeda, the Taliban, and LeT.

130.   **Paktia, Paktika, and Khost Provinces (P2K).** LeT terrorists forward deployed inside Afghanistan to provide embedded support to the joint al-Qaeda/Haqqani Network cells operating in the P2K Provinces. By 2009 and 2010, "[t]he integration of the group's members with the Taliban and Haqqani Network also accelerated, … [which] enable[ed] LeT fighters to expand their presence to"[115] the P2K Provinces, where LeT operatives embedded in joint al-Qaeda/Haqqani Network cells to commit attacks against Americans.

131.   **Kabul Attack Network-Related Provinces.** LeT terrorists also forward deployed in and around Kabul, including the other provinces of the Kabul Attack Network, to provide embedded support to the joint al-Qaeda/Haqqani Network/Taliban cell that jointly committed Kabul Attack Network attacks.

---

[114] Lisa Curtis, *Pakistan*, The Heritage Foundation (Jan. 26, 2011), https://www.heritage.org/middle-east/commentary/pakistan.

[115] Tankel, *Lashkar-e-Taiba*, *supra* note 96, at 22.

55

### E. Jaish-e-Mohammed

132.    JeM is a Sunni extremist group founded by Masood Azhar with funding and support from Osama bin Laden. The organization is based in Pakistan, and one of its original goals was to unite Kashmir with Pakistan.

133.    JeM has long served as one of the Taliban's Punjabi allies in both Afghanistan and Pakistan.

134.    JeM has openly declared war against the United States, which designated JeM an FTO in 2001.[116]

135.    After the Taliban and al-Qaeda were routed by U.S. forces in the fall of 2001, "the Taliban and al-Qaida … receiv[ed] help from … Jaish-e-Mohammed"[117] in addition to the help the Taliban and al-Qaeda received from LeT and the Haqqani Network.

136.    In June 2008, JeM began shifting its focus from Kashmir to Afghanistan in order to escalate its support for attacks against U.S. and Coalition forces.

137.    JeM has a history of helping al-Qaeda and the Taliban commit spectacular suicide bombing attacks in Afghanistan and Pakistan. For example,

---

[116] National Counterterrorism Center, *Jaish-e-Mohammed (JEM)* (last updated Sept. 2013), https://www.dni.gov/nctc/groups/JEM.html.

[117] Associated Press, *Pockets of Taliban, al-Qaeda Fighters are Said to be Regrouping in Afghanistan*, St. Louis Post Dispatch, 2002 WLNR 1220832 (Mar. 2, 2002).

U.S. officials suspected that a successful suicide attack in Pakistan that killed a U.S. diplomat in 2006 was probably the work of terrorists associated with al-Qaeda, the Taliban, and JeM. And in Afghanistan, JeM "was a close ally" of the Taliban, with JeM's leader, Masood Azhar, being a "frequent visitor of Taliban leader Mullah Mohammed Omar."[118]

138.    JeM also has a history of working jointly with Lashkar-e-Taiba as a force multiplier for al-Qaeda and its Taliban and Haqqani Network allies. For example, JeM provided logistical support for a sophisticated suicide truck bombing attack against the civilians at the Marriott Hotel Pakistan on September 20, 2008, which was committed by al-Qaeda, Haqqani Network, and Lashkar-e-Taiba, resulting in the deaths of dozens and injuries of hundreds. Similarly, "there is evidence to suggest the main suspects [of the 2008 Mumbai attack], Lashkar-e-Toiba and its smaller ally Jaish-e-Mohammed, … may have co-ordinated the attack with elements from the Taliban and al-Qa'ida, operating out of Pakistan's tribal territories."[119]

139.    As one analyst put it in late 2008, "[o]ne plausible theory" is that JeM, LeT, al-Qaeda, the Taliban, Haqqanis, and Pakistani Taliban "have forged an

[118] Kathy Gannon, Associated Press, *Islamic militants threatened attacks on Bhutto if she returned to Pakistan*, Canadian Press (Oct. 18, 2007).

[119] Richard Beeston, *Washington crucial as attack exposes terror groups' deadly strategies*, Australian (Dec. 2, 2008).

alliance that is executing a strategy in the region to defend themselves against a new US-led strategy" in the Afghanistan/Pakistan theater.[120] Similarly, while discussing the failed Times Square bombing, the CNN international correspondent Nic Robertson observed in 2010 that "Jaish-e-Mohammed" had "ties to the Taliban and al Qaeda" through which JeM, the Taliban and al-Qaeda were engaged in "cooperation … at quite an effective level at the moment."[121] Indeed, by 2009, it was "now accepted" even within elements of the Pakistani military "that Al Qaeda, the Taliban and their allies among the Punjabi jihadis operate as a syndicate," and that such allies "included the Jaish-e-Mohammed."[122]

140.    JeM's participation in the al-Qaeda Terror Syndicate continued at all relevant times. For example, one security expert, addressing the state of play of al-Qaeda's global jihadist ambitions as of July 2012, testified as follows:

> al Qaeda's Senior Leadership is back on their heels. Key leaders have met their demise including, of course, Usama Bin Laden … Nevertheless, the ideology that Bin Laden and others … have propounded lives on. This ideology is the lifeblood that continues to sustain the vitality and growth of the global jihadist movement. Make no mistake: while the core of al Qaeda may be seriously and significantly diminished, … the threat now comes in various sizes, shapes and forms. There are still many and varied al Qaeda affiliates that continue to thrive, most notably in Yemen and the Sahel, and in

---

[120] *Id.*

[121] Highlights of U.S. Broadcast News Coverage of the Middle East from May 8, 2010 (Full Transcripts) Federal News Service Transcripts, 2010 WLNR 27829208 (May 9, 2010).

[122] Nirupama Subramanian, *Pakistan: two questions, multiple realities*, Hindu, 2009 WLNR 23938767 (Nov. 27, 2009).

Somalia. … At the same time, a veritable witch's brew of jihadists exists in Pakistan, including for example, the Haqqani network, Lashkar-e-Taiba (LeT), Tehrik-i-Taliban Pakistan …, Harkat-ul-Jihad al-Islami (HuJI), Jaish-e-Mohammed, and the Islamic Movement of Uzbekistan. We have seen in the past and continue to see ***substantial evidence of cooperation and collaboration between these latter groups and al Qaeda***.[123]

141.   Indeed, the U.S. designated JeM as a Foreign Terrorist Organization in substantial part because of the role JeM plays in augmenting the power of al-Qaeda and other al-Qaeda linked terrorists operating in Afghanistan and Pakistan as part of the Syndicate. As terrorism scholar Bill Roggio has explained, "[t]he US government has listed Jaish-e-Mohammed (JeM) as a Foreign Terrorist Organization and its leader, Massod Azhar, as a specially designated global terrorist for their ties to al Qaeda and other jihadist groups."[124]

142.   JeM supported al-Qaeda attacks by acting as an agent and proxy for al-Qaeda. JeM did this by directly seconding its fighters to al-Qaeda, for the latter to jointly deploy with the Taliban in eastern Afghanistan as part of al-Qaeda's Brigade 313. As a Pakistani newspaper editorialized in 2010:

---

[123] U.S. Senate Committee on Homeland Security & Governmental Affairs, *Hearing: The Future of Homeland Security: Evolving and Emerging Threats* (July 11, 2012) (Prepared Statement of Frank J. Cilluffo, Director, Homeland Security Policy Institute, George Washington Univ.) (emphasis added), *available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Cilluffo-2012-07-11.pdf.

[124] House Foreign Affairs Subcommittee on Asia and the Pacific and Terrorism, Nonproliferation, and Trade, *Hearing: Pakistan: Friend or Foe in the Fight Against Terrorism*, U.S. Cong. News, 2016 WLNR 21268984 (Jul. 12, 2016) (testimony of Bill Roggio).

Brigade 313 is al Qaeda's military organisation in Pakistan, and is made up of Taliban and allied jihadist groups. Members of Lashkar-e-Jhangvi, Harkat-ul-Jihad-al-Islami, Lashkar-e-Taiba, Jaish-e-Mohammed, Jandullah (the Karachi-based, al Qaeda-linked group), and several other Pakistani terror groups are known to have merged with al Qaeda in Pakistan, and the group operates under the name of Brigade 313.[125]

143.    Like its ally LeT, another of JeM's key roles is to serve as a "talent scout" for al-Qaeda, Taliban, and Haqqani terrorists in Afghanistan. The U.S. government itself recognized the key role that Masood Azhar and JeM have played in recruiting suicide bombers to support the Taliban and al-Qaeda's shared jihad in Afghanistan. Specifically, according to the Treasury Department, "In 2008, JEM recruitment posters in Pakistan contained a call from Azhar for volunteers to join the fight in Afghanistan against Western forces."[126] As a former senior Indian official summarized in March 2009, "[i]t is now established that while the Taliban's cadres in Afghanistan are primarily Afghans nationals, a substantial number of suicide bombers in Afghanistan are from militant groups drawn from Pakistan's Punjab province, like the Lashkar-e-Taiba and Jaish-e-Mohammed."[127]

---

[125] *Al Qaeda and Terror in Karachi*, The Express Tribune (Pakistan), 2010 WLNR 27040331 (Nov. 17, 2010).

[126] U.S. Dep't of Treasury, *Treasury Targets Pakistan-Based Terrorist Organizations Lashkar-E Tayyiba and Jaish-E Mohammed* (Nov. 4, 2010).

[127] G. Parthasaraty, *Pakistan Under Jihadi Threat*, Business Line (Mar. 5, 2009) (author is former High Commissioner to Pakistan).

144.    JeM plays a special role in al-Qaeda's Syndicate as the terrorist group responsible for taking the lead in collecting and paying out so-called "martyr payments" to the families of al-Qaeda-aligned suicide bombers who blow themselves up in Afghanistan. JeM facilitated martyr payments to many of the suicide bombers who committed the attacks in this case.

145.    Martyr payments provide a direct and powerful incentive to the perpetrators of suicide bombings. The knowledge that such payments are available makes people more likely to join terrorist causes, and more likely to carry out suicide attacks on behalf of FTOs. The payments are an important incentive not only from a strictly monetary standpoint, but also because they confer prestige on the recipients. Thus, a desire to earn martyr payments for one's family is a significant motivation in many suicide attacks.

146.    After the United States designated JeM an FTO in 2001, the organization began operating through a front group called Al Rehmat Trust ("ART"). Since then, ART has been involved in fundraising for JeM, including for militant training and indoctrination at its mosques and madrassas, as well as providing support to the families of terrorists who had been arrested or killed.

147.    ART was known to be a terrorist organization. For example, in 2006, Pakistani government forces raided an ART camp in Mansehra, Pakistan, arresting 15 people and seizing funds. Then, on November 4, 2010, the U.S. Treasury

61

Department designated ART as an FTO, stating: "Al Rehmat Trust, an operational front for JEM was designated for providing support to and for acting for or on behalf of JEM, and Mohammed Masood Azhar Alvi, JEM's founder and leader, was also designated today for acting for on behalf of JEM."[128] As such, ART was and is also a member of the al-Qaeda Terror Syndicate. It remains designated as an FTO to this day.

148.    In ART's capacity as "operational front" for JeM, the U.S. Treasury Department publicly stated that ART "has provided support for militant activities in Afghanistan and Pakistan, including financial and logistical support to foreign fighters operating in both countries. In early 2009, several prominent members of al Rehmat Trust were recruiting students for terrorist activities in Afghanistan."[129]

149.    "As of early 2009, al Rehmat Trust had initiated a donation program in Pakistan to help support families of militants who had been arrested or killed. . . . Al Rehmat Trust has also provided financial support and other services to the Taliban, including financial support to wounded Taliban fighters from Afghanistan."[130]

---

[128] *Treasury Targets Pakistan-Based Terrorist Organizations*, *supra* note 126.

[129] *Id.*

[130] U.S. Dep't of the Treasury, *Protecting Charitable Organizations – P*, https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-p.aspx.

150.    In addition to this "operational" role, ART was designated for raising funds for JeM. As part of the public designation, the then-Under Secretary for Terrorism and Financial Intelligence described the action as "an important step in incapacitating the operational and financial networks of these deadly organizations."[131] The Australian Government's current designation of JeM as a "terrorist organisation" states: "the Al-Rehmat Trust is the principal source of income for JeM and continues to operate despite being sanctioned by several countries."[132]

### F.  Kabul Attack Network

151.    The Kabul Attack Network is an operational manifestation of the terrorist Syndicate led by al-Qaeda and the Taliban, including the Haqqani Network. Specifically, the Kabul Attack Network is a set of terrorist cells, which includes members from each of the terrorist groups involved in the Syndicate, and focuses on attacks against targets in Kabul and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Kunar, Ghazni, and Zabul.[133] It is active around key waypoints and transit routes on the way to Kabul, including

---

[131] *Treasury Targets Pakistan-Based Terrorist Organizations*, *supra* note 126.

[132] Australian National Security, *Jaish-e-Mohammad* (last visited June 4, 2020), https://www.nationalsecurity.gov.au/Listedterroristorganisations/Pages/Jaish-e-Mohammad.aspx.

[133] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J. (Oct. 5, 2011).

Wardak, Ghazni City, and areas of Logar Province. The Kabul Attack Network has been responsible for suicide bombings and other attacks on Americans in Kabul and the surrounding areas.[134]

152.    The Kabul Attack Network's members include the Taliban (including the Haqqani Network), as well as al-Qaeda, Lashkar-e-Taiba, and other terrorist organizations active in the Kabul area. Each of these terrorist groups participates in Kabul Attack Network attacks and contributes personnel and resources to such attacks. Attacks committed by the Kabul Attack Network are committed jointly by al-Qaeda, Taliban, and Haqqani Network personnel. And funding for any of the involved terrorist groups contributed to the attacks.

153.    The Kabul Attack Network is led by Mullah Dawood, the Taliban's shadow governor for Kabul who is also a Taliban and Haqqani Network commander, and Taj Mir Jawad, a top commander in the Haqqani Network with a long history of high-profile attacks. Both Dawood and Jawad reported to Sirajuddin Haqqani, the dual-hatted al-Qaeda-Taliban terrorist ultimately responsible for the Kabul Attack Network's attack strategy.

154.    According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network specifically with the facilitation of

---

[134] Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

weapons and fighters into the area south of Kabul in Logar and Wardak."[135]

Additionally, senior Haqqani leaders operating from their traditional strongholds

often planned and executed terrorist attacks by the Kabul Attack Network,

sometimes even giving tactical advice during attacks.

155.    Many Plaintiffs, or their family members, were killed or injured in

attacks by the Kabul Attack Network. For example, on October 29, 2011, the

Kabul Attack Network executed a suicide-bombing attack that destroyed a large

armored bus transporting U.S. forces around Kabul and killed LTC David E.

Cabrera and SSG Christopher R. Newman, whose family members are Plaintiffs in

this case, and 16 others. *See infra* ¶¶ 464-480, 688-696. Almost four years later, on

August 22, 2015, the Kabul Attack Network murdered U.S. government

contractors (and Army veterans) Richard P. McEvoy and Corey J. Dodge, whose

family members are also Plaintiffs in this case, in a suicide-bombing attack against

a NATO convoy in Kabul. *See infra* ¶¶ 507-515, 655-665.

---

[135] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J. (Aug. 20, 2010).

## II.    National Bank of Pakistan Knowingly Provided Material and Substantial Support to Terrorists and Terrorist Organizations

### A. National Bank of Pakistan Provided Material Support to Members of the al-Qaeda Terror Syndicate and Their Agents

156.    By helping customers who were active terrorist operatives and fundraisers to directly fund, and funnel money to, members of the al-Qaeda Terror Syndicate, NBP knowingly provided substantial financial support to the Syndicate's member FTOs and the Taliban. NBP also provided financial services directly to the co-head of ART, which was an FTO and member of the Syndicate.

157.    Considering NBP's extensive and extended relationships with the above-described terrorist operatives, their own fundraising reports, and public reports of the terrorist programs such fundraising supported, NBP facilitated more than a million dollars of transactions directly to Syndicate operatives acting on behalf of al-Qaeda, the Taliban, the Pakistani Taliban, LeT, and JeM from 2007 through at least 2016.

**NBP's Customer Hafiz Khan Was a Terrorist Operative and Fundraiser for The Pakistani Taliban, a Member of the al-Qaeda Terror Syndicate That Killed Americans in Afghanistan**

158.    Hafiz Khan lived for approximately six decades in the Swat Valley in Pakistan before moving to Miami, Florida, where he became a U.S. citizen. From Florida, Hafiz Khan transferred funds to Pakistan for the purpose of supporting the Pakistani Taliban, and by extension al-Qaeda. In May 2011, a federal grand jury

indicted Hafiz Khan and others for providing and conspiring to provide material support to terrorists in violation of 18 U.S.C. §§ 2339A, and 2339B. After a 29-day jury trial, Hafiz Khan was convicted of all counts and sentenced to twenty-five years in prison. His conviction was upheld on appeal.

159.   In recorded conversations that took place in 2009 and 2010, Hafiz Khan stated that he was part of the Pakistani Taliban,[136] and declared that he supported both the Pakistani Taliban and al-Qaeda, including in their terror campaigns against the United States. In a conversation with his grandson, Alam Zeb, who was himself "associated with the [Pakistani] Taliban,"[137] Hafiz Khan referred repeatedly to "our Shagirdan [Taliban]."[138] He hoped that "Allah [would] make all the Taliban victorious over [the Americans], victorious over the whole world."[139] Upon hearing that the Taliban had killed four American soldiers in Afghanistan, Hafiz Khan declared that "[t]hey should kill four thousand more."[140] He hoped that a thousand Americans would die every month.[141] Upon hearing that the Taliban had shot down an American helicopter in Afghanistan, Hafiz Khan

---

[136] *See* Dawn, *FBI Informant Recalls*, *supra* note 2.

[137] *Khan* Trial Transcript, Doc. 835, at 54-55 (recording of conversation dated Sept. 20, 2010).

[138] *Khan* Trial Transcript, Doc. 833, at 166 (recording of conversation dated Sept. 19, 2009).

[139] *Khan* Trial Transcript, Doc. 837, at 165 (recording of conversation dated July 24, 2010).

[140] *Khan* Trial Transcript, Doc. 833, at 199 (recording of conversation dated Aug. 23, 2010).

[141] *Khan* Trial Transcript, Doc. 833, at 191 (recording of conversation dated July 5, 2010).

hoped that Allah would "bring death to 50,000 of them."[142] Upon hearing that the Pakistani Taliban had killed ten Christians, Hafiz Khan commented that he was "getting happy," and hoped that the American general in Afghanistan, "along with all his companions, may get eliminated at the hands of the Taliban."[143] Upon hearing the prediction that another terrorist attack would take place in the United States, he exclaimed, "Oh Allah, may it be! Oh Allah! Oh Allah! May Allah paralyze all their powers."[144] And he commented, after hearing news of an attempted bombing in New York, that "[t]hese al-Qaeda people are awesome people."[145] He hoped that Allah would destroy the Americans so they would "all die with this desire" to capture Osama bin Laden unfulfilled.[146]

160.   Hafiz Khan specifically condoned the use of suicide bombings—as long as those bombings targeted government and military personnel. He called for suicide bombings by the Pakistani Taliban.[147] He specifically endorsed an attack in the Pakistani legislature.[148] And when Hafiz Khan heard that the Pakistani Taliban

---

[142] *Khan* Trial Transcript, Doc. 833, at 200-202 (recording of conversation dated Sept. 22, 2010).

[143] *Khan* Trial Transcript, Doc. 837, at 193 (recording of conversation dated Aug. 16, 2010).

[144] *Khan* Trial Transcript, Doc. 833, at 187 (recording of conversation dated June 27, 2010).

[145] *Khan* Trial Transcript, Doc. 833, at 210 (recording of conversation dated July 1, 2010).

[146] *Khan* Trial Transcript, Doc. 833, at 196 (recording of conversation dated Aug. 16, 2010).

[147] *Khan* Trial Transcript, Doc. 833, at 209 (recording of conversation dated Aug. 22, 2009).

[148] *Khan* Trial Transcript, Doc. 833, at 154-55 (recording of conversation dated Aug. 12, 2009).

had carried out a suicide bombing at a public market, he opined that "this should be done at the government places" instead.[149]

161.    Hafiz Khan supported the al-Qaeda Terror Syndicate in at least two ways. First, he sent funds to the Pakistani Taliban, using his accounts at NBP to facilitate the transfers. Hafiz Khan would raise money in the United States from donors, family, or his own work. According to Hafiz Khan's expert witness CPA, Hafiz Khan deposited those funds in his NBP account in the United States and sent them to his accounts at NBP in Pakistan. He would then either instruct the NBP branch in Pakistan to permit third parties to make withdrawals, or give pre-signed checks to those third parties to make substantial withdrawals from the accounts at the branch. Those third parties either were members of the Pakistani Taliban or used the money for the Pakistani Taliban's benefit to acquire weapons and provide medical treatment to injured terrorists.

162.    The U.S. government demonstrated that Hafiz Khan used his NBP bank accounts to deliver money to the Pakistani Taliban and its agents through the following transactions:[150]

---

[149] *Khan* Trial Transcript, Doc. 833, at 207 (recording of conversation dated Oct. 9, 2009).

[150] *See* Superseding Indictment, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 103, at 7-10 (S.D. Fl. 2013). At trial, the government introduced bank records and recorded conversations to substantiate all of these transfers.

- On August 13, 2008, a Pakistani Taliban sympathizer and Proscribed Person[151] in Pakistan named Ali Rehman, who provided guns and money to the Pakistani Taliban,[152] obtained $10,000 from one of Hafiz Khan's NBP bank accounts.

- On January 22, 2009, Rehman obtained another $10,000 from one of Hafiz Khan's NBP bank accounts.

- On March 25, 2009, Rehman obtained another $10,000 from one of Hafiz Khan's NBP accounts.

- On December 3, 2009, Alam Zeb, who, as noted above, is Hafiz Khan's grandson and associated with the Pakistani Taliban, withdrew $2,300 from one of Hafiz Khan's NBP accounts. The evidence showed that at least some of this money went to Noor Muhammad, an injured Pakistani Taliban terrorist.[153]

- On November 10, 2010, Rehman obtained $5,000 from one of Hafiz Khan's NBP accounts.

163.   These transfers were part of, and helped fuel, a sophisticated financial and terrorist infrastructure that had been developed over a significant period of time. With this infrastructure in place, Hafiz Khan was able effectively to hand money directly to the Pakistani Taliban, enabling its attacks, including the shootings and suicide bombings that Hafiz Khan had hoped for.[154]

---

[151] A Proscribed Person is a person placed on a government list that is specifically created to help financial institutions avoid doing business with certain individuals.

[152] *Khan* Trial Transcript, Doc. 834, at 107 (recording of conversation dated Aug. 3, 2010).

[153] *Khan* Trial Transcript, Doc. 834, at 132-35 (testimony of Special Agent Ferlazzo).

[154] *Khan* Trial Transcript, Doc. 841, at 86-87 (expert testimony documenting the low prices of guns and explosives in the region); Ann Wilkens, *Suicide Bombers and Society: A Study on Suicide Bombers in Afghanistan and Pakistan*, at 15-16 & n.14 (2011), *available at* https://www.foi.se/rest-api/report/FOI-R--3058--SE (describing the low price of suicide bombs).

164.    The second way in which Hafiz Khan supported the Pakistani Taliban was through his "madrassa," a religious school he owned in the town of Galoch, in the Swat Valley.[155] Hafiz Khan bragged that his madrassa sent children to train with the leader of the Pakistani Taliban, and then went on to Afghanistan to kill Americans.[156] Indeed, the madrassa displayed a banner which read "Death to America."[157] The madrassa also provided shelter and other support for members of the Pakistani Taliban.[158] In the summer and autumn of 2009, the Pakistani Army closed and occupied Hafiz Khan's madrassa because they suspected it to be engaged in terrorist activity, including sheltering Hafiz Khan's son, Ikram Khan, a Pakistani Taliban commander, and other Pakistani Taliban operatives.[159] The madrassa was also funded, in part, by money transferred by Hafiz Khan to Pakistan through his NBP U.S. dollar accounts. Although Hafiz Khan left Pakistan before

---

[155] *See* Government's Sentencing Memorandum, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 802, at 27 (S.D. Fl. 2013) (explaining that the madrassa hosted Pakistani Taliban preachers, was a place where the Pakistani Taliban slept, was shut down by the Pakistani Army due to suspected terrorist links, and sent children to learn from a Pakistani Taliban leader how to kill Americans in Afghanistan).

[156] *Khan* Trial Transcript, Doc. 835, at 50 (conversation recorded on Aug. 28, 2010).

[157] *Khan* Trial Transcript, Doc. 854, at 74 (testimony of Special Agent Ferlazzo).

[158] *Khan* Trial Transcript, Doc. 835, at 55-57 (Special Agent Ferlazzo recounting conversation recorded on Sept. 20, 2010).

[159] *Khan* Trial Transcript, Doc. 836, at 59, 63 (Special Agent Ferlazzo testifies that the Army occupied the madrassa in August 2009 and is there until at least October).

the period relevant to this Amended Complaint, he exercised significant control over the madrassa from afar.[160]

**NBP's Customer James McLintock, Personally and Through Al-Ramah Welfare Organisation, Was a Terrorist Operative and Fundraiser for al-Qaeda and the Taliban, Members of the al-Qaeda Terror Syndicate That Killed Americans in Afghanistan**

165.    James Alexander McLintock was born in Scotland and raised a Catholic. He converted to Islam sometime around his university years, and traveled to Pakistan and Afghanistan and joined the mujahideen fighting the Soviet Union. In 1994, McLintock traveled to Bosnia to fight against the Serbs, and later returned to live in Pakistan.[161]

166.    A press report describing U.S. intelligence gathered from detainees in Guantanamo Bay, stated "American analysts believed McLintock, 49, helped to run the training camps in Afghanistan, where he lived at the time. A detainee assessment states: 'Abu Abdallah al-Scotlandi fought in Bosnia and has close ties to Ali Muhammad Abdul Aziz al–Fahkri, the primary trainer and leader of Khaldan training camp.'"[162]

---

[160] *Khan* Trial Transcript, Doc. 835, at 46-47 (testimony of Special Agent Ferlazzo).

[161] James Hall, *From Student to a Fighter Dubbed Tartan Taleban*, Scotsman (Dec. 4, 2004).

[162] Craig McDonald, *US Claims Tartan Taliban Suspect James McLintock Helped to Run Terror Training Camps in Afghanistan*, Daily Record (Aug. 24, 2014).

167.    U.S. Defense Department officials described the Khaldan camp as an al-Qaeda facility. This was the facility where Zacarias Moussaoui (who pleaded guilty for conspiring to kill Americans for al-Qaeda as part of the September 11 attacks) and Ahmed Ressam (who was convicted of plotting to bomb Los Angeles International Airport) trained for attacks on the United States.[163]

168.    Contemporaneous press reports indicated McLintock was arrested on three occasions on suspicion of terrorism. The first was in December 2001, near the Afghanistan-Pakistan border, by troops searching for Osama bin Laden. The second was in Manchester in 2003, in anti-terror raids. The third was in Pakistan in 2009. In connection with these arrests, he obtained a high profile as a suspected terrorist in the media.[164]

169.    On March 31, 2016, the U.S. Treasury Department publicly designated McLintock and RWO as SDGTs, finding that McLintock provided

---

[163] *See* Phil Hirschkorn, *Training Camp Links Millennium, Embassy Bombers*, CNN.com (July 5, 2001), https://www.cnn.com/2001/LAW/07/05/terror.trials.linked/; Moussaoui's presence at the camp was confirmed by Ressam's testimony in his criminal trial, as well as the indictment in Moussaoui's own U.S. criminal case, and by a statement of agreed facts in that case. *See United States v. Moussaoui*, No. 01-455-A (E.D. Va.).

[164] *See, e.g.*, Declan Walsh, *Scot Known as the 'Tartan Taliban' Held in Pakistan*, The Guardian (Apr. 12, 2009); *'Tartan Taliban' Arrested*, The Independent (Apr. 13, 2009); Abdul Taher, *Tartan Taliban Linked to Bombers*, The Times (UK) (Aug. 14, 2005); Ian Burrell, *Aid Worker Known as the 'Tartan Taliban' Is Released Without Charge*, The Independent (Jan. 31, 2002).

support and was "[l]inked to" al-Qaeda, the Taliban, and LeT.[165] The Treasury

Department stated that these designations were intended to "disrupt the fundraising

and support networks of al-Qaida, the Taliban, and Lashkar-e-Tayyiba."[166]

170.   The Treasury Department found that McLintock since at least 2007

has provided funding to al-Qaeda. This included cash contributions to senior

al-Qaeda commanders for the purpose of fighting Coalition forces in Kunar

Province in Afghanistan. Kunar Province was a hub of terrorist activity. In 2007, it

saw 973 insurgent attacks, making it the second most active Afghan province after

Kandahar.[167] McLintock's funding also included using RWO as an al-Qaeda front

for financing insurgents and training them to manufacture IEDs.

171.   The Treasury Department also found that since at least August 2009,

McLintock, through RWO, provided funding to LeT.

172.   The Treasury Department also found that at least since 2010,

McLintock has financed the Taliban's attacks against Coalition forces in

Afghanistan, including through regular cash payments delivered by courier to

---

[165] U.S. Dep't of the Treasury, *Counter Terrorism Designations* (Mar. 31, 2016), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20160331.aspx.

[166] U.S. Dep't of the Treasury, *United States and Saudi Arabia Designate Terrorist Fundraising and Support Networks* (Mar. 31, 2016), https://www.treasury.gov/press-center/press-releases/Pages/jl0400.aspx.

[167] Brian Glyn Williams, *Afghanistan's Heart of Darkness*, CTC Sentinel, Vol. 1, No. 12 (Nov. 2008), https://www.ctc.usma.edu/afghanistans-heart-of-darkness-fighting-the-taliban-in-kunar-province/.

senior Taliban commanders through RWO, which provided funds for attacks in Kunar province, and by recruiting boys to become terrorists by paying them money. McLintock himself claimed that he financially supported 3,500 terrorists in Pakistan and 1,000 terrorists in Afghanistan.

173.    Among other contributions, McLintock transferred thousands of U.S. dollars to Shaykh Aminullah, who has been designated an SDGT since 2009 for providing material support to al-Qaeda and the Taliban. Shaykh Aminullah was, among other things, the head of the Ganj Madrassa in Pakistan, which was the first madrassa ever to be targeted for sanctions by the United States (in 2013). In explaining the decision to designate the madrassa, the U.S. government explained that it served "as a training center and facilitates funding for al-Qa'ida, Lashkar-e Tayyiba, and the Taliban."[168] Specifically, "students were trained to become bomb manufacturers and suicide bombers" for these terrorist groups.[169] The madrassa was found to be "at the heart of the financial and logistical support network" that provides "the fighters, training, and supplies for" al-Qaeda, LeT, and the Taliban "to carry out their acts of violence against coalition forces and civilians alike."[170]

---

[168] U.S. Dep't of the Treasury, *Treasury Designates Senior Al-Qa'ida Official and Terrorist Training Center Supporting Lashkar-E Tayyiba and the Taliban* (Aug. 20, 2013), https://www.treasury.gov/press-center/press-releases/Pages/jl2144.aspx.

[169] *Id.*

[170] *Id.*

Indeed, U.S. intelligence reported that McLintock gave Shaykh Aminullah $2,600 after Aminullah said he needed it to train his madrassa students, adding that 200 of them had been sent to fight in Afghanistan.

174.   In supporting the al-Qaeda Terror Syndicate, McLintock relied on his banking relationship with NBP. On RWO's website and other materials soliciting donations, it prominently displayed its bank account information at NBP as a preferred destination for donations. Banking with a major Pakistani financial institution thereby lent RWO an air of legitimacy.

175.   McLintock's fundraising and support for terrorism were significant. He regularly made cash payments to members of the al-Qaeda Terror Syndicate of several thousand dollars each. The Treasury Department estimated that from April 2012 until April 2013, McLintock raised over $180,000 for RWO. RWO itself reported that from May 2012 to December 2013 it received donations totaling approximately $330,000. And as noted above, McLintock was providing funds and other resources to the Syndicate from at least 2007 (and possibly beforehand) until at least 2016. Given this rate and duration of donations, it is likely RWO received well over $500,000 through its NBP account during the time period relevant to Plaintiffs' claims.

**NBP Customer Ghulam Murtaza Used His NBP Account to Fund Al-Rehmat Trust, a Designated Foreign Terrorist Organization and Alter-Ego for the FTO JeM, Which Was a Member of the al-Qaeda Terror Syndicate that Provided Financial and Logistical Support to al-Qaeda and Taliban Terrorists in Afghanistan**

176.    Al-Rehmat Trust ("ART"), which the U.S. Treasury Department designated an FTO in November 2010 as an "operational front" for JeM, as well as JeM's agent/proxy and chief fundraiser, also uses NBP for its fundraising activities.

177.    In the early 1990s, Masood Azhar, the founder of JeM and co-head of ART (with Ghulam Murtaza) developed a successful terrorist finance playbook for another Pakistani FTO, Harkat-ul-Mujahedeen ("HuM"), *i.e.*, the publication of a monthly magazine designed to recruit and raise funds:

> With a print run of about 1,000, nearly all of which were distributed free at mosques, the magazine detailed the heroic accomplishments of the mujahedeen in Afghanistan, inspiring a reverence among mosque-goers that translated into a steady stream of new recruits for the group. And the publication of the group's bank account number in each issue helped bring in substantial donations every year. The magazine's success quickly propelled Azhar into Harkat-ul-Mujahedeen's leadership ranks.[171]

178.    Azhar followed this same playbook with ART, using the newsletter *Al Qalam*. *Al Qalam* is one of JeM's flagship newsletters, and has been published weekly, in print and online, since at least the mid-2000's. Like the magazine Azhar

---

[171] Yudhijit Bhattacharjee, *The Terrorist Who Got Away*, N.Y. Times Magazine (Mar. 19, 2020).

managed for HuM, *Al Qalam* glorified the Taliban and attacks on Americans in Afghanistan.

179.  *Al Qalam* is widely distributed and read in Pakistan, and is printed in Urdu and English, indicating a target audience beyond Pakistan. Its website is designed to provide the same content as the weekly printed version.

180.  Beginning at least as early as March 2007, ART published fundraising appeals in *Al Qalam* that encouraged JeM supporters to donate to ART campaigns. These appeals closed with the following deposit information for donors: "Account No: 10560-9 in the name of Ghulam Murtaza—National Bank, Satellite Town, Branch Code No: 957 Bahawalpur." NBP currently lists Branch 957 at "Bahawalpur S.T." on its website.[172]

181.  There were at least four different *Al Qalam* solicitations between at least as early as March 2007 and going at least through January 2014 that referenced Murtaza and the NBP account.

182.  Two advertisements, which appeared on the *Al Qalam* website from at least October 2007 to at least January 2014, explicitly solicited funding for "martyr payments," meaning payments to terrorists supported by JeM who were imprisoned or injured, or to their families if the terrorist was killed in action. The

---

[172] *See* National Bank of Pakistan, List of Open NBP Branches during lockdown under COVID-19 (Conventional) (Last visited June 5, 2020), https://www.nbp.com.pk/misc/coventional-open-branches.pdf.

first of these stated: "Quite an endeavor is underway for establishing the supremacy of the Faith . . . devotees are marching ahead." The flyer then listed several "welfare projects," including "above all providing sustenance to the families of martyrs, those who are incarcerated and Muslim victors." The flyer stated: "All these tasks are underway and, thanks to Allah, are progressing by the day . . . . Under the banner of Al-Rahmat Trust." The solicitation continued "You would definitely want your money to be spent on these welfare projects," before closing with Murtaza's account details at NBP.

183.   The second "martyr payment" solicitation in *Al Qalam*, also "live" on its website from at least October 2007 to at least January 2014, included: "Struggle for religious supremacy is on the rise and, by the grace of Allah, is becoming fruitful. Providing sustenance to the families of the martyrs is continuing and is on the rise." It exhorted readers to "Walk side by side on the path of good with Al-Rahmat Trust," and again closed with Murtaza's NBP account information.

184.   Both of these solicitations promised that donations would produce returns, with respect to the "projects" detailed, "many fold." One offered the chance to "barter one for seven hundred."

185.   The donations these flyers solicited, to be paid into an NBP account, were central to the U.S. government's designation of ART as an "operational front" and fundraising arm of JeM in November 2010. As the designation stated,

79

ART's "support for militant activities in Afghanistan and Pakistan" included "recruiting students for terrorist activities in Afghanistan"[173] And as the Treasury Department explained, "[a]s of early 2009, al Rehmat Trust had initiated a donation program in Pakistan to help support families of militants who had been arrested or killed. . . . Al Rehmat Trust has also provided financial support and other services to the Taliban, including financial support to wounded Taliban fighters from Afghanistan."[174] The promise of payments to such recruits in case of injury, or to their families in case of death, is a well-established incentive for engaging in terrorist violence. JeM thus raised money to support al-Qaeda's and the Taliban's terrorist campaign against Americans by making martyr payments to the Syndicate's suicide bombers and providing medical care to wounded Taliban terrorists.

186.    *Al Qalam* also published two additional fundraising solicitations, purportedly to build mosques in Pakistan. One appeared on the *Al Qalam* website from at least March 2009 to June 2013, while the other appeared from at least February 2011 to at least September 2013. The subject of these appeals—the building of mosques—was also central to the Treasury Department's designation

---

[173] *Treasury Targets Pakistan-Based Terrorist Organizations*, *supra* note 126.

[174] U.S. Dep't of the Treasury, *Protecting Charitable Organizations – P* (last visited June 4, 2020), https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-charities_execorder_13224-p.aspx.

of ART as an FTO. As the designation explained, "Al Rehmat Trust has also been involved in fundraising for JEM, including for militant training and indoctrination at its mosques and madrassas."[175] Indeed, JeM's headquarters in Bahawalpur, Pakistan includes a large and well-known mosque.

187.    JeM and ART did not hide their many fundraising appeals. In November 2011, the Jamestown Foundation, a global research and analysis think tank, published a report on JeM stating that ART "openly carries out fund raising activities using legitimate banking channels."[176] The article cited a contemporaneous flier posted on the *Al Qalam* website, seeking donations to Murtaza's NBP account.

188.    NBP's knowledge of Murtaza's roles with ART and JeM was not limited to the *Al Qalam* fundraising appeals. Murtaza has long been known to be a close associate of JeM founder Masood Azhar, and a high-profile terrorist figure in his own right; prior to managing ART, Murtaza was head of the Punjab chapter of HuM, which has been a designated FTO since 1997.

189.    NBP's complicity with ART's fundraising continued well after the United States designated ART as a terrorist organization. In 2016, Indian media

---

[175] *Treasury Targets Pakistan-Based Terrorist Organizations*, *supra* note 126.

[176] Animesh Roul, *Jaish-e-Muhammad's Charity Wing Revitalizes Banned Group in Pakistan*, Terrorism Monitor (Nov. 11, 2011), https://jamestown.org/program/jaish-e-muhammads-charity-wing-revitalizes-banned-group-in-pakistan/.

reported that "although "some countries have proscribed al-Rahmat—the United States, in November 2010, imposed sanctions calling it the 'operational front' for the Jaish, and the United Arab Emirates has followed—it continues to operate through publicly-advertised bank accounts in Pakistan."[177] Around the same time, other media sources reported both that Murtaza had likely been personally involved in a recent terror attack in India, and that "[t]he accounts of Al Rahmat Trust in National Bank . . . are handled by" Murtaza.[178] In 2018, Indian media reported that Murtaza was still heading ART.[179]

190.    Based on these sources, ART and Murtaza have been openly using accounts at NBP to raise funds from at least 2007 through at least January, 2016.

### B. National Bank of Pakistan Acted With the Requisite Scienter for Primary and Secondary Liability

191.    As set forth in detail below, NBP knew each of the following facts: (1) that it was providing financial services and funds to terrorists and terrorist organizations in the al-Qaeda Terror Syndicate; (2) that these terrorists and terrorist organizations were actively engaged in acts of international terrorism directed

---

[177] Praveen Swami, *With Backing of ISI, Jaish-e-Muhammad Rises Like a Phoenix in Pakistan*, Indian Express (Jan. 11, 2016).

[178] Rajesh Ahuja, *Pathankot Attackers Called Head of Jaish Charity Organisation*, Hindustan Times (Jan. 18, 2016).

[179] Ankit Kumar, *Masood Azhar's Jaish-e-Mohammad Sells Medicines to Collect Funds from Pakistan*, Hindustan Times (May 21, 2018).

against Americans; (3) that NBP's provision of financial services and funds to these terrorists and terrorist organizations served an important role in financing their operations and facilitated violence against Americans in the region; and (4) that providing financial services to these terrorist and terrorist groups was illegal precisely because it would facilitate terrorist violence.

192.    Moreover, although the transactions at issue in this case were part of NBP's commercial banking business, they are not properly regarded as routine or innocuous. Instead, they involved patterns of suspicious behavior that were recognizable to prosecutors, bank regulators, and to NBP itself. Further, NBP ignored the results of its Know Your Customer and Customer Due Diligence processes to provide accounts and financial services to terrorists. These repeated and knowing acts were substantial deviations from NBP's own internal policies, which were mandated by its regulator, SBP. Such substantial deviations from standard practices are, by definition, not "routine," particularly when the beneficiaries were individuals and groups NBP knew to be terrorists.

193.    NBP knew that its customers and their transactions were connected to terrorism based on internal policies and procedures that alerted it to the use of its accounts, financial services, and good name and legitimacy by Hafiz Khan, McLintock/RWO, and Murtaza/ART, all of which were either prosecuted or

designated by the United States for funding members of the al-Qaeda Terror Syndicate.

194.   Those policies and procedures included rigorous and clear "Know Your Customer" requirements that obligated NBP staff to verify the identity of any client, which entailed, among other things, "[c]onsulting lists of *known or suspected* terrorists or terrorist organizations provided to the financial institution *by any government agency* to determine whether a client appears on any such list." (Emphasis added). The "Types of Customers NBP will not accept" included "Entities / persons appearing in OFAC/EU/UN lists and any other list recommended in each jurisdiction where NBP operates" and "Entities/persons appearing in negative sanctions lists," including "those **who are known for their association with such entities and persons**, whether under the proscribed name or a different name." (Emphasis in original). It is clear from these policies that NBP actually monitored "negative sanctions lists," such as U.S. and U.N. terrorist designations in real time, and consulted them regularly. NBP could not have meaningfully screened customers according to its policies otherwise.

195.   NBP did not limit itself to "negative lists" maintained by outside entities. The "Sanctions Lists that NBP will use" included the "Bank's Internal List."

196.   Accounts for purported charities, and madrassas in particular, were always considered "high risk." NBP's policies stated the "Following entities / customers will be high risk customer," and listed (among others) "Religious Organization," "NGO," "NPO" (non-profit organization), "Madrassas," and "Charitable organizations." NBP's policies provided that "[a]ccount opening" for these entities "will be subject to enhanced due diligence . . . of the entity, its signatories and members of the governing body. Additionally, under enhanced due diligence, all associates/members will be subject to scrutiny through negative lists linked with CAOP to assure that these persons are not affiliated with any prescribed [sic] entity/entities."

197.   In addition to "enhanced due diligence," any such "high risk" account required approval by senior staff of NBP. According to the bank's internal manuals, "[f]or all High Risk Accounts approval from Compliance Group Head Office will be required. Compliance Group Head Office will accord approval on the recommendations of Regional Head & Branch Manager (Who must conduct the Enhanced Due Diligence of all high risk customers before requesting for approval from head office)." NBP even specified how such approval should be sought: "For getting approval from Head Office, email should be sent to sashami@nbp.com.pk and AMLTeam@nbp.com.pk."

198.   NBP did not limit its diligence—"enhanced" or otherwise—to checking "negative lists" such as lists of sanctioned persons and entities. For all NBP accounts, an "'account opening application form' must be submitted and should be signed by the Branch Operations Manager / Branch Manager after he has satisfied himself of the *bonafides, respectability and genuineness* of the prospective account holder *beyond a doubt*." (Emphasis added). "Accounts which belong to individuals / entities with *dubious character*, or where there are *reasonable grounds for suspicion* in the conduct / operations should be referred to Regional Management Committee through Regional Operations Chief for review / decision to close the account." (Emphasis added).

199.   NBP also did not limit its customer diligence to the moment it opened an account. Instead, NBP stated that it would "keep[] that [Know Your Customer] information up to date" and informed staff: "It is not correct to think of KYC as a one-time process towards commencing the relationship with the customer rather it is a continuing process till the relationship exists."

200.   Consistent with that directive, NBP continually monitored high risk accounts. In conducting the required "Ongoing Monitoring of Accounts," all "High Risk Category accounts"—defined as accounts for NGOs, NPOs, Trusts, Madrassas, Charities, Welfare Associations, and accounts for collection of donations—"must be reviewed and monitored to ensure that these organizations,

86

their authorized signatories, members of their governing body and the beneficial

owners are not linked with any proscribed entities and persons, whether under the

same name or a different name. In case of any positive match, Branch will

immediately refer the case to Compliance to take action as per law."

201.    In addition, when conducting ongoing monitoring, NBP's policies

provided that "[s]pecial attention shall be paid on cash based transactions

considering examples of *Red Alerts* given in Annexure-III to the Manual."

Annexure III provided "EXAMPLES OR CHARACTERISTICS OF

SUSPICIOUS TRANSACTIONS (RED ALERTS) THAT MAY BE A CAUSE

FOR INCREASED SCRUTINTY FOR AML/CFT PURPOSES," which, in

addition to cash transactions, included "[a]n account opened in the name of a legal

entity that is believed to be involved in the activities of an association or

foundation whose aims are related to the claims or demands of a terrorist

organization."

202.    NBP also detailed its customer due diligence policies in

questionnaires its executives submitted to the Wolfsberg Group, an association of

13 global banks whose stated aim is to develop financial services industry

standards, during the period relevant to Plaintiffs' claims. From 2010 to the

present, NBP has regularly checked "Yes" for each of these questions: (1) "Does

the FI[180] have a requirement to collect information regarding its customers'

business activities?"; (2) "Does the FI screen customers and transactions against

lists of persons, entities or countries issued by government/competent

authorities?"; and (3) "In addition to inspections by the government

supervisors/regulators, does the FI client have an internal audit function or other

independent third party that assesses AML policies and practices on a regular

basis?" Thus, NBP has consistently represented that it collects and checks

information for all its banking customers that would trigger numerous red flags

with respect to Khan, McLintock/RWO, and Murtaza/ART, and that NBP's

internal audit function would identify the staff's "practices," including deviations

from policy, regarding these customers.

203.   NBP's internal policies were guided by and based on requirements

from its regulator, SBP. In 2009, SBP issued one of many "Circulars" to all banks

in Pakistan. Annexure I to Circular Letter No. 7 detailed KYC and CDD

requirements. SBP explained: "With the view to preserve integrity and safety of

the financial system, it is expedient to prevent the possible use of the banking

sector for money laundering and terrorist financing."[181]

---

[180] In the Wolfsberg questionnaires, "FI" is short for "Financial Institution."

[181] State Bank of Pakistan, ANNEXURE-I, Attachment to BPRD Circular Letter No.07 of 2009, at 1 (2009), http://www.sbp.org.pk/bprd/2009/Annexure-I-CL7.pdf.

204.   The baseline requirement was that "Banks / DFIs shall formulate and put in place, a comprehensive CDD / KYC policy duly approved by their Board of Directors and in case of branches of foreign banks, approved by their head office, and cascade the same down the line to each and every business location / concerned officers for strict compliance."[182] Customer due diligence was to be conducted when, among other things, "(a) establishing business relationship; (b) conducting occasional transactions above rupees one million whether carried out in a single operation or in multiple operations that appear to be linked; (c) carrying out occasional wire transfers (domestic / cross border) regardless of any threshold; (d) there is suspicion of money laundering / terrorist financing."[183]

205.   Annexure I was not simply concerned with surface level due diligence, but also required banks to "identify the beneficial ownership of accounts/ transactions by taking all reasonable measures" and "determine whether the customer is acting on behalf of another person, and should then take reasonable steps to obtain sufficient identification data to verify the identity of that other person."[184] For any customer who was a "legal person," banks in Pakistan "are required to take reasonable measures to (i) understand the ownership and control

---

[182] *Id.*

[183] *Id.*

[184] *Id.* at 2.

structure of the customer (ii) determine that the natural persons who ultimately

own or control the customer. This includes those persons who exercise ultimate

effective control over a legal person or arrangement."[185]

206. SBP also "advised that CDD / KYC is not a one time exercise to be

conducted at the time of entering into a formal relationship with customer / account

holder. This is an on-going process for prudent banking practices."[186]

207. All of the above was considered standard diligence. SBP made clear

that bank AML/CTF policies should provide for "Enhanced Customer Due

Diligence depending upon the customers' background, country of origin, public or

high profile position, nature of business, etc."[187] SBP's Circular stated: "Banks /

DFIs shall conduct enhanced due diligence when: (a) dealing with high-risk

customers, business relationship or transaction including the following; . . . legal

persons or arrangements including non-governmental organizations (NGOs) / not-

for-profit organizations (NPOs) and trusts / charities . . . high net worth customers

with no clearly identifiable source of income; and . . . customers holding public or

high profile positions." [188]

---

[185] *Id.*

[186] *Id.* at 3.

[187] *Id.* at 1.

[188] *Id.* at 4.

208.   Under SBP's requirements, if a bank at any time was "not able to satisfactorily complete required CDD / KYC measures including identity, beneficial ownership or information on purpose and intended nature of business relationship," then the banking relationship was to be terminated and the suspicious behavior reported to authorities.[189]

209.   SBP reiterated these requirements in two documents circulated to all banks in Pakistan in 2012. The first document recommended that "enhanced due diligence" be performed on suspicious customers, a process which could "include . . . Obtaining additional information on the customer (occupation, volume of assets, address, information available through public databases, *internet*, etc)."[190]

210.   The second document again required that banks engage in ongoing monitoring of "all business relations with customers,"[191] and stated: "Banks/DFIs shall not provide any banking services to proscribed entities and persons or to those who are associated with such entities and persons, whether under the

---

[189] *Id.*

[190] State Bank of Pakistan, *AML/CFT Guidelines on Risk Based Approach for Banks & DFIs*, at 5 (2012), http://www.sbp.org.pk/bprd/2012/C2-BRA-Guidelines.pdf. (Emphasis added).

[191] State Bank of Pakistan, *Anti-Money Laundering and Combating the Financing of Terrorism (AML/CFT) Regulations for Banks & DFIs*, at 7 (Sept. 13, 2012), http://www.sbp.org.pk/bprd/2012/C2-AML-CFT-Regulations.pdf.

proscribed name or with a different name. The banks/DFIs should monitor their relationships on a continuous basis and ensure that no such relationship exists."[192]

211.   SBP also issued specific conditions for banking relationships with NGOs and "charities," including a requirement to "conduct enhanced due diligence (including obtaining senior management approval) . . . to ensure that these accounts are used for legitimate purposes and the transactions are commensurate with the stated objectives and purposes."[193] Furthermore, "individuals who are authorized to operate these accounts and members of their governing body should also be subject to comprehensive CDD. Banks/DFIs should ensure that these persons are not affiliated with any proscribed entity, whether under the same name or a different name."[194]

212.   SBP further contemplated that NBP and other banks would monitor newspapers and other publications for references to the bank's accounts: "In case of advertisements through newspapers or any other medium, especially when bank account number is mentioned for donations, Banks/DFIs will ensure that the title of the account is the same as that of the entity soliciting donations."[195] Given that "enhanced due diligence" could include Internet searches on bank customers, NBP

---

[192] *Id*. at 8.

[193] *Id*. at 9.

[194] *Id*. at 10.

[195] *Id*.

likely reviewed references to its own accounts online and in Pakistani publications as well. NBP would be particularly likely to do so for customers it knew solicited donations (as even minimal KYC and CDD efforts revealed), especially where the customers' public profile includes associations with terrorists.

213.   Indeed, it is not only likely, but highly likely, that NBP saw any mention of its name on the Internet during the relevant period (particularly when combined with account information) because NBP employed a "Media Manager" whose job description (per her profile on LinkedIn) includes "continuously monitor[ing] online public relations." NBP's monitoring efforts revealed that its customers were notorious terrorists, and that some were using their NBP accounts to solicit donations, including explicitly for "martyr payments" and other terrorist causes. More broadly, SBP's regulations put NBP on notice that terror financing would cause terrorist violence in the region.

214.   NBP also knew that its policies and procedures for preventing money laundering and terrorist finance were under scrutiny. During the time period relevant to this Complaint, NBP was involved in legal proceedings in France involving alleged money laundering charges (NBP was convicted and fined 200,000 euros by French authorities in December 2008). Separately, in August 2008, the Hong Kong Monetary Authority cited NBP for numerous deficiencies in its Hong Kong branch's anti-money laundering and terrorist finance practices.

215.   Thus, during the period prior to the attacks that injured Plaintiffs, NBP not only issued policies and procedures relating to AML/CTF and KYC requirements but was under active pressure from various regulators to improve implementation of those policies and procedures.

216.   Therefore, NBP had a clear affirmative duty to monitor its customers and their accounts and to flag, report, and block suspicious transactions.

217.   It also had a clear affirmative duty to monitor publicly available information and allegations about its customers, including Hafiz Khan, McLintock/RWO, and Murtaza/ART, and about the use of its accounts.

218.   As set forth in greater detail below, application of NBP policies and SBP requirements to the financial accounts and transactions of Hafiz Khan, McLintock/RWO, and Murtaza/ART raised "red flags" for NBP staff from the branch level to the "Head Office" and upper management.

219.   NBP intentionally ignored these red flags for years, allowing each of the NBP customers discussed herein to continue to funnel significant funds to members of the al-Qaeda Terror Syndicate, and with respect to McLintock/RWO and Murtaza/ART, to continue to benefit from NBP's good name and legitimacy in Pakistan and elsewhere.

**NBP Knew About Hafiz Khan's Terrorist Activities**

220.   As Hafiz Khan's own defense counsel explained, money "would go into the National Bank of Pakistan in the United States," and "then it would go over to Pakistan and someone would take it out at that end."[196] Hafiz Khan's trial expert, a CPA, confirmed that Hafiz Khan had an NBP account in the United States.[197] The government stated that Hafiz Khan had at least two U.S. dollar-denominated bank accounts with NBP, with account numbers ending in 451 and 522, that received money from the United States and disbursed it to support the Pakistani Taliban.[198] During trial, Hafiz Khan's accomplice Ali Rehman referred to a third account ending in 540.[199]

221.   Many of Hafiz Khan's financial transactions funded a madrassa and mosque in Pakistan, and thus they were the beneficiaries of his NBP accounts. Both madrassas and mosques are defined by NBP's policies as a type of "High Risk Customer." Furthermore, even the most limited diligence on Hafiz Khan, his family, and Ali Rehman, all of whom NBP staff interacted with directly, would reveal their associations with terrorist groups, including the Pakistani Taliban.

---

[196] *Khan* Trial Transcript, Doc. 845, at 90 (questions between defense counsel and defense summary witness).

[197] *Id.* at 90-91.

[198] *Khan* Trial Transcript, Doc. 834, at 108-09 (testimony of Special Agent Ferlazzo).

[199] *Khan* Trial Transcript, Doc. 847, at 37 (testimony of Ali Rehman).

222.   Hafiz Khan's transactions were suspicious enough to trigger the United States government's investigation, which ultimately led to Hafiz Khan's conviction for providing material support to terrorists and terrorist organizations. It was open, obvious, and transparent to NBP that Khan was involved in these transactions, and, with complete access to the account information, NBP had far greater real-time visibility into the transactions than did the U.S. government.

223.   Indeed, NBP staff were personally involved in Hafiz Khan's transactions. Ali Rehman—a "Proscribed Person" in Pakistan who was indicted by the United States for providing material support to the Pakistani Taliban, and was described by Hafiz Khan as his contact who purchased guns for the Pakistani Taliban—made multiple withdrawals of amounts up to $10,000 each from Hafiz Khan's NBP accounts.

224.   Rehman testified in Hafiz Khan's trial that in order to withdraw this money, Rehman had to physically travel to NBP's branch in Mingora, Pakistan. There, Rehman provided a check signed by Hafiz Khan to the bank manager.

225.   The bank manager had been instructed by Hafiz Khan to pay out money on the check, but Rehman was still required to sign the check himself, and the bank manager would physically give the money to Rehman.[200] Hafiz Khan

---

[200] *Khan* Trial Transcript, Doc. 847, at 37-38 (testimony of Ali Rehman).

testified to the same effect, averring that the reason the manager personally

supervised the transfers was to prevent fraud.[201]

226.   Thus, NBP bank managers were interacting personally with both

Hafiz Khan and with Rehman in connection with illegal transfers in order to ensure

that the transfers were effected as Hafiz Khan intended.

227.   A similar interaction occurred when Hafiz Khan released funds to his

grandson Alam Zeb, who was associated with the Pakistani Taliban. Hafiz Khan

called the branch manager of NBP's branch in Deolai, Pakistan, to instruct him to

release the funds to Zeb, who picked up the funds in person from the NBP branch

manager.[202]

228.   In the course of processing these and other transactions for Hafiz

Khan, NBP's policies provided notice that the transfers and withdrawals were

unusual and suspicious. NBP's "Policy Manual on Anti Money Laundering,"

which was in effect from 2008 to 2010, noted that the U.S. "State Department cites

the following examples as indications of terrorist financing," and listed behavior

that Hafiz Khan engaged in, including "[u]se of multiple personal and business

accounts to collect and funnel funds to a small number of foreign beneficiaries,"

"[b]eneficiaries are located in a problematic foreign jurisdiction," and "[s]tated

---

[201] *Khan* Trial Transcript, Doc. 850, at 96-97 (testimony of Hafiz Khan).

[202] *See Khan* Trial Transcript, Doc. 834, at 118-19 (conversation recorded Nov. 24, 2009).

occupations of those engaging in transactions that are not commensurate with the level of activity."

229.  These criteria were triggered in Hafiz Khan's case. Hafiz Khan had at least two NBP accounts in Pakistan, and used them to distribute significant funds to Pakistani beneficiaries, primarily Rehman, who was neither a relation nor a business associate of Hafiz Khan's, but was listed as a "Proscribed Person" by the Pakistani government.

230.  A Proscribed Person is a person on a Pakistani government list that is specifically created to help financial institutions avoid doing business with those people. Indeed, NBP's policies specifically state that "the Bank is prohibited from providing any banking services to proscribed entities and persons *or to those who are known for their association with such entities and persons*, whether under the proscribed name or with a different name." NBP knew that Hafiz Khan was associated with Rehman, as Khan instructed NBP branch managers to transfer funds to Rehman. At a minimum, Rehman's involvement with Hafiz Khan's transactions raised serious concerns about their purpose.

231.  The recipients of Hafiz Khan's fund transfers also lived in or near an extremely "problematic" jurisdiction: the Swat Valley. This was another red flag NBP ignored. NBP, which had branches in Swat and the surrounding areas, and its staff in the area knew that during the relevant time period, the Pakistani Taliban

was extremely active in the area. Hundreds of attacks had occurred in the region starting in 2007,[203] and the Pakistani Army was cracking down on the insurgency in Swat. NBP accordingly would know that any financial support for the Pakistani Taliban in Swat would likely translate directly into violence in the region—whether the money was used for explosives, guns, training, recruitment, or to care for terrorists.

232.   Hafiz Khan's "stated occupation" was another red flag NBP ignored. NBP knew, based on "Know Your Customer" verification all NBP branches were required to complete, that Hafiz Khan was an imam of a mosque, a relatively low-paid position that earned him "close to $3,000" per month.[204] And NBP, seeing his fund transfers to Rehman and others, saw that they were not commensurate with his income. NBP's internal policies would reveal this significant disparity between Hafiz Khan's income and the size of his transfers.

233.   Indeed, the amounts transferred raised red flags even independent of Hafiz Khan's occupation. NBP's internal policies in effect from at least 2005 through 2010 required NBP staff to review transactions involving an amount of 500,000 Pakistani rupees (approximately $5,800 in 2010) or more and screen them

---

[203] *Khan* Trial Transcript, Doc. 840, at 209-11, 841, at 9 (expert testimony about outbreak of TTP terrorism in Swat Valley from 2007 through 2008, extending into 2009).

[204] *Khan* Trial Transcript, Doc. 842, at 65 (testimony of Anwar Ansari).

for any indicia of suspicious activity. Between 2008 and 2010, Khan's transfers of $10,000 U.S. dollars significantly exceeded 500,000 Pakistani rupees.

234.    Hafiz Khan's transactions also involved an unusual process, *i.e.*, the use of pre-signed checks. SBP's "Examples of Suspicious Transactions," in effect from 2004 on, specifically identified "[f]requent withdrawal of large amounts by means of cheques" as inherently suspect.[205]

235.    Similarly, NBP's own internal policy manuals noted that SBP's "Regulation M-5 of Prudential Regulations for Corporate / Commercial Banking require for paying special attention to all complex, unusually large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose and their reporting to State Bank of Pakistan." Hafiz Khan's scheme to transfer funds in $10,000 increments to Ali Rehman by use of multiple checks fit that pattern precisely.

236.    NBP's customer due diligence policies also alerted staff that members of Hafiz Khan's family were suspected of Pakistani Taliban affiliation. For example, multiple Pakistani police reports from the 2008 period identified Hafiz Khan's son Ikram Khan (AKA Ikramul Haq) as a Pakistani Taliban member.[206]

---

[205] *See* State Bank of Pakistan, Banking Policy Department Circular No. 20 of 2004 (June 16, 2004), *available at* http://www.sbp.org.pk/bpd/2004/C20.htm, and Appendix I, Section 3(iii), *available at* http://www.sbp.org.pk/bpd/2004/annx_c20.pdf.

[206] *See Khan* Trial Transcript, Doc. 844, at 200 (testimony of Ikram Khan); *see also* Shamim Shahid, *Man Arrested in Miami Is Wanted in Pakistan Too!*, Pakistan Today (May 16, 2011).

These Pakistani police reports specifically identified Hafiz Khan as the father of Ikram Khan, and indicated that Ikram Khan participated in and was "wanted" for at least five terrorist attacks, including multiple Pakistani Taliban attacks, between 2008 and 2009.

237.    Thus, both Hafiz Khan and Ikram Khan were identified in government documents that cast suspicion on the significant funds transfers Hafiz Khan made into Pakistan.

238.    In addition, witnesses who lived in the area had observed Ikram Khan in 2008 armed and accompanying a Pakistani Taliban commander named Motabar Khan, who was arrested and detained by the Pakistani Army in September 2009.[207] Consistent with the madrassa's general support for the Pakistani Taliban, Motabar Khan also preached there.[208]

239.    During the 2008 to 2009 period, NBP's anti-money laundering policies required it to investigate suspicious persons or people named by the police as potentially involved in terrorism. Given Ikram Khan's close association with his

---

[207] *See Khan* Trial Transcript, Doc. 835, at 17 (recording of Hafiz Khan identifying Motabar Khan as a Pakistani Taliban commander); *Khan* Trial Transcript, Doc. 839, at 131-32 (testimony of Saifullah Khan that Motabar and Ikram were observed together and both armed with guns, and that the "entire area" knew that Motabar was a Pakistani Taliban commander); *Khan* Trial Transcript, Doc. 845, at 35 (U.S. Attorney noting that Motabar was arrested by the army in or around Sept. 2009).

[208] *Khan* Trial Transcript, Doc. 854, at 201-02 (U.S. Attorney alludes to recorded conversation showing that Motabar Khan preached at Hafiz Khan's madrassa).

father—as noted in police reports from the geographic area where NBP had multiple branches—NBP knew to look for suspicious transactions from Hafiz Khan.

240.   NBP's policies also required NBP staff to identify the purpose for Hafiz Khan's remittances, both when Hafiz Khan initiated the transfers and when the recipient took cash directly from the NBP branch managers. Thus, NBP staff knew that some of Hafiz Khan's transfers of U.S. dollars to multiple Pakistani accounts were for the purpose of funding his madrassa and mosque, which was itself a form of material support to the Pakistani Taliban.

241.   NBP's knowledge of the purposes of Hafiz Khan's fund transfers also required treating Hafiz Khan's NBP accounts as "High Risk" and subject to "Enhanced Due Diligence" because the accounts' beneficiaries included a madrassa and mosque.

242.   Any fund transfers through NBP branches for the purpose of funding Hafiz Khan's madrassa raised terrorism finance red flags with the NBP branch managers who approved them. First, madrassas in general raise heightened concerns, which is why NBP's AML and CTF policies treat them as "High Risk" and require heightened diligence.

243.   That is for good reason. Experts have explained that the vast majority (90%) of suicide bombers from Swat Valley studied in madrassas.[209] This specific madrassa was even more suspicious. Hafiz Khan bragged that children from his madrassa were sent to train with the leader of the Pakistani Taliban, and went on to fight and kill Americans in Afghanistan. And Hafiz Khan's madrassa had been closed and occupied by the Pakistani Army for approximately three months in 2009 due to suspicion of its involvement with the Pakistani Taliban.

244.   To be more specific, the madrassa was shut down because Ikram Khan and a well-known Pakistani Taliban commander were associated with it.[210] NBP was aware of these risks before and while it processed Hafiz Khan's transactions.

245.   As a Pakistani bank with considerable familiarity with the country and its particular terrorism financing risks, NBP also knew that the al-Qaeda Terror Syndicate is adept at raising money from foreign supporters. As the government's expert witness testified at Hafiz Khan's trial, the Pakistani Taliban has a "robust support network" in other countries, including the United States.[211] Thus, NBP's

---

[209] *Khan* Trial Transcript, Doc. 840, at 182 (testimony of Khurum Iqbal).

[210] *Khan* Trial Transcript, Doc. 839, at 122-26 (explaining the reasons the Pakistani Army shut down and occupied the madrassa).

[211] *Khan* Trial Transcript, Doc. 840, at 204.

AML and CTF policies and procedures were designed to identify money transfers
going to the Pakistani Taliban.

246.    It also was common knowledge—as reported in the global media,
including Pakistani media—that the Pakistani Taliban and al-Qaeda were closely
aligned and collaborating with each other. This is demonstrated by the sources
cited *supra* ¶¶ 98-105. Accordingly, NBP knew that by facilitating fund transfers
to the Pakistani Taliban, it was also necessarily assisting al-Qaeda.

247.    Finally, NBP itself provided additional evidence that it knew Hafiz
Khan's accounts were highly suspicious—and indeed that they funded the
Pakistani Taliban—by its actions after the U.S. government indicted Hafiz Khan,
members of his family, and Ali Rehman for providing material support to
terrorists. According to federal prosecutors, Hafiz Khan's accounts in Pakistan
remained open in early July 2011,[212] more than 90 days after his arrest for funding
the Pakistani Taliban, an event widely reported in the U.S. and Pakistan.[213] As late

---

[212] *See* Transcript of Hearing on Motion to Set Aside Pretrial Detention, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 78, at 76 (S.D. Fl. 2011).

[213] *See, e.g.*, Associated Press, *Miami Imam, 2 Sons Charged With Supporting Taliban*, Dawn (Pakistan) (May 15, 2011) ("An elderly Miami imam and two of his sons have been arrested on federal charges they provided financial support to the Pakistani Taliban, while three others in Pakistan have been indicted on charges of handling distribution of the funds, authorities say. . . . The Pakistani Taliban are designated by the State Department as a terrorist organization. The indictment lists about $50,000 in transactions. According to the indictment, the funds were used to buy guns, support militants' families and promote the cause of the Pakistani Taliban. It alleges that Hafiz Khan owns a religious school in northwest Pakistan that shelters members of the Pakistani Taliban and trains children to become militants."). NBP knew about Hafiz Khan's

as May 2012, the U.S. government cited Izhar Khan's "ability to access his family's multiple U.S. dollar bank accounts and extensive landholdings in Pakistan" as a basis for his continued detention, an argument the District Court accepted.[214] As discussed above, there is substantial evidence that NBP knew before Hafiz Khan was indicted that his NBP accounts and transactions were used to support the Pakistani Taliban. NBP's failure to close those accounts *after* the indictment adds to the inference that NBP knew what Hafiz Khan and his co-conspirators were doing all along.

**NBP Knew About McLintock/RWO's Terrorist Activities**

248.    With respect to McLintock and RWO, all of their characteristics discussed above, *see supra* ¶¶ 165-175, combined with the required diligence and approvals of each, also alerted NBP and its staff, from the lowest to highest levels, that the bank's customer was providing material support to the al-Qaeda Terror Syndicate.

---

arrest and indictment when they occurred because the U.S. government had subpoenaed his bank records as part of its investigation. *See Khan* Trial Transcript, Doc. 834, at 107-09 (testimony of Special Agent Ferlazzo). NBP also generally monitored press reports for news about itself, *see* NBP, Articles (last visited June 5, 2020), https://www.nbp.com.pk/ARTICLES/index.aspx (amalgamating articles about NBP, including articles from the newspaper *Dawn*), and almost certainly followed public reports about its indicted customers. Thus, NBP also knew what Hafiz Khan was indicted for providing material support that bought guns and otherwise financed terrorist attacks by the Pakistani Taliban.

[214] *See* Government's Response to Defendant Izhar Khan's Motion for Reconsideration of Pretrial Detention Order, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 319, at 2 (S.D. Fl. 2012); Order, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 360 (S.D. Fl. 2012).

249.   Prior to the 2016 designations of McLintock and RWO as SDGTs, the bank's "Know Your Customer" policies revealed that McLintock was suspected of associating with and providing material support to members of the al-Qaeda Terror Syndicate—which put NBP on notice that the financial donations coming through to McLintock and RWO were funding the Syndicate. Furthermore, McLintock's internationally-publicized nickname—the "Tartan Taliban"— informed NBP that its customer was likely a terrorist himself.

250.   Once the U.S. government designated McLintock and RWO as SDGTs for providing material support to the Syndicate, NBP's ongoing monitoring of their account raised additional red flags and "Red Alerts," which NBP's staff and management intentionally ignored.

251.   McLintock raised significant sums for terrorists (approximately $180,000 in 2012-13 from British donors alone), openly and notoriously directing donors to his NBP accounts on the RWO website.

252.   That site provided complete bank account details, including the full IBAN number to enable international transfers. The NBP account was the only bank account owned by RWO listed on its website. RWO also published printed reports of its fundraising activities, which listed its NBP account as the sole means for international donations.

106

253. The opening and use of the McLintock/RWO account with NBP entailed "enhanced due diligence," triggered numerous red flags, and required approval by NBP staff at multiple levels, including the "Head Office."

254. RWO, with headquarters less than a half-mile from an NBP branch, purported to fit within several categories of customers always considered "High Risk," subject to "Enhanced Due Diligence," and requiring upper management approval: NGO, NPO, charitable organization, Welfare Association, and account for the collection of donations.

255. In addition, the supporting documents for the Treasury Department's designations of McLintock and RWO detailed that McLintock made regular transfers of thousands of U.S. dollars, in *cash* to senior Taliban commanders in Afghanistan. Donations to RWO went into an NBP account, and it is very likely that at least some of the cash McLintock passed to the Taliban was withdrawn from the same account. Such cash transactions were a "Red Alert" according to NBP's policies and procedures, particularly when combined with the many other red flags discussed below.

256. For one, McLintock was the President, CEO and Chairman who controlled RWO. NBP's KYC policies identified his association with RWO, and NBP subjected him to "Enhanced Due Diligence" and upper management approval.

107

257.   Any diligence conducted on McLintock—much less "enhanced" diligence"—triggered serious red flags because public reports going back to 2001 identified him as a well-known jihadist fighter and a funder of terrorist activities and organizations as early as 2001, when his first arrest earned him the nickname "Tartan Taliban" in international headlines. McLintock also had many well-publicized associations with al-Qaeda, the Taliban, and terrorist causes generally. Consequently, it would have been impossible to perform even the most cursory diligence without discovering a litany of articles identifying him as the "Tartan Taliban," reporting on his multiple arrests on suspicion of terrorist activity, and revealing the well-substantiated accusations against him.

258.   Among the headlines: "*Scot Seized in Afghanistan May Be bin Laden Recruit*" (in the Scotsman, Dec. 2001); "*Scot Questioned in Pakistan Over Links to al Qaeda*" (in the Herald (Glasgow), Dec. 2001); "*How a Scot Turned His Back on the UK to Fight for Islam*" (in the Daily Mail (UK), Jan. 2002); "*'Traitor' Scot Caught by Border Guard: THE TARTAN TALIBAN*" (in the Daily Star (UK), Jan. 2002); "*Muslim Scot 'Had Links with Leeds Bombers'*" (in the Yorkshire Post, Aug. 2005); "*Briton Being Grilled for Terror Links*" (in Dawn, Apr. 2009); "*'Tartan Taliban' Held*" (in Scotland on Sunday, Apr. 2009); "*The White Man's Jihad*" (in Foreign Policy, May 2011); "*U.S. Claims Tartan Taliban Suspect James McLintock Helped to Run Terror Training Camps in Afghanistan*" (in the Daily

Record (UK)), Aug. 2014); and "*Scottish Jihadi Dubbed 'Tartan Taliban' Is Teaching Young Students How to Use Bombs*" (in the Daily Record (UK), July 2017).

259.    NBP's ongoing monitoring of McLintock and RWO could not have missed these and other public reports, in prominent Pakistani and international press outlets, over an eight-year period. Accordingly, this diligence put NBP on notice that McLintock was associated with terrorists.

260.    NBP's management was also required to attest, on an ongoing basis, to the good character and "bonafides" of McLintock and RWO. Management could not have done so in good faith.

261.    Once the U.S. government designated McLintock and RWO as SDGTs on March 31, 2016, they were added to international sanctions lists that NBP monitored continuously.

262.    RWO updated its website after the U.S. designation, yet the website continued to promote RWO's NBP account as a way to "Donate to RWO" until at least late August 2016—more than four months after McLintock and RWO were designated as SDGTs.

**NBP Knew About ART, JeM, and Murtaza's Terrorist Activities**

263.    The ART/Murtaza transactions were equally suspicious as they were openly carried out in the name of and for the benefit of ART, a known front group

for JeM, using an NBP account under the name of a known terrorist financier—and both JeM (as of December 2001) and ART (as of November 2010) were designated FTOs.

264.   All of the characteristics of Murtaza, ART, and JeM discussed above (*see* ¶¶ 132-150), combined with the required "Enhanced Diligence" and approvals of each, alerted NBP and its staff, from the lowest to highest levels, that Murtaza's NBP account was providing material support to the al-Qaeda Terror Syndicate. As the co-head of ART, a major terrorist organization and a designated FTO, Murtaza is a prominent figure whose identity had been reported in the mainstream media.

265.   Moreover, JeM and ART's physical presence in the city of Bahawalpur, where NBP has 35 branches (including the branch directly connected to ART), was significant. One NBP branch is located less than a mile from a four-story compound that serves as JeM's national headquarters. In April 2016, a *Wall Street Journal* reporter found a gunman guarding the JeM compound.[215] A sign outside the compound said it houses a madrassa "under the guidance" of JeM's leader Azhar.[216] Two of Azhar's heavily fortified homes are also within a mile of an NBP branch. JeM has several other facilities within five miles of several NBP

---

[215] Saeed Shah, *Despite Crackdown, Some Pakistani Militants Walk the Streets*, Wall St. J. (Apr. 25, 2016). *See also id*. (The "outlawed extremist group, one with ties to al Qaeda, continues to operate openly at its base in [Bahawalpur] . . . . 'We don't hide who we are. We are a jihadist group,' said a cleric affiliated with Jaish.").

[216] *Id*.

branches, including a 10-acre compound used for training terrorists and as a safe

haven for terrorists fighting in Afghanistan. NBP's many employees working and

living at its dozens of branches in Bahawalpur could not have missed JeM's

presence and facilities in the city, or its open association with NBP's customer

ART.

266.   In addition, the advertisements soliciting donations in *Al Qalam*

themselves linked ART and Murtaza, and the existence of those ads was discussed

in other media publications. Moreover, when an NBP account is referenced in

Pakistani publications, NBP's policies require it to confirm that the name on the

account matches the name of the entity soliciting funds to the account. For the *Al*

*Qalam* solicitations, such diligence revealed Murtaza's close association with

ART. Indeed, he was the keeper of ART's funds.

267.   Accordingly, NBP knew the Murtaza/ART account was "High Risk"

and subject to "Enhanced Due Diligence," which triggered numerous red flags, and

required approval by NBP staff at multiple levels, including the "Head Office."

268.   ART purported to fit within several categories of customers always

subject to "Enhanced Due Diligence" and requiring upper management approval:

NGO, NPO, charitable organization, Trust, and account for the collection of

donations.

269.   ART was also publicly identified as the fundraising arm of JeM. ART and JeM, as of November 2010, were both designated by the U.S. government as FTOs, and thus appeared on the international sanctions lists NBP staff monitored continuously. Public reports available on the Internet confirmed that ART raises funds for JeM through NBP.

270.   Even aside from these designations, NBP branch managers could not have missed the fact that ART was the fundraising arm of JeM and thus suffered from "dubious character." By instead certifying ART's "bonafides" and "respectability," as was required of all NBP customers, NBP's managers intentionally ignored what NBP's own policy documents referred to as "Red Alerts."

271.   Furthermore, the accounts were in Murtaza's name. NBP's KYC policies required him to be subjected to "Enhanced Due Diligence" and upper management approval.

272.   Any diligence conducted on Murtaza—much less "enhanced" diligence"— raised significant red flags. Murtaza was publicly identified as a key associate of JeM's founder and the co-head of ART, a designated FTO. He was also publicly identified as a leader of the HuM terrorist group, before he joined the leadership of JeM. And Murtaza was the type of customer SBP directed NBP to scrutinize closely: a "high net worth customer[] with no clearly identifiable source

of income" (other than public solicitations for martyr payments by a terrorist group), and a person holding a "high profile" position (as co-head of ART).[217] Thus, Murtaza was a highly suspicious customer under NBP's policies and SBP's requirements, even if NBP (impossibly) was not aware of his association with Azhar, ART and JeM.

### NBP Knew That Its Conduct Was Illegal, and Facilitated Terrorist Violence Against Americans

273.  In addition to knowing that it was assisting customers engaged in terrorism and terror financing, NBP also knew that the terrorists and terrorist organizations it assisted were committed to killing Americans. Indeed, as explained in the description of the Syndicate, *supra*, such terrorist attacks in Afghanistan are the *raison d'être* of al-Qaeda and the Taliban—and that fact was reported in multiple high-profile public sources in the U.S., Pakistani, and international media, as well as by reputable government sources including the U.S. government, the United Nations, and the Pakistani government, all of which had taken public steps to stop the flow of funds to these organizations. Further, one of the main beneficiaries of NBP's material support and assistance to terrorists, ART, openly solicited donations, using an NBP account, in *Al Qalam* newsletters that glorified the Taliban and its attacks on Americans in Afghanistan.

---

[217] *See* State Bank of Pakistan, ANNEXURE-I, *supra* note 181, at 4.

274.   NBP did not just frustrate U.S. and ISAF efforts to incapacitate the al-Qaeda Terror Syndicate; it knew that by providing accounts to, and performing financial transactions for, the Syndicate's members, it was playing a substantial role in their violent or life-endangering terrorist activities.

275.   During the period relevant to Plaintiffs' claims, the government of Pakistan relied on the Pakistani Anti-Terrorism Act, 1997 to starve terrorist groups of the funds critical to their ability to plan and stage attacks. This is clear from the Act's preamble: "An Act to provide for the prevention of terrorism, sectarian violence and for speedy trial of heinous offences."[218]

276.   NBP recognized its essential role in achieving the Anti-Terrorism Act 1997's purpose of preventing terrorist violence. NBP's "GLOBAL KYC/AML/CFT/SANCTIONS COMPLIANCE POLICY" states: "Under the Anti-Terrorism Act-ATA 1997, AML Act 2010 and State Bank of Pakistan's AML/CFT Guidelines (revised on Nov 14, 2017), the Bank is prohibited from providing any banking services to proscribed entities and persons or to those who are known for their association with such entities and persons, whether under the proscribed name or with a different name."

277.   NBP also recognized that its strict compliance with AML and CTF rules and regulations—including its own policies and procedures—was critical to

---

[218] Anti-Terrorism Act, 1997, *available at* https://www.satp.org/Docs/Document/7.pdf.

both the global war on terror and to the United States' efforts to prevent terrorist

attacks on Americans. As the third edition of NBP's "Policy Manual," titled "Anti-

Money Laundering, Anti-Terrorist Financing and Know Your Customer"[219]

explained:

> Terrorist financing networks are global, and consequently, *efforts to*
> *identify and deny terrorists access to funds must also be global. An*
> *essential component of* the governments around the globe *counter-*
> *terrorism strategy has been to identify, disrupt, and dismantle the*
> *financial networks of terrorist organizations. The global effort to stop*
> *terrorist financing is fundamentally a preventive strategy. In the*
> *aftermath of events of September 11, 2001 the US passed the USA*
> *PATRIOT Act to ensure that both combating the financing of*
> *terrorism (CFT) and anti-money laundering (AML) was given*
> *adequate focus by US financial institutions.* The act also had extra-
> territorial impact and non-US banks having correspondent banking
> accounts or doing business with US had to upgrade their AML/CFT
> processes. . . . Assets forfeiture and sharing of information has proven
> to be the *most effective way* to combat money laundering and terrorist
> financing. (Emphasis added).

278.    NBP's leadership was also aware of the critical role of financial

institutions and CTF practices in stopping terrorist attacks globally. In September

2013, Rana Assad Amin was appointed to NBP's Board of Directors. At the time,

he was Advisor to the Finance Division, Ministry of Finance, which promulgates

AML and CTF rules for financial institutions. Before joining NBP, he represented

Pakistan at national and international forums on the prevention of money

---

[219] This internal NBP manual is undated, but was submitted to a repository of banking
manuals in April 2011.

laundering and terrorist finance. Amin thus knew that AML and CFT requirements exist for financial institutions not merely to prevent terrorist financing but to prevent terrorist attacks.

279.   NBP also explicitly stated in an internal policy manual that "[a]ll international transactions denominated in US Dollars are routed through United States of America," that all such transactions "are subject to scrutiny with the list provided by the [United States] Office of the Foreign Assets Control (OFAC)," and that "OFAC administers and enforce[s] economic and trade sanctions based on US foreign policy and national security goals." Given the other statements in its internal policy manuals, its understanding of Pakistan's Anti-Terrorism Act, 1997, and its Director's experience with global Counter-Terrorist Finance efforts, NBP knew that one of the "US foreign policy and national security goals" motivating the maintenance of, and required compliance with, the OFAC designation lists was the prevention of terrorist attacks on Americans.

280.   Thus, NBP understood that its compliance with U.S. terrorism laws and attention to U.S. designations played a substantial role in preventing attacks on Americans. Conversely, NBP knew that when it flouted U.S. designations and legal requirements, and provided safe harbor to the SDGT and FTO members of the al-Qaeda Terror Syndicate, it played a substantial role in such attacks.

116

281.    Finally, NBP knew the violent consequences of its provision of banking services to members of the al-Qaeda Terror Syndicate because it was charged with, and admitted to, knowledge of United States laws that prohibited material support to, aiding and abetting of, and conspiracy with terrorist groups. In March 2010, NBP submitted responses to a questionnaire from the Wolfsberg Group, and represented that "Our Foreign Branches are required to comply with the rules and regulations of the country where these branches are located." NBP knew such rules and regulations in order to comply with them. Accordingly, NBP should be charged with knowledge of U.S. banking rules and regulations in connection with its United States branches.

282.    A sophisticated financial institution could not miss the purpose of the criminal law prohibitions on material support to terrorists. As the U.S. Supreme Court has explained, "Congress has prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. 18 U.S.C. § 2339B(a)(1). That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.' Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)."[220] Accordingly, NBP understood that "any

---

[220] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010).

contribution" it made to members of the al-Qaeda Terror Syndicate would illegally facilitate their terrorist activity.

283.   Thus, with respect to primary liability under the ATA, NBP's policies for countering money laundering and the financing of terrorism, its understanding of the purposes of those policies and the violent consequences of violating them, and its actual conduct with respect the terrorists and terrorist groups it not only serviced but shielded from asset seizures and other legal actions, establish that NBP facilitated the flow of essential funds to members of the al-Qaeda Terror Syndicate knowing or with deliberate indifference that it was (i) providing material support to FTOs with knowledge of or deliberate indifference to their connection to terrorism; and (ii) providing material support to terrorist groups knowing or deliberately indifferent to the consequence, that its support would generally the terrorists' violent campaigns, including against Americans.

284.   Because support for terrorism was the necessary consequence of NBP's actions, and because NBP knew this, it also acted with the apparent intent to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping. Indeed, these outcomes were the avowed purposes of NBP's terrorist customers.

285.    NBP also acted with the scienter necessary for secondary liability. NBP's policies, understanding of the purpose of those policies, and conduct contrary to them establish that it was generally aware that it was playing a role in the overall tortious scheme to commit terrorist violence by facilitating terrorist financing to members of the al-Qaeda Terror Syndicate.

### C. National Bank of Pakistan's Assistance to the al-Qaeda Terror Syndicate Was Substantial, and Caused Terror Attacks

286.    NBP played a crucial role in allowing members of the al-Qaeda Terror Syndicate to raise funds. By maintaining accounts and processing transactions for Hafiz Khan, McLintock/RWO, and Murtaza/ART, NBP participated in the financial infrastructure essential to terrorism focused on Afghanistan. By allowing terrorist groups and fundraisers to openly solicit donations to their NBP accounts, NBP also lent its good name and legitimacy to their fundraising efforts.

287.    The funds NBP harbored for and transferred to members of the al-Qaeda Terror Syndicate were significant enough, and close enough in time to the attacks on Plaintiffs, to have been a substantial factor in both strengthening the Syndicate's terrorist enterprise and causing (in both a factual and legal sense) the attacks on Plaintiffs.

288.    As the United States explained in the criminal case against Hafiz Khan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."[221]

289.    The money NBP sent to the Syndicate members contributed to their ability to carry out attacks against Americans in Afghanistan. As the U.S. government observed in the prosecution of Hafiz Khan, "money in Pakistan, especially Swat, goes a long way, particularly when used to purchase arms in the markets on the Afghan-Pakistan border and when sent in the form of valuable U.S. dollars."[222]

290.    Moreover, in addition to weapons and training, "financial support . . . to injured Taliban fighters and their families, was just as important in promoting the Pakistani Taliban's violent campaign."[223] Indeed, it does not take much money "to make violence possible in that part of the world or to make it worthwhile for a fighter to leave his or her family behind knowing they will be aided by money from America."[224]

---

[221] Transcript of Arraignment, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 31, at 19 (S.D. Fl. 2011).

[222] Government's Trial Brief, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 613, at 22 (S.D. Fl. 2013).

[223] *Khan* Trial Transcript, Doc. 833, at 48-49 (government's opening statement).

[224] *Khan* Trial Transcript, Doc. 833, at 48 (government's opening statement).

291.   That is all the more true because the al-Qaeda Terror Syndicate already had a sophisticated terrorist infrastructure that allowed it to deploy these funds for maximum violent effect.

292.   In this case, the amounts transferred were significant. This Amended Complaint identifies three sets of customers (Hafiz Khan, McLintock/RWO, and Murtaza/ART/JeM), who collectively used NBP accounts to transfer at least a million dollars, or potentially millions of dollars, to members of the al-Qaeda Terror Syndicate, over a period of at least ten years.

293.   Those sustained transfers provided the Syndicate sufficient resources to injure and kill Americans in Afghanistan, including the Plaintiffs and their family members.

294.   The significance of NBP's assistance is confirmed by the findings underlying the laws it violated. U.S. law flatly prohibits knowingly providing any material support to an FTO, and broadly prohibits transactions with SDGTs. This is precisely because the U.S. government—both Congress and the Executive Branch—have concluded that such transactions promote terrorist violence.

295.   As an unclassified cable (as published by *WikiLeaks*) from the U.S. Ambassador to India to the U.S. Secretary of State explained in February 2010:

> *Cutting off the financing of terrorist groups is a key component of our national strategy to combat terrorism. A large number of terrorist organizations operate in South Asia including*, but not limited to *al-Qa'ida (AQ), Lashkar e-Tayyiba (LT), Tehrik*i-Taliban (TTP)*, Harakat ul-Jihad-

i-Islami/Bangladesh (HUJI-B), Harakat ul-Jihad-Islami (HUJI), Harakat ul-Mujahedin (HUM), *Jaish-e-Mohammed (JEM)*, and Lashkar I Jhangvi (LJ). *In order to operate and grow, these groups depend on and receive funding from outside sources* including wealthy donors and grass root organizations in Pakistan, Saudi Arabia, United Arab Emirates (UAE) and other Gulf and Islamic states. *Building the capacity* of governments in South Asian countries *to stem the flow of funds to terrorist groups is essential to disrupting their activities*. The creation of robust financial investigative capabilities in South Asia is *critical to reaching our counterterrorism goals*.[225]

296.    By encouraging and facilitating money transfers to members of the al-Qaeda Terror Syndicate and granting their assets safe harbor from U.S. and Pakistani regulators in NBP accounts, NBP performed an essential role in providing material support, and aiding and abetting and conspiring to provide material support, to the Pakistani Taliban, al-Qaeda, and the rest of the al-Qaeda Terror Syndicate, including specifically their violent or life-endangering activities.

297.    With respect to Hafiz Khan, the U.S. government's prosecution and his ultimate conviction made clear that his financial transfers through NBP accounts in the United States and Pakistan substantially assisted one member of the Syndicate, the Pakistani Taliban.

298.    The same is true of McLintock/RWO and Murtaza/ART: both raised substantial sums from overseas donors and transferred those funds into their NBP

---

[225] https://wikileaks.org/plusd/cables/10NEWDELHI356_a.html

accounts, where they were shielded from seizure or other restrictions that would make the funds less accessible and useful for terrorist purposes.

299.    The U.S. Treasury Department designated McLintock/RWO as SDGTs and ART as an FTO to stop these flows of funds and deprive the al-Qaeda Terror Syndicate of any things of value. McLintock and RWO were thus designated to "to disrupt the fundraising and support networks of al-Qaida, the Taliban, and Lashkar-e-Tayyiba" and "financially cripple terrorist financiers."

300.    The FTO designation of ART "targeted the financial and support networks of" JEM and was "an important step in incapacitating the operational and financial networks of these deadly organizations."

301.    Further, NBP lent its good name, legitimacy, and financial services to a specific and deadly component of ART's fundraising efforts, by accepting donations for "martyr payments" to terrorists who helped al-Qaeda and the Taliban attack Americans in Afghanistan. An Indian press report stated: "In 2010, a Jaish-affiliated publication claimed that the trust was paying pensions to the families of at least 850 jihadists killed or imprisoned in India, as well as in other countries. The interesting point to note here is that al-Rahmat has continued to operate through publicly-advertised bank accounts in Pakistan."[226] NBP not only accepted

---

[226] India TV News Desk, *ISI backing and a load of cash: Decoding the resurgence of Jaish-e-Muhammad*, India TV (Jan. 12. 2016), https://www.indiatvnews.com/news/india/isi-

martyr payments for these 850 (or more) terrorists, it facilitated payments *to* terrorists and their families, as those funds were very likely withdrawn from the same NBP account they went into.

302.   By knowingly engaging in transactions for, and providing financial services to, members of the al-Qaeda Terror Syndicate, NBP provided substantial assistance to those groups, and caused the terror attacks that injured Plaintiffs.

### D. National Bank of Pakistan's Assistance to the al-Qaeda Terror Syndicate Had a Substantial Nexus to the United States

303.   NBP's substantial assistance to the al-Qaeda Terror Syndicate had a substantial nexus to the United States for at least three reasons: (1) much of NBP's conduct involved sending U.S. dollars from or through NBP's branches in the United States to NBP accounts in Pakistan, or currency exchanges at its New York branch that required U.S. dollars, for the purpose of financing terrorism; (2) NBP's own acts were directed at the United States because it knew that its material support would aid terrorists targeting Americans; and (3) NBP conspired with terrorists who directed their violent acts at the United States.

304.   With respect to the first nexus to the United States, Hafiz Khan deposited funds with an NBP branch in the United States—and communicated with

---

backing-and-a-load-of-cash-decoding-the-resurgence-of-jaish-56975.html. *See also* Cable from U.S. Ambassador, *supra* note 225.

U.S.-based employees of NBP about his transactions[227]—and the funds were withdrawn at NBP branches in Pakistan. These transactions relied completely on NBP's U.S. branches and personnel.

305.    NBP also relied on the United States in assisting McLintock/RWO and Murtaza/ART. NBP aided both terrorist operatives in raising funds by using its New York branch to convert the donations they received from outside Pakistan into U.S. dollars, which NBP in turn routed to the Syndicate. McLintock and RWO also withdrew U.S. dollars—which NBP converted at its New York branch—from their NBP account. According to the supporting documents for the U.S. Treasury Department's designations of McLintock and RWO, McLintock regularly made deliveries of thousands of U.S. dollars to senior Taliban commanders in Afghanistan.

306.    McLintock, through RWO's website, solicited donations from all over the world, and provided for donors to transfer funds in multiple currencies, including U.S. dollars. Indeed, the payment processing application on RWO's website offered "USD" as the default currency option.

307.    According to the Treasury Department's designations of McLintock and RWO, "between April 2011 and April 2012 RWO received the equivalent of

---

[227] *See, e.g.*, *Khan* Trial Transcript, Doc. 836, at 17 (testimony of Special Agent Ferlazzo recounting an instance in which a bank transfer to the branch in Pakistan had been held up, and Hafiz Khan had inquired with the NBP branch in Washington, D.C. about the status).

approximately $180,000 from donors in the United Kingdom. RWO has also received financial support from charities in the Persian Gulf and the United Kingdom." RWO continued to receive funds from the U.K. and Persian Gulf after April 2012.

308.   ART also solicited and received substantial donations from outside Pakistan. As India TV found in 2016, "The trust soon began soliciting funds in Pakistan and the Gulf monarchies, to build 313 mosques and seminaries. In 2010, a Jaish-affiliated publication claimed that the trust was paying pensions to the families of at least 850 jihadists killed or imprisoned in India, as well as in other countries. The interesting point to note here is that al-Rahmat has continued to operate through publicly-advertised bank accounts in Pakistan."[228]

309.   Donations to McLintock/RWO, which came from individual donors in the U.K., the U.K.-based Salam Foundation (using its own account at NatWest Bank), Persian Gulf charities, and around the world, were transferred to the McLintock/RWO account at NBP through currency exchanges: donations were made in various currencies and then exchanged into U.S. dollars and transferred into the McLintock/RWO account at NBP in U.S. dollars or Pakistani Rupees. The

---

[228] *ISI backing and a load of cash*, *supra* note 226. *See also* Cable from U.S. Ambassador, *supra* note 225.

RWO website specifically provided the SWIFT code required to transfer funds internationally to NBP's Peshawar branch.

310.    Likewise, Murtaza/ART received substantial donations from outside Pakistan, particularly from the Persian Gulf. These donations would be made in native currencies, like Saudi Riyals, *not* Pakistani Rupees (which are not a currency of choice outside South Asia). They would then be exchanged into U.S. Dollars and transferred into the Murtaza/ART account at NBP in Pakistani Rupees.

311.    Commercial banks transacting in currency pairs—*i.e.*, accepting funds in one currency and depositing them in another—typically choose a central currency to exchange into and out of. As Stanford Economics Professor Ronald McKinnon explained, "choosing one currency like the dollar to be the intermediary currency is the most natural way of economizing on foreign exchange transacting.[229]

312.    That is because it is far easier and less expensive to use a single central currency than it is to set up bilateral currency exchange markets for every possible currency pair (the example Professor McKinnon gives is that if a bank wished to trade 150 currencies all against each other, it could set up 149 markets if it used a central currency, as opposed to 11,175 markets if it created a separate

---

[229] Ronald McKinnon, *The World Dollar Standard and Globalization: New Rules for the Game?*, Stanford Ctr. for Int'l Dev., at 8-9 (Sept. 2003), *available at* https://kingcenter.stanford.edu/sites/default/files/publications/181wp.pdf.

market for each currency pair). The U.S. dollar is by far the most common central currency.

313.   NBP's policies and procedures in place from at least April 2011 onward make clear that NBP's New York branch was essential to the currency exchange process that allowed McLintock/RWO and ART to obtain donations from outside Pakistan—in U.S. dollars and other currencies—and deposit them in either U.S. dollar or Pakistani Rupee accounts at NBP.

314.   Those policies and procedures state:

> The major portion of foreign trade and foreign remittances including export, import, home remittances of Pakistan are denominated in US Dollars. All international transactions denominated in US Dollars are routed through [the] United States of America either by direct instructions to Banks in [the] USA to make payments or by providing cover through Banks located in [the] USA. All these payments and receipts are subject to scrutiny with the list provided by Office of Foreign Assets Control (OFAC) of the US Department of Treasury. The OFAC administers and enforce[s] economic and trade sanctions based on US foreign policy and national security goals.

315.   NBP's internal documents make clear that all U.S. Dollar transactions touch on NBP's New York branch:

> The incharges SWIFT Centers and Foreign Exchange Desk at FX branches must understand that ***NBP New York is playing [a] central role*** in providing the services of US Dollar international wire transfers to NBP Head Office and domestic branches. NBP New York will have to comply with all the US Regulatory requirements. Therefore, NBP New York is bound to comply with the above standards and has the right to decline/reject the handling of any transaction which does not fulfill the stated requirements. (Emphasis added).

316.   NBP's AML and CFT policy manual specifically addressed transactions using SWIFT, such as those McLintock solicited on the RWO website:

> For payments to be affected on behalf of customer via Swift, Message Type MT 103 is to be used to ensure conveying of clear information on the originator and beneficiary including the purpose of the transaction. For example foreign exchange remittances transactions involving US dollar values should be sent to Wall Street Branch, New York, USA via Swift Message MT 103.

317.   Thus, NBP's New York branch not only facilitated transfers of funds to and from the Hafiz Khan, McLintock/RWO, and Murtaza/ART accounts in Pakistan, they also subjected each transaction to "scrutiny," based on New York and Federal law, including OFAC regulations and U.S. terrorist designations. The New York branch therefore played an essential role in both triggering the red flags and "Red Alerts" these transactions raised and knowingly ignoring them to allow the transactions to proceed.

318.   Accordingly, NBP, through the use of its U.S. branches, has purposefully availed itself of (1) the United States' dependable and transparent banking system (which allows donors to its terrorist customers to transfer funds without fear of loss); (2) the U.S. dollar as a stable and fungible currency (which permits the exchange of currencies essential to terrorist fundraising); and (3) the predictable jurisdictional and commercial law of New York and the United States.

319.    The second substantial nexus between NBP's actions relevant to the

claims herein and the United States is that NBP knew its actions targeted the

United States by directly undermining U.S. foreign-policy interests in Afghanistan

and jeopardizing the safety of American service members deployed there. When it

decided to permit members of the al-Qaeda Terror Syndicate to open and use NBP

accounts, and to benefit from NBP's good name and legitimacy, NBP knew it was

helping al-Qaeda and the Taliban conduct attacks designed specifically to

influence U.S. policy by killing and injuring American personnel. *See, e.g.*, ¶¶ 273-

282, 297-301.

320.    Finally, NBP joined a conspiracy to commit terrorist attacks against

Americans. NBP's terrorist customers were engaged in an ongoing conspiracy,

through the Syndicate, to commit terrorist attacks against Americans. This

conspiracy was purposely directed at the United States because the Syndicate

sought to kill Americans specifically, and to undermine U.S. foreign policy

interests by targeting U.S. soldiers and civilians abroad.

321.    To achieve the objective of that conspiracy, the conspirators sought to

raise money to fund the planning and commission of terrorist attacks. These

resources were essential the conspiracy's ability to achieve its objective.

322.    NBP's terrorist customers were themselves members of the

conspiracy because they were either members of the Syndicate (as in the case of

130

ART and Murtaza) or were agents of members of the Syndicate (as in the case of Hafiz Khan and McLintock). By agreeing to help these conspirators raise funds for the Syndicate, while knowing that terrorist organizations would use the funds to pay for terrorist attacks, NBP joined the Syndicate conspiracy.

323.    The terrorist attacks at issue in this case were foreseeable acts in furtherance of the conspiracy. Indeed, the attacks, and others like them, were the conspiracy's primary objective.

### III.    Al-Qaeda Committed, Planned, and/or Authorized the Terrorist Attacks That Injured Plaintiffs.

324.    While NBP and its customers were supporting the al-Qaeda Terror Syndicate, the Syndicate was carrying out violent attacks on Americans. The attacks at issue in this case involved 44 unique victims. They occurred from December 30, 2009 through January 14, 2019, and generally included suicide bombings in Afghanistan, as well as shooting and bombing attacks by the Kabul Attack Network or by al-Qaeda, and attacks by the Taliban (including the Haqqani Network) in the Kunar province of Afghanistan.

325.    As explained in greater detail below, al-Qaeda's participation was the common thread in these attacks. Each time, al-Qaeda committed, planned, and/or authorized the attack. Al-Qaeda also coordinated these attacks with one or more of its Syndicate partners, as explained in greater detail below.

## A. The Camp Chapman Attack (December 30, 2009)

326.    On December 30, 2009, a suicide bomber named Humam Khalil al-Balawi ("Balawi") attacked a secret CIA base in the Khost Province of Afghanistan known as Camp Chapman. Balawi posed as an informant willing to provide information about high-value al-Qaeda targets in Pakistan. Upon gaining entry to the base, he detonated a suicide vest, murdering nine people, seven of whom were American. Six others were seriously injured. The Camp Chapman Attack was the largest attack on the CIA since the 1983 bombing of a Marine compound in Beirut, Lebanon.[230]

327.    Balawi acted as an agent of the al-Qaeda Terror Syndicate.[231]

328.    Al-Qaeda authorized the Camp Chapman Attack. Specifically, Sheikh Saeed al Masri, al-Qaeda's number three leader at the time, authorized the attack.[232]

329.    The Pakistani Taliban helped plan and execute the attack by providing financial and logistical support. That support was coordinated by Hakimullah Mehsud, the leader of the Pakistani Taliban, who appeared in a video released after

---

[230] The events surrounding this attack are chronicled in a book, Joby Warrick, *The Triple Agent: The al-Qaeda Mole Who Infiltrated the CIA* (2012) (hereinafter "Warrick, *Triple Agent*").

[231] Nick Schifrin, *Al Qaeda Claims Responsibility for CIA Base Bombing*, ABC News (Jan. 6, 2010); Mark Sappenfield, *CIA Agents Killed in Afghanistan Were in Taliban's Backyard*, Christian Science Monitor (Dec. 31, 2009); Riedel, *Deadly Embrace*, *supra* note 8, at 99-100.

[232] Warrick, *Triple Agent* at 154; *see also* Bruce Riedel, *Three Is the Loneliest Number*, Foreign Policy (June 2, 2010).

the fact together with Balawi to take credit for "arranging" the attack.[233] Balawi also trained at a Pakistani Taliban camp in North Waziristan, where he was protected by, and learned to use, weapons of the kind Hafiz Khan gave the Syndicate funds to obtain.[234] And the U.S. State Department determined that Pakistani Taliban leader Qari Hussain, who was "one of TTP's top lieutenants and serves as the trainer and organizer of the group's suicide bombers," is "believed to have trained" Balawi before the Camp Chapman Attack.[235]

330.    For its part, the Haqqani Network (as part of the Taliban) provided substantial assistance to its al-Qaeda and Pakistani Taliban terrorist partners in the Camp Chapman Attack, including the al-Qaeda suicide bomber, Balawi. The Haqqani Network provided key support, including but not limited to intelligence and logistical support. The Taliban has also publicly taken responsibility for the attack.

331.    Statements by al-Qaeda and the Pakistani Taliban confirmed that the attack was retaliation against the CIA for drone strikes that had killed (among others) Baitullah Mehsud, who was at the time leader of the Pakistani Taliban.

---

[233] Lee Ferran, *Taliban Releases Image of 'Martyred' Leader Hakimullah Mehsud*, ABC News (Nov. 4, 2013).

[234] Warrick, *Triple Agent* at 150.

[235] U.S. Dep't of State, *Terrorist Designation of Tehrik-E Taliban (TTP) Leader Qari Hussain* (Jan. 20, 2011).

332.   Through their collaborative effort, al-Qaeda, the Pakistani Taliban, and the Haqqani Network jointly committed the Camp Chapman Attack, through their agent Balawi.

### B. The al-Qaeda / Taliban / Kabul Attack Network Attacks (June 7, 2010 through January 14, 2019)

333.   The remaining attacks at issue in this case were committed between June 7, 2010 and January 14, 2019 by a combination of al-Qaeda and the Taliban (including, in many cases, the Haqqani Network), often via the Kabul Attack Network, with LeT and JeM providing support in the form of recruiting and training suicide bombers (for the attacks that involved suicide bombings), and JeM providing additional support by making martyr payments (for the attacks in which the attacker was injured or died).

334.   In all of these attacks, whether the attack was carried out by al-Qaeda, the Taliban, or some combination of the two (either in the Kabul Attack Network or a different joint cell), al-Qaeda, as the leader of the Syndicate, played a key role in planning, authorizing, or committing the attack.

**Al-Qaeda Led the Syndicate**

335.   Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group capable of launching attacks around the world. After moving to Sudan in the early 1990s, al-Qaeda's leadership returned to Afghanistan in approximately 1996, where it was sheltered

by the Taliban for the next five years. Osama bin Laden declared war on the United States in a published *fatwa* (an authoritative religious decree) in 1996.[236] One scholar who surveyed first-hand accounts of the initial meeting between bin Laden and the Taliban during this period reported that it "emphasize[d] the Taliban's humble attitude toward the Saudi guest and their immediate readiness to serve him."[237]

336.    In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, bin Laden had met with Mullah Mohammed Omar personally and offered to lend his fighters to the Taliban. As bin Laden's deputy, Abu Hafs al-Masri, wrote at the time, the Taliban "movement is a capable Islamic entity and it is possible that it can be a turning point for the betterment of the Islamic world. The movement needs a vision and it needs support. It needs someone who will give it a military strategy. And it needs to build a military force which is suitable for the situation in Afghanistan."[238] To that end, al-Qaeda shared technical knowledge with the Taliban and paid the Taliban between $10 million to $20 million a year for shelter. In doing so, Al-Qaeda

---

[236] *See* sources cited *supra* note 10.

[237] Stenersen, *Al-Qaida in Afghanistan*, *supra* note 10, at 58.

[238] *Id.* at 67-68.

supplied the strategy and support the Taliban needed to morph into a deadly
terrorist group capable of inflicting mass casualties on Americans.

337.   At the same time that Osama bin Laden was cementing his ties with
the Taliban, he was escalating his attacks on the United States. In 1998, while
under the Taliban's protection, Osama bin Laden declared a global jihad against
the United States, calling on all Muslims to kill Americans at any opportunity. On
August 7, 1998, al-Qaeda suicide bombers in explosive-laden trucks attacked U.S.
embassies in Kenya and Tanzania, killing more than 200 people. The United States
responded two weeks later with missile strikes on al-Qaeda bases in Afghanistan
and demanded that Mullah Omar turn over Osama bin Laden. He refused.

338.   On October 8, 1999, the U.S. State Department designated al-Qaeda
as an FTO, and a week later the United Nations called for sanctions against the
Taliban unless it expelled bin Laden from Afghanistan. Again, the Taliban refused.

339.   In the spring 2001, Osama bin Laden, on behalf of al-Qaeda, pledged
an oath of allegiance to Mullah Omar and the Taliban. A few months later, on
September 11, 2001, al-Qaeda attacked the World Trade Center in New York and
the Pentagon, killing thousands. A third attack, possibly aimed at the White House,
was thwarted by passengers aboard United Flight 93. The United States demanded
once again that the Taliban turn over bin Laden, and once again the Taliban

refused. The Coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

340.   Al-Qaeda's and the Taliban's close relationship continued long after September 11. During this period, the Taliban's "ties to al-Qaeda were crucial to the Taliban's growth as an insurgency after its routing from Afghanistan."[239] In May 2007, for example, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one."[240] In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."[241] By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly. "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda," he told *The Wall Street Journal*.[242] And as Lieutenant General Ronald L. Burgess, Jr. testified to the Senate Select Committee on Intelligence, "Al-Qa'eda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."[243]

---

[239] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 3.

[240] Thomas Ruttig, *The Other Side*, Afghanistan Analysts Network, at 23 (July 2009).

[241] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[242] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[243] *Current and Projected National Security Threats to the United States?*: Hr'g Of The Senate Select Committee On Intelligence, S. Hr'g 111-557, at 13 (Feb. 2, 2010) (statement of Lt. Gen. Ronald Burgess, Jr., Dir., Def. Intelligence Agency), 2010 WLNR 27828348.

341.    The Taliban and al-Qaeda have remained intimately intertwined in the years since. For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day.[244] When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

342.    The overlap between the organizations meant that al-Qaeda routinely played an important role in Taliban and Haqqani terrorist attacks. As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin. This is by design. Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition. Al Qaeda was always a joint venture."[245] Mr. Joscelyn testified that the word "syndicate"—referring to the Taliban's and al-Qaeda's joint terrorist venture in Afghanistan—offers an "excellent description of how al Qaeda operates."[246]

343.    Al-Qaeda's leadership of that terrorist syndicate reflected the degree to which al-Qaeda and the Taliban became fully and operationally intertwined. As

---

[244] Thomas Joscelyn & Bill Roggio, *New Taliban Emir Accepts al Qaeda's Oath of Allegiance*, Long War J. (Aug. 14, 2015).

[245] Roggio & Joscelyn, *The al Qaeda-Taliban Connection*, *supra* note 9.

[246] *Al-Qaeda in Afghanistan and Pakistan: An Enduring Threat*, Hr'g Before the H. Comm. on Foreign Affairs, Subcommittee on Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156 , at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260.

India's Permanent Representative to the United States explained in describing the al-Qaeda-Taliban "syndicate of terrorism," both groups were by 2011 "ideologically and operationally fused."[247] By the fall of 2009, the noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less as a single entity. The signs of this are everywhere."[248]

344.    The Taliban and al-Qaeda's interdependence and joint venture continued throughout the period in which Plaintiffs were killed and injured. As two defense writers noted in 2016, the U.S. military's relative success against al-Qaeda neither eliminated al-Qaeda nor broke apart the Syndicate in which it participated: Afghanistan's southern and eastern provinces remained a "hub of Afghan insurgents and [the] al-Qaeda-led terrorist syndicate."[249]

345.    In 2010, one terrorism scholar warned against drawing a bright line between al-Qaeda and the Afghan terrorist groups that it sponsored. In explaining the importance of "recogniz[ing] the link between al Qa'ida and Afghan insurgent groups," he observed that a "policy focused on targeting al-Qa'ida—and not the

---

[247] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[248] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009).

[249] Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO: Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108.

Taliban, Haqqani Network, or other groups—would ignore one of the most egregious lessons from September 11."[250]

346.   The U.S. government agreed with that assessment. During the relevant timeframe, the U.S. government repeatedly stated that al-Qaeda and the Taliban acted together in a terrorist "syndicate," and warned against efforts to distinguish between them. Examples include:

- Secretary of State Hillary Clinton, July 2009: "[W]e had an intensive strategic review upon taking office[.] And we not only brought the entire United States government together, but we reached out to friends and allies . . . [T]he result of that strategic review was to conclude that *al-Qaeda* is supported by and uses its extremist allies like elements within *the Taliban* . . . *to be proxies for a lot of its attacks* . . . So the *Taliban* . . . [is] part of a kind of *terrorist syndicate with al-Qaeda at the center*[.]"[251]

- Secretary of State Hillary Clinton, December 2009: "[W]e have increasingly come to see these organizations *not as separate independent operators* that occasionally cooperate with one another, *but as part of a syndicate of terrorism*. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially. And *at the head of the table, like an old Mafia kind of diagram, sits al Qaeda*."[252]

- Secretary of Defense Robert Gates, January 2010: "Defense Secretary Robert M. Gates said yesterday that *Al Qaeda was using proxy terrorist groups to orchestrate attacks in* . . . *Afghanistan* as part of a broader

[250] Seth G. Jones, *In the Graveyard of Empires: America's War in Afghanistan*, at 332 (2010).

[251] *Sec. of State Hillary Clinton*, NBC News: Meet the Press (July 26, 2009) (emphasis added).

[252] *Afghanistan: Assessing The Road Ahead*, Hr'g before the U.S. Senate Committee on Foreign Relations, S. Hr'g 111-479, at 24 (Dec. 3, 2009) (statement of Hillary Rodham Clinton, Sec'y of State, U.S. State Dep't).

strategy to destabilize the region. In a news conference held after two days of meetings with Indian officials, *Gates said Al Qaeda had formed a 'syndicate' of terrorist groups with Taliban factions in Afghanistan and Pakistan* . . . 'What we see is that the success of any one of these groups leads to new capabilities and a new reputation for all,' Gates said. *'A victory for one is a victory for all.'* US intelligence officials have said that jihadi groups in the region are cooperating more closely than ever . . . *Gates said all of the factions were working under the umbrella of Al Qaeda*."[253]

- Secretary of Defense Robert Gates, May 2010: "The other concern we have . . . is the *creation of the syndicate of terrorist organizations* that are working with each other*, al Qaeda,* the Taliban in Pakistan*, the Taliban in Afghanistan, the Haqqani Network*. There are five or six of these groups that are now really working together and *a success for one is a success for all* . . . And so this problem has become more complex as these groups have *gotten closer and cooperated operationally* in a way that we really haven't seen, I think, significantly before 2007, 2006."[254]

- Under Secretary of Defense for Policy Michele Flournoy, April 2011: "*We view al Qaeda, Haqqani, the Taliban, these are all part of a syndicate* of groups that help each other. *The Pakistanis tend to make finer distinctions between them* -- you know, not being . . . tolerant to some, like al Qaeda, but otherwise tolerating others. *We are trying to* work with them to *shift that perspective* and shift that calculus."[255]

---

[253] *Gates Casts Qaeda as Terror Syndicate*, Wash. Post (Jan. 21, 2010), 2010 WLNR 1263055 (emphasis added).

[254] *John King Presents: Full Interview with Secretary of Defense Robert Gates*, CNN (May 8, 2010), 2010 WLNR 27823364 (emphasis added).

[255] *Pakistan Must Meet Certain Expectations on Counter-Terrorism*, Hindustan Times (Apr. 22, 2011) (emphasis added).

**Al-Qaeda Authorized and Planned Taliban Terrorist Attacks**

347.   Since at least the mid-2000s, al-Qaeda planned and authorized the

Taliban's, including the Haqqani Network's, attacks on U.S. forces in Afghanistan

in several ways.

348.   **Authorization.** Al-Qaeda provided critical religious authorization for

Taliban (including the Haqqani Network) attacks on U.S. forces. As noted above,

in 1998 Osama bin Laden himself directed all Muslims to kill Americans at every

opportunity. In the ensuing years, senior al-Qaeda leaders issued a series of *fatwas*

directed toward the Taliban, conferring religious permission for them to attack

Coalition forces in Afghanistan. Examples include:

- Osama bin Laden, October 2001: "[A]s [Mullah] Omar has said, the British invaded and were defeated in Afghanistan before bin Laden was to be found here, and the Russians came, before we did, and now ***the Americans have come, and we implore God to defeat them like He defeated their previous allies***. . . . I say that ***jihad is without doubt mandatory*** for all Muslims . . ."[256]

- Ayman al-Zawahiri, May 2006: "I address my statement to my Muslim brothers in Kabul … ***I appeal to Muslims in Kabul in particular and throughout Afghanistan in general, for the sake of God, to sincerely stand against the infidels' forces***, which are invading Muslims' lands. . . . I appeal to my Muslim brothers in Kabul in particular, and throughout Afghanistan in general, to defend Islam. . . . I urge them to . . . ***resist this infidel***, oppressive, and unjust occupation of Muslims' lands. . . . My Muslim brothers in Kabul in particular and throughout Afghanistan in

---

[256] *Osama bin Laden: Terror for Terror*, Al-Jazeera (Oct. 21, 2001) (emphasis added).

general: Stand by the mujahideen until the invading forces are expelled . . . ."[257]

- <u>Ayman al-Zawahiri, September 2007</u>: "My Muslim nation: Abd-al-Rashid Ghazi, Mullah Dadollah, Abdallah Azzam, Abu-Umar al-Sayf, Hammudah al-Uqlah, Abdallah al-Rashud, and those like them of the mujahid and steadfast ulema are the ones who *deserve to be followed by you*. . . . *The Crusaders themselves have admitted their defeat in Afghanistan at the hands of the lions of the Taliban* under the banner of the lion of Islam, our amir, the leader of the faithful, Mullah Muhammad Omar Mujahid, may God watch over him."[258]

- <u>Ayman al-Zawahiri, August 2009</u>: "What is taking place in Afghanistan is a *lesson that the entire Muslim Nation must learn*. The Afghans should be proud of the fact that they will go down in Islamic history as the people whose Islamic emirate, led by the Commander of the Faithful, Mullah Muhammad Omar (may God protect him) has challenged America, the strongest power on the face of the earth. This emirate has sacrificed all it has for the sake of its doctrine, its principals, and for the protection and the safety of its Muslim migrant brothers, as well as the oppressed mujahidin . . . ."[259]

- <u>Ayman al-Zawahiri, May 2012</u>: "O' Muslim, glorious, defiant Afghan people, and O' Muslim Ummah everywhere: *join the Mujahideen, support and back them up, and fight under the banner of the Islamic Emirate under the leadership of the Amir of Believers Mulla Muhammad Omar Mujahid* . . . who caused the Crusaders consecutive defeats and who are on the verge of expelling them [Crusaders] from the pure Afghanistan . . . Fight the enemies of Allah . . . Their defeat began

---

[257] *Ayman al-Zawahiri: Zawahiri Addresses Afghans*, Al-Jazeera (May 30, 2006) (emphasis added).

[258] *Ayman al-Zawahiri: Power of Truth*, As-Sahab (Sept. 20, 2007) (emphasis added).

[259] *Ayman al-Zawahiri: The Facts of Jihad and the Lies of Hypocrisy*, As-Sahab (Aug. 4, 2009) (emphasis added).

appearing on the horizon, so intensify your attacks on them until Allah gives you dominance over them."[260]

349.    After Osama bin Laden was killed, the Taliban confirmed his religious and moral authority over their Afghan jihad, stating: "Osama Bin Laden You were the **sheikh of the Umma**, a zealous man, and **the scholar and imam of the nation at the level of Jihad** and the fighting of the enemies and their minions. You were **our** sheikh, **our** imam and **role model**, the hero and miracle of our times, unique among your peers, pious and highly sensible."[261]

350.    Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in the al-Qaeda Terror Syndicate. That multi-group Syndicate involved periodic mafia-style meetings in which al-Qaeda, the Taliban (including the Haqqani Network), and other members of the Syndicate (such as Lashkar-e-Taiba) would confer about geographies and targets to attack.[262] The Syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the Syndicate's individual members. Among other things, the Syndicate specifically approved: (i) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding

---

[260] *Ayman al-Zawahiri: Statement on the Burning of Qur'ans in Kabul*, As-Sahab (May 9, 2012) (emphasis added).

[261] Al-Somood, *Bin Laden is alive O dead ones and the cowards should not dare close their eyes* (July 1, 2011) (emphasis added).

[262] *See* Roggio & Joscelyn, *The al Qaeda-Taliban Connection*, *supra* note 9.

144

provinces; (ii) the campaign of suicide attacks against Americans throughout Afghanistan; (iii) the Taliban's campaign of using anti-American IED and suicide attacks specifically in N2KL and P2K; and (iv) the Taliban's "surge" in Kandahar and Helmand from 2010 through 2012.

351.   The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan. In observing that this superstructure formed an Afghan-Pakistani "syndicate," a former CIA analyst and White House observer documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."[263]

352.   Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban members. Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[264]

353.   Al-Qaeda's messages of authorization extended to suicide bombings. In February 2003, bin Laden issued a recording calling specifically for suicide

---

[263] Riedel, *Deadly Embrace*, *supra* note 8, at 100.

[264] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019).

attacks in Afghanistan and Iraq. A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans all over the world."[265] The Taliban had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible. Al-Qaeda trumpeted that success online, announcing, "[w]hile suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[266] With al-Qaeda's authorization, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006.

354.    Al-Qaeda's role in that suicide-bombing trend was pivotal. As Islamic history scholar Brian Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban. These demonstrative acts and videos of successful

---

[265] *Osama bin Laden: Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

[266] Brian Glyn Williams, *Suicide Bombings in Afghanistan*, Jane's Islamic Affairs Analyst, at 5 (Sept. 2007), *available at* https://www.brianglynwilliams.com/IAA%20suicide.pdf.

[al-Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."[267]

355.   Al-Qaeda also authorized the Taliban's use of IED attacks against Americans in Afghanistan. Osama bin Laden publicly called for the Taliban to escalate its IED campaign against Americans in Afghanistan on several occasions in 2006 alone, in speeches in which he instructed his followers that Allah supported their use of IEDs because of the psychological terror, "destruction of the soldier's morale" and "rise in cases of suicide among" Americans. Osama bin Laden's messages of authorization—directed toward a specific type of Muslim (Taliban), a class of target (Americans in Afghanistan), and weapon (IEDs)—were important in enabling the Taliban's IED campaign against Coalition forces.

356.   Al-Qaeda also authorized the Taliban's use of RPG attacks against Americans in Afghanistan. In 2006, for example, Osama bin Laden publicly called for anti-American terrorists to escalate their use of RPGs in Afghanistan.

357.   Al-Qaeda also authorized the Taliban's campaign of kidnapping Americans and others who supported the Afghan government. For example, Mustafa Abu al-Yazid (aka Saeed al-Masri), was one of al-Qaeda's founders, served as al-Qaeda's leader in Afghanistan, and helped persuade the Taliban to

---

[267] Brian Glyn Williams, *Afghanistan Declassified: A Guide to America's Longest War*, at 202 (2012).

"adopt[] a number of 'al-Qaida inspired' tactics, first and foremost suicide bombings, but also others associated with al-Qaida, such as kidnappings, decapitation of hostages, roadside bombs, and an active media campaign."[268] Similarly, another senior al-Qaeda leader, Abu Hafs al-Najdi (aka Abdul Ghani), "commonly instructed subordinate leaders to conduct kidnapping operations against foreigners."[269]

358. **Planning.** Al-Qaeda also planned the Taliban's, including the Haqqani Network's, terrorist attacks against Americans in Afghanistan. Working through its Syndicate partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as regional terrorist attacks, particularly in Afghanistan."[270] Two terrorism scholars explained al-Qaeda's Syndicate-related shuras as follows:

> The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. . . . It established a number of shuras to ***coordinate strategy, operations, and tactics*** against the West and regional allied governments. In particular, al-Qaeda fighters have been involved in ***planning and carrying out suicide attacks,***

---

[268] Anne Stenersen, *Blood Brothers Or A Marriage Of Convenience? The Ideological Relationship Between Al-Qaida And The Taliban*, Paper presented at ISA's 50th Annual Convention, "Exploring the Past, Anticipating the Future" in New York City, Feb. 15-18, 2009, *available at* https://convention2.allacademic.com/one/isa/isa09/.

[269] ISAF Joint Command, *ISAF Confirms Number 2 Insurgent Killed In Coalition Airstrike*, Def. Visual Info. Distribution Serv. (Apr. 13, 2011).

[270] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 3.

***developing improved explosive devices, and helping conduct operations*** against high-value targets.[271]

359.   Al-Qaeda training provided another key mechanism through which that planning occurred. Before the September 11 attacks, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans.

360.   By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan. According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] ***Haqqani is also affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda*** (AQ) in North Waziristan.
>
> . . . A list and brief description of each facility follows.
>
> A. Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.
>
> B. There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah. Approximately 45 U/I Arabs and Uzbeks receive training there.

---

[271] *Id.* at 3-4.

C. An AQ training facility called "Shaki Masood" is located in Miram Shah and over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).

D. Another AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan. Over 80 Arabs receive training there (NFI).[272]

361.   One al-Qaeda operative, whom U.S. officials characterized as "an important al-Qaida planner and explosives expert," Ghazwan al-Yemeni, trained Taliban members in Miran Shah, in Pakistan.[273] He eventually helped plan the December 30, 2009 attack on Camp Chapman that killed Harold Brown, Jr., Dane Clark Paresi, and Jeremy Jason Wise, whose family members are Plaintiffs in this case. *See infra* ¶¶ 326-332.

362.   The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province—both reportedly "hosted by the Taliban."[274] One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

---

[272] Defense Intelligence Agency, *Intelligence Information Report: Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))* (Apr. 16, 2008) (emphasis added; original emphasis omitted).

[273] Evan F. Kohlmann, *Al-Qa'ida's Yemeni Expatriate Faction In Pakistan*, CTC Sentinel, Vol. 4, Issue 1, at 11-12 (Jan. 2011).

[274] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019), https://www.politico.com/magazine/story/2019/03/18/donald-trump-afghanistan-zalmay-khalilzad-225815.

363.    Al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its spectacular suicide bombings and insider attacks. As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," including insider attacks in Kabul "through operations planned together with Sirajuddin Haqqani."[275]

364.    Al-Qaeda also planned Taliban attacks by devising the operational scheme through which the Taliban carried out its attacks, and by providing the Taliban with financing that helped it do so. For example, in July 2010, the U.S. Treasury Department designated Nasiruddin Haqqani, the brother of Sirajuddin, a Specially Designated Global Terrorist pursuant to Executive Order 13224.[276] The designation noted that Nasiruddin had received terrorist funding via payments from al-Qaeda.[277] More broadly, al-Qaeda has long provided substantial financial assistance to the Taliban, with the aim of increasing the frequency of its terrorist attacks against Americans in Afghanistan. Al-Qaeda not only provided direct aid, but also helped the Taliban raise additional funds from Arabs around the world—

---

[275] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 9.

[276] U.S. Dep't of Treasury, *Treasury Targets Taliban and Haqqani Network Leadership: Treasury Designates Three Financiers Operating in Afghanistan and Pakistan* (July 22, 2010).

[277] *Id.*

all of which was important to the Taliban's anti-American campaign of terrorism in Afghanistan.

365.    Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates the planning activities of the al-Qaeda-Taliban Syndicate. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the leaders of the respective terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting in Pakistan in early spring 2003."[278] Another purported Gitmo detainee file as quoted by Messrs. Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist, stated as follows:

> [Afghani] is assessed to have attended a joint operations meeting among extremist elements in mid-2006. A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . . and the Islamic Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.[279]

---

[278] Roggio & Joscelyn, *The al Qaeda-Taliban Connection*, *supra* note 9.

[279] *Id.* (brackets in original).

Taken together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[280]

366.    The Taliban also relied on "Al-Sahab, al Qa'ida's media enterprise, to distribute video propaganda and recruit supporters."[281] As terrorism scholar Seth Jones explained, al-Qaeda's media-support for the Taliban was as important operationally as its financial support: "Afghan groups were able to tap into the broad international jihadi network" because "al Qa'ida was instrumental in improving" the Taliban's "communications capabilities."[282] In addition, "jihadi websites, with links to al Qa'ida, … helped raise funds for the Taliban. Some solicited military items for the Taliban, including gas masks and night vision goggles."[283]

367.    Al-Qaeda also taught the Taliban effective terrorist tradecraft. Through its relationship with al-Qaeda, the Taliban "developed or acquired new commercial communications gear and field equipment," as well as "good tactical, camouflage, and marksmanship training."[284] They also "share[d] communication

---

[280] *Id.*

[281] Jones, *Graveyard of Empires*, *supra* note 250, at 232.

[282] *Id.* at 291.

[283] *Id.* at 292.

[284] *Id.* at 293.

and transportation routes, coordinate[d] attacks, and even utilize[d] the same explosive and suicide-bomber networks."[285]

368.   All of these activities were part of al-Qaeda's planning of the Taliban's terrorist attacks in Afghanistan. By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends. In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies. As terrorism scholar Thomas Ruttig observed: "Both in Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[286] Here, its "cooptation" of the Taliban was especially effective.

369.   Al-Qaeda's planning activities extended to suicide bombings in particular. The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy. Al-Qaeda exported its suicide-bombing expertise to the Taliban through their joint Syndicate, and in so doing played a pivotal leadership and operational role in every Taliban suicide bombing in Afghanistan. For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

---

[285] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 9.

[286] Ruttig, *The Other Side*, *supra* note 240, at 22.

370.    Al-Qaeda planned suicide bombings in Afghanistan by mounting a coordinated communications campaign to persuade Taliban (including Haqqani) terrorists to embrace suicide attacks against Americans. This campaign included messaging touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of Taliban and Haqqani leadership.

371.    Al-Qaeda used this message—and the moral authority conveyed by bin Laden's 2003 *fatwa* authorizing martyrdom operations—to change the Taliban's organizational posture toward suicide bombing. Those efforts convinced the Taliban to begin participating in, and claiming credit for, al-Qaeda-planned suicide attacks in Afghanistan. Without al-Qaeda's involvement, neither Taliban leadership nor its rank-and-file commanders would have embraced suicide bombing as a permissible tactic against Coalition forces in Afghanistan. As Dr. Jones summarized the evidence, "Al Qa'ida's involvement was particularly important in this regard because Afghan insurgent groups were surprisingly inept at suicide attacks." [287]

372.    To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps that converted disaffected recruits into suicide bombers at an industrial scale. In collaboration with other Syndicate members,

---

[287] Jones, *Graveyard of Empires*, *supra* note 250, at 293.

Al-Qaeda created and designed a process for identifying candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal a suicide vest, navigate a checkpoint, and detonate for maximum impact. Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

373.   Under al-Qaeda's standard training procedure for suicide bombers, each suicide bomber swore fealty to al-Qaeda. Al-Qaeda emphasized declarations of fealty to ensure the suicide bomber's commitment to al-Qaeda's and the Taliban's jihad by creating a psychological "point of no return" for the bomber. Suicide bombers who completed al-Qaeda's training course were officially viewed by al-Qaeda as al-Qaeda operatives and given all the stature in jihadist circles that such a title provided.

374.   To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban relied upon a series of dual-hatted al-Qaeda/Taliban terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons. Such dual-hatted al-Qaeda/Taliban terrorists include, but are not limited to, the following:

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network. Sirajuddin Haqqani operated at least four joint al-Qaeda/Taliban training camps in North Waziristan, from which al-Qaeda and the Taliban supported the suicide bombing

campaign in Afghanistan with a regular stream of al-Qaeda operatives who would kill themselves in Taliban martyrdom attacks. Sirajuddin Haqqani helped plan many of the suicide attacks in this case, including, but not limited to, the October 29, 2011 suicide bombing conducted by al-Qaeda and the Haqqani Network under the auspices of the Kabul Attack Network, which killed David E. Cabrera, James M. Darrough, and Christopher R. Newman.

- **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces. Rahman worked closely with al-Qaeda's chief of operations for Kunar Province, Abu Ikhlas al-Masri, with whom he shared operations, training, and logistics resources. Rahman helped plan suicide attacks that took place in N2KL, including, but not limited to, the June 21, 2010 suicide attack in Kunar Province that killed Andrew R. Looney.

- **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari)**, a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban. Sheikh Aminullah helped plan suicide attacks that took place in N2KL. He also received direct contributions from NBP customer McLintock.

375.   Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers in support of the Taliban's jihad against Americans in Afghanistan. This attack infrastructure included (i) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the Syndicate; (ii) joint al-Qaeda/Taliban safehouses and ratlines to support the deployment of suicide bombers inside Afghanistan; and (iii) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for purposes of maximizing the chance the particular attacker would

157

carry out his attack, as well as incentivizing the next generation of suicide bombers thereafter.

376. As a reflection of the joint nature of al-Qaeda-Taliban martyrdom operations, al-Qaeda suicide bombers were often referred to as "Mullah Omar's Missiles." By following a strategy in which the weapon (*i.e.*, the suicide bomber) was created by al-Qaeda and then deployed by the Taliban, both organizations played to their respective operational competencies to maximize the impact of their shared jihad against Americans in Afghanistan.

377. Al-Qaeda's planning of the Taliban's terrorist campaign against Americans in Afghanistan also emphasized tactics designed to shoot down American helicopters, including Black Hawks and Chinooks. Al-Qaeda's role was essential, as the Taliban and Haqqani Network terrorists had no tactical experience successfully targeting American helicopters prior to their training from al-Qaeda. Al-Qaeda's anti-helicopter training was renowned in jihadist circles, having successfully trained terrorists in Iraq and Somalia with a substantial history of downing American helicopters, including the "Black Hawk Down" incident during the Battle of Mogadishu in 1993, and a litany of successful attacks in Iraq from 2003 through 2007.

378. Shooting down a helicopter with an RPG requires precise training and is one of the most challenging attack types for an unskilled terrorist to execute.

158

Consequently, al-Qaeda's specialized skills, experience, and training had an

outsized impact on the Taliban and Haqqani Network. Al-Qaeda forward-deployed

trainers into Afghanistan for the specific purpose of instructing Taliban fighters

concerning attacks targeting helicopters. The Taliban deployed this training to

attack multiple American and Coalition helicopters, including in a June 9, 2010

attack that killed Joel Gentz and Benjamin White, whose family members are

Plaintiffs in this case. *See infra* ¶¶ 534-540, 798-809.

379.    Al-Qaeda further planned the Taliban's campaign of fertilizer-based

IEDs in Afghanistan. As the acclaimed journalist Peter Bergen documented in

2009:

> [I]n recent years, Taliban leaders have drawn especially close to
> Al Qaeda. … Today, at the leadership level, the Taliban and Al Qaeda
> function ***more or less as a single entity***. The signs of this are
> everywhere. For instance, IED attacks in Afghanistan have increased
> dramatically since 2004. What happened? As a Taliban member told
> Sami Yousafzai and Ron Moreau of *Newsweek*, "***The Arabs taught us***
> ***how to make an IED by mixing nitrate fertilizer and diesel fuel and***
> ***how to pack plastic explosives and to connect them to detonators***
> ***and remote-control devices like mobile phones***. We learned how to
> do this blindfolded so we could safely plant IEDs in the dark."[288]

Roughly 80% or more of all the IEDs used in successful attacks against Americans

in Afghanistan since 2007 have been fertilizer-based IEDs. On information and

---

[288] Bergen, *The Front*, *supra* note 248 (emphasis added).

belief, nearly all of the IED victims in this case were killed by fertilizer-based IEDs planted by the Taliban and derived from al-Qaeda schematics and training.

380.    More broadly, al-Qaeda members regularly trained Taliban commanders in sophisticated bomb-making techniques that were material to the Taliban's ability to assemble and deploy explosives against Coalition forces. According to the terrorism scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated improvised explosive devices (IEDs), including remote controlled detonators. For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas. They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology. Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[289]

As part of that assistance, al-Qaeda also invited Taliban commanders to Iraq, where it learned how to make armor-penetrating "shaped" charges,[290] a type of IED later known as an EFP.

381.    Al-Qaeda's support of Taliban IED and EFP attacks also included the use of forward deployed al-Qaeda terrorist trainers throughout Afghanistan. For example, by 2010, "[i]n southern Afghanistan, there [were] pockets of al Qa'ida

---

[289] Jones, *Graveyard of Empires*, *supra* note 250, at 292.

[290] Sami Yousafzai & Ron Moreau, *Unholy Allies: The Taliban Haven't Quit, And Some Are Getting Help And Inspiration From Iraq*, Newsweek (Sept. 25, 2005).

. . . in Helmand and several neighboring provinces, such as Kandahar and Zabol," which helped the Taliban "conduct suicide attacks and other improvised explosive device[]" attacks.[291] Al-Qaeda also forward deployed IED terrorist trainers in P2K and N2KL.

382.    Al-Qaeda's planning efforts were significant and amplified the lethality of the Taliban insurgency. Indeed, al-Qaeda's ability to export its terrorism expertise to local groups like the Taliban is what "renders al-Qaeda effective in the first place."[292] In the case of the Taliban, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[]ing of what some observer[s] call 'strategic-level funding.'"[293] Those activities were material to the Taliban's ability to execute the type of attacks that killed and injured Plaintiffs. As Mr. Ruttig concluded, al-Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[294]

383.    As Mr. Bergen put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something

---

[291] Jones, *Graveyard of Empires*, *supra* note 250, at 330.

[292] Ruttig, *The Other Side*, *supra* note 240, at 22.

[293] *Id*.

[294] *Id*.

like U.S. Special Forces do—as trainers and force multipliers."[295] Al-Qaeda's sophistication and support was important to the Taliban's terrorist enterprise. And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks. For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[296]

**Al-Qaeda Directly Participated in Taliban Terrorist Attacks**

384.   Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. In the early 2000s, al-Qaeda's third-ranking member, Abu Layth-al Libi, participated in attacks on Americans in Afghanistan alongside Taliban members under the command of Sirajuddin Haqqani. On July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Wanat in Nuristan Province, killing nine U.S. soldiers. In May 2010, Taliban and al-Qaeda members participated in an attack on the U.S. airbase in Bagram, killing an American contractor.

---

[295] Bergen, *The Front*, *supra* note 248.

[296] Joscelyn, *Al Qaeda Growing Stronger*, *supra* note 264.

385.   In fact, many terrorist operatives were "dual-hatted," meaning that they were both Taliban and al-Qaeda members. Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs. Examples are set forth below.

386.   **Nangarhar, Nuristan, Kunar and Laghman Provinces (N2KL).** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) Nangarhar, Nuristan, Kunar and Laghman Provinces, which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the Taliban, and LeT maintained joint cells responsible for anti-American terrorism. The dual-hatted al-Qaeda/Taliban terrorists who ran the cells include:

- **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[297] Al-Qahtani maintained this position until he was killed in a U.S. airstrike on or about October 2016. After Qahtani's death, al-Qaeda's General Command issued a statement praising Qahtani's leadership of a joint cell with the Taliban, through which Qahtani "participated with their mujahidin brothers from the Islamic Emirate . . . in cleansing [Kunar and Nuristan Province] from the crusaders' abomination."[298]

- **Sakhr al-Taifi**, al-Qaeda's second highest leader in Afghanistan, who, while embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against Afghan security forces and coalition troops throughout

---

[297] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan*, Long War J. (Nov. 4, 2016).

[298] Al-Qaeda General Command, *The Martyrdom of the Commander Faruq al-QabtanT and His Comrades in Konar Province* (Nov. 23, 2016), *available at* https://scholarship.tricolib.brynmawr.edu/bitstream/handle/10066/18978/AQC20161123.pdf?sequence=1&isAllowed=y.

eastern Afghanistan," and "also supplie[d] weapons and equipment to insurgents."[299] On information and belief, al-Taifi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells in N2KL until he was killed in a Coalition airstrike on or about May 27, 2012.

- **Mufti Assad**, an al-Qaeda network leader for Kunar Province, who "was an insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who provided training to insurgents on how to construct and use improvised explosive devices."[300] On information and belief, Assad replaced al-Taifi after the latter was killed, and Assad assumed the same role until he himself was killed in a coalition airstrike on or about August 2012.

- **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces. On information and belief, al-Qurayshi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces prior to his death on or about September 25, 2010 during a coalition airstrike that also killed a senior Taliban commander named Matin who operated as part of the al-Quarayshi's joint al-Qaeda/Taliban cell.

- **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks. On information and belief, al-Kuwaiti helped commit every IED attack carried out by joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces prior to his death on or about September 25, 2010 during the same coalition airstrike that also killed al-Qurayshi and the Taliban commander Matin.

- **Abu Ikhlas al-Masri**, a who served as an al-Qaeda commander responsible for helping coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture on or about December 2010. On

---

[299] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

[300] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

information and belief, al-Masri helped commit all of the attacks carried out by al-Qaeda/Taliban joint cells in Kunar Province until his death.

- **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who "coordinated attacks against coalition forces" and "conducted training" for terrorists throughout Kunar Province, "as well as weapons procurement."[301] Waqas replaced Masri as al-Qaeda's operations chief in Kunar Province until Waqas was killed in the same April 13, 2011 coalition airstrike that killed al-Najdi. On information and belief, Waqas helped commit all of the attacks carried out by al-Qaeda/Taliban joint cells in Kunar Province after al-Masri's death.

- **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who directed al-Qaeda operations in Kunar Province, and was specifically responsible for "planning attacks against Afghan and coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" that were facilitated by his "network" of Taliban terrorists.[302] On information and belief, al-Najdi planned and authorized the Taliban's attacks against Americans in Kunar Province, including its suicide attacks, prior to his death in a Coalition airstrike on April 13, 2011.

- **Fatah Gul**, an al-Qaeda facilitator who "ran terrorist training camps where insurgents learned how to conduct improvised explosive devices attacks" in the N2KL region of Afghanistan.[303] Fatah Gul maintained this position until he was killed in a Coalition airstrike on or about August 2012.

387.   Joint al-Qaeda/Taliban/LeT cells operating under the local command of the above al-Qaeda terrorists committed the attacks that killed and/or injured Blaine E. Redding, Andrew R. Looney, Jared C. Plunk, Carlos J. Negron, Sr.,

---

[301] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Apr. 16, 2011).

[302] U.S. Dep't of Def., *Strike Kills No. 2 Insurgent in Afghanistan* (Apr. 26, 2011).

[303] ISAF Joint Command, *Morning Operational Update* (Aug. 5, 2012).

Shaun M. Mittler, Benjamen G. Chisholm, Charles L. Adkins, William Gross Paniagua, and Kevin. J. Griffin.

388. **Paktia, Paktika, and Khost Provinces (P2K).** Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also operated as a "traditional al-Qaeda safe haven[]."[304] In this area, al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism. The dual-hatted terrorists who ran the cells include:

- **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's ruling council. On information and belief, Harrach helped commit every major Haqqani Network attack in Afghanistan prior to his death on or about May 19, 2010. As one Haqqani source told *Der Spiegel* in January 2009, "[i]f we want to do something, we always ask [Harrach] for his opinion."

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network, who has previously stated that al-Qaeda "enlighten[s] the road for [the Taliban] and they resist against the cross worshippers [i.e., the Americans] by cooperating with us and us with them in one trench" pursuant to cooperation between al-Qaeda and the Taliban "at the highest limits."[305] On information and belief, Sirajuddin Haqqani planned, authorized, and helped to commit the Haqqani Network's attack campaign in P2K after Harrach's death on or about May 19, 2010.

---

[304] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 89, at 11-12.

[305] Roggio, *Taliban Cooperation*, *supra* note 38.

- **Khalil al-Rahman Haqqani**, is a brother of Jalaluddin Haqqani and served as a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and operational commander" for the Haqqani Network,[306] as well as an agent who "acted on behalf of al-Qa'ida"[307] and had "been linked to al-Qa'ida terrorist operations."[308] On information and belief, Khalil al-Rahman Haqqani helped to plan, authorize, and commit the Haqqani Network's attacks after Harrach's death on or about May 19, 2010.

389.    Joint al-Qaeda/Taliban cells operating under the local command of the above dual-hatted al-Qaeda/Taliban terrorists committed the attacks that killed and/or injured Nicholas J. Aleman, Vincent J. Ellis, and Jeremy F. Hardison.

390.    **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city. This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including the Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing attacks. *See supra* Part I.F. The dual-hatted al-Qaeda/Taliban terrorists who ran the cells include:

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network. On information and belief, Sirajuddin Haqqani has served as the overall strategic planner

---

[306] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War J. (Feb. 9, 2011).

[307] U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[308] U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani Network Leaders* (Aug. 20, 2014).

supervising the activities of the Kabul Attack Network beginning no later than April 2010, and he has continued in that role to this day.

- **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban. On information and belief, Wazir commanded the activities of the Kabul Attack Network in Ghazni Province, and planned every attack committed by the Kabul Attack Network there until he was killed by a Coalition air strike on or about November 21, 2013.

391.    The joint al-Qaeda/Taliban Kabul Attack Network cells operating under the command of these dual-hatted al-Qaeda/Taliban terrorists committed the attacks that injured and/or killed Karl A. Campbell, Charles L. Adkins, David L. Brodeur, Frank D. Bryant Jr., Jay Henigan, David E. Cabrera, James M. Darrough, Christopher R. Newman, Jonathan A. Gollnitz, Orion N. Sparks, Anne T. Smedinghoff, Angel Roldan, Jr., Paul Goins, Jr., Jason D. Landphair, Corey J. Dodge, Richard P. McEvoy, and Barry Sutton. *See infra* ¶¶ 419-427, 445-489, 499-515, 541-558, 589-595, 621-632, 655-665, 688-696, 724-733, 745-766, 779-790.

## IV.    The Plaintiffs

### A. The Camp Chapman Attack Plaintiffs

392.    The following Plaintiffs are suing based on injuries sustained during the Camp Chapman Attack, described in detail *supra* ¶¶ 326-332.

**The Harold Brown Jr. Family**

393.    Harold Brown Jr. served in Afghanistan as a U.S. government employee serving in the Central Intelligence Agency. On December 30, 2009, Mr. Brown died from injuries sustained in the Camp Chapman Attack.

394.    Mr. Brown was a national of the United States at the time of the attack and his death.

395.    As a result of the attack, Mr. Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for their own injuries and for the damages Mr. Brown sustained.

396.    Plaintiff Harold Brown Sr. is the father of Mr. Brown. He is a national of the United States.

397.    Plaintiff Barbara Brown is the mother of Mr. Brown. She is a national of the United States.

398.    Plaintiff Paula Rich is the sister of Mr. Brown. She is a national of the United States.

399.    Plaintiff Regina Brown is the sister of Mr. Brown. She is a national of the United States.

400.   As a result of the death of Mr. Brown, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Brown's society, companionship, and counsel.

**The Dane Clark Paresi Family**

401.   Dane Clark Paresi served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Paresi died from injuries sustained in the Camp Chapman Attack.

402.   Mr. Paresi was a national of the United States at the time of the attack and his death.

403.   As a result of the attack, Mr. Paresi was injured in his person and/or property. The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for their own injuries and for damages Mr. Paresi sustained.

404.   Plaintiff MindyLou Paresi is the widow of Mr. Paresi. She is a national of the United States.

405.   Plaintiff Janet G. Paresi is the mother of Mr. Paresi. She is a national of the United States.

406.   Plaintiff Alexandra VandenBroek is the step-daughter of Mr. Paresi. She is a national of the United States. Alexandra VandenBroek lived in the same

household as Mr. Paresi for a substantial period of time and considered Mr. Paresi the functional equivalent of a biological father.

407.   Plaintiff Elizabeth Santina Paresi is the daughter of Mr. Paresi. She is a national of the United States.

408.   Plaintiff Santina Cartisser is the sister of Mr. Paresi. She is a national of the United States.

409.   Plaintiff Terry Paresi is the brother of Mr. Paresi. He is a national of the United States.

410.   As a result of the death of Mr. Paresi, each member of the Paresi Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Paresi's society, companionship, and counsel.

**The Jeremy Jason Wise Family**

411.   Jeremy Jason Wise served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Wise died from injuries sustained in the Camp Chapman Attack.

412.    Mr. Wise was a national of the United States at the time of the attack and his death.

413.   As a result of the attack, Mr. Wise was injured in his person and/or property. The Plaintiff members of the Wise Family are the survivors and/or heirs

of Mr. Wise and are entitled to recover for their own injuries and the damages Mr. Wise sustained.

414.   Plaintiff Dana Marie Bernhardt is the widow of Mr. Wise. She is a national of the United States.

415.   Plaintiff Mary Lee Wise is the mother of Mr. Wise. She is a national of the United States.

416.   Plaintiff E.P., by and through his next friend Dana Marie Bernhardt, is the minor step-son of Mr. Wise. He is a national of the United States. E.P., by and through his next friend Dana Marie Bernhardt, lived in the same household as Mr. Wise for a substantial period of time and considered Mr. Wise the functional equivalent of a biological father.

417.   Plaintiff Mary Heather Wise is the sister of Mr. Wise. She is a national of the United States.

418.   As a result of the death of Mr. Wise, each member of the Wise Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Wise's society, companionship, and counsel.

**B.  The al-Qaeda / Taliban / Kabul Attack Network Attack Plaintiffs**
**The Charles L. Adkins Family**

419.   Sergeant First Class Charles L. Adkins served in Afghanistan as a member of the U.S. Army. On April 16, 2011, SFC Adkins was injured in a suicide

bombing insider attack in Laghman Province, Afghanistan. SFC Adkins died on April 16, 2011 as a result of injuries sustained during the attack.

420.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

421.   SFC Adkins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

422.   SFC Adkins was a national of the United States at the time of the attack and his death.

423.   As a result of the attack, SFC Adkins was injured in his person and/or property. The Plaintiff members of the Adkins Family are the survivors and/or heirs of SFC Adkins and are entitled to recover for the damages SFC Adkins sustained.

424.   Plaintiff Charles E. Adkins is the father of SFC Adkins. He is a national of the United States.

425.   Plaintiff Sheila G. Good is the mother of SFC Adkins. She is a national of the United States.

426.   Plaintiff Velvet L. Adkins is the step-mother of SFC Adkins. She is a national of the United States. Velvet L. Adkins lived in the same household as SFC

Adkins for a substantial period of time and considered SFC Adkins the functional equivalent of a biological son.

427.   As a result of the April 16, 2011 attack and SFC Adkins's injuries and death, each member of the Adkins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Adkins's society, companionship, and counsel.

**The Nicholas J. Aleman Family**

428.   Sergeant Nicholas J. Aleman served in Afghanistan as a member of the U.S. Marine Corps. On December 5, 2010, Sgt Aleman was injured in a suicide bombing insider attack in Paktia Province, Afghanistan. Sgt Aleman died on December 5, 2010 as a result of injuries sustained during the attack.

429.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

430.   Sgt Aleman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was improperly wearing the uniform of his enemy, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a market.

174

431.  Sgt Aleman was a national of the United States at the time of the attack and his death.

432.  As a result of the attack, Sgt Aleman was injured in his person and/or property. The Plaintiff members of the Aleman Family are the survivors and/or heirs of Sgt Aleman and are entitled to recover for the damages Sgt Aleman sustained.

433.  Plaintiff Jose Aleman is the father of Sgt Aleman. He is a national of the United States.

434.  Plaintiff Stephanie Hager is the sister of Sgt Aleman. She is a national of the United States.

435.  As a result of the December 5, 2010 attack and Sgt Aleman's injuries and death, each member of the Aleman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Sgt Aleman's society, companionship, and counsel.

**The Darrik C. Benson Family**

436.  Special Warfare Operator Chief Petty Officer Darrik C. Benson served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SOC (SEAL) Benson was injured in an attack on a helicopter in Wardak Province, Afghanistan. SOC (SEAL) Benson died on August 6, 2011 as a result of injuries sustained during the attack.

175

437.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

438.   SOC (SEAL) Benson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

439.   SOC (SEAL) Benson was a national of the United States at the time of the attack and his death.

440.   As a result of the attack, SOC (SEAL) Benson was injured in his person and/or property. The Plaintiff members of the Benson Family are the survivors and/or heirs of SOC (SEAL) Benson and are entitled to recover for the damages SOC (SEAL) Benson sustained.

441.   Plaintiff Frederick C. Benson is the father of SOC (SEAL) Benson. He is a national of the United States.

442.   Plaintiff Beverly Mills is the mother of SOC (SEAL) Benson. She is a national of the United States.

443.   Plaintiff Brianna N. Benson is the sister of SOC (SEAL) Benson. She is a national of the United States.

444.   As a result of the August 6, 2011 attack and SOC (SEAL) Benson's injuries and death, each member of the Benson Family has experienced severe

mental anguish, emotional pain and suffering, and the loss of SOC (SEAL) Benson's society, companionship, and counsel.

**The David L. Brodeur Family**

445.    Major David L. Brodeur served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, Maj Brodeur was injured in an insider attack in Kabul Province, Afghanistan. Maj Brodeur died on April 27, 2011 as a result of injuries sustained during the attack.

446.    The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

447.    Maj Brodeur's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

448.    Maj Brodeur was a national of the United States at the time of the attack and his death.

449.    As a result of the attack, Maj Brodeur was injured in his person and/or property. The Plaintiff members of the Brodeur Family are the survivors and/or heirs of Maj Brodeur and are entitled to recover for the damages Maj Brodeur sustained.

450.   Plaintiff Susan Brodeur is the widow of Maj Brodeur. She is a national of the United States.

451.   Plaintiff D.L.B., by and through his next friend Susan Brodeur, is the minor son of Maj Brodeur. He is a national of the United States.

452.   Plaintiff E.L.B., by and through her next friend Susan Brodeur, is the minor daughter of Maj Brodeur. She is a national of the United States.

453.   Plaintiff Joyce A. Brodeur is the mother of Maj Brodeur. She is a national of the United States.

454.   Plaintiff Lawrence A. Brodeur is the father of Maj Brodeur. He is a national of the United States.

455.   As a result of the April 27, 2011 attack and Maj Brodeur's injuries and death, each member of the Brodeur Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Maj Brodeur's society, companionship, and counsel.

**The Frank D. Bryant Jr. Family**

456.   Lieutenant Colonel Frank D. Bryant Jr. served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, Lt Co Bryant was injured in an insider attack in Kabul Province, Afghanistan. Lt Co Bryant died on April 27, 2011 as a result of injuries sustained during the attack.

457.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

458.   Lt Co Bryant's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

459.   Lt Co Bryant was a national of the United States at the time of the attack and his death.

460.   As a result of the attack, Lt Co Bryant was injured in his person and/or property. The Plaintiff members of the Bryant Family are the survivors and/or heirs of Lt Co Bryant and are entitled to recover for the damages Lt Co Bryant sustained.

461.   Plaintiff Janice Harriman Bryant is the widow of Lt Co Bryant. She is a national of the United States.

462.   Plaintiff S.L.B., by and through his next friend Janice Harriman Bryant, is the minor son of Lt Co Bryant. He is a national of the United States.

463.   As a result of the April 27, 2011 attack and Lt Co Bryant's injuries and death, each member of the Bryant Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Lt Co Bryant's society, companionship, and counsel.

**The David E. Cabrera Family**

464.    Lieutenant Colonel David E. Cabrera served in Afghanistan as a member of the U.S. Army. On October 29, 2011, LTC Cabrera was injured in a suicide bombing attack in Kabul Province, Afghanistan. LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the attack.

465.    The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

466.    LTC Cabrera's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

467.    LTC Cabrera was a national of the United States at the time of the attack and his death.

468.    As a result of the attack, LTC Cabrera was injured in his person and/or property. The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

180

469.   Plaintiff August Cabrera is the widow of LTC Cabrera. She is a national of the United States.

470.   Plaintiff M.G.C., by and through his next friend August Cabrera, is the minor son of LTC Cabrera. He is a national of the United States.

471.   Plaintiff R.X.C., by and through his next friend August Cabrera, is the minor son of LTC Cabrera. He is a national of the United States.

472.   Plaintiff Corbin Cabrera is the son of LTC Cabrera. He is a national of the United States.

473.   Plaintiff Gillian Leigh Cabrera is the daughter of LTC Cabrera. She is a national of the United States.

474.   Plaintiff Ronald Paul Hopkins is the brother of LTC Cabrera. He is a national of the United States.

475.   Plaintiff Suzanne Renae Martinez is the sister of LTC Cabrera. She is a national of the United States.

476.   Plaintiff JD Prosser is the sister of LTC Cabrera. She is a national of the United States.

477.   Plaintiff Robert Cabrera is the foster-father of LTC Cabrera. He is a national of the United States. Robert Cabrera lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological son.

181

478.    Plaintiff Daniel Matias Cabrera is the foster-brother of LTC Cabrera. He is a national of the United States. Daniel Matias Cabrera lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother.

479.    Plaintiff Gloria Diane Trelfa is the foster-sister of LTC Cabrera. She is a national of the United States. Gloria Diane Trelfa lived in the same household as LTC Cabrera for a substantial period of time and considered LTC Cabrera the functional equivalent of a biological brother.

480.    As a result of the October 29, 2011 attack and LTC Cabrera's injuries and death, each member of the Cabrera Family has experienced severe mental anguish, emotional pain and suffering, and the loss of LTC Cabrera's society, companionship, and counsel.

**The Karl A. Campbell Family**

481.    Sergeant Karl A. Campbell served in Afghanistan as a member of the U.S. Army. On October 4, 2010, SGT Campbell was injured in an IED attack in Kabul Province, Afghanistan. SGT Campbell died on October 4, 2010 as a result of injuries sustained during the attack.

482.    The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

483.   SGT Campbell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

484.   SGT Campbell was a national of the United States at the time of the attack and his death.

485.   As a result of the attack, SGT Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of SGT Campbell and are entitled to recover for the damages SGT Campbell sustained.

486.   Plaintiff Arthur Campbell is the father of SGT Campbell. He is a national of the United States.

487.   Plaintiff Audrey Campbell is the mother of SGT Campbell. She is a national of the United States.

488.   Plaintiff Tina Marie Campbell is the sister of SGT Campbell. She is a national of the United States.

489.   As a result of the October 4, 2010 attack and SGT Campbell's injuries and death, each member of the Campbell Family has experienced severe mental

183

anguish, emotional pain and suffering, and the loss of SGT Campbell's society, companionship, and counsel.

**The Benjamen G. Chisholm Family**

490.    Private First Class Benjamen G. Chisholm served in Afghanistan as a member of the U.S. Army. On August 17, 2010, PFC Chisholm was injured in an IED attack in Kunar Province, Afghanistan. PFC Chisholm died on August 17, 2010 as a result of injuries sustained during the attack.

491.    The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

492.    PFC Chisholm's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

493.    PFC Chisholm was a national of the United States at the time of the attack and his death.

494.    As a result of the attack, PFC Chisholm was injured in his person and/or property. The Plaintiff members of the Chisholm Family are the survivors

and/or heirs of PFC Chisholm and are entitled to recover for the damages PFC Chisholm sustained.

495.   Plaintiff Glenn Chisholm is the father of PFC Chisholm. He is a national of the United States.

496.   Plaintiff Linda Reynolds is the mother of PFC Chisholm. She is a national of the United States.

497.   Plaintiff Karma Chisholm is the step-mother of PFC Chisholm. She is a national of the United States. Karma Chisholm lived in the same household as PFC Chisholm for a substantial period of time and considered PFC Chisholm the functional equivalent of a biological son.

498.   As a result of the August 17, 2010 attack and PFC Chisholm's injuries and death, each member of the Chisholm Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Chisholm's society, companionship, and counsel.

**The James M. Darrough Family**

499.   Sergeant James M. Darrough served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SGT Darrough was injured in a suicide bombing attack in Kabul Province, Afghanistan. SGT Darrough died on October 29, 2011 as a result of injuries sustained during the attack.

185

500.   The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

501.   SGT Darrough's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

502.   SGT Darrough was a national of the United States at the time of the attack and his death.

503.   As a result of the attack, SGT Darrough was injured in his person and/or property. The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

504.   Plaintiff Robert Charles Darrough is the father of SGT Darrough. He is a national of the United States.

505.   Plaintiff Judith Sara Darrough is the step-mother of SGT Darrough. She is a national of the United States. Judith Sara Darrough lived in the same

household as SGT Darrough for a substantial period of time and considered SGT Darrough the functional equivalent of a biological son.

506.   As a result of the October 29, 2011 attack and SGT Darrough's injuries and death, each member of the Darrough Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Darrough's society, companionship, and counsel.

**The Corey J. Dodge Family**

507.   Corey J. Dodge served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. Dodge was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the attack.

508.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

509.   Mr. Dodge's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

510.    Mr. Dodge was a national of the United States at the time of the attack and his death.

511.    As a result of the attack, Mr. Dodge was injured in his person and/or property. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

512.    Plaintiff Kelli Dodge is the widow of Mr. Dodge. She is a national of the United States.

513.    Plaintiff B.C.D., by and through his next friend Kelli Dodge, is the minor son of Mr. Dodge. He is a national of the United States.

514.    Plaintiff P.A.D., by and through her next friend Kelli Dodge, is the minor daughter of Mr. Dodge. She is a national of the United States.

515.    As a result of the August 22, 2015 attack and Mr. Dodge's injuries and death, each member of the Dodge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Dodge's society, companionship, and counsel.

**The Vincent J. Ellis Family**

516.    Private First Class Vincent J. Ellis served in Afghanistan as a member of the U.S. Army. On June 1, 2012, PFC Ellis was injured in a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and

fragmentation grenades in Khost Province, Afghanistan. PFC Ellis died on June 6, 2012 as a result of injuries sustained during the attack.

517.   The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

518.   PFC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

519.   PFC Ellis was a national of the United States at the time of the attack and his death.

520.   As a result of the attack, PFC Ellis was injured in his person and/or property. The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

521.   Plaintiff Brian Edward Ellis is the father of PFC Ellis. He is a national of the United States.

522.   Plaintiff Julie Ann Ellis is the mother of PFC Ellis. She is a national of the United States.

523.   Plaintiff Vanessa Marie Anzures is the sister of PFC Ellis. She is a national of the United States.

524.    Plaintiff Victor Raymond Ellis is the brother of PFC Ellis. He is a national of the United States.

525.    As a result of the June 1, 2012 attack and PFC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Ellis's society, companionship, and counsel.

**The Richard A. Essex Family**

526.    Sergeant Richard A. Essex served in Afghanistan as a member of the U.S. Army. On August 16, 2012, SGT Essex was injured in an attack on a helicopter in Kandahar Province, Afghanistan. SGT Essex died on August 16, 2012 as a result of injuries sustained during the attack.

527.    The attack was committed by the Taliban.

528.    SGT Essex's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

529.    SGT Essex was a national of the United States at the time of the attack and his death.

530.   As a result of the attack, SGT Essex was injured in his person and/or property. The Plaintiff members of the Essex Family are the survivors and/or heirs of SGT Essex and are entitled to recover for the damages SGT Essex sustained.

531.   Plaintiff Charles Essex is the father of SGT Essex. He is a national of the United States.

532.   Plaintiff Marion Ruth Hopkins is the mother of SGT Essex. She is a national of the United States.

533.   As a result of the August 16, 2012 attack and SGT Essex's injuries and death, each member of the Essex Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Essex's society, companionship, and counsel.

**The Joel C. Gentz Family**

534.   Captain Joel C. Gentz served in Afghanistan as a member of the U.S. Air Force. On June 9, 2010, Capt Gentz was injured in an attack on a helicopter in Helmand Province, Afghanistan. Capt Gentz died on June 9, 2010 as a result of injuries sustained during the attack.

535.   The attack was committed by the Taliban.

536.   Capt Gentz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s)

who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

537.    Capt Gentz was a national of the United States at the time of the attack and his death.

538.    As a result of the attack, Capt Gentz was injured in his person and/or property. The Plaintiff members of the Gentz Family are the survivors and/or heirs of Capt Gentz and are entitled to recover for the damages Capt Gentz sustained.

539.    Plaintiff Judith Rowe Gentz is the mother of Capt Gentz. She is a national of the United States.

540.    As a result of the June 9, 2010 attack and Capt Gentz's injuries and death, each member of the Gentz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Capt Gentz's society, companionship, and counsel.

**The Paul Goins Jr. Family**

541.    Paul Goins Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Goins was injured in an IED attack in Kabul Province, Afghanistan. Mr. Goins died on February 10, 2014 as a result of injuries sustained during the attack.

542.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

543.   Mr. Goins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

544.   Mr. Goins was a national of the United States at the time of the attack and his death.

545.   As a result of the attack, Mr. Goins was injured in his person and/or property. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

546.   Plaintiff Patricia Goins is the widow of Mr. Goins. She is a national of the United States.

547.   Plaintiff Paul Edward Goins III is the son of Mr. Goins. He is a national of the United States.

548.   Plaintiff Emmitt Dwayne Burns is the step-son of Mr. Goins. He is a national of the United States. Emmitt Dwayne Burns lived in the same household

as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

549.   Plaintiff Janice Caruso is the step-daughter of Mr. Goins. She is a national of the United States. Janice Caruso lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

550.   Plaintiff Dana Rainey is the step-daughter of Mr. Goins. She is a national of the United States. Dana Rainey lived in the same household as Mr. Goins for a substantial period of time and considered Mr. Goins the functional equivalent of a biological father.

551.   As a result of the February 10, 2014 attack and Mr. Goins's injuries and death, each member of the Goins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Goins's society, companionship, and counsel.

**The Jonathan A. Gollnitz Family**

552.   Sergeant Jonathan A. Gollnitz served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SGT Gollnitz was injured in a suicide bombing attack in Logar Province, Afghanistan. SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the attack.

553.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

554.   SGT Gollnitz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

555.   SGT Gollnitz was a national of the United States at the time of the attack and his death.

556.   As a result of the attack, SGT Gollnitz was injured in his person and/or property. The Plaintiff members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

557.   Plaintiff L.C.D., by and through his next friend, Bridgett L. DeHoff, is the son of SGT Gollnitz. He is a national of the United States.

558.   As a result of the September 26, 2012 attack and SGT Gollnitz's injuries and death, each member of the Gollnitz Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gollnitz's society, companionship, and counsel.

**The Kevin J. Griffin Family**

559.    Command Sergeant Major Kevin J. Griffin served in Afghanistan as a member of the U.S. Army. On August 8, 2012, CSM Griffin was injured in a suicide bombing attack in Kunar Province, Afghanistan. CSM Griffin died on August 8, 2012 as a result of injuries sustained during the attack.

560.    The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack), acting together in a joint al-Qaeda-Taliban-LeT cell, with al-Qaeda providing, indoctrinating, and training the suicide bomber.

561.    CSM Griffin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

562.    CSM Griffin was a national of the United States at the time of the attack and his death.

563.    As a result of the attack, CSM Griffin was injured in his person and/or property. The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

564.   Plaintiff Matt Griffin is the brother of CSM Griffin. He is a national of the United States.

565.   Plaintiff Shawn Patrick Griffin is the brother of CSM Griffin. He is a national of the United States.

566.   Plaintiff Sheila Ristaino is the sister of CSM Griffin. She is a national of the United States.

567.   Plaintiff Carol Griffin is the step-mother of CSM Griffin. She is a national of the United States. Carol Griffin lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological son.

568.   Plaintiff Daniel Griffin is the step-brother of CSM Griffin. He is a national of the United States. Daniel Griffin lived in the same household as CSM Griffin for a substantial period of time and considered CSM Griffin the functional equivalent of a biological brother.

569.   As a result of the August 8, 2012 attack and CSM Griffin's injuries and death, each member of the Griffin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CSM Griffin's society, companionship, and counsel.

**The William Gross Paniagua Family**

570.   Sergeant William Gross Paniagua served in Afghanistan as a member of the U.S. Army. On July 31, 2011, SGT Gross Paniagua was injured in an IED attack in Kunar Province, Afghanistan. SGT Gross Paniagua died on July 31, 2011 as a result of injuries sustained during the attack.

571.   The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

572.   SGT Gross Paniagua's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

573.   SGT Gross Paniagua was a national of the United States at the time of the attack and his death.

574.   As a result of the attack, SGT Gross Paniagua was injured in his person and/or property. The Plaintiff members of the Gross Paniagua Family are the survivors and/or heirs of SGT Gross Paniagua and are entitled to recover for the damages SGT Gross Paniagua sustained.

575.   Plaintiff Carlos Benjamin Gross Rios Sr. is the father of SGT Gross Paniagua. He is a national of the United States.

576.   Plaintiff Soccoro Gross Paniagua is the mother of SGT Gross Paniagua. She is a national of the United States.

577.   Plaintiff Carlos Benjamin Gross Paniagua is the brother of SGT Gross Paniagua. He is a national of the United States.

578.   Plaintiff Felicia Gross Paniagua is the cousin and foster-sister of SGT Gross Paniagua. She is a national of the United States. Felicia Gross Paniagua lived in the same household as SGT Gross Paniagua for a substantial period of time and considered SGT Gross Paniagua the functional equivalent of a biological brother.

579.   As a result of the July 31, 2011 attack and SGT Gross Paniagua's injuries and death, each member of the Gross Paniagua Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Gross Paniagua's society, companionship, and counsel.

**The Jeremy F. Hardison Family**

580.   Sergeant Jeremy F. Hardison served in Afghanistan as a member of the U.S. Army National Guard. On October 1, 2012, SGT Hardison was injured in a suicide bombing attack by an individual wearing an Afghan police uniform in

Khost Province, Afghanistan. SGT Hardison died on October 1, 2012 as a result of injuries sustained during the attack.

581.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

582.    SGT Hardison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was improperly wearing the uniform of his enemy, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public market.

583.    SGT Hardison was a national of the United States at the time of the attack and his death.

584.    As a result of the attack, SGT Hardison was injured in his person and/or property. The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

585.    Plaintiff Jerry Hardison is the father of SGT Hardison. He is a national of the United States.

586.    Plaintiff Teresa Hardison is the mother of SGT Hardison. She is a national of the United States.

587.    Plaintiff Justina Hardison is the sister of SGT Hardison. She is a national of the United States.

588.    As a result of the October 1, 2012 attack and SGT Hardison's injuries and death, each member of the Hardison Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Hardison's society, companionship, and counsel.

**The Jay Henigan Family**

589.    Jay Henigan served in Afghanistan as a civilian government contractor working for the Central Intelligence Agency. On September 25, 2011, Mr. Henigan was injured in an insider attack in Kabul Province, Afghanistan. Mr. Henigan died on September 25, 2011 as a result of injuries sustained during the attack.

590.    The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

591.    Mr. Henigan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

592.   Mr. Henigan was a national of the United States at the time of the attack and his death.

593.   As a result of the attack, Mr. Henigan was injured in his person and/or property. The Plaintiff members of the Henigan Family are the survivors and/or heirs of Mr. Henigan and are entitled to recover for the damages Mr. Henigan sustained.

594.   Plaintiff Alex Henigan is the son of Mr. Henigan. He is a national of the United States.

595.   As a result of the September 25, 2011 attack and Mr. Henigan's injuries and death, each member of the Henigan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Henigan's society, companionship, and counsel.

**The Manoharan "Paul" Kamaleson Family**

596.   Manoharan "Paul" Kamaleson served in Afghanistan as the civilian chief operating officer of the First MicroFinance Bank. On January 14, 2019, Mr. Kamaleson was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Kamaleson died on January 14, 2019 as a result of injuries sustained during the attack.

597.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

598.   Mr. Kamaleson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who detonated the bomb neither wore uniforms nor otherwise identified themselves as enemy combatants, and this detonation indiscriminately placed civilians at risk, injuring at least 12 women and 23 children among more than the 100 persons who were injured in this attack.

599.   Mr. Kamaleson was a national of the United States at the time of the attack and his death.

600.   As a result of the attack, Mr. Kamaleson was injured in his person and/or property. The Plaintiff members of the Kamaleson Family are the survivors and/or heirs of Mr. Kamaleson and are entitled to recover for the damages Mr. Kamaleson sustained.

601.   Plaintiff Nicole Kamaleson is the widow of Mr. Kamaleson. She is a national of the United States.

602.   Plaintiff Barclay Kamaleson is the son of Mr. Kamaleson. He is a national of the United States.

603.    Plaintiff Cade Kamaleson is the son of Mr. Kamaleson. He is a national of the United States.

604.    Plaintiff Cedric Paul Kamaleson is the son of Mr. Kamaleson. He is a national of the United States.

605.    Plaintiff Sunderraj Mark Kamaleson is the brother of Mr. Kamaleson. He is a national of the United States.

606.    As a result of the January 14, 2019 attack and Mr. Kamaleson's injuries and death, each member of the Kamaleson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Kamaleson's society, companionship, and counsel.

**The Kevin King Family**

607.    Plaintiff Professor Kevin King served in Afghanistan as a civilian professor teaching at American University of Afghanistan. On August 7, 2016, Mr. King was kidnapped at gunpoint just outside the front gates of American University of Afghanistan. Mr. King was held hostage under deplorable conditions, beaten regularly, and denied adequate medical care for over three years before being released in a prisoner exchange on November 19, 2019. The attack severely wounded Mr. King, and he has suffered from severe caloric malnutrition, muscle atrophy, peripheral neuropathy, hypocalcemia, vitamin D deficiency, low bone mineral density, hyperparathyroidism, frostbite on feet and ankles, a weak bladder,

204

and other physical injuries due to repeated beatings. As a result of the August 7, 2016 attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering.

608.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

609.   The attack that injured Mr. King would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian college professor not taking part in hostilities and was tortured during captivity, and the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

610.   Mr. King was a national of the United States at the time of the attack, and remains one to this day.

611.   Plaintiff Stephanie Ann Miller is the sister of Mr. King. She is a national of the United States.

612.   As a result of the August 7, 2016 attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

**The Michael J. Knapp Family**

613.   Sergeant Michael J. Knapp served in Afghanistan as a member of the U.S. Army. On May 18, 2012, SGT Knapp was injured in an indirect fire attack in

Kunar Province, Afghanistan. SGT Knapp died on May 18, 2012 as a result of injuries sustained during the attack.

614.    The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

615.    SGT Knapp's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

616.    SGT Knapp was a national of the United States at the time of the attack and his death.

617.    As a result of the attack, SGT Knapp was injured in his person and/or property. The Plaintiff members of the Knapp Family are the survivors and/or heirs of SGT Knapp and are entitled to recover for the damages SGT Knapp sustained.

618.    Plaintiff Abby Knapp-Morris is the widow of SGT Knapp. She is a national of the United States.

619.    Plaintiff K.K., by and through her next friend Abby Knapp-Morris, is the minor daughter of SGT Knapp. She is a national of the United States.

620.    As a result of the May 18, 2012 attack and SGT Knapp's injuries and death, each member of the Knapp Family has experienced severe mental anguish,

emotional pain and suffering, and the loss of SGT Knapp's society, companionship, and counsel.

**The Jason D. Landphair Family**

621.   Jason D. Landphair served in Afghanistan as a civilian government contractor working for Praetorian Standard Inc. On January 29, 2015, Mr. Landphair was injured in an insider attack in Kabul Province, Afghanistan. Mr. Landphair died on January 29, 2015 as a result of injuries sustained during the attack.

622.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

623.   Mr. Landphair's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

624.   Mr. Landphair was a national of the United States at the time of the attack and his death.

625.   As a result of the attack, Mr. Landphair was injured in his person and/or property. The Plaintiff members of the Landphair Family are the survivors

and/or heirs of Mr. Landphair and are entitled to recover for the damages Mr. Landphair sustained.

626.    Plaintiff Natasha Buchanan is the widow of Mr. Landphair. She is a national of the United States.

627.    Plaintiff L.A.E.L.B., by and through her next friend Natasha Buchanan, is the minor daughter of Mr. Landphair. She is a national of the United States.

628.    Plaintiff S.L.L.B., by and through her next friend Natasha Buchanan, is the minor daughter of Mr. Landphair. She is a national of the United States.

629.    Plaintiff Douglas A. Landphair is the father of Mr. Landphair. He is a national of the United States.

630.    Plaintiff Jean S. Landphair is the mother of Mr. Landphair. She is a national of the United States.

631.    Plaintiff Meredith Landphair is the sister of Mr. Landphair. She is a national of the United States.

632.    As a result of the January 29, 2015 attack and Mr. Landphair's injuries and death, each member of the Landphair Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Landphair's society, companionship, and counsel.

**The David William Haalilio Lau Family**

633.    Plaintiff Sergeant First Class David William Haalilio Lau served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, SFC Lau was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings. As a result of the April 4, 2012 attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

634.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

635.    The attack that injured SFC Lau would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

636.    SFC Lau was a national of the United States at the time of the attack, and remains one to this day.

637.    Plaintiff Hamide Lau is the wife of SFC Lau. She is a national of the United States.

638.    Plaintiff K.L., by and through his next friend David William Haalilio Lau, is the minor son of SFC Lau. He is a national of the United States.

639.    Plaintiff M.L., by and through her next friend David William Haalilio Lau, is the minor daughter of SFC Lau. She is a national of the United States.

640.    Plaintiff Alexander Lau is the son of SFC Lau. He is a national of the United States.

641.    Plaintiff Vivian Perry is the mother of SFC Lau. She is a national of the United States.

642.    Plaintiff Holly Lau Abraham is the sister of SFC Lau. She is a national of the United States.

643.    Plaintiff Leroy Wingkit Lau Jr. is the brother of SFC Lau. He is a national of the United States.

644.    Plaintiff Michelle Lee Rauschenberger is the sister of SFC Lau. She is a national of the United States.

645.    Plaintiff Jammie Joann Smith is the sister of SFC Lau. She is a national of the United States.

210

646.    As a result of the April 4, 2012 attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

**The Andrew R. Looney Family**

647.    Sergeant Andrew R. Looney served in Afghanistan as a member of the U.S. Army. On June 21, 2010, SGT Looney was injured in a suicide bombing attack in Kunar Province, Afghanistan. SGT Looney died on June 21, 2010 as a result of injuries sustained during the attack.

648.    The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

649.    SGT Looney's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

650.    SGT Looney was a national of the United States at the time of the attack and his death.

651.    As a result of the attack, SGT Looney was injured in his person and/or property. The Plaintiff members of the Looney Family are the survivors and/or

heirs of SGT Looney and are entitled to recover for the damages SGT Looney

sustained.

652.   Plaintiff C. Richard Looney is the father of SGT Looney. He is a

national of the United States.

653.   Plaintiff Martha Looney is the mother of SGT Looney. She is a

national of the United States.

654.   As a result of the June 21, 2010 attack and SGT Looney's injuries and

death, each member of the Looney Family has experienced severe mental anguish,

emotional pain and suffering, and the loss of SGT Looney's society,

companionship, and counsel.

**The Richard P. McEvoy Family**

655.   Richard P. McEvoy served in Afghanistan as a civilian government

contractor working for DynCorp, Int'l. On August 22, 2015, Mr. McEvoy was

injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. McEvoy

died on August 22, 2015 as a result of injuries sustained during the attack.

656.   The attack was committed by the Taliban (including the Haqqani

Network, a designated FTO at the time of the attack) and al-Qaeda (a designated

FTO at the time of the attack) acting together in the Kabul Attack Network.

657.   Mr. McEvoy's murder would have violated the laws of war if these

terrorist groups were subject to them because, among other reasons, he was a

civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

658.   Mr. McEvoy was a national of the United States at the time of the attack and his death.

659.   As a result of the attack, Mr. McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

660.   Plaintiff Kathleen McEvoy is the widow of Mr. McEvoy. She is a national of the United States.

661.   Plaintiff Michelle Rose McEvoy is the daughter of Mr. McEvoy. She is a national of the United States.

662.   Plaintiff Patrick Charles McEvoy is the son of Mr. McEvoy. He is a national of the United States.

663.   Plaintiff Janice H. Proctor is the mother of Mr. McEvoy. She is a national of the United States.

664.   Plaintiff Luann Varney is the sister of Mr. McEvoy. She is a national of the United States.

665.   As a result of the August 22, 2015 attack and Mr. McEvoy's injuries and death, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. McEvoy's society, companionship, and counsel.

**The Shaun M. Mittler Family**

666.   Staff Sergeant Shaun M. Mittler served in Afghanistan as a member of the U.S. Army. On July 10, 2010, SSG Mittler was injured in a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan. SSG Mittler died on July 10, 2010 as a result of injuries sustained during the attack.

667.   The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

668.   SSG Mittler's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

669.   SSG Mittler was a national of the United States at the time of the attack and his death.

670.   As a result of the attack, SSG Mittler was injured in his person and/or property. The Plaintiff members of the Mittler Family are the survivors and/or heirs of SSG Mittler and are entitled to recover for the damages SSG Mittler sustained.

671.   Plaintiff Cristine Mittler is the daughter of SSG Mittler. She is a national of the United States.

672.   Plaintiff Terry Mittler is the father of SSG Mittler. He is a national of the United States.

673.   Plaintiff Joyce L. Turner is the mother of SSG Mittler. She is a national of the United States.

674.   Plaintiff Misty Marie Barclay is the sister of SSG Mittler. She is a national of the United States.

675.   Plaintiff Alexander Lee Mittler is the brother of SSG Mittler. He is a national of the United States.

676.   As a result of the July 10, 2010 attack and SSG Mittler's injuries and death, each member of the Mittler Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Mittler's society, companionship, and counsel.

**The Carlos J. Negron Sr. Family**

677.   Specialist Carlos J. Negron Sr. served in Afghanistan as a member of the U.S. Army. On July 10, 2010, SPC Negron was injured in a complex attack involving a rocket propelled grenade and small arms fire in Kunar Province, Afghanistan. SPC Negron died on July 10, 2010 as a result of injuries sustained during the attack.

678.   The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

679.   SPC Negron's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

680.   SPC Negron was a national of the United States at the time of the attack and his death.

681.   As a result of the attack, SPC Negron was injured in his person and/or property. The Plaintiff members of the Negron Family are the survivors and/or heirs of SPC Negron and are entitled to recover for the damages SPC Negron sustained.

682.   Plaintiff Gabriel Negron is the father of SPC Negron. He is a national of the United States.

683.   Plaintiff Marta Torres is the mother of SPC Negron. She is a national of the United States.

684.   Plaintiff Jose Negron is the brother of SPC Negron. He is a national of the United States.

685.   Plaintiff Maribel Negron is the sister of SPC Negron. She is a national of the United States.

686.   Plaintiff Marvin Negron is the brother of SPC Negron. He is a national of the United States.

687.   As a result of the July 10, 2010 attack and SPC Negron's injuries and death, each member of the Negron Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Negron's society, companionship, and counsel.

**The Christopher R. Newman Family**

688.   Staff Sergeant Christopher R. Newman served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SSG Newman was injured in a suicide bombing attack in Kabul Province, Afghanistan. SSG Newman died on October 29, 2011 as a result of injuries sustained during the attack.

689.    The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

690.    SSG Newman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

691.    SSG Newman was a national of the United States at the time of the attack and his death.

692.    As a result of the attack, SSG Newman was injured in his person and/or property. The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

693.    Plaintiff Amanda Newman is the widow of SSG Newman. She is a national of the United States.

694.    Plaintiff Derrick Anthony Davis is the brother of SSG Newman. He is a national of the United States.

695.    Plaintiff Donald Edward Newman Sr. is the grandfather of SSG Newman. He is a national of the United States. Donald Edward Newman Sr. lived in the same household as SSG Newman for a substantial period of time and considered SSG Newman the functional equivalent of a biological son.

696.    As a result of the October 29, 2011 attack and SSG Newman's injuries and death, each member of the Newman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Newman's society, companionship, and counsel.

**The Bryan J. Nichols Family**

697.    Chief Warrant Officer 2 Bryan J. Nichols served in Afghanistan as a member of the U.S. Army Reserve. On August 6, 2011, CW2 Nichols was injured in an attack on a helicopter in Wardak Province, Afghanistan. CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack.

698.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

699.    CW2 Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

700.    CW2 Nichols was a national of the United States at the time of the attack and his death.

701.    As a result of the attack, CW2 Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of CW2 Nichols and are entitled to recover for the damages CW2 Nichols sustained.

702.    Plaintiff Cynthia Nichols is the mother of CW2 Nichols. She is a national of the United States.

703.    Plaintiff Douglas Nichols is the father of CW2 Nichols. He is a national of the United States.

704.    Plaintiff Brandon Nichols is the brother of CW2 Nichols. He is a national of the United States.

705.    As a result of the August 6, 2011 attack and CW2 Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW2 Nichols's society, companionship, and counsel.

**The Jared C. Plunk Family**

706.    Specialist Jared C. Plunk served in Afghanistan as a member of the U.S. Army. On June 25, 2010, SPC Plunk was injured in a complex attack involving small arms fire and rocket propelled grenades in Kunar Province,

Afghanistan. SPC Plunk died on June 25, 2010 as a result of injuries sustained during the attack.

707.    The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

708.    SPC Plunk's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

709.    SPC Plunk was a national of the United States at the time of the attack and his death.

710.    As a result of the attack, SPC Plunk was injured in his person and/or property. The Plaintiff members of the Plunk Family are the survivors and/or heirs of SPC Plunk and are entitled to recover for the damages SPC Plunk sustained.

711.    Plaintiff Glenda Willard is the mother of SPC Plunk. She is a national of the United States.

712.    Plaintiff Michelle Hock is the sister of SPC Plunk. She is a national of the United States.

713.    Plaintiff Ranee Massoni is the sister of SPC Plunk. She is a national of the United States.

714.   Plaintiff Jordan Plunk is the brother of SPC Plunk. He is a national of the United States.

715.   Plaintiff Justin T. Plunk is the brother of SPC Plunk. He is a national of the United States.

716.   As a result of the June 25, 2010 attack and SPC Plunk's injuries and death, each member of the Plunk Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plunk's society, companionship, and counsel.

**The Blaine E. Redding Family**

717.   Specialist Blaine E. Redding served in Afghanistan as a member of the U.S. Army. On June 7, 2010, SPC Redding was injured in an IED attack in Kunar Province, Afghanistan. SPC Redding died on June 7, 2010 as a result of injuries sustained during the attack.

718.   The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell.

719.   SPC Redding's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as

enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

720.   SPC Redding was a national of the United States at the time of the attack and his death.

721.   As a result of the attack, SPC Redding was injured in his person and/or property. The Plaintiff members of the Redding Family are the survivors and/or heirs of SPC Redding and are entitled to recover for the damages SPC Redding sustained.

722.   Plaintiff Blaine A. Redding is the father of SPC Redding. He is a national of the United States.

723.   As a result of the June 7, 2010 attack and SPC Redding's injuries and death, each member of the Redding Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Redding's society, companionship, and counsel.

**The Angel Roldan Jr. Family**

724.   Angel Roldan Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On May 16, 2013, Mr. Roldan was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the attack.

725.   The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

726.   Mr. Roldan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road during rush hour.

727.   Mr. Roldan was a national of the United States at the time of the attack and his death.

728.   As a result of the attack, Mr. Roldan was injured in his person and/or property. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

729.   Plaintiff Lieselotte R. Roldan is the widow of Mr. Roldan. She is a national of the United States.

730.   Plaintiff Angel R. Roldan is the son of Mr. Roldan. He is a national of the United States.

731.    Plaintiff Matthias P. Roldan is the son of Mr. Roldan. He is a national of the United States.

732.    Plaintiff Samantha G. Roldan is the daughter of Mr. Roldan. She is a national of the United States.

733.    As a result of the May 16, 2013 attack and Mr. Roldan's injuries and death, each member of the Roldan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Roldan's society, companionship, and counsel.

**Christopher J. Rosebrock**

734.    Plaintiff Captain Christopher J. Rosebrock served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rosebrock was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded CPT Rosebrock, who suffers from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums. As a result of the April 4, 2012 attack and his injuries, CPT Rosebrock has experienced severe physical and emotional pain and suffering.

735.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

225

736.   The attack that injured CPT Rosebrock would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

737.   CPT Rosebrock was a national of the United States at the time of the attack and remains one to this day.

**The Nicholas J. Rozanski Family**

738.   Captain Nicholas J. Rozanski served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack in Faryab Province, Afghanistan. CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack.

739.   The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing, indoctrinating, and training the suicide bomber.

740.   CPT Rozanski's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified

themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

741.   CPT Rozanski was a national of the United States at the time of the attack and his death.

742.   As a result of the attack, CPT Rozanski was injured in his person and/or property. The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

743.   Plaintiff Alex Jason Rozanski is the brother of CPT Rozanski. He is a national of the United States.

744.   As a result of the April 4, 2012 attack and CPT Rozanski's injuries and death, each member of the Rozanski Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Rozanski's society, companionship, and counsel.

**The Anne T. Smedinghoff Family**

745.   U.S. Foreign Service officer Anne T. Smedinghoff served in Afghanistan as a member of the U.S. State Department. On April 6, 2013, Ms. Smedinghoff was injured in a suicide bombing attack in Zabul Province, Afghanistan. Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the attack.

746.    The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

747.    Ms. Smedinghoff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, she was a civilian State Department Employee not taking part in hostilities and escorting Afghan journalists covering American officials donating books to a school.

748.    Ms. Smedinghoff was a national of the United States at the time of the attack and her death.

749.    As a result of the attack, Ms. Smedinghoff was injured in her person and/or property. The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

750.    Plaintiff Mary Beth Smedinghoff is the mother of Ms. Smedinghoff. She is a national of the United States.

751.    Plaintiff Thomas Smedinghoff is the father of Ms. Smedinghoff. He is a national of the United States.

752.    Plaintiff Joan M. Smedinghoff is the sister of Ms. Smedinghoff. She is a national of the United States.

753.    Plaintiff Mark T. Smedinghoff is the brother of Ms. Smedinghoff. He is a national of the United States.

754.    Plaintiff Regina C. Smedinghoff is the sister of Ms. Smedinghoff. She is a national of the United States.

755.    As a result of the April 6, 2013 attack and Ms. Smedinghoff's injuries and death, each member of the Smedinghoff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Smedinghoff's society, companionship, and counsel.

**The Orion N. Sparks Family**

756.    Staff Sergeant Orion N. Sparks served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SSG Sparks was injured in a suicide bombing attack in Logar Province, Afghanistan. SSG Sparks died on September 26, 2012 as a result of injuries sustained during the attack.

757.    The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

758.    SSG Sparks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

759.    SSG Sparks was a national of the United States at the time of the attack and his death.

760.    As a result of the attack, SSG Sparks was injured in his person and/or property. The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

761.    Plaintiff Garry Lee Sparks is the father of SSG Sparks. He is a national of the United States.

762.    Plaintiff Jan Marie Hurnblad Sparks is the mother of SSG Sparks. She is a national of the United States.

763.    Plaintiff Erik Sparks is the brother of SSG Sparks. He is a national of the United States.

764.    Plaintiff Zachary Douglas Sparks is the brother of SSG Sparks. He is a national of the United States.

765.    Plaintiff Jane Sparks is the step-mother of SSG Sparks. She is a national of the United States. Jane Sparks lived in the same household as SSG Sparks for a substantial period of time and considered SSG Sparks the functional equivalent of a biological son.

766.    As a result of the September 26, 2012 attack and SSG Sparks's injuries and death, each member of the Sparks Family has experienced severe

mental anguish, emotional pain and suffering, and the loss of SSG Sparks's society, companionship, and counsel.

**The Nicholas P. Spehar Family**

767.    Special Warfare Operator Petty Officer 2nd Class Nicholas P. Spehar served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SO2 (SEAL) Spehar was injured in an attack on a helicopter in Wardak Province, Afghanistan. SO2 (SEAL) Spehar died on August 6, 2011 as a result of injuries sustained during the attack.

768.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack).

769.    SO2 (SEAL) Spehar's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

770.    SO2 (SEAL) Spehar was a national of the United States at the time of the attack and his death.

771.    As a result of the attack, SO2 (SEAL) Spehar was injured in his person and/or property. The Plaintiff members of the Spehar Family are the survivors and/or heirs of SO2 (SEAL) Spehar and are entitled to recover for the damages SO2 (SEAL) Spehar sustained.

772.    Plaintiff Annette Spehar is the mother of SO2 (SEAL) Spehar. She is a national of the United States.

773.    Plaintiff Patrick Spehar is the father of SO2 (SEAL) Spehar. He is a national of the United States.

774.    Plaintiff Lisa Martinusen is the sister of SO2 (SEAL) Spehar. She is a national of the United States.

775.    Plaintiff Marie Sentina Mielke is the sister of SO2 (SEAL) Spehar. She is a national of the United States.

776.    Plaintiff Jacob Louis Spehar is the brother of SO2 (SEAL) Spehar. He is a national of the United States.

777.    Plaintiff Luke Spehar is the brother of SO2 (SEAL) Spehar. He is a national of the United States.

778.    As a result of the August 6, 2011 attack and SO2 (SEAL) Spehar's injuries and death, each member of the Spehar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SO2 (SEAL) Spehar's society, companionship, and counsel.

**The Barry Sutton Family**

779.    Barry Sutton served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. Sutton was

injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the attack.

780.    The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network.

781.    Mr. Sutton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

782.    Mr. Sutton was a national of the United States at the time of the attack and his death.

783.    As a result of the attack, Mr. Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

784.    Plaintiff Erin Nicole Goss is the daughter of Mr. Sutton. She is a national of the United States.

785.    Plaintiff Summer Breanne Sutton is the daughter of Mr. Sutton. She is a national of the United States.

233

786.    Plaintiff Harriet Sutton is the mother of Mr. Sutton. She is a national of the United States.

787.    Plaintiff Trecia Brock Hood is the sister of Mr. Sutton. She is a national of the United States.

788.    Plaintiff Wendy Shedd is the sister of Mr. Sutton. She is a national of the United States.

789.    Plaintiff Freddie Dewey Sutton is the brother of Mr. Sutton. He is a national of the United States.

790.    As a result of the August 22, 2015 attack and Mr. Sutton's injuries and death, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sutton's society, companionship, and counsel.

**The Ryan Gregory Timoney Family**

791.    Plaintiff Captain Ryan Gregory Timoney served in Afghanistan as a member of the U.S. Army. On May 20, 2012, CPT Timoney was injured in a suicide bomber attack in Uruzgan Province, Afghanistan. The attack severely wounded CPT Timoney, who lost his left leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty. As a

result of the May 20, 2012 attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

792.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

793.    The attack that injured CPT Timoney would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

794.    CPT Timoney was a national of the United States at the time of the attack, and remains one to this day.

795.    Plaintiff Diane Timoney is the mother of CPT Timoney. She is a national of the United States.

796.    Plaintiff Gregory Timoney is the father of CPT Timoney. He is a national of the United States.

797.    As a result of the May 20, 2012 attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**The Benjamin D. White Family**

798.    Senior Airman Benjamin D. White served in Afghanistan as a member of the U.S. Air Force. On June 9, 2010, SrA White was injured in an attack on a helicopter in Helmand Province, Afghanistan. SrA White died on June 9, 2010 as a result of injuries sustained during the attack.

799.    The attack was committed by the Taliban.

800.    SrA White's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

801.    SrA White was a national of the United States at the time of the attack and his death.

802.    As a result of the attack, SrA White was injured in his person and/or property. The Plaintiff members of the White Family are the survivors and/or heirs of SrA White and are entitled to recover for the damages SrA White sustained.

803.    Plaintiff Anthony Curtis White is the father of SrA White. He is a national of the United States.

804.    Plaintiff A.E.W., by and through his next friend Anthony Curtis White, is the minor brother of SrA White. He is a national of the United States.

805.    Plaintiff Z.L.W., by and through his next friend Anthony Curtis White, is the minor brother of SrA White. He is a national of the United States.

806.    Plaintiff Laura White is the sister of SrA White. She is a national of the United States.

807.    Plaintiff Mark Anthony White is the brother of SrA White. He is a national of the United States.

808.    Plaintiff Jennifer Lynn White is the step-mother of SrA White. She is a national of the United States. Jennifer Lynn White lived in the same household as SrA White for a substantial period of time and considered SrA White the functional equivalent of a biological son.

809.    As a result of the June 9, 2010 attack and SrA White's injuries and death, each member of the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SrA White's society, companionship, and counsel.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(d)
### *for Aiding and Abetting Foreign Terrorist Organizations*

810.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

811.   Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331(1).

812.   All of the attacks that injured Plaintiffs were committed, planned, and/or authorized by al-Qaeda, an organization that had been designated an FTO as of the date of the attacks.

813.   Some of the attacks that injured Plaintiffs were also committed, planned, and/or authorized by the Haqqani Network after its designation as an FTO in 2012. Some were committed by LeT after its designation as an FTO in 2001.

814.   NBP aided and abetted the person(s) who committed the attacks by knowingly providing illicit financial services that facilitated large funds transfers from Hafiz Kahn, McLintock, RWO, Murtaza, and/or others to the members of the al-Qaeda Terror Syndicate in the lead-up to the terrorist attacks.

815.   NBP was generally aware that by unlawfully providing funds to the al-Qaeda Terror Syndicate, it was playing a role in the Syndicate's violent or life-endangering terrorist and tortious activities.

238

816.   As alleged above, NBP provided this assistance knowingly.

817.   The assistance NBP provided was substantial, *inter alia*, because the amount of money provided to the al-Qaeda Terror Syndicate was significant, NBP had a culpable state of mind, and the duration of the assistance was multiple years, evincing a deliberate intention by NBP to participate in, and further, the ongoing illicit enterprise.

818.   The attacks at issue were a reasonably foreseeable result of the Syndicate's violent or life-endangering terrorist and tortious activities.

819.   In amending the ATA through JASTA, Congress has repeatedly stressed its objective to create civil liability for persons and entities that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

820.   NBP should accordingly be held liable for civil aiding and abetting under 18 U.S.C. § 2333(d).

### Second Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(d)
### *for Conspiring with Foreign Terrorist Organizations*

821.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

822.   NBP entered into a conspiracy with its customers (Hafiz Khan, McLintock/RWO, and Murtaza/ART—as well as the transferees who received

these customers' money in Afghanistan and Pakistan), as well as al-Qaeda, the Haqqani Network, the Pakistani Taliban, LeT, and JeM to join the al-Qaeda Terror Syndicate's terrorist campaign.

823.   As explained above, the Syndicate members conspired to carry out a terror campaign targeting American servicemembers and civilians in Afghanistan. Hafiz Khan and his transferees joined that conspiracy by providing funds, terrorist operatives, and a safehouse to the Pakistani Taliban and al-Qaeda, both members of the conspiracy. McLintock, RWO, and their transferees were fronts for al-Qaeda, which was the leader of the conspiracy, and also provided funds and resources to LeT, a member of the conspiracy. Murtaza, ART, and JeM were likewise members of the conspiracy.

824.   NBP knew that the objective of the conspiracy between these sophisticated terrorist organizations was to carry out terrorist attacks, including attacks against American servicemembers and civilians.

825.   NBP joined the conspiracy by knowingly agreeing to facilitate the financial services and fund transfers that provided members of the al-Qaeda Terror Syndicate with resources to fulfill their roles in the conspiracy.

826.   The attacks were foreseeable acts in furtherance of this conspiracy that caused Plaintiffs' injuries.

827.   NBP should accordingly be held liable for conspiracy under 18 U.S.C.
§ 2333(d).

### Third Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(a) for
### *Providing Material Support to Terrorists in Violation of 18 U.S.C. § 2339A*

828.   Plaintiffs repeat and re-allege each and every allegation of the
foregoing paragraphs as if fully set forth herein.

829.   NBP provided material support or resources to members of the
al-Qaeda Terror Syndicate in violation of 18 U.S.C. § 2339A by transferring, *inter
alia*, funds (including a significant number of U.S. dollars from the United States)
to these terrorist organizations knowing that those funds would be used in
preparation for or in carrying out one or more violations of enumerated predicate
offenses, including 18 U.S.C. §§ 844(f) (destroying federal property), 930(c)
(homicide in the course of attacking a federal facility), 956 (conspiracy to kill,
kidnap, maim, or injure individuals, or to damage property, in a foreign country),
1114 (killing a federal officer, employee, or member of the armed forces), 1361
(destruction of federal property), and 2332 (killing or assaulting a United States
national outside the United States).

830.   NBP's provision of material support in the form of funds (including a
significant number of U.S. dollars from the United States) and financial services to
notorious terrorists in the manner and with the knowledge alleged in this Amended

Complaint constitutes acts of international terrorism, because they involve acts that are violent or dangerous to human life, that violated the criminal laws of the laws of the United States, and objectively appeared to be intended to influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping, and transcends national boundaries.

831.   NBP's actions caused Plaintiffs' injuries by providing the al-Qaeda Terror Syndicate with funds and financial services necessary and sufficient to carry out the terrorist attacks implicated in this case.

832.   NBP should accordingly be held liable under 18 U.S.C. § 2333(a).

### Fourth Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(a) for Providing Material Support to Terrorist Organizations *in Violation of 18 U.S.C. § 2339B*

833.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

834.   As stated above, NBP provided funds and financial services to the Pakistani Taliban, a designated FTO and member of the al-Qaeda Terror Syndicate. It also provided funds and financial services to RWO, a front organization for the FTO al-Qaeda, and a supporter of the FTO LeT and of al-Qaeda's ally in the Syndicate, the Taliban. And it provided funds and financial

services to ART, an FTO and the alter-ego of FTO JeM, through the Murtaza/ART account.

835.    NBP knew, or was deliberately indifferent to the fact, that the members of the al-Qaeda Terror Syndicate shared resources as a matter of course, so that by providing resources to any of these terrorist customers, NBP was providing material support to al-Qaeda and the other FTOs in the al-Qaeda Terror Syndicate. Specifically, NBP knew that the Pakistani Taliban and al-Qaeda were closely allied and shared resources. And it knew that ART was an alter-ego of FTO JeM, and that Murtaza was an agent of both ART and JeM.

836.    Before any of the events in this case transpired, al-Qaeda, LeT, and JeM had already been designated FTOs by the U.S. State Department. NBP accordingly knew, or was deliberately indifferent to the fact, that it was providing material support and resources to a designated FTO by providing the banking services alleged in this Amended Complaint.

837.    Other FTOs, including the Pakistani Taliban, ART, and the Haqqani Network, were so designated during the events that gave rise to this case. Upon their designation, NBP knew, or was deliberately indifferent to the fact, that they were so designated. With respects to payments occurring after the dates of designation, NBP accordingly knew, or was deliberately indifferent to the fact, that

it was providing material support and resources to a designated FTO by providing the banking services alleged in this Amended Complaint.

838.  By knowingly providing material support in the form of funds and financial services to individuals and entities it knew were FTOs, or were agents, fronts, or alter-egos of FTOs, NBP violated 18 U.S.C. § 2339B, which prohibits knowingly providing any material support or resources to a designated FTO.

839.  NBP's knowing provision of material support to FTOs constitutes acts of international terrorism, because that conduct involved acts that are violent or dangerous to human life, violated the criminal laws of the United States, and objectively appeared to be intended to influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping, and transcends national boundaries.

840.  NBP's actions caused Plaintiffs' injuries by providing the members of the al-Qaeda Terror Syndicate, including al-Qaeda, the Pakistani Taliban, LeT, ART, and the Haqqani Network with funds necessary and sufficient to carry out the terrorist attacks implicated in this case.

841.  NBP should accordingly be held liable under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

244

(b) Enter judgment against NBP and in favor of all Plaintiffs for compensatory damages (including for physical and emotional pain and suffering, loss of society, companionship, comfort, advice, and counsel, and economic loss) in amounts to be determined at trial;

(c) Enter judgment against NBP and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

(d) Enter judgment against NBP and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorney's fees, pursuant to 18 U.S.C. § 2333;

(e) Grant pre-judgment interest, as authorized by law; and

(f) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

*/s/Tejinder Singh*

Ryan R. Sparacino
 (pro hac vice)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
Ryan.sparacino@sparacinopllc.com

Tejinder Singh
 (SDNY Bar No. TS0613)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202.362.0636
Fax: 866.574.2033
tsingh@goldsteinrussell.com

Dated: June 5, 2020