# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

HAROLD BROWN SR., BARBARA BROWN,
PAULA RICH, REGINA BROWN, MINDYLOU
PARESI, JANET G. PARESI, ALEXANDRA
VANDENBROEK, ELIZABETH SANTINA
PARESI, SANTINA CARTISSER, TERRY PARESI,
DANA MARIE BERNHARDT, MARY LEE WISE,
E.P., by and through his next friend Dana Marie
Bernhardt, MARY HEATHER WISE, CHARLES E.
ADKINS, VELVET L. ADKINS, SHEILA G. GOOD,
JOSE ALEMAN, STEPHANIE HAGER, SUZANNA
LYNN AUSBORN, MITCHELL MICHAEL-
WILLIAM MALOY, SUMMER LYNN MALOY,
BRIANNA N. BENSON, FREDERICK C. BENSON,
BEVERLY MILLS, D.L.B., by and through his next
friend Susan Brodeur, E.L.B., by and through her next
friend Susan Brodeur, MAGGIE MAE BILYEU,
JOYCE A. BRODEUR, LAWRENCE A. BRODEUR,
SUSAN BRODEUR, ESTATE OF CHRISTOPHER
L. BROWN, by and through its personal
representative Ariell S. Taylor, ARIELL S. TAYLOR,
CHRISTOPHER BAPTIST, ERNEST L. BROWN II,
DOMINIC JACOBS, JIM ARTHUR JACOBS, JIM
AUGUSTINO JACOBS, LAGUANDA S. JACOBS,
GLADYS M. VEREEN, JANICE HARRIMAN
BRYANT, S.L.B., by and through his next friend
Janice Harriman Bryant, AUGUST CABRERA,
CORBIN CABRERA, DANIEL MATIAS
CABRERA, GILLIAN LEIGH CABRERA, M.G.C.,
by and through his next friend August Cabrera,
R.X.C., by and through his next friend August
Cabrera, ROBERT CABRERA, RONALD PAUL
HOPKINS, SUZANNE RENAE MARTINEZ, JD
PROSSER, GLORIA DIANE TRELFA, CYNTHIA
CAROL CAMPBELL, ARTHUR CAMPBELL,
AUDREY CAMPBELL, TINA MARIE CAMPBELL,
KARMA CHISHOLM, GLENN CHISHOLM,
LINDA REYNOLDS, JUDITH SARA DARROUGH,
ROBERT CHARLES DARROUGH, B.C.D., by and
through his next friend Kelli Dodge, KELLI DODGE,
P.A.D., by and through her next friend Kelli Dodge,
PHOUTHASITH DOUANGDARA, CAREY
GREGGORY DUVAL, VANESSA MARIE

**SECOND AMENDED
COMPLAINT UNDER THE
ANTI-TERRORISM ACT
(18 U.S.C. § 2333)**

JURY TRIAL DEMANDED

No. 19-cv-11876

ANZURES, BRIAN EDWARD ELLIS, JULIE ANN
ELLIS, VICTOR RAYMOND ELLIS, CATHERINE
ELM BOATWRIGHT, MARGARET ELM
CAMPBELL, DENNIS JOHN ELM, DONNA LEE
ELM, MATTHEW ELM, CHRISTINE RANGEL,
CHARLES ESSEX, MARION RUTH HOPKINS,
LOUELLA E. FRISON, JUDITH ROWE GENTZ,
EMMITT DWAYNE BURNS, JANICE CARUSO,
PATRICIA GOINS, PAUL EDWARD GOINS III,
DANA RAINEY, L.C.D., by and through his next
friend Bridgett L. DeHoff, KIRK ANDREW
GOLLNITZ, TYLER GOLLNITZ, DANIEL
GRIFFIN, MATT GRIFFIN, SHAWN PATRICK
GRIFFIN, SHEILA RISTAINO, CAROL GRIFFIN,
CARLOS BENJAMIN GROSS PANIAGUA,
FELICIA GROSS PANIAGUA, SOCORRO GROSS
PANIAGUA, CARLOS BENJAMIN GROSS RIOS
SR., CRAIG GROSS, NATALIE GROSS, JERRY
HARDISON, JUSTINA HARDISON, TERESA
HARDISON, ALEX HENIGAN, KATHLEEN
LYNN ALEXANDER, DANIEL OWEN HUGHES,
PATRICIA SHIRLEY HUGHES, KRISTINE ANNE
ZITNY, MICHAEL IUBELT, SHELBY IUBELT,
V.I., by and through her next friend Shelby Iubelt,
CHARLOTTE LOQUASTO, J.A.L., by and through
his next friend Charlotte Loquasto, BARCLAY
KAMALESON, CADE KAMALESON, CEDRIC
PAUL KAMALESON, NICOLE KAMALESON,
SUNDERRAJ MARK KAMALESON, JOHN C.
MCCARTHY, ALISON R. POHN, KEVIN KING,
STEPHANIE ANN MILLER, ABBY KNAPP-
MORRIS, K.K., by and through her next friend Abby
Knapp-Morris, L.A.E.L.B., by and through her next
friend Natasha Buchanan, NATASHA BUCHANAN,
S.L.L.B., by and through her next friend Natasha
Buchanan, DOUGLAS A. LANDPHAIR, JEAN S.
LANDPHAIR, MEREDITH LANDPHAIR, HOLLY
LAU ABRAHAM, DAVID WILLIAM HAALILIO
LAU, ALEXANDER LAU, HAMIDE LAU, K.L., by
and through his next of friend David William Haalilio
Lau, LEROY WINGKIT LAU JR., M.L., by and
through her next friend David William Haalilio Lau,
VIVIAN PERRY, MICHELLE LEE
RAUSCHENBERGER, JAMMIE JOANN SMITH, C.
RICHARD LOONEY, MARTHA LOONEY,
CHESTER R. MCBRIDE SR., ANNIE L. MCBRIDE,

CHARLETTE GILBERT, CHARMAINE RENEE
GILBERT, JORDAN GILBERT, M.M., by and
through his next friend Sonja McDaniel, SONJA
MCDANIEL, JASMINE THOMAS, KATHLEEN
MCEVOY, MICHELLE ROSE MCEVOY,
PATRICK CHARLES MCEVOY, JANICE H.
PROCTOR, LUANN VARNEY, MISTY MARIE
BARCLAY, ALEXANDER LEE MITTLER,
CRISTINE MITTLER, TERRY MITTLER, JOYCE
L. TURNER, GABRIEL NEGRON, JOSE NEGRON,
MARIBEL NEGRON, MARVIN NEGRON
MARTA TORRES, DERRICK ANTHONY DAVIS,
AMANDA NEWMAN, DONALD EDWARD
NEWMAN SR., BRANDON NICHOLS, CYNTHIA
NICHOLS, DOUGLAS NICHOLS, MARY R.
HAMMERBACHER-NICHOLS, MONTE
DOUGLAS NICHOLS, NICOLE ANN ROBLES,
A.T.P., by and through her next friend Stewart Lamar
Perry, G.W.P., by and through his next friend Julianne
Good Perry, JULIANNE GOOD PERRY,
KATHLEEN PERRY, L.R.P., by and through her next
friend Julianne Good Perry, STEWART LAMAR
PERRY, JOHN TERRY PITTMAN SR., IDA BELLE
PITTMAN, MICHELLE HOCK, RANEE MASSONI,
JORDAN PLUNK, JUSTIN T. PLUNK, GLENDA
WILLARD, JUDITH L. ASHLEY, LOUISE P.
CONLON, MEGHAN JANET HOLLINGSWORTH,
MARYJANE G. MEDEIROS, SARAH TIFFANY
PETERSON, BRIAN PROVOST, GAIL PROVOST,
GERTRUDE PROVOST, JOHN A. PROVOST,
LOUIS PROVOST, PAUL PROVOST, SCOTT
PETER PROVOST, SPENCER DANA PROVOST,
BLAINE A. REDDING, SUMMER REEVES DUNN,
HANNAH MASON, CHARLOTTE ANN REEVES,
JENNIFER KATHERINE REEVES, KATRINA M.
REEVES, VICTORIA JANE REEVES, JOYCE ANN
TULLOCH, MALLORY TAYLOR WILLIAMS,
MICHELLE RILEY, RODNEY RILEY, DANIEL
MARK ROBINSON, ANGEL R. ROLDAN,
LIESELOTTE R. ROLDAN, MATTHIAS P.
ROLDAN, SAMANTHA G. ROLDAN,
CHRISTOPHER J. ROSEBROCK, ALEX JASON
ROZANSKI, S.M.P., by and through her next friend
Deborah Schoonhoven, A.M.S., by and through her
next friend Tammie Schoonhoven, A.R.S., by and
through her next friend Tammie Schoonhoven,

CHRISTOPHER SCOTT SCHOONHOVEN,
DEBORAH FERN SCHOONHOVEN, TAMMIE
SUE SCHOONHOVEN, JOAN M. SMEDINGHOFF,
MARK T. SMEDINGHOFF, MARY BETH
SMEDINGHOFF, REGINA C. SMEDINGHOFF,
THOMAS SMEDINGHOFF, JAN MARIE
HURNBLAD SPARKS, ERIK SPARKS, GARRY
LEE SPARKS, JANE SPARKS, ZACHARY
DOUGLAS SPARKS, LISA MARTINUSEN,
MARIE SENTINA MIELKE, ANNETTE SPEHAR,
JACOB LOUIS SPEHAR, LUKE SPEHAR,
PATRICK SPEHAR, CHARLES WESLEY
STRANGE III, C.E.S., by and through her next friend
Charles Wesley Strange, CHARLES WESLEY
STRANGE, KATELYN MARIE STRANGE, ERIN
NICOLE GOSS, TRECIA BROCK HOOD, WENDY
SHEDD, FREDDIE DEWEY SUTTON, HARRIET
SUTTON, SUMMER BREANNE SUTTON, DIANE
TIMONEY, GREGORY TIMONEY, RYAN
GREGORY TIMONEY, CATHERINE KIMBERLY
VAUGHN KRYZDA, C.C.V., by and through her
next friend Catherine Kimberly Vaughn Kryzda,
R.C.V., by and through his next friend Catherine
Kimberly Vaughn Kryzda, ROBERT MARTIN
KAHOKULANI VICKERS JR., ROBERT MARTIN
KAHOKULANI VICKERS SR. HORTENSE
KAINOA WAINANI VICKERS, K.N.V., by and
through his next friend Hortense Kainoa Wainani
Vickers, K.E.F.V., by and through her next friend
Hortense Kainoa Wainani Vickers, K.M.G.V., by and
through her next friend Hortense Kainoa Wainani
Vickers, MARK MATTHEW KALEINANI
VICKERS, MARY JANE VICKERS, VANCE
MARSHALL KELIIOLANI VICKERS, MICHELLE
JOY KAPUNAHELEOKALANI YARBOROUGH,
MAKAHEA XHELILI, ANTHONY CURTIS
WHITE, A.E.W., by and through his next friend
Anthony Curtis White, JENNIFER LYNN WHITE,
LAURA WHITE, MARK ANTHONY WHITE, and
ZACHARY L. WHITE,

                    Plaintiffs,

iv

v.

NATIONAL BANK OF PAKISTAN,

Defendant.

Ryan R. Sparacino
 (pro hac vice)
SPARACINO PLLC
1920 L Street, NW, Suite 535
Washington, DC 20036
Tel: 202.629.3530
Ryan.sparacino@sparacinopllc.com

Tejinder Singh
 (SDNY Bar No. TS0613)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Tel: 202.362.0636
Fax: 866.574.2033
tsingh@goldsteinrussell.com

Gary M. Osen
Ari Ungar
Michael J. Radine
Osen LLC
2 University Plaza, Suite 402
Hackensack, NJ 07601
Tel: 201.265.6400
gosen@osenlaw.com
aungar@osenlaw.com
mradine@osenlaw.com

## NATURE OF THE ACTION

1.      This is an action under the Anti-Terrorism Act ("ATA") as amended by the

Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(a) and (d), brought on

behalf of Americans injured and the families of Americans killed in a series of terrorist attacks in

Afghanistan from the end of 2009 through early 2019. The attacks were perpetrated by members

of a syndicate of terrorist organizations led by al-Qaeda—referred to here as the "Syndicate."

2.      The attacks were committed by the Taliban, which was designated a Specially

Designated Global Terrorist ("SDGT") in 2002, and which includes the Haqqani Network, itself

designated a Foreign Terrorist Organization ("FTO") in 2012, and were planned, authorized,

and/or committed by al-Qaeda, an FTO since 1999.

3.      Some of the attacks were joined or supported by one or more additional members

of the Syndicate. These additional members include Lashkar-e-Taiba ("LeT" or "LT"),

designated an FTO in 2001; Jaish-e-Mohammed ("JeM"), designated an FTO in 2001; and the

Tehrik-i-Taliban Pakistan ("TTP"), designated an FTO in 2010. The Syndicate also used joint

operational cells that fused al-Qaeda, Taliban (including the Haqqani Network), and LeT

operatives in Kabul and the surrounding provinces, which joint cells the Department of Defense

labeled the Kabul Attack Network.

4.      The defendant National Bank of Pakistan ("NBP") knowingly provided financial

support for the Syndicate by providing banking services to several notorious terrorist groups and

fundraisers. NBP helped at least three significant customers provide funds to the Syndicate,

thereby enhancing its ability to carry out terrorist attacks, including the attacks that injured

Plaintiffs.

5.      The first NBP customer is a terrorist operative and financier named Hafiz

Muhammad Sher Ali Khan ("Khan"), who, starting at least as early as 2008, and into 2010, sent

tens of thousands of dollars from the U.S. to TTP terrorists for the purpose of supporting al-Qaeda and the TTP. For these transfers, Khan was convicted by the U.S. government of providing material support to terrorists and terrorist organizations. The evidence against Khan showed his commitment to terrorism. In myriad recorded statements, Khan praised the TTP and al-Qaeda, and wished death on Americans, especially those fighting in Afghanistan. He also sent U.S. dollars from the U.S. to, and for the benefit of, the TTP. Members of his family were known or suspected to be members of the TTP. And Khan's "madrassa" (a religious school) in Pakistan was likewise a sanctuary for the TTP. A confidential source reported to the FBI that the madrassa displayed a banner stating "Death to America," and Khan bragged that children from his madrassa had gone on to receive terrorism training with the leader of the TTP to kill Americans in Afghanistan.

6.      The evidence against Khan also directly implicated NBP. Khan maintained multiple bank accounts with NBP, including at least one account in the U.S., used to fund the TTP. At Khan's instructions, NBP would transfer money from his U.S. account to his Pakistani accounts to make funds available to individuals facilitating weapons purchases by the TTP, and who provided cash to TTP terrorists. Khan also used his U.S. and Pakistani NBP accounts to fund his madrassa, which provided additional support to the TTP.

7.      The use of the NBP accounts was critical to Khan's terrorist activities. For example, when an informant posing as a TTP sympathizer asked Khan for money to take to the TTP, he responded, "No, I do not give this way. . . . I send it through my bank."[1]

---

[1] *See* Trial Transcript, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 835, at 42 (S.D. Fl. 2013) (hereinafter "*Khan* Trial Transcript") (testimony of FBI Special Agent Michael Ferlazzo, recounting recorded conversation that occurred on Sept. 19, 2010).

8.      In light of Khan's well-established links to the TTP, and NBP banking policies that marked his transactions as suspicious, NBP knew that the dollars he sent through his NBP accounts were for the purpose of supporting terrorist activities. Moreover, the U.S. government represented that Khan's NBP accounts in Pakistan were open as late as May 2012, *a year after* he was arrested and indicted for providing material support to the TTP.

9.      NBP also knew that any support for the Pakistani Taliban was the same as support for al-Qaeda and the Syndicate. As explained in greater detail below, these organizations were closely connected.

10.     The second terrorist NBP customer is James Alexander McLintock ("McLintock"), referred to in the popular press as the "Tartan Taliban."[2] According to the U.S. Treasury Department, starting no later than August 2009, McLintock raised and transferred hundreds of thousands of dollars to terrorists. McLintock and the sham charity the Treasury Department stated he "controlled" as its "president, CEO, and chairman," the Al-Ramah Welfare Organisation ("RWO"), were named as SDGTs by the U.S. government in 2016 for their role in funding al-Qaeda and other terrorist organizations.

11.     According to the Treasury Department's press release, issued contemporaneously with the SDGT designation on March 31, 2016, RWO is "a front organization for al-Qaida that has been used to finance al-Qaida, the Taliban, [LeT], and other Afghan extremist groups. Outside of RWO, James McLintock has also personally supported multiple terrorist groups."

12.     This support was extensive. McLintock provided funds, including U.S. dollars, and resources such as materials for explosive devices and training in how to make such devices,

---

[2] McLintock has various aliases, including Al Rashidi, Yaqoob or Yaqub Mansoor, Qari, and al-Scotlandi. For simplicity, Plaintiffs refer to him as "McLintock," and use brackets to substitute McLintock for his aliases in quoted materials when necessary.

to al-Qaeda, LeT, and the Taliban for years, and claimed to a government source that he financially supported 3,500 terrorists in Pakistan and 1,000 in Afghanistan.

13.    NBP played a critical role in McLintock's terrorist fundraising operation. From at least 2010 until at least late 2016 (months after the Treasury Department's designation), McLintock maintained RWO's account at NBP and used the account to send cash from foreign donors to terrorist operatives in Pakistan and Afghanistan. He advertised those accounts on RWO's website. NBP permitted all of this even though prominent news outlets had reported that McLintock had repeatedly been arrested (as early as 2001), in Pakistan and the United Kingdom, on suspicion of terrorism.

14.    Given the nature and notoriety of McLintock's and RWO's connection to the terrorist groups in the Syndicate, and the pattern of their financial transactions, NBP was aware of its role providing banking services—through McLintock and RWO—to support the Syndicate's terrorist activities.

15.    The third terrorist NBP customer is Al-Rehmat Trust ("ART") and its key operative and fundraiser Ghulam Murtaza ("Murtaza"). ART is a front for the al-Qaeda affiliate, Jaish-e-Mohammed ("JeM") which the U.S. designated as an FTO on December 26, 2001. ART was known to be a front or alter-ego for JeM, and was itself designated an FTO on November 4, 2010. Nevertheless, from at least early 2007 to early 2014, ART publicly sought donations in its own name and Murtaza's name—and advertised Murtaza's NBP bank account for those donations. Contemporaneous press accounts indicate that Murtaza continued to maintain and manage an NBP account for ART into 2016. The funds in this account flowed to JeM and ART, which notoriously helped al-Qaeda recruit suicide bombers. The funds were also used for so-

called "martyr payments" to injured terrorists and the families of slain terrorists to incentivize suicide bombers.

16.    NBP's actions were committed knowingly because the bank had robust Know Your Customer ("KYC"), Anti-Money Laundering ("AML") and Counter Terrorist-Finance ("CTF") policies in place. Under these policies, it knew the nature of these customers and their transactions, and understood the linkages between the transactions and terrorism. Indeed, NBP understood that such transactions were prohibited precisely because they facilitate terrorist violence.

17.    NBP's assistance to the Syndicate was also substantial. From 2007 through at least 2016, the bank provided at least a million dollars to Syndicate members, despite clear red flags alerting NBP to the nature of these transactions. Multiple government sources have repeatedly emphasized that any material contribution to members of the Syndicate facilitates their violent agenda. NBP's assistance was more than enough to cause the attacks in this case.

18.    NBP's conduct subverted several policies designed to make it impossible for terrorists to access legitimate banking resources and provided an air of legitimacy to transactions supporting terrorism.

## THE PARTIES

19.    Plaintiffs are 273 individuals, comprising American nationals injured and the family members of American nationals killed in terrorist attacks planned, authorized, and/or committed by FTO members of the Syndicate in Afghanistan. The Plaintiffs and the attacks are described in further detail below. Plaintiffs are further described in Exhibit A attached hereto.

20.    Defendant is the National Bank of Pakistan, headquartered in Karachi, Pakistan.

21.    NBP is majority-owned by the State Bank of Pakistan ("SBP"). As of December 31, 2019, SBP held 1,599,845,728 shares of NBP, accounting for 75.2% of NBP's share capital.

The Government of Pakistan separately owns and holds 0.29% of NBP's share capital. NBP's certification under the USA PATRIOT Act lists SBP as the only owner who "directly or indirectly, (a) owns, controls, or has power to vote 25 percent or more of any class of voting securities or other voting interests of Foreign Bank; or (b) controls in any manner the election of a majority of directors (or individuals exercising similar functions) of Foreign Bank."[3]

22.    NBP has had a branch in the United States since at least the mid-1960s. NBP currently has one New York branch office. NBP's USA PATRIOT Act certification states that "[NBP] is a resident of the United States at the following street address: 100 Wall Street N.Y. 10005."[4] NBP has a second U.S. branch at 1875 Connecticut Ave. N.W., Washington, DC 20009.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338, as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism, and/or their estates, survivors, or heirs.

24.    NBP is not immune from liability under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604. NBP is not an organ of the state and its employees are not government employees; it is instead an ordinary commercial bank in Pakistan. Moreover, the Government of Pakistan does not directly own a majority of NBP's shares.

25.    NBP is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because NBP's conduct had a substantial nexus

---

[3] National Bank of Pakistan, Certification Regarding Correspondent Accounts for Foreign Banks, at 3 (2017), https://www.nbp.com.pk/pac/PatriotActCertification.pdf.

[4] *Id*. at 4.

to the U.S. and to New York, including the transfer of U.S. dollars from the U.S. to bank accounts in Pakistan for the purpose of financing terrorism. Indeed, NBP's U.S. presence was both central and essential to NBP's role in financing terrorism, as the New York branch facilitated donations from around the world to terrorists in Pakistan and knowingly ignored U.S. designations that would have stopped the transactions entirely.

26.    Moreover, NBP entered the United States voluntarily, has maintained branches here for decades, and has claimed the benefit of U.S. law by initiating legal actions in this Court and the Supreme Court of New York. NBP has also purposefully availed itself of U.S. jurisdiction to commit its tortious acts, including the processing of financial transactions for the terrorists that injured Plaintiffs through its New York branch.

27.    Jurisdiction in this venue is also appropriate because jurisdiction exists as to NBP's terrorist customers discussed herein, who purposefully directed their conduct at the U.S. by targeting Americans and American foreign policy in Afghanistan. NBP conspired with these customers to facilitate the maintenance of accounts and transfers of funds that supported these terrorist attacks.

28.    Venue is proper in this district pursuant to 18 U.S.C. § 2334(a), because NBP has an agent here (its branch), and 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### I.    The al-Qaeda Terror Syndicate

29.    Since the U.S.-led overthrow of the Taliban-controlled government in Afghanistan in 2001, terrorists have repeatedly attacked American service members and civilians there. This case focuses on al-Qaeda and its affiliates, which worked in concert and shared resources, personnel, and operational plans. Given such coordination, the consensus view of the U.S. government at the time was that America was threatened by the resulting terrorist

superstructure: a "syndicate" composed of al-Qaeda, the TTP, the Taliban, LeT, and other allied terrorist groups.

30.    Indeed, the existence of a terrorist syndicate was contemplated by Osama bin Laden himself, who conceived of al-Qaeda as the leader of a broad coalition of terrorist organizations across Pakistan and Afghanistan.

**A.  Al-Qaeda**

31.    Osama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamic terrorist organization intent on destroying the U.S. Osama bin Laden declared war on the U.S. in a published fatwa (religious decree) in 1996 and, in 1998, he declared a global jihad calling on all Muslims to kill Americans.

32.    The U.S. State Department designated al-Qaeda as an FTO on October 8, 1999. It remains designated as such to this day.

33.    After the attack on September 11, 2001, the U.S. demanded that the Taliban turn over bin Laden, and the Taliban refused. A U.S.-led coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan. Thereafter, bin Laden and his Syndicate allies reconstituted their efforts in support of the Taliban's efforts in Afghanistan.

**B.  Taliban and the Haqqani Network**

34.    The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters who had expelled the Soviet Union from Afghanistan. In July 2002, the U.S. designated the Taliban and its leader Mohammed Omar as SDGTs. President Bush

found that the Taliban's designation was necessary to guard against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."[5]

35.    On December 26, 2007, Congress enacted a law declaring that, for purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act, . . . the Taliban shall be considered to be a terrorist organization."[6] As a State Department official explained, the U.S. government treats the Taliban "as a Foreign Terrorist Organization for immigration purposes."[7]

36.    At all relevant times, the U.S. government viewed the Taliban as a terrorist group, not as the legitimate armed force of any nation.

37.    The Taliban's principal goal has long been to expel Americans from the country and undermine the democratically elected government of Afghanistan. To that end, the Taliban began ramping up attacks on U.S. forces during the mid-2000s. The Taliban also began to use new attack types during this timeframe, including suicide bombings (a tactic introduced by al-Qaeda). For example, the Taliban committed six suicide bombings in Afghanistan in 2004, and 141 in 2006. Remotely detonated bombings also more than doubled between 2005 and 2006.

38.    In 2008 and 2009, the growing Taliban-led insurgency attacked U.S. forces throughout Afghanistan, with a particular emphasis on the southern provinces, especially Helmand and Kandahar. By 2010, the Taliban's power and influence was growing, and it had regained much of the territory it had lost after September 11.

39.    The Taliban often attacked American military forces, contractors, and Afghan forces. But it also targeted civilian aid workers and non-governmental organizations. In recent

---

[5] Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[6] Consolidated Appropriations Act of 2007, § 691(d), Pub. L. No. 110-161, 121 Stat. 1844, 2365.

[7] U.S. Dep't of State, *Senior Administration Officials on the Terrorist Designation of the Haqqani Network* (Sept. 7, 2012).

years, the Taliban has increased attacks on civilians by placing explosives in public locations and using suicide bombers. It routinely used improvised explosive devices ("IEDs") that included passive detonation devices that would be triggered by any nearby movement (including by civilians). It has also used civilians to attract Coalition forces before detonating a bomb, frequently killing more civilians than Coalition forces.

40.    The Taliban carried out the terrorist attacks that killed or injured the Plaintiffs in this case. To effectuate those attacks, it employed a number of different terrorist tactics. Most prominently, the Taliban relied heavily on IEDs, including Explosively Formed Penetrators ("EFPs"), designed to destroy American armored vehicles and inflict heavy casualties. The Taliban also used suicide bombers and insider attacks. Many Plaintiffs, or their family members, were killed or injured by these methods.

41.    The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network has been part of the Taliban since at least 1995 and is closely allied and interdependent with al-Qaeda.

42.    On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.

43.    The United States previously designated multiple Haqqani leaders as SDGTs. On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."[8] In 2010 and 2011, the U.S. Treasury Department designated

---

[8] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated*

three other members of the Haqqani family—Nasiruddin, Khalil Al-Rahman, and Badruddin—as fundraisers and commanders of the Haqqani Network. By February 2014, the U.S. State Department and the U.S. Treasury Department had designated fourteen leaders in the Haqqani Network under Executive Order 13224.

44.    The Haqqani Network was especially active in the southeastern parts of Afghanistan, particularly in the Paktia, Paktika, and Khost ("P2K") Provinces. It also developed a significant presence in the surrounding Provinces of Kabul, Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in those areas. Indeed, the Taliban's terrorist commanders and shadow governors in the P2K area are often members of the Haqqani Network.

45.    The Haqqani Network's influence is not limited to the southeastern provinces. There is also significant overlap between the broader leadership of the Taliban and the Haqqani Network. Sirajuddin Haqqani has been a member of the Taliban's governing council since at least 2010. Since 2015, he has been the Deputy Emir of the Taliban, the Taliban's second in command.

46.    In particular, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. After September 11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government. In October 2001, a purported Jihadist publication described Jalaluddin as the "chief of the Taliban army."[9]

---

*Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008).

[9] Karachi Jasarat, *Chief of Taliban Army Contacts Jamaat-i-Islami Chief* (Oct. 11, 2001).

47.     In 2016, the *New York Times* reported that, according to a senior Taliban commander in southern Afghanistan, Sirajuddin Haqqani was in "constant contact" with Taliban field commanders throughout Afghanistan, including outside the Haqqani Network's area of particular influence in the southeast.[10] According to the commander, all field commanders had to contact Sirajuddin Haqqani for permission before launching a terrorist offensive.

48.     The Haqqani Network also influenced Taliban decisions about which types of attacks to employ. The Haqqani Network was the first to use suicide bombings in Afghanistan, an innovation that al-Qaeda taught it. The Haqqani Network also was involved in the rising number of Taliban-insider attacks—which strategically undermined relations between U.S. and Afghan forces.

49.     Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban. The Taliban has rejected claims that the Haqqani Network is separate from the Taliban.

50.     The Haqqani Network also has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After September 11, the Haqqanis provided sanctuary to bin Laden after he fled Afghanistan; Jalaluddin Haqqani himself announced that the Taliban would "retreat to the mountains and begin a long guerrilla war to reclaim our pure land from infidels" and stated that "Osama bin Laden . . . [is] safe and sound and carrying out [his] duties."[11]

51.     The Haqqani Network's close relationship with other terrorist groups has helped to develop the modern terrorist Syndicate operating in Afghanistan. In furtherance of that goal,

---

[10] Mujib Mashal, *Haqqanis Steering Deadlier Taliban In Afghanistan, Officials Say*, N.Y. Times (May 7, 2016).

[11] Aslam Khan, *Taliban Leader Warns Of Long Guerilla War*, Gulf News UAE (Oct. 21, 2001).

the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism abroad. Senior Haqqani Network officials also have publicly indicated that the Haqqani Network and al-Qaeda are one. And in July 2008, Jalaluddin Haqqani's son—18 year old Muhamman Omar Haqqani—was killed alongside a top al-Qaeda commander in southeast Afghanistan. The Haqqani Network also maintains training camps and safe houses that have been used by al-Qaeda and Taliban operatives.

52.     More recently, Sirajuddin Haqqani has welcomed al-Qaeda members to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan. And when the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a SDGT, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[12] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.

**C.  Pakistani Taliban (TTP)**

53.     The TTP is a Sunni Islamic terrorist organization that was formally created in 2007 and organized to advance a terrorist agenda in Afghanistan and Pakistan. At all times, the TTP espoused a radical, violent Islamist ideology that emphasized violent attacks against the perceived enemies of Islam, including Americans in the region.

---

[12] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

54.     The TTP was first led by Baitullah Mehsud, a jihadist who followed "the fanatic Talibanized version of Islam," under which his stated view was that "only jihad can bring peace to the world."[13]

55.      On or about August 5, 2009, Baitullah Mehsud was killed by a CIA drone strike in Pakistan. The TTP retaliated for Mehsud's death by participating in the Camp Chapman Attack in coordination with al-Qaeda.

56.     On September 1, 2010, the U.S. State Department designated the TTP as an FTO. It remains designated as such to this day.

57.     As the government explained in Khan's trial, however, "just because the Pakistani Taliban was not formally designated as a foreign terrorist organization . . . until that date, September 1, 2010, does not mean the group suddenly became violent on that day."[14] Instead, the group engaged in "extreme violence during 2008, 2009, and the first part of 2010"—the entire time the funds at issue in this case were being transferred to it.[15]

58.     John Brennan (then the chief counterterrorism advisor to the President, and later director of the Central Intelligence Agency) commented in 2010 that the TTP "is closely allied with al-Qaeda. They train together, they plan together, they plot together. They are almost indistinguishable."[16] Others have described the TTP as a "franchise" of al-Qaeda that gives al-Qaeda operational support in Pakistan.[17]

---

[13] Hassan Abbas, *A Profile of Tehrik-i-Taliban Pakistan*, CTC Sentinel, Vol. 1, Issue 2, at 3 (Jan. 2008) ("*TTP Profile*").

[14] *Khan* Trial Transcript, Doc. 833, at 29-30 (government's opening statement).

[15] *Id*. at 30.

[16] Kathleen Hennessey, *N.Y. Bomber has al Qaeda tie, White House Says*, SFGate (May 10, 2010).

[17] Ayesha Siddiqa, *Pakistan's Counterterrorism Strategy: Separating Friends from Enemies*, 34 Wash. Quarterly 149, 153 (2011).

59.     More specifically, the TTP provided a critical safe-haven for both al-Qaeda and the Afghan Taliban in parts of South Waziristan Agency (a hilly region in northwest Pakistan, along the Afghan border) as early as 2007. TTP leader Qari Hussain helped al-Qaeda train the suicide bomber who carried out the Camp Chapman Attack.

60.     In its order designating the TTP as an FTO, the State Department assigned responsibility to the TTP and al-Qaeda for the Camp Chapman Attack and noted that "TTP and al-Qa'ida have a symbiotic relationship; TTP draws ideological guidance from al-Qa'ida, while al-Qa'ida relies on TTP for safe haven in the Pashtun areas along the Afghan-Pakistani border. This mutual cooperation gives TTP access to both al-Qa'ida's global terrorist network and the operational experience of its members. Given the proximity of the two groups and the nature of their relationship, TTP is a force multiplier for al-Qa'ida."[18]

61.     Al-Qaeda's and the TTP's close coordination matters because it means that, in the time frame relevant to the allegations here, providing support to the TTP necessarily meant assisting al-Qaeda as well. The organizations planned together, trained together, shared resources, and attacked together. Any support to the TTP enabled that organization to plan or commit terrorist attacks against Americans in Afghanistan, alone and as part of the Syndicate.

**D.  Lashkar-e-Taiba**

62.     Lashkar-e-Taiba ("LeT") means "Army of the Pure," and was founded in Pakistan in the early 1990s. Since its inception, the group has been engaged in terrorist activities, causing the United States to designate it as an FTO on December 26, 2001—and to subsequently renew that designation and expand it to include LeT's aliases and affiliates.

---

[18] U.S. Dep't of State, *Designations of Tehrik-e Taliban Pakistan and Two Senior Leaders* (Sept. 1, 2010).

63.     At all relevant times, LeT was known to be a terrorist group that targeted Americans in Afghanistan for attack. As one terrorism scholar observed, "[w]hen viewed from the perspective of the United States, it is safe to say that LeT has long undermined U.S. interests in the global war on terror" and "threaten[ed] U.S. soldiers and civilians in Afghanistan."[19]

64.     LeT and Al-Qaeda have close ties dating back to the anti-Soviet war. LeT has a long history of providing support to al-Qaeda members.

65.     As the insurgency targeting Americans in Afghanistan "gained strength in 2005-2006, … [LeT] began facilitating access" to Afghanistan for LeT members to fight under al-Qaeda and the Taliban's banner.[20] One terrorism scholar explained LeT's close operational ties with al-Qaeda, the Taliban, and the Haqqani Network as follows:

> [L]ike al-Qaeda, LeT has demonstrated a remarkable ability to forge coalitions with like-minded terrorist groups. These alliances are most clearly on display within South Asia, where, in addition to al-Qaeda, LeT cooperates with other militant groups, such as the Afghan Taliban, in the areas of recruiting, training, tactical planning, financing, and operations. … In Pakistan, LeT cooperates actively with the Afghan Taliban … and also coordinates operations against Afghanistan with al-Qaeda and the Haqqani Network.[21]

66.     Collaboration between LeT and its al-Qaeda, Taliban, and Haqqani Network partners in the Syndicate "was centered on the jihad in Afghanistan" and "included the joint recruitment and infiltration of fighters into Afghanistan; sharing safe houses and resources, including weapons, explosives and information; and joint training and fighting in Afghanistan."[22]

---

[19] Ashley J. Tellis, *The Menace That Is Lashkar-e-Taiba*, Carnegie Endowment for International Peace Policy Outlook (2012).

[20] Stephen Tankel, *Lashkar-e-Taiba: Past Operations and Future Prospects*, at 6 (2011).

[21] Tellis, *Menace*, *supra* note 19.

[22] Tankel, *supra* note 20, at 19 (2011).

67.     As the U.S. government and terrorism scholars recognized, LeT played a vital role in al-Qaeda's "syndicate." For example, in February 2010, one scholar observed that "[t]oday," al-Qaeda and LeT "cooperate on training and recruitment for the Afghan jihad against coalition forces, equipping fighters and infiltrating them across the Durand Line separating Pakistan and Afghanistan."[23] Similarly, in March 2012, another scholar noted that "[w]ith recruitment, fundraising, and operations extending to Afghanistan, Iraq, Central Asia, Europe, Africa, and Australia, LeT has rapidly become a formidable global threat. Today, LeT has close ties with al-Qaeda in Pakistan and supports the Afghan Taliban's military operations."[24]

68.     As an affiliate of al-Qaeda, LeT provided critical support to the Syndicate by sourcing thousands of foreign fighters to receive training by al-Qaeda to be deployed in Afghanistan on behalf of the joint al-Qaeda/Taliban (including Haqqani Network) cells operating in the key provinces there.

69.     LeT and its front organizations also provide essential logistical support to facilitate the operation of al-Qaeda-run training camps in Waziristan by providing funding, safe houses, travel support, and recruits, for the camps.

70.     LeT—alongside its ally, JeM—also played the key role in sourcing nearly all of the suicide bombers who were ultimately trained by al-Qaeda and deployed as suicide attackers on behalf of the joint al-Qaeda/Taliban (including Haqqani Network) cells operating in N2KL, P2K, and the Kabul Attack Network-related Provinces. "[R]ecruitment for suicide bombings conducted by other groups" was a particular "LeT specialty."[25] LeT and JeM furnished every

---

[23] Stephen Tankel, *The Long Arm of Lashkar-e-Taiba* at 1-2, Wash. Inst. for Near East Policy, Policy Watch # 1361 (Feb. 17, 2010).

[24] Tellis, *Menace*, *supra* note 19.

[25] Tellis, *Menace*, *supra* note 19.

suicide bomber who was ultimately trained to become an al-Qaeda operative and used in every suicide bombing attack in this case other than the Camp Chapman attack.

71.    LeT terrorists do not openly participate in attacks in Afghanistan under LeT's banner. Instead, LeT terrorists were (and remain) embedded in joint al-Qaeda/Taliban cells in Afghanistan. This was an operational manifestation of al-Qaeda's syndicate strategy, which facilitated the efficient embedding of LeT terrorists in the terrorist cells that were of greatest importance to the shared al-Qaeda/Taliban enterprise.

72.    LeT terrorists sometimes worked on behalf of more than one jihadist group. James McLintock, for example, was a triple-hatted operative of al-Qaeda, LeT, and the Taliban. LeT and al-Qaeda terrorists were often dual-hatted, as LeT was the Pakistani jihadist group that most closely adhered to al-Qaeda's interpretation of Islam.

**E.  Jaish-e-Mohammed**

73.    JeM is a Sunni extremist group founded by Masood Azhar with funding and support from Osama bin Laden. JeM has long served as one of the Taliban's Punjabi allies in both Afghanistan and Pakistan.

74.    JeM has openly declared war against the United States, which designated JeM an FTO in 2001.

75.    After the Taliban and al-Qaeda were routed by U.S. forces in the fall of 2001, "the Taliban and al-Qaida … receiv[ed] help from … Jaish-e-Mohammed."[26]

76.    JeM has a history of helping al-Qaeda and the Taliban commit spectacular suicide bombing attacks in Afghanistan and Pakistan.

---

[26] Associated Press, *Pockets of Taliban, al-Qaeda Fighters are Said to be Regrouping in Afghanistan*, St. Louis Post Dispatch, 2002 WLNR 1220832 (Mar. 2, 2002).

77.     JeM also has a history of working jointly with LeT as a force multiplier for al-Qaeda and its Taliban and Haqqani Network allies. For example, JeM provided logistical support for a sophisticated suicide truck bombing attack against the civilians at the Marriott Hotel Pakistan on September 20, 2008, which was committed by al-Qaeda, Haqqani Network, and Lashkar-e-Taiba, resulting in the deaths of dozens and injuries of hundreds.

78.     As one analyst put it in late 2008, "[o]ne plausible theory" is that JeM, LeT, al-Qaeda, the Taliban, Haqqanis, and Pakistani Taliban "have forged an alliance that is executing a strategy in the region to defend themselves against a new US-led strategy" in the Afghanistan/Pakistan theater.[27] Indeed, by 2009, it was "now accepted" even within elements of the Pakistani military "that Al Qaeda, the Taliban and their allies among the Punjabi jihadis operate as a syndicate," and that such allies "included the Jaish-e-Mohammed."[28]

79.     JeM's participation in the Syndicate continued at all relevant times. Indeed, the U.S. designated JeM as an FTO in substantial part because of the role it plays in augmenting al-Qaeda and other al-Qaeda linked terrorists operating in Afghanistan and Pakistan as part of the Syndicate.

80.     Like its ally LeT, another of JeM's key roles is to serve as a "talent scout" for al-Qaeda, Taliban, and Haqqani terrorists in Afghanistan. The U.S. government itself recognized the key role that Masood Azhar and JeM have played in recruiting suicide bombers to support the Taliban and al-Qaeda's shared jihad in Afghanistan. Specifically, according to the Treasury Department, "In 2008, JEM recruitment posters in Pakistan contained a call from Azhar for

---

[27] Richard Beeston, *Washington crucial as attack exposes terror groups' deadly strategies*, Australian (Dec. 2, 2008).

[28] Nirupama Subramanian, *Pakistan: two questions, multiple realities*, Hindu, 2009 WLNR 23938767 (Nov. 27, 2009).

volunteers to join the fight in Afghanistan against Western forces."[29] As a former senior Indian official summarized in March 2009, "[i]t is now established that while the Taliban's cadres in Afghanistan are primarily Afghans nationals, a substantial number of suicide bombers in Afghanistan are from militant groups drawn from Pakistan's Punjab province, like the Lashkar-e-Taiba and Jaish-e-Mohammed."[30]

81.    JeM plays a special role in al-Qaeda's Syndicate as the terrorist group responsible for taking the lead in collecting and paying out so-called "martyr payments" to the families of al-Qaeda-aligned suicide bombers who blow themselves up in Afghanistan. JeM facilitated martyr payments to many of the suicide bombers who committed the attacks in this case. Martyr payments provide a direct and powerful incentive to the perpetrators of suicide bombings. The knowledge that such payments are available makes people more likely to join terrorist causes, and more likely to carry out suicide attacks on behalf of FTOs. The payments are an important incentive not only from a strictly monetary standpoint, but also because they confer prestige on the recipients.

82.    After the United States designated JeM an FTO in 2001, the organization began operating through a front group called Al Rehmat Trust ("ART"). Since then, ART has been involved in fundraising for JeM.

83.    ART was known to be a terrorist organization. For example, in 2006, Pakistani government forces raided an ART camp in Mansehra, Pakistan, arresting 15 people and seizing funds. Then, on November 4, 2010, the U.S. Treasury Department designated ART as an FTO,

---

[29] U.S. Dep't of Treasury, *Treasury Targets Pakistan-Based Terrorist Organizations Lashkar-E Tayyiba and Jaish-E Mohammed* (Nov. 4, 2010).

[30] G. Parthasaraty, *Pakistan Under Jihadi Threat*, Business Line (Mar. 5, 2009) (author is former High Commissioner to Pakistan).

stating: "Al Rehmat Trust, an operational front for JEM was designated for providing support to and for acting for or on behalf of JEM, and Mohammed Masood Azhar Alvi, JEM's founder and leader, was also designated today for acting for on behalf of JEM."[31] As such, ART was and is also a member of the Syndicate. It remains designated as an FTO to this day.

84.    In addition to this "operational" role, ART was designated for raising funds for JeM. As part of the public designation, the then-Under Secretary for Terrorism and Financial Intelligence described the action as "an important step in incapacitating the operational and financial networks of these deadly organizations."[32] The Australian Government's current designation of JeM as a "terrorist organisation" states: "the Al-Rehmat Trust is the principal source of income for JeM and continues to operate despite being sanctioned by several countries."[33]

### F.  Kabul Attack Network

85.    The Kabul Attack Network is an operational manifestation of the Syndicate led by al-Qaeda and the Taliban, including the Haqqani Network. Specifically, the Kabul Attack Network is a set of terrorist cells, which includes members from each of the terrorist groups involved in the Syndicate, and focuses on attacks against targets in Kabul and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Kunar, Ghazni, and Zabul. It is active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City,

---

[31] U.S. Dep't of Treasury, *Treasury Targets Pakistan-Based Terrorist Organizations Lashkar-E Tayyiba and Jaish-E Mohammed* (Nov. 4, 2010).

[32] *Id*.

[33] Australian National Security, *Jaish-e-Mohammad* (last visited June 4, 2020), https://www.nationalsecurity.gov.au/Listedterroristorganisations/Pages/Jaish-e-Mohammad.aspx.

and areas of Logar Province. The Kabul Attack Network has been responsible for suicide bombings and other attacks on Americans in Kabul and the surrounding areas.

86.     The Kabul Attack Network's members include the Taliban (including the Haqqani Network), as well as al-Qaeda, Lashkar-e-Taiba, and other terrorist organizations active in the Kabul area. Each of these terrorist groups participates in Kabul Attack Network attacks and contributes personnel and resources to such attacks. Attacks committed by the Kabul Attack Network are committed jointly by al-Qaeda, Taliban, and Haqqani Network personnel. And funding for any of the involved terrorist groups contributed to these attacks.

87.     As described further below, many Plaintiffs, or their family members, were killed or injured in attacks by the Kabul Attack Network.

## II. National Bank of Pakistan Knowingly Provided Material and Substantial Support to Terrorists and Terrorist Organizations

### A. National Bank of Pakistan Provided Material Support to Members of the al-Qaeda Terror Syndicate and Their Agents

88.     By helping customers who were active terrorist operatives and fundraisers to directly give money to members of the Syndicate, NBP knowingly provided substantial financial support to the Syndicate's member FTOs and the Taliban. NBP also provided financial services directly to the co-head of ART, which was an FTO and member of the Syndicate.

89.     Considering NBP's extensive and extended relationships with the above-described terrorist operatives, their own fundraising reports, and public reports of the terrorist programs such fundraising supported, NBP facilitated more than a million dollars directly to Syndicate operatives acting on behalf of al-Qaeda, the Taliban, TTP, LeT, and JeM from 2007 through at least 2016.

**NBP's Customer Khan Was a Terrorist Operative and Fundraiser for The TTP, a Member of the Syndicate That Killed Americans in Afghanistan**

90.     Khan lived for approximately six decades in the Swat Valley in Pakistan before moving to Miami, Florida, where he became a U.S. citizen. From Florida, Khan transferred funds to Pakistan for the purpose of supporting the TTP, and by extension al-Qaeda. In May 2011, a federal grand jury indicted Khan and others for providing and conspiring to provide material support to terrorists in violation of 18 U.S.C. §§ 2339A, and 2339B. Khan was convicted of all counts.

91.     In recorded conversations that took place in 2009 and 2010, Khan stated that he was part of the TTP, and declared that he supported both the TTP and al-Qaeda. Khan made several statements supporting terrorist attacks against Americans in Afghanistan. Khan specifically condoned the use of suicide bombings—as long as those bombings targeted government and military personnel.

92.     Khan supported the Syndicate in at least two ways. First, he sent funds to the TTP, using his accounts at NBP to facilitate the transfers. Khan would raise money in the U.S. from donors, family, or his own work. Hafiz Khan deposited those funds in his NBP account in the U.S. and sent them to his accounts at NBP in Pakistan. He would then either instruct the NBP branch in Pakistan to permit third parties to make withdrawals, or give pre-signed checks to those third parties to make substantial withdrawals from the accounts. Those third parties either were members of the TTP or used the money for the TTP's benefit.

93.     The U.S. government demonstrated that Khan used his NBP bank accounts to deliver money to the TTP through the following transactions:

- On August 13, 2008, a TTP sympathizer and Proscribed Person in Pakistan named Ali Rehman, who provided guns and money to the TTP, obtained $10,000 from one of Khan's NBP bank accounts.

- On January 22, 2009, Rehman obtained another $10,000 from one of Khan's NBP bank accounts.

- On March 25, 2009, Rehman obtained another $10,000 from one of Khan's NBP accounts.

- On December 3, 2009, Alam Zeb, Khan's grandson and who is associated with the TTP, withdrew $2,300 from one of Khan's NBP accounts. The evidence showed that at least some of this money went to Noor Muhammad, an injured TTP terrorist.

- On November 10, 2010, Rehman obtained $5,000 from one of Khan's NBP accounts.

94.    These transfers were part of, and helped fuel, a sophisticated financial infrastructure to support terrorism. With this infrastructure in place, Khan was able to direct money to the TTP and enable its attacks,.

95.    The second way in which Khan supported the TTP was through his "madrassa," a religious school he owned in Pakistan. Khan bragged that his madrassa sent children to train with the leader of the TTP, and then went on to Afghanistan to kill Americans. Indeed, the madrassa displayed a banner which read "Death to America." The madrassa also provided shelter and other support for members of the Pakistani Taliban. In the summer and autumn of 2009, the Pakistani Army closed and occupied Khan's madrassa because they suspected it to be engaged in terrorist activity, including sheltering TTP operatives. The madrassa was also funded, in part, by money transferred by Khan to Pakistan through his NBP U.S. dollar accounts.

**NBP's Customer James McLintock, Personally and Through Al-Ramah Welfare Organisation, Was a Terrorist Operative and Fundraiser for al-Qaeda and the Taliban, Members of the al-Qaeda Terror Syndicate That Killed Americans in Afghanistan**

96.    McLintock was born in Scotland and raised a Catholic, but later converted to Islam and joined the mujahideen fighting the Soviet Union. A press report describing U.S. intelligence gathered from detainees in Guantanamo Bay, stated "American analysts believed McLintock, 49, helped to run the training camps in Afghanistan, where he lived at the time. A

24

detainee assessment states: 'Abu Abdallah al-Scotlandi fought in Bosnia and has close ties to Ali Muhammad Abdul Aziz al–Fahkri, the primary trainer and leader of Khaldan training camp.'[34]

97.     U.S. Defense Department officials described the Khaldan camp as an al-Qaeda facility. This was the facility where Zacarias Moussaoui (who pleaded guilty for conspiring to kill Americans for al-Qaeda as part of the September 11 attacks) and Ahmed Ressam (who was convicted of plotting to bomb Los Angeles International Airport) trained for attacks on the United States.

98.     Contemporaneous press reports indicated McLintock was arrested on three occasions on suspicion of terrorism. The first was in December 2001, near the Afghanistan-Pakistan border, by troops searching for Osama bin Laden. The second was in Manchester in 2003, in anti-terror raids. The third was in Pakistan in 2009. In connection with these arrests, he obtained a high profile as a suspected terrorist in the media.

99.     On March 31, 2016, the U.S. Treasury Department publicly designated McLintock and RWO as SDGTs, finding that McLintock provided support and was linked to al-Qaeda, the Taliban, and LeT. The Treasury Department stated that these designations were intended to disrupt the fundraising and support networks of those organizations.

100.    The Treasury Department found that McLintock since at least 2007 has provided funding to al-Qaeda. This included cash contributions to senior al-Qaeda commanders for the purpose of fighting Coalition forces in Kunar Province in Afghanistan. Kunar Province was a hub of terrorist activity. In 2007, it saw 973 insurgent attacks, making it the second most active

---

[34] Craig McDonald, *US Claims Tartan Taliban Suspect James McLintock Helped to Run Terror Training Camps in Afghanistan*, Daily Record (Aug. 24, 2014).

Afghan province after Kandahar. McLintock's funding also included using RWO as an al-Qaeda front for financing insurgents and training them to manufacture IEDs.

101.    The Treasury Department also found that since at least August 2009, McLintock, through RWO, provided funding to LeT.

102.    The Treasury Department also found that at least since 2010, McLintock has financed the Taliban's attacks against Coalition forces in Afghanistan, including through regular cash payments delivered by courier to senior Taliban commanders through RWO, which provided funds for attacks in Kunar province, and by recruiting boys to become terrorists by paying them money. McLintock himself claimed that he financially supported 3,500 terrorists in Pakistan and 1,000 terrorists in Afghanistan.

103.    Among other contributions, McLintock transferred thousands of U.S. dollars to Shaykh Aminullah, the head of a madrassa in Pakistan with known links to terrorism. Aminullah has been designated an SDGT since 2009 for providing material support to al-Qaeda and the Taliban. U.S. intelligence reported that McLintock gave Aminullah $2,600 after Aminullah said he needed it to train his madrassa students, adding that 200 of them had been sent to fight in Afghanistan.

104.    In supporting the Syndicate, McLintock relied on his banking relationship with NBP. On RWO's website and other materials soliciting donations, it prominently displayed its bank account information at NBP as a preferred destination for donations. Banking with a major Pakistani financial institution thereby lent RWO an air of legitimacy.

105.    McLintock's fundraising and support for terrorism were significant. He regularly made cash payments to members of the Syndicate of several thousand dollars each. The Treasury Department estimated that from April 2012 until April 2013, McLintock raised over $180,000

for RWO. RWO itself reported that from May 2012 to December 2013 it received donations totaling approximately $330,000. And as noted above, McLintock was providing funds and other resources to the Syndicate from at least 2007 (and possibly beforehand) until at least 2016.

**NBP's Customer Ghulam Murtaza Used His NBP Account to Fund Al-Rehmat Trust, a Designated FTO and Alter-Ego for the FTO JeM, Which Was a Member of the Syndicate that Provided Financial and Logistical Support to al-Qaeda and Taliban Terrorists in Afghanistan**

106.    Al-Rehmat Trust ("ART"), which the U.S. Treasury Department designated an FTO in November 2010 as an "operational front" for JeM, as well as JeM's agent/proxy and chief fundraiser, also uses NBP for its fundraising activities.

107.    In the early 1990s, Masood Azhar, the founder of JeM and co-head of ART (with Ghulam Murtaza) developed a successful terrorist finance playbook for another Pakistani FTO, Harkat-ul-Mujahedeen ("HuM"), *i.e.*, the publication of a monthly magazine designed to recruit and raise funds:

> With a print run of about 1,000, nearly all of which were distributed free at mosques, the magazine detailed the heroic accomplishments of the mujahedeen in Afghanistan, inspiring a reverence among mosque-goers that translated into a steady stream of new recruits for the group. And the publication of the group's bank account number in each issue helped bring in substantial donations every year. The magazine's success quickly propelled Azhar into Harkat-ul-Mujahedeen's leadership ranks.[35]

108.    Azhar followed this same playbook with ART, using the newsletter *Al Qalam*. *Al Qalam* is one of JeM's flagship newsletters, and has been published weekly, in print and online, since at least the mid-2000's. Like the magazine Azhar managed for HuM, *Al Qalam* glorified the Taliban and attacks on Americans in Afghanistan.

---

[35] Yudhijit Bhattacharjee, *The Terrorist Who Got Away*, N.Y. Times Magazine (Mar. 19, 2020).

109.    *Al Qalam* is widely distributed and read in Pakistan, and is printed in Urdu and English, indicating a target audience beyond Pakistan. Its website is designed to provide the same content as the weekly printed version.

110.    Beginning at least as early as March 2007, ART published fundraising appeals in *Al Qalam* that encouraged JeM supporters to donate to ART campaigns. These appeals closed with the following deposit information for donors: "Account No: 10560-9 in the name of Ghulam Murtaza—National Bank, Satellite Town, Branch Code No: 957 Bahawalpur." NBP currently lists Branch 957 at "Bahawalpur S.T." on its website.[36]

111.    There were at least four different *Al Qalam* solicitations between at least as early as March 2007 and going at least through January 2014 that referenced Murtaza and the NBP account. Some of these solicitations explicitly solicited funding for "martyr payments" to injured or killed terrorists.

112.    The donations these flyers solicited, to be paid into an NBP account, were central to the U.S. government's designation of ART as an "operational front" and fundraising arm of JeM in November 2010.

113.    JeM and ART did not hide their many fundraising appeals. In November 2011, the Jamestown Foundation, a global research and analysis think tank, published a report on JeM stating that ART "openly carries out fund raising activities using legitimate banking channels."[37]

---

[36] *See* National Bank of Pakistan, List of Open NBP Branches during lockdown under COVID-19 (Conventional) (last visited June 5, 2020), https://www.nbp.com.pk/misc/conventional-open-branches.pdf.

[37] Animesh Roul, *Jaish-e-Muhammad's Charity Wing Revitalizes Banned Group in Pakistan*, Terrorism Monitor (Nov. 11, 2011), https://jamestown.org/program/jaish-e-muhammads-charity-wing-revitalizes-banned-group-in-pakistan/.

The article cited a contemporaneous flier posted on the *Al Qalam* website, seeking donations to Murtaza's NBP account.

114.    NBP's knowledge of Murtaza's roles with ART and JeM was not limited to the *Al Qalam* fundraising appeals. Murtaza has long been known to be a close associate of JeM founder Masood Azhar, and a high-profile terrorist figure in his own right; prior to managing ART, Murtaza was head of the Punjab chapter of HuM, which has been a designated FTO since 1997.

115.    NBP's complicity with ART's fundraising continued well after the United States designated ART as a terrorist organization. In 2016, Indian media reported that although "some countries have proscribed al-Rahmat—the United States, in November 2010, imposed sanctions calling it the 'operational front' for the Jaish, and the United Arab Emirates has followed—it continues to operate through publicly-advertised bank accounts in Pakistan."[38] Around the same time, other media sources reported both that Murtaza had likely been personally involved in a recent terror attack in India, and that "[t]he accounts of Al Rahmat Trust in National Bank . . . are handled by" Murtaza.[39] In 2018, Indian media reported that Murtaza was still heading ART.[40]

116.    Based on these sources, ART and Murtaza have been openly using accounts at NBP to raise funds from at least 2007 through at least January 2016.

---

[38] Praveen Swami, *With Backing of ISI, Jaish-e-Muhammad Rises Like a Phoenix in Pakistan*, Indian Express (Jan. 11, 2016).

[39] Rajesh Ahuja, *Pathankot Attackers Called Head of Jaish Charity Organisation*, Hindustan Times (Jan. 18, 2016).

[40] Ankit Kumar, *Masood Azhar's Jaish-e-Mohammad Sells Medicines to Collect Funds from Pakistan*, Hindustan Times (May 21, 2018).

B.  **National Bank of Pakistan Acted With the Requisite Scienter for Primary and Secondary Liability**

117.    As set forth in detail below, NBP knew each of the following facts: (1) that it was providing financial services and funds to terrorists and terrorist organizations in the Syndicate; (2) that these terrorists and terrorist organizations were actively engaged in acts of international terrorism directed against Americans; (3) that NBP's provision of financial services and funds to these terrorists and terrorist organizations served an important role in financing their operations and facilitated violence against Americans in the region; and (4) that providing financial services to these terrorist and terrorist groups was illegal precisely because it would facilitate terrorist violence.

118.    Moreover, although the transactions at issue in this case were part of NBP's commercial banking business, they are not properly regarded as routine or innocuous. Instead, they involved patterns of suspicious behavior that were recognizable to prosecutors, bank regulators, and to NBP itself. These repeated and knowing acts were substantial deviations from NBP's own internal policies, which were mandated by its regulator, SBP.

119.    Those policies and procedures included rigorous and clear "Know Your Customer" requirements that obligated NBP staff to verify the identity of any client, which entailed, among other things, "[c]onsulting lists of *known or suspected* terrorists or terrorist organizations provided to the financial institution *by any government agency* to determine whether a client appears on any such list." (Emphasis added). The "Types of Customers NBP will not accept" included "Entities / persons appearing in OFAC/EU/UN lists and any other list recommended in each jurisdiction where NBP operates" and "Entities/persons appearing in negative sanctions lists," including "those **who are known for their association with such entities and persons**, whether under the proscribed name or a different name." (Emphasis in

original). It is clear from these policies that NBP actually monitored "negative sanctions lists," such as U.S. and U.N. terrorist designations in real time, and consulted them regularly. NBP could not have meaningfully screened customers according to its policies otherwise.

120.    NBP did not limit itself to "negative lists" maintained by outside entities. The "Sanctions Lists that NBP will use" included the "Bank's Internal List."

121.    Accounts for purported charities, and madrassas in particular, were always considered "high risk." NBP's policies stated the "Following entities / customers will be high risk customer," and listed (among others) "Religious Organization," "NGO," "NPO" (non-profit organization), "Madrassas," and "Charitable organizations." NBP's policies provided that "[a]ccount opening" for these entities "will be subject to enhanced due diligence . . . of the entity, its signatories and members of the governing body. Additionally, under enhanced due diligence, all associates/members will be subject to scrutiny through negative lists linked with CAOP to assure that these persons are not affiliated with any prescribed [sic] entity/entities."

122.    In addition to "enhanced due diligence," any such "high risk" account required approval by senior staff of NBP. According to the bank's internal manuals, "[f]or all High Risk Accounts approval from Compliance Group Head Office will be required. Compliance Group Head Office will accord approval on the recommendations of Regional Head & Branch Manager (Who must conduct the Enhanced Due Diligence of all high risk customers before requesting for approval from head office)."

123.    NBP did not limit its diligence—"enhanced" or otherwise—to checking "negative lists" such as lists of sanctioned persons and entities. For all NBP accounts, an "'account opening application form' must be submitted and should be signed by the Branch Operations Manager / Branch Manager after he has satisfied himself of the *bonafides, respectability and genuineness* of

the prospective account holder *beyond a doubt*." (Emphasis added). "Accounts which belong to individuals / entities with *dubious character*, or where there are *reasonable grounds for suspicion* in the conduct / operations should be referred to Regional Management Committee through Regional Operations Chief for review / decision to close the account." (Emphasis added).

124.    NBP also did not limit its customer diligence to the moment it opened an account. Instead, NBP stated that it would "keep[] that [Know Your Customer] information up to date" and informed staff: "It is not correct to think of KYC as a one-time process towards commencing the relationship with the customer rather it is a continuing process till the relationship exists."

125.    Consistent with that directive, NBP continually monitored high risk accounts. In conducting the required "Ongoing Monitoring of Accounts," all "High Risk Category accounts"—defined as accounts for NGOs, NPOs, Trusts, Madrassas, Charities, Welfare Associations, and accounts for collection of donations—"must be reviewed and monitored to ensure that these organizations, their authorized signatories, members of their governing body and the beneficial owners are not linked with any proscribed entities and persons, whether under the same name or a different name. In case of any positive match, Branch will immediately refer the case to Compliance to take action as per law."

126.    In addition, when conducting ongoing monitoring, NBP's policies provided that "[s]pecial attention shall be paid on cash based transactions considering examples of *Red Alerts* given in Annexure-III to the Manual." Annexure III provided "EXAMPLES OR CHARACTERISTICS OF SUSPICIOUS TRANSACTIONS (RED ALERTS) THAT MAY BE A CAUSE FOR INCREASED SCRUTINY FOR AML/CFT PURPOSES," which, in addition to cash transactions, included "[a]n account opened in the name of a legal entity that is believed

to be involved in the activities of an association or foundation whose aims are related to the claims or demands of a terrorist organization."

127.    NBP also detailed its customer due diligence policies in questionnaires its executives submitted to the Wolfsberg Group, an association of 13 global banks whose stated aim is to develop financial services industry standards, during the period relevant to Plaintiffs' claims. In those questionnaires, NBP has consistently represented that it collects and checks information for all its banking customers that would trigger numerous red flags with respect to Khan, McLintock/RWO, and Murtaza/ART, and that NBP's internal audit function would identify the staff's "practices," including deviations from policy, regarding these customers.

128.    NBP's internal policies were guided by and based on requirements from its regulator, SBP. Those due diligence requirements were expressly created to "prevent the possible use of the banking sector for money laundering and terrorist financing."[41]

129.    Under SBP's requirements, if a bank at any time was not able to satisfactorily complete the required due diligence requirements, then the banking relationship was to be terminated and the suspicious behavior reported to authorities.

130.    SBP reiterated these requirements in two documents circulated to all banks in Pakistan in 2012, including statements that enhanced due diligence should include referencing public databases and the internet, and that enhanced due diligence should be used for any NGOs or charities.

131.    SBP further contemplated that NBP and other banks would monitor newspapers and other publications for references to the bank's accounts. Given that "enhanced due

---

[41] State Bank of Pakistan, ANNEXURE-I, Attachment to BPRD Circular Letter No.07 of 2009, at 1 (2009), http://www.sbp.org.pk/bprd/2009/Annexure-I-CL7.pdf.

diligence" could include Internet searches on bank customers, NBP likely reviewed references to its own accounts online and in Pakistani publications as well. NBP would be particularly likely to do so for customers it knew solicited donations (as even minimal KYC and CDD efforts revealed), especially where the customers' public profile includes associations with terrorists.

132.    Indeed, it is likely that NBP saw any mention of its name on the Internet during the relevant period (particularly when combined with account information) because NBP employed a "Media Manager" whose job description included continuous monitoring of online public relations. NBP's monitoring efforts revealed that its customers were notorious terrorists, and that some were using their NBP accounts to solicit donations, including explicitly for "martyr payments" and other terrorist causes. More broadly, SBP's regulations put NBP on notice that terror financing would cause terrorist violence in the region.

133.    NBP also knew that its policies and procedures for preventing money laundering and terrorist finance were under scrutiny. During the time period relevant to this Complaint, NBP was involved in legal proceedings in France involving alleged money laundering charges (NBP was convicted and fined 200,000 euros by French authorities in December 2008). Separately, in August 2008, the Hong Kong Monetary Authority cited NBP for numerous deficiencies in its Hong Kong branch's anti-money laundering and terrorist finance practices.

134.    As set forth in greater detail below, application of NBP policies and SBP requirements to the financial accounts and transactions of Hafiz Khan, McLintock/RWO, and Murtaza/ART raised "red flags" for NBP staff from the branch level to the "Head Office" and upper management. NBP intentionally ignored these red flags for years, allowing each of the NBP customers discussed herein to continue giving significant funds to members of the Syndicate and to continue benefiting from NBP's legitimacy.

**NBP Knew About Hafiz Khan's Terrorist Activities**

135.    Many of Khan's financial transactions funded a madrassa and mosque in Pakistan, and thus they were beneficiaries of his NBP accounts. Both madrassas and mosques are defined by NBP's policies as a type of "High Risk Customer." Furthermore, even the most limited diligence on Khan, his family, and Ali Rehman, all of whom NBP staff interacted with directly, would reveal their associations with terrorist groups, including the TTP.

136.    Khan's transactions were suspicious enough to trigger the U.S. government's investigation, which ultimately led to Khan's conviction. It was open, obvious, and transparent to NBP that Khan was involved in these transactions, and, with complete access to the account information, NBP had far greater real-time visibility into the transactions than did the U.S. government.

137.    Indeed, NBP staff were personally involved in Hafiz Khan's transactions. Ali Rehman, who was a "Proscribed Person" in Pakistan and who was indicted by the U.S. for providing material support to the TTP, testified in Khan's trial that in order to withdraw the money transferred by Khan through NBP, Rehman had to physically travel to NBP's branch in Mingora, Pakistan. There, Rehman provided a check signed by Khan to the bank manager.

138.    The bank manager had been instructed by Khan to pay out money on the check, but Rehman was still required to sign the check himself, and the bank manager would physically give the money to Rehman. Khan testified that the manager personally supervised the transfers to prevent fraud.

139.    Thus, NBP bank managers were interacting personally with both Khan and with Rehman in connection with illegal transfers in order to ensure that the transfers were effected as Khan intended.

140.    A similar interaction occurred when Hafiz Khan released funds to his grandson Alam Zeb, who was associated with the TTP. Khan called the branch manager of NBP's branch in Deolai, Pakistan, to instruct him to release the funds to Zeb, who picked up the funds in person from the NBP branch manager.

141.    In the course of processing these and other transactions for Hafiz Khan, NBP's policies provided notice that the transfers and withdrawals were unusual and suspicious. Indeed, NBP's "Policy Manual on Anti Money Laundering," which was in effect from 2008 to 2010, noted that the U.S. "State Department cites the following examples as indications of terrorist financing," and listed behavior that Hafiz Khan engaged in, including "[u]se of multiple personal and business accounts to collect and funnel funds to a small number of foreign beneficiaries," "[b]eneficiaries are located in a problematic foreign jurisdiction," and "[s]tated occupations of those engaging in transactions that are not commensurate with the level of activity."

142.    As stated above, Rehman was designated as a Proscribed Person by the Pakistani government. A Proscribed Person is a person on a Pakistani government list created to help financial institutions avoid doing business with those people. Indeed, NBP's policies specifically state that "the Bank is prohibited from providing any banking services to proscribed entities and persons *or to those who are known for their association with such entities and persons*, whether under the proscribed name or with a different name."

143.    The recipients of Khan's fund transfers also lived in or near an extremely "problematic" jurisdiction: the Swat Valley. This was another red flag NBP ignored. NBP, which had branches in Swat and the surrounding areas, and its staff in the area knew that during the relevant time period, the TTP was extremely active in the area. Hundreds of attacks had occurred in the region starting in 2007, and the Pakistani Army was cracking down on the insurgency in

Swat. NBP accordingly would know that any financial support for the TTP in Swat would likely translate directly into violence in the region.

144.    Hafiz Khan's "stated occupation" was another red flag NBP ignored. NBP knew, based on "Know Your Customer" verification all NBP branches were required to complete, that Hafiz Khan was an imam of a mosque, a relatively low-paid position. And NBP, seeing his fund transfers to Rehman and others, saw that they were not commensurate with his income. NBP's internal policies would reveal this disparity between Khan's income and the size of his transfers.

145.    Indeed, the amounts transferred raised red flags even independent of Khan's occupation. NBP's internal policies in effect from at least 2005 through 2010 required NBP staff to review transactions involving an amount of 500,000 Pakistani rupees (approximately $5,800 in 2010) or more and screen them for any indicia of suspicious activity. Between 2008 and 2010, Khan's transfers of $10,000 U.S. dollars significantly exceeded 500,000 Pakistani rupees.

146.     Khan's transactions also involved an unusual process, *i.e.*, the use of pre-signed checks. SBP's "Examples of Suspicious Transactions," in effect from 2004 on, specifically identified "[f]requent withdrawal of large amounts by means of cheques" as inherently suspect.[42]

147.    Similarly, NBP's own internal policy manuals noted that SBP regulations required paying special attention to, and reporting, unusual transactions. Khan's scheme to transfer funds in $10,000 increments to Rehman by use of multiple checks fit that pattern precisely.

148.    NBP's customer due diligence policies also alerted staff that members of Khan's family were suspected of TTP affiliation. For example, multiple Pakistani police reports from the

---

[42] *See* State Bank of Pakistan, Banking Policy Department Circular No. 20 of 2004 (June 16, 2004), *available at* http://www.sbp.org.pk/bpd/2004/C20.htm, and Appendix I, Section 3(iii), *available at* http://www.sbp.org.pk/bpd/2004/annx_c20.pdf.

2008 period identified Khan's son Ikram Khan (AKA Ikramul Haq) as a TTP member. These Pakistani police reports specifically identified Khan as the father of Ikram Khan, and indicated that Ikram Khan participated in and was "wanted" for at least five terrorist attacks, including multiple TTP attacks between 2008 and 2009. Witnesses in the area had also observed Ikram Khan in 2008 armed and accompanying a TTP commander.

149.    During the 2008 to 2009 period, NBP's anti-money laundering policies required it to investigate suspicious persons or people named by the police as potentially involved in terrorism. Given Ikram Khan's close association with his father—as noted in police reports from the geographic area where NBP had multiple branches—NBP knew to look for suspicious transactions from Khan.

150.    NBP's policies also required NBP staff to identify the purpose for Khan's remittances, both when Hafiz Khan initiated the transfers and when the recipient took cash directly from the NBP branch managers. Thus, NBP staff knew that some of Khan's transfers of U.S. dollars to multiple Pakistani accounts were for the purpose of funding his madrassa and mosque, which was itself a form of material support to the TTP.

151.    Any fund transfers through NBP branches for the purpose of funding Khan's madrassa raised terrorism finance red flags with the NBP branch managers who approved them. First, madrassas in general raise heightened concerns, which is why NBP's AML and CTF policies treat them as "High Risk" and require heightened diligence. Second, Khan's madrassa was well-known for its connections to the TTP and was closed by the Pakistani Army for several months in 2009 due to its involvements with the TTP. NBP was aware of these risks before and while it processed Khan's transactions.

152.    As a Pakistani bank with considerable familiarity with the country and its particular terrorism financing risks, NBP also knew that the Syndicate is adept at raising money from foreign supporters. Thus, NBP's AML and CTF policies and procedures were designed to identify money transfers going to the TTP.

153.    It also was common knowledge—as reported in the global media, including Pakistani media—that the TTP and al-Qaeda were closely aligned and collaborating with each other. Accordingly, NBP knew that by facilitating fund transfers to the TTP, it was also necessarily assisting al-Qaeda.

154.    NBP's conduct after Khan was arrested by the U.S. government provides further evidence that it knew Khan's accounts were suspicious. According to federal prosecutors, Khan's accounts in Pakistan remained open in early July 2011, more than 90 days after his arrest for funding the TTP, an event widely reported in the U.S. and Pakistan. As late as May 2012, the U.S. government cited Izhar Khan's "ability to access his family's multiple U.S. dollar bank accounts and extensive landholdings in Pakistan" as a basis for his continued detention, an argument the District Court accepted.[43] As discussed above, NBP knew before Khan was indicted that his NBP accounts and transactions were used to support the TTP. NBP's failure to close those accounts *after* the indictment adds to the inference that NBP knew what Khan and his co-conspirators were doing all along.

**NBP Knew About McLintock/RWO's Terrorist Activities**

155.    With respect to McLintock and RWO, all of their characteristics discussed above, combined with the required diligence and approvals of each, also alerted NBP and its staff, from

---

[43] *See* Government's Response to Defendant Izhar Khan's Motion for Reconsideration of Pretrial Detention Order, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 319, at 2 (S.D. Fl. 2012); Order, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 360 (S.D. Fla. 2012).

the lowest to highest levels, that the bank's customer was providing material support to the Syndicate.

156.    Prior to the 2016 designations of McLintock and RWO as SDGTs, the bank's KYC policies revealed that McLintock was suspected of providing material support to members of the Syndicate—which put NBP on notice that the financial donations coming through to McLintock and RWO were funding the Syndicate. Furthermore, McLintock's internationally publicized nickname—the "Tartan Taliban"— informed NBP that its customer was likely a terrorist himself.

157.    Once the U.S. government designated McLintock and RWO as SDGTs for providing material support to the Syndicate, NBP's ongoing monitoring of their account raised additional red flags and "Red Alerts," which NBP's staff and management intentionally ignored.

158.    McLintock raised significant sums for terrorists (approximately $180,000 in 2012-13 from British donors alone), openly and notoriously directing donors to his NBP accounts on the RWO website. That site provided complete bank account details, including the full IBAN number to enable international transfers. The NBP account was the only bank account owned by RWO listed on its website. RWO also published printed reports of its fundraising activities, which listed its NBP account as the sole means for international donations.

159.    The opening and use of the McLintock/RWO account with NBP entailed "enhanced due diligence," triggered numerous red flags, and required approval by NBP staff at multiple levels, including the "Head Office." The RWO fit within several categories of customers always considered "High Risk," subject to "Enhanced Due Diligence," and requiring upper management approval.

160.    In addition, the supporting documents for the Treasury Department's designations of McLintock and RWO detailed that McLintock made regular transfers of thousands of U.S. dollars, in *cash* to senior Taliban commanders in Afghanistan. Donations to RWO went into an NBP account. Such cash transactions were a "Red Alert" according to NBP's policies and procedures.

161.    McLintock was the President, CEO and Chairman who controlled RWO. NBP's KYC policies identified his association with RWO, and NBP subjected him to "Enhanced Due Diligence" and upper management approval.

162.    Any diligence conducted on McLintock—much less "enhanced" diligence"— triggered serious red flags because public reports going back to 2001 identified him as a well-known jihadist fighter and a funder of terrorist activities and organizations as early as 2001, when his first arrest earned him the nickname "Tartan Taliban" in international headlines. McLintock also had many well-publicized associations with al-Qaeda, the Taliban, and terrorist causes generally. Consequently, it would have been impossible to perform even the most cursory diligence without discovering his connections to terrorism.

163.    NBP's ongoing monitoring of McLintock and RWO could not have missed these and other public reports, in prominent Pakistani and international press outlets, over an eight-year period. Accordingly, this diligence put NBP on notice that McLintock was associated with terrorists.

164.    Once the U.S. government designated McLintock and RWO as SDGTs on March 31, 2016, they were added to international sanctions lists that NBP monitored continuously.

165.    RWO updated its website after the U.S. designation, yet the website continued to promote RWO's NBP account as a way to "Donate to RWO" until at least late August 2016.

**NBP Knew About ART, JeM, and Murtaza's Terrorist Activities**

166.    The ART/Murtaza transactions were equally suspicious as they were openly carried out in the name of  ART, a known front group for JeM, using an NBP account under the name of a known terrorist financier—and both JeM (as of December 2001) and ART (as of November 2010) were designated FTOs.

167.    All of the characteristics of Murtaza, ART, and JeM discussed above, combined with the required "Enhanced Diligence" and approvals of each, alerted NBP and its staff, that Murtaza's NBP account was providing material support to the Syndicate. As the co-head of ART, a designated FTO, Murtaza is a prominent figure whose identity had been reported in the mainstream media.

168.    In addition, the advertisements soliciting donations in *Al Qalam* themselves linked ART and Murtaza, and the existence of those ads was discussed in other media publications. Moreover, when an NBP account is referenced in Pakistani publications, NBP's policies require it to confirm that the name on the account matches the name of the entity soliciting funds to the account. For the *Al Qalam* solicitations, such diligence revealed Murtaza's close association with ART. Indeed, he was the keeper of ART's funds.

169.    Accordingly, NBP knew the Murtaza/ART account was "High Risk" and subject to "Enhanced Due Diligence," which triggered numerous red flags, and required approval by NBP staff at multiple levels, including the "Head Office."

170.    ART purported to fit within several categories of customers always subject to "Enhanced Due Diligence" and requiring upper management approval.

171.    ART was also publicly identified as the fundraising arm of JeM. ART and JeM, as of November 2010, were both designated by the U.S. government as FTOs, and thus appeared on

the international sanctions lists NBP staff monitored continuously. Public reports available on the Internet confirmed that ART raises funds for JeM through NBP.

172.    Furthermore, the accounts were in Murtaza's name. NBP's KYC policies required him to be subjected to "Enhanced Due Diligence" and upper management approval.

173.    Any diligence conducted on Murtaza—much less "enhanced" diligence"— raised significant red flags. Murtaza was publicly identified as a key associate of JeM's founder and the co-head of ART, a designated FTO. He was also publicly identified as a leader of the HuM terrorist group, before he joined the leadership of JeM. And Murtaza was the type of customer SBP directed NBP to scrutinize closely: a "high net worth customer[] with no clearly identifiable source of income" (other than public solicitations for martyr payments by a terrorist group), and a person holding a "high profile" position (as co-head of ART).[44]

**NBP Knew That Its Conduct Was Illegal, and Facilitated Terrorist Violence Against Americans**

174.    In addition to knowing that it was assisting customers engaged in terrorism and terror financing, NBP also knew that the terrorists and terrorist organizations it assisted were committed to killing Americans. Indeed, as explained in the description of the Syndicate, *supra*, such terrorist attacks in Afghanistan are the *raison d'être* of al-Qaeda and the Taliban—and that fact was reported in multiple high-profile public sources in the U.S., Pakistani, and international media, as well as by reputable government sources including the U.S. government, the United Nations, and the Pakistani government, all of which had taken public steps to stop the flow of funds to these organizations. Further, one of the main beneficiaries of NBP's material support

---

[44] *See* State Bank of Pakistan, ANNEXURE-I, *supra* note 41, at 4.

and assistance to terrorists, ART, openly solicited donations, using an NBP account, in *Al Qalam* newsletters that glorified the Taliban and its attacks on Americans in Afghanistan.

175.    NBP also recognized that its strict compliance with AML and CTF rules and regulations—including its own policies and procedures—was critical to both the global war on terror and to the United States' efforts to prevent terrorist attacks on Americans. As the third edition of NBP's "Policy Manual," titled "Anti-Money Laundering, Anti-Terrorist Financing and Know Your Customer"[45] explained:

> Terrorist financing networks are global, and consequently*, efforts to identify and deny terrorists access to funds must also be global. An essential component of* the governments around the globe *counter-terrorism strategy has been to identify, disrupt, and dismantle the financial networks of terrorist organizations. The global effort to stop terrorist financing is fundamentally a preventive strategy. In the aftermath of events of September 11, 2001 the US passed the USA PATRIOT Act to ensure that both combating the financing of terrorism (CFT) and anti-money laundering (AML) was given adequate focus by US financial institutions.* The act also had extra-territorial impact and non-US banks having correspondent banking accounts or doing business with US had to upgrade their AML/CFT processes. . . . Assets forfeiture and sharing of information has proven to be the *most effective way* to combat money laundering and terrorist financing. (Emphasis added).

176.    NBP's leadership was also aware of the critical role of financial institutions and CTF practices in stopping terrorist attacks globally. In September 2013, Rana Assad Amin was appointed to NBP's Board of Directors. Before joining NBP, he represented Pakistan at national and international fora on the prevention of money laundering and terrorist finance. Amin thus knew that AML and CFT requirements exist for financial institutions not merely to prevent terrorist financing but to prevent terrorist attacks.

---

[45] This internal NBP manual is undated, but was submitted to a repository of banking manuals in April 2011.

177.    NBP also stated in an internal policy manual that "[a]ll international transactions denominated in US Dollars are routed through United States of America," that all such transactions "are subject to scrutiny with the list provided by the [United States] Office of the Foreign Assets Control (OFAC)," and that "OFAC administers and enforce[s] economic and trade sanctions based on US foreign policy and national security goals." Thus, NBP knew that one of the "US foreign policy and national security goals" motivating the maintenance of, and required compliance with, the OFAC designation lists was the prevention of terrorist attacks on Americans.

178.    NBP understood that its compliance with U.S. terrorism laws and attention to U.S. designations played a substantial role in preventing attacks on Americans. Conversely, NBP knew that when it flouted U.S. designations and legal requirements, and provided safe harbor to members of the Syndicate, it played a substantial role in such attacks.

179.    A sophisticated financial institution could not miss the purpose of the criminal law prohibitions on material support to terrorists. Those prohibitions are based on the idea that any contribution to such an organization facilitates terrorist conduct.[46] Accordingly, NBP understood that "any contribution" it made to members of the Syndicate would illegally facilitate their terrorist activity.

### C. National Bank of Pakistan's Assistance to the al-Qaeda Terror Syndicate Was Substantial, and Caused Terror Attacks

180.    NBP played a crucial role in allowing members of the Syndicate to raise funds. By maintaining accounts and processing transactions for Khan, McLintock/RWO, and Murtaza/ART, NBP participated in the financial infrastructure essential to terrorism focused on

---

[46] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010).

Afghanistan. By allowing terrorist groups and fundraisers to openly solicit donations to their NBP accounts, NBP also lent its legitimacy to their fundraising efforts.

181.    The funds NBP harbored for and transferred to members of the Syndicate were significant enough, and close enough in time to the attacks on Plaintiffs, to have been a substantial factor in both strengthening the Syndicate's terrorist enterprise and causing (factually and legally) the attacks on Plaintiffs.

182.    As the United States explained in the criminal case against Khan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."[47]

183.    The money NBP sent to the Syndicate members contributed to their ability to carry out attacks against Americans in Afghanistan. Money in the form of U.S. dollars goes a long way when used to purchase arms. In addition to weapons and training, financial support to injured fighters and their families promotes terrorist activity.

184.    In this case, the amounts transferred were significant. As described herein, three sets of customers (Khan, McLintock/RWO, and Murtaza/ART/JeM), collectively used NBP accounts to transfer at least a million dollars to members of the Syndicate over a period of at least ten years.

185.    The significance of NBP's assistance is confirmed by the findings underlying the laws it violated. U.S. law flatly prohibits knowingly providing any material support to an FTO, and broadly prohibits transactions with SDGTs. This is precisely because the U.S. government have concluded that such transactions promote terrorist violence.

---

[47] Transcript of Arraignment, *United States v. Khan*, No. 11-cr-20331-RNS, Doc. 31, at 19 (S.D. Fl. 2011).

186.    As an unclassified cable from the U.S. Ambassador to India to the U.S. Secretary

of State explained in February 2010:

> *Cutting off the financing of terrorist groups is a key component of our national strategy to combat terrorism. A large number of terrorist organizations operate in South Asia including*, but not limited to *al-Qa'ida (AQ), Lashkar e-Tayyiba (LT), Tehrik\*i-Taliban (TTP),* Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B), Harakat ul-Jihad-Islami (HUJI), Harakat ul-Mujahedin (HUM), *Jaish-e-Mohammed (JEM)*, and Lashkar I Jhangvi (LJ). *In order to operate and grow, these groups depend on and receive funding from outside sources* including wealthy donors and grass root organizations in Pakistan, Saudi Arabia, United Arab Emirates (UAE) and other Gulf and Islamic states. *Building the capacity* of governments in South Asian countries *to stem the flow of funds to terrorist groups is essential to disrupting their activities*. The creation of robust financial investigative capabilities in South Asia is *critical to reaching our counterterrorism goals*.[48]

187.    By encouraging and facilitating money transfers to members of the Syndicate and

granting their assets safe harbor from U.S. and Pakistani regulators in NBP accounts, NBP

performed an essential role in providing material support, and aiding and abetting and conspiring

to provide material support, to the TTP, al-Qaeda, and the rest of the Syndicate, including their

violent activities.

188.    With respect to Khan, the U.S. government's prosecution made clear that his

financial transfers through NBP accounts in the United States and Pakistan substantially assisted

one member of the Syndicate, the TTP.

189.    The same is true of McLintock/RWO and Murtaza/ART: both raised substantial

sums from overseas donors and transferred those funds into their NBP accounts, where they were

shielded from seizure or other restrictions that would make the funds less accessible and useful

for terrorist purposes.

---

[48] https://wikileaks.org/plusd/cables/10NEWDELHI356_a.html

190.     The U.S. Treasury Department designated McLintock/RWO as SDGTs and ART as an FTO to stop these flows of funds and deprive the Syndicate of any things of value.

191.     The FTO designation of ART "targeted the financial and support networks of" JEM and was "an important step in incapacitating the operational and financial networks of these deadly organizations."

192.     Further, NBP lent legitimacy and financial services to a specific and deadly component of ART's fundraising efforts, by accepting donations for "martyr payments" to terrorists who helped al-Qaeda and the Taliban attack Americans in Afghanistan. NBP not only accepted martyr payments for terrorists, but it facilitated payments *to* terrorists and their families, as those funds were very likely withdrawn from the same NBP account they went into.

### D.  National Bank of Pakistan's Assistance to the al-Qaeda Terror Syndicate Had a Substantial Nexus to the United States

193.     NBP's substantial assistance to the Syndicate had a substantial nexus to the United States.

194.     With respect to the first nexus, Khan deposited funds with an NBP branch in the U.S.—and communicated with U.S.-based employees of NBP about his transactions—and the funds were withdrawn at NBP branches in Pakistan. These transactions relied completely on NBP's U.S. branches and personnel.

195.     NBP also relied on the U.S. in assisting McLintock/RWO and Murtaza/ART. NBP aided both in raising funds by using its New York branch to convert the donations they received from outside Pakistan into U.S. dollars, which NBP in turn routed to the Syndicate. McLintock and RWO also withdrew U.S. dollars—which NBP converted at its New York branch—from their NBP account.

196.    McLintock, through RWO's website, solicited donations from all over the world, and provided for donors to transfer funds in multiple currencies, including U.S. dollars. Indeed, the payment processing application on RWO's website offered "USD" as the default currency option.

197.    Donations to McLintock/RWO, which came from individual donors around the world, were transferred to the McLintock/RWO account at NBP through currency exchanges: donations were made in various currencies and then exchanged into U.S. dollars and transferred into the McLintock/RWO account at NBP in U.S. dollars or Pakistani Rupees. The RWO website specifically provided the SWIFT code required to transfer funds internationally to NBP's Peshawar branch.

198.    Likewise, Murtaza/ART received substantial donations from outside Pakistan, particularly from the Persian Gulf. These donations would be made in native currencies, like Saudi Riyals, *not* Pakistani Rupees (which are not a currency of choice outside South Asia). They would then be exchanged into U.S. Dollars and transferred into the Murtaza/ART account at NBP in Pakistani Rupees.

199.    Commercial banks transacting in currency pairs—*i.e.*, accepting funds in one currency and depositing them in another—typically choose a central currency to exchange into and out of. The U.S. dollar is by far the most common central currency.

200.    NBP's policies and procedures in place from at least April 2011 onward make clear that NBP's New York branch was essential to the currency exchange process that allowed McLintock/RWO and ART to obtain donations from outside Pakistan—in U.S. dollars and other currencies—and deposit them in either U.S. dollar or Pakistani Rupee accounts at NBP. Those policies and procedures state:

The major portion of foreign trade and foreign remittances including export, import, home remittances of Pakistan are denominated in US Dollars. All international transactions denominated in US Dollars are routed through [the] United States of America either by direct instructions to Banks in [the] USA to make payments or by providing cover through Banks located in [the] USA. All these payments and receipts are subject to scrutiny with the list provided by Office of Foreign Assets Control (OFAC) of the US Department of Treasury. The OFAC administers and enforce[s] economic and trade sanctions based on US foreign policy and national security goals.

201.    NBP's internal documents make clear that all U.S. Dollar transactions touch on

NBP's New York branch:

The incharges SWIFT Centers and Foreign Exchange Desk at FX branches must understand that ***NBP New York is playing [a] central role*** in providing the services of US Dollar international wire transfers to NBP Head Office and domestic branches. NBP New York will have to comply with all the US Regulatory requirements. Therefore, NBP New York is bound to comply with the above standards and has the right to decline/reject the handling of any transaction which does not fulfill the stated requirements. (Emphasis added).

202.    NBP's AML and CFT policy manual specifically addressed transactions using

SWIFT, such as those McLintock solicited on the RWO website:

For payments to be affected on behalf of customer via Swift, Message Type MT 103 is to be used to ensure conveying of clear information on the originator and beneficiary including the purpose of the transaction. For example foreign exchange remittances transactions involving US dollar values should be sent to Wall Street Branch, New York, USA via Swift Message MT 103.

203.    Thus, NBP's New York branch not only facilitated transfers of funds to and from

the Khan, McLintock/RWO, and Murtaza/ART accounts in Pakistan, they also subjected each

transaction to "scrutiny," based on New York and Federal law, including OFAC regulations and

U.S. terrorist designations. The New York branch therefore played an essential role in both

triggering the red flags and "Red Alerts" these transactions raised and knowingly ignoring them.

### III.    Al-Qaeda Committed, Planned, and/or Authorized the Terrorist Attacks That Injured Plaintiffs.

204.    While NBP and its customers were supporting the Syndicate, the Syndicate was carrying out violent attacks on Americans. The attacks at issue in this case involved 44 unique victims. They occurred from December 30, 2009 through January 14, 2019, and generally included suicide bombings in Afghanistan, shooting and IED attacks, and other terrorist attacks in Afghanistan's Kunar Province.

205.    As explained in greater detail below, al-Qaeda's participation was the common thread in these attacks. Each time, al-Qaeda committed, planned, and/or authorized the attack. Al-Qaeda also coordinated these attacks with one or more of its Syndicate partners, as explained in greater detail below.

### A.  The Camp Chapman Attack (December 30, 2009)

206.    On December 30, 2009, a suicide bomber named Humam Khalil al-Balawi ("Balawi") attacked a secret CIA base in the Khost Province of Afghanistan known as Camp Chapman. Balawi posed as an informant willing to provide information about high-value al-Qaeda targets in Pakistan. Upon gaining entry to the base, he detonated a suicide vest, murdering nine people, seven of whom were American. Six others were seriously injured. The Camp Chapman Attack was the largest attack on the CIA since the 1983 bombing of a Marine compound in Beirut, Lebanon.

207.    Balawi acted as an agent of the Syndicate.

208.    Al-Qaeda authorized the Camp Chapman Attack. Specifically, Sheikh Saeed al Masri, al-Qaeda's number three leader at the time, authorized the attack.

209.    The TTP helped plan and execute the attack by providing financial and logistical support. That support was coordinated by Hakimullah Mehsud, the leader of the TTP, who

appeared in a video released after the fact together with Balawi to take credit for "arranging" the attack. Balawi also trained at a Pakistani Taliban camp in North Waziristan, where he was protected by, and learned to use, weapons of the kind Khan gave the Syndicate funds to obtain. And the U.S. State Department determined that TTP leader Qari Hussain, trained Balawi before the Camp Chapman Attack.

210.    The Haqqani Network (as part of the Taliban) substantially participated alongside its al-Qaeda and TTP partners in the Camp Chapman Attack. The Haqqani Network provided key support, including but not limited to intelligence and logistical support, in committing the attack. The Taliban has also publicly taken responsibility for the attack.

**B.   The al-Qaeda / Taliban / Kabul Attack Network Attacks (June 7, 2010 through January 14, 2019)**

211.    The remaining attacks at issue in this case were jointly committed between June 7, 2010 and January 14, 2019 by al-Qaeda and the Taliban (including, in many cases, the Haqqani Network), often via the Kabul Attack Network, with LeT and JeM providing support in the form of recruiting and training suicide bombers (for the attacks that involved suicide bombings), and JeM providing additional support by making martyr payments (for the attacks in which the attacker was injured or died).

212.    In all of these attacks, whether the attack was carried out by al-Qaeda, the Taliban, or some combination of the two (either via the Kabul Attack Network or a different joint cell), al-Qaeda, as the leader of the Syndicate, played a key role in planning, authorizing, or committing the attack.

**Al-Qaeda Led the Syndicate**

213.    Following the Soviet withdrawal from Afghanistan, Osama bin Laden began to transform al-Qaeda into a global terrorist group capable of launching attacks around the world. Beginning in approximately 1996, the Taliban sheltered al-Qaeda in Afghanistan.

214.    In return for the Taliban's safe harbor, al-Qaeda provided substantial resources to the Taliban. By March 1997, bin Laden had met with Mullah Mohammed Omar personally and offered to lend his fighters to the Taliban. Furthermore, al-Qaeda shared technical knowledge with the Taliban and paid the Taliban between $10 million to $20 million a year for shelter. In doing so, Al-Qaeda supplied the strategy and support the Taliban needed to morph into a deadly terrorist group capable of inflicting mass casualties on Americans.

215.    In the spring 2001, Osama bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban. A few months later, al-Qaeda perpetrated the events of September 11, 2001, killing thousands in the U.S.. The U.S. demanded that the Taliban turn over bin Laden, and the Taliban refused. The Coalition invaded Afghanistan in October, and bin Laden and Taliban leaders eventually fled to Pakistan.

216.    Al-Qaeda's and the Taliban's close relationship continued long after September 11. Several commentators, including a Taliban official, noted that the Taliban and al-Qaeda were effectively the same.

217.    The Taliban and al-Qaeda have remained intimately intertwined in the years since. For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day. When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

218.    The overlap between the organizations meant that al-Qaeda routinely played an important role in Taliban and Haqqani terrorist attacks. Terrorism scholar Thomas Joscelyn testified before Congress that al-Qaeda operated as a "syndicate," referring to a joint venture between the Taliban, al-Qaeda, and similarly-minded groups.

219.    The Taliban and al-Qaeda's interdependence and joint venture continued throughout the period in which Plaintiffs were killed and injured. As two defense writers noted in 2016, the U.S. military's relative success against al-Qaeda neither eliminated al-Qaeda nor broke apart the Syndicate in which it participated: Afghanistan's southern and eastern provinces remained a "hub of Afghan insurgents and [the] al-Qaeda-led terrorist syndicate."[49]

220.    In 2010, one terrorism scholar warned against drawing a bright line between al-Qaeda and the Afghan terrorist groups that it sponsored. In explaining the importance of "recogniz[ing] the link between al Qa'ida and Afghan insurgent groups," he observed that a "policy focused on targeting al-Qa'ida—and not the Taliban, Haqqani Network, or other groups—would ignore one of the most egregious lessons from September 11."[50]

221.    The U.S. government agreed with that assessment. During the relevant timeframe, the U.S. government repeatedly stated that al-Qaeda and the Taliban acted together in a terrorist "syndicate," and warned against efforts to distinguish between them.

**Al-Qaeda Authorized and Planned Taliban Terrorist Attacks**

222.    Since at least the mid-2000s, al-Qaeda planned and authorized the Taliban's, including the Haqqani Network's, attacks on U.S. forces in Afghanistan in several ways.

---

[49] Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO: Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108.

[50] Seth G. Jones, *In the Graveyard of Empires: America's War in Afghanistan*, at 332 (2010).

223.    **Authorization.** Al-Qaeda provided critical religious authorization for Taliban (including the Haqqani Network) attacks on U.S. forces. As noted above, in 1998 Osama bin Laden himself directed all Muslims to kill Americans at every opportunity. In the ensuing years, senior al-Qaeda leaders issued a series of *fatwas* directed toward the Taliban, conferring religious permission for them to attack Coalition forces in Afghanistan.

224.    Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in the Syndicate. That multi-group Syndicate involved periodic mafia-style meetings in which al-Qaeda, the Taliban (including the Haqqani Network), and other members of the Syndicate (such as LeT) would confer about geographies and targets to attack. The Syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the Syndicate's individual members. Among other things, the Syndicate specifically approved: (i) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding provinces; (ii) the campaign of suicide attacks against Americans throughout Afghanistan; (iii) the Taliban's campaign of using anti-American IED and suicide attacks specifically in N2KL and P2K; and (iv) the Taliban's "surge" in Kandahar and Helmand from 2010 through 2012.

225.    Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban members. Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[51]

---

[51] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019).

226.    Al-Qaeda's messages of authorization extended to suicide bombings. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans all over the world."[52] The Taliban had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible. Al-Qaeda trumpeted that success online, announcing, "[w]hile suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[53] With al-Qaeda's authorization, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006.

227.    Al-Qaeda also authorized the Taliban's use of IED attacks against Americans in Afghanistan. Osama bin Laden publicly called for the Taliban to escalate its IED campaign against Americans in Afghanistan on several occasions in 2006 alone, in speeches in which he instructed his followers that Allah supported their use of IEDs because of the psychological terror, "destruction of the soldier's morale" and "rise in cases of suicide among" Americans. Osama bin Laden's messages of authorization—directed toward a specific type of Muslim (Taliban), a class of target (Americans in Afghanistan), and weapon (IEDs)—were important in enabling the Taliban's IED campaign against Coalition forces.

---

[52] *Osama bin Laden: Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

[53] Brian Glyn Williams, *Suicide Bombings in Afghanistan*, Jane's Islamic Affairs Analyst, at 5 (Sept. 2007), *available at* https://www.brianglynwilliams.com/IAA%20suicide.pdf.

228.    Al-Qaeda also authorized the Taliban's use of RPG attacks against Americans in Afghanistan. In 2006, for example, Osama bin Laden publicly called for anti-American terrorists to escalate their use of RPGs in Afghanistan.

229.    Al-Qaeda also authorized the Taliban's campaign of kidnapping Americans and others who supported the Afghan government. For example, Mustafa Abu al-Yazid (aka Saeed al-Masri), was one of al-Qaeda's founders, served as al-Qaeda's leader in Afghanistan, and helped persuade the Taliban to "adopt[] a number of 'al-Qaida inspired' tactics, first and foremost suicide bombings, but also others associated with al-Qaida, such as kidnappings, decapitation of hostages, roadside bombs, and an active media campaign."[54] Similarly, another senior al-Qaeda leader, Abu Hafs al-Najdi (aka Abdul Ghani), "commonly instructed subordinate leaders to conduct kidnapping operations against foreigners."[55]

230.    **Planning.** Al-Qaeda also planned the Taliban's, including the Haqqani Network's, terrorist attacks against Americans in Afghanistan. Working through its Syndicate partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as regional terrorist attacks, particularly in Afghanistan."[56]

231.    Al-Qaeda training provided another key mechanism through which that planning occurred. Before the September 11 attacks, al-Qaeda operated training camps in eastern

---

[54] Anne Stenersen, *Blood Brothers Or A Marriage Of Convenience? The Ideological Relationship Between Al-Qaida And The Taliban*, Paper presented at ISA's 50th Annual Convention, "Exploring the Past, Anticipating the Future" in New York City, Feb. 15-18, 2009, *available at* https://convention2.allacademic.com/one/isa/isa09/.

[55] ISAF Joint Command, *ISAF Confirms Number 2 Insurgent Killed In Coalition Airstrike*, Def. Visual Info. Distribution Serv. (Apr. 13, 2011).

[56] Lauren McNally & Marvin G. Weinbaum, *A Resilient al-Qaeda in Afghanistan and Pakistan*, MEI Policy Focus 2016-18, at 3 (Aug. 2016).

Afghanistan at the Taliban's request. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans.

232.    By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan.

233.    One al-Qaeda operative, Ghazwan al-Yemeni, trained Taliban members in Miran Shah, in Pakistan. He eventually helped plan the December 30, 2009 attack on Camp Chapman.

234.    The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province—both reportedly "hosted by the Taliban."[57] One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

235.    Al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its spectacular suicide bombings and insider attacks. As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," including insider attacks in Kabul "through operations planned together with Sirajuddin Haqqani."[58]

236.    More broadly, al-Qaeda has also long provided substantial financial assistance to the Taliban, with the aim of increasing the frequency of its terrorist attacks against Americans in Afghanistan. Al-Qaeda not only provided direct aid, but also helped the Taliban raise additional funds from Arabs around the world—all of which was important to the Taliban's anti-American campaign of terrorism in Afghanistan.

---

[57] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019), https://www.politico.com/magazine/story/2019/03/18/donald-trump-afghanistan-zalmay-khalilzad-225815.

[58] McNally & Weinbaum, *Resilient al-Qaeda*, *supra* note 56, at 9.

237.    All of these activities were part of al-Qaeda's planning of the Taliban's terrorist attacks in Afghanistan. By providing advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends. In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies.

238.    Al-Qaeda's planning activities extended to suicide bombings in particular. The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy. Al-Qaeda exported its suicide-bombing expertise to the Taliban through their joint Syndicate, and in so doing played a pivotal leadership and operational role in every Taliban suicide bombing in Afghanistan. For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

239.    Under al-Qaeda's standard training procedure for suicide bombers, each suicide bomber swore fealty to al-Qaeda. Al-Qaeda emphasized declarations of fealty to ensure the suicide bomber's commitment to al-Qaeda's and the Taliban's jihad by creating a psychological "point of no return" for the bomber. Suicide bombers who completed al-Qaeda's training course were officially viewed by al-Qaeda as al-Qaeda operatives and given all the stature in jihadist circles that such a title provided.

240.    To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban relied upon a series of dual-hatted al-Qaeda/Taliban terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons. Such dual-hatted al-Qaeda/Taliban terrorists include, but are not limited to, the following:

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network.

- **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces.

- **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari)**, a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban.

241.    Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers in support of the Taliban's jihad against Americans in Afghanistan. This attack infrastructure included (i) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the Syndicate; (ii) joint al-Qaeda/Taliban safehouses and ratlines to support the deployment of suicide bombers inside Afghanistan; and (iii) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for purposes of maximizing the chance the particular attacker would carry out his attack, as well as incentivizing the next generation of suicide bombers thereafter.

242.    Al-Qaeda's planning of the Taliban's terrorist campaign against Americans in Afghanistan also emphasized tactics designed to shoot down American helicopters, including Black Hawks and Chinooks. Al-Qaeda's role was essential, as the Taliban and Haqqani Network terrorists had no tactical experience successfully targeting American helicopters prior to their training from al-Qaeda.

243.    Shooting down a helicopter with an RPG requires precise training and is one of the most challenging attack types for an unskilled terrorist to execute. Consequently, al-Qaeda's specialized skills, experience, and training had an outsized impact on the Taliban and Haqqani Network. Al-Qaeda forward-deployed trainers into Afghanistan for the specific purpose of instructing Taliban fighters concerning attacks targeting helicopters.

244.    Al-Qaeda further planned the Taliban's campaign of fertilizer-based IEDs in Afghanistan. As the acclaimed journalist Peter Bergen documented in 2009:

> [I]n recent years, Taliban leaders have drawn especially close to Al Qaeda. … Today, at the leadership level, the Taliban and Al Qaeda function ***more or less as a single entity***. The signs of this are everywhere. For instance, IED attacks in Afghanistan have increased dramatically since 2004. What happened? As a Taliban member told Sami Yousafzai and Ron Moreau of *Newsweek*, "***The Arabs taught us how to make an IED by mixing nitrate fertilizer and diesel fuel and how to pack plastic explosives and to connect them to detonators and remote-control devices like mobile phones***. We learned how to do this blindfolded so we could safely plant IEDs in the dark."[59]

Roughly 80% or more of all the IEDs used in successful attacks against Americans in Afghanistan since 2007 have been fertilizer-based IEDs. On information and belief, nearly all of the IED victims in this case were killed by fertilizer-based IEDs planted by the Taliban and derived from al-Qaeda schematics and training.

245.    More broadly, al-Qaeda members regularly trained Taliban commanders in sophisticated bomb-making techniques that were material to the Taliban's ability to assemble and deploy explosives against Coalition forces. According to the terrorism scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated improvised explosive devices (IEDs), including remote controlled detonators. For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas. They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology. Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[60]

As part of that assistance, al-Qaeda also invited Taliban commanders to Iraq, where it learned how to make armor-penetrating "shaped" charges,[61] a type of IED later known as an EFP.

---

[59] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009) (emphasis added).

[60] Seth G. Jones, *In the Graveyard of Empires: America's War in Afghanistan*, at 292 (2010).

[61] Sami Yousafzai & Ron Moreau, *Unholy Allies: The Taliban Haven't Quit, And Some Are Getting Help And Inspiration From Iraq*, Newsweek (Sept. 25, 2005).

**Al-Qaeda Directly Participated in Taliban Terrorist Attacks**

246.    Al-Qaeda members also committed attacks alongside the Taliban, including some

of the attacks that killed or injured Plaintiffs or their family members. In the early 2000s,

al-Qaeda's third-ranking member, Abu Layth-al Libi, participated in attacks on Americans in

Afghanistan alongside Taliban members under the command of Sirajuddin Haqqani. On July 13,

2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Wanat in

Nuristan Province, killing nine U.S. soldiers. In May 2010, Taliban and al-Qaeda members

participated in an attack on the U.S. airbase in Bagram, killing an American contractor.

247.    In fact, many terrorist operatives were "dual-hatted," meaning that they were both

Taliban and al-Qaeda members. Those dual-hatted terrorists directly committed many of the

attacks that killed and injured Plaintiffs. Examples are set forth below.

248.    **Nangarhar, Nuristan, Kunar and Laghman Provinces (N2KL).** Al-Qaeda

deployed senior operatives to coordinate attacks in the strategically critical (and contiguous)

N2KL provinces, which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the

Taliban, and LeT maintained joint cells responsible for anti-American terrorism. The dual-hatted

al-Qaeda/Taliban terrorists who ran the cells include:

- **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[62] After Qahtani's death in 2016, al-Qaeda's General Command issued a statement praising Qahtani's leadership of a joint cell with the Taliban, through which Qahtani "participated with their mujahidin brothers from the Islamic Emirate . . . in cleansing [Kunar and Nuristan Province] from the crusaders' abomination."[63]

---

[62] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan*, Long War J. (Nov. 4, 2016).

[63] Al-Qaeda General Command, *The Martyrdom of the Commander Faruq al-QabtanT and His Comrades in Konar Province* (Nov. 23, 2016), *available at* https://scholarship.tricolib.brynmawr.edu/bitstream/handle/10066/18978/AQC20161123.pdf?sequence=1 &isAllowed=y.

- **Sakhr al-Taifi**, al-Qaeda's second highest leader in Afghanistan, who, while embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against Afghan security forces and coalition troops throughout eastern Afghanistan," and "also supplie[d] weapons and equipment to insurgents."[64] On information and belief, al-Taifi helped commit all of the attacks carried out by joint al-Qaeda/Taliban cells in N2KL until he was killed in a Coalition airstrike on or about May 27, 2012.

- **Mufti Assad**, an al-Qaeda network leader for Kunar Province, who "was an insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who provided training to insurgents on how to construct and use improvised explosive devices."[65] On information and belief, Assad replaced al-Taifi after the latter was killed, and Assad assumed the same role until he himself was killed in a coalition airstrike on or about August 2012.

249.     **Paktia, Paktika, and Khost Provinces (P2K).** Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also operated as an al-Qaeda safe haven. In this area, al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism. The dual-hatted terrorists who ran the cells include:

- **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's ruling council. On information and belief, Harrach helped commit every major Haqqani Network attack in Afghanistan prior to his death on or about May 19, 2010.

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network. On information and belief, Sirajuddin Haqqani planned, authorized, and helped to commit the Haqqani Network's attack campaign in P2K after Harrach's death on or about May 19, 2010.

- **Khalil al-Rahman Haqqani**, is a brother of Jalaluddin Haqqani and served as a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and

[64] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

[65] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

operational commander" for the Haqqani Network,[66] as well as an agent who "acted on behalf of al-Qa'ida"[67] and had "been linked to al-Qa'ida terrorist operations."[68] On information and belief, Khalil al-Rahman Haqqani helped to plan, authorize, and commit the Haqqani Network's attacks after Harrach's death on or about May 19, 2010.

250.    **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city. This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including the Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing attacks. The dual-hatted al-Qaeda/Taliban terrorists who ran the cells include:

- **Sirajuddin Haqqani**, a member of al-Qaeda's ruling council and commander of the Haqqani Network. On information and belief, Sirajuddin Haqqani has served as the overall strategic planner supervising the activities of the Kabul Attack Network beginning no later than April 2010, and he has continued in that role to this day.

- **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban. On information and belief, Wazir commanded the activities of the Kabul Attack Network in Ghazni Province, and planned every attack committed by the Kabul Attack Network there until he was killed by a Coalition air strike on or about November 21, 2013.

## IV.    Plaintiffs and Their Family Members Harmed in Terrorist Attacks

251.    Harold Brown Jr., a U.S. national, served in Afghanistan as a U.S. government employee serving in the Central Intelligence Agency. On December 30, 2009, Mr. Brown died from injuries sustained in the Camp Chapman Attack. The Plaintiff members of the Harold

---

[66] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War J. (Feb. 9, 2011).

[67] U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[68] U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani Network Leaders* (Aug. 20, 2014).

Brown Family are the survivors and/or heirs of Mr. Brown and are entitled to recover for their own injuries and for the damages Mr. Brown sustained.

252.    Dane Clark Paresi, a U.S. national, served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Paresi died from injuries sustained in the Camp Chapman Attack. The Plaintiff members of the Paresi Family are the survivors and/or heirs of Mr. Paresi and are entitled to recover for their own injuries and for damages Mr. Paresi sustained.

253.    Jeremy Jason Wise, a U.S. national, served in Afghanistan as a civilian government contractor working for Xe Services. On December 30, 2009, Mr. Wise died from injuries sustained in the Camp Chapman Attack. The Plaintiff members of the Wise Family are the survivors and/or heirs of Mr. Wise and are entitled to recover for their own injuries and the damages Mr. Wise sustained.

254.    Sergeant First Class Charles L. Adkins, a U.S. national, served in Afghanistan as a member of the U.S. Army. On April 16, 2011, SFC Adkins was injured in a suicide bombing insider attack in Laghman Province, Afghanistan. SFC Adkins died on April 16, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell. The Plaintiff members of the Adkins Family are the survivors and/or heirs of SFC Adkins and are entitled to recover for the damages SFC Adkins sustained.

255.    Sergeant Nicholas J. Aleman, a U.S. national, served in Afghanistan as a member of the U.S. Marine Corps. On December 5, 2010, Sgt Aleman was injured in a suicide bombing insider attack in Paktia Province, Afghanistan. Sgt Aleman died on December 5, 2010 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part

of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a

joint al-Qaeda-Taliban cell. The Plaintiff members of the Aleman Family are the survivors

and/or heirs of Sgt Aleman and are entitled to recover for the damages Sgt Aleman sustained.

256.    Major Jeffrey O. Ausborn, a U.S. national, served in Afghanistan as a member of

the U.S. Air Force. On April 27, 2011, Maj Ausborn was injured in an insider attack in Kabul

Province, Afghanistan. Maj Ausborn died on April 27, 2011 as a result of injuries sustained

during the attack. The attack was committed by the Taliban (including the Haqqani Network)

and al-Qaeda (a designated FTO at the time of the attack) acting together as part of the Kabul

Attack Network. The Plaintiff members of the Ausborn Family are the survivors and/or heirs of

Maj. Ausborn and are entitled to recover for the damages Maj. Ausborn sustained.

257.    Chief Petty Officer (SEAL) Darrik C. Benson, a U.S. national, served in

Afghanistan as a member of the U.S. Navy. On August 6, 2011, SOC (SEAL) Benson was

injured in an attack on a helicopter in Wardak Province, Afghanistan. SOC (SEAL) Benson died

on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed

by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of

the attack). The Plaintiff members of the Benson Family are the survivors and/or heirs of SOC

(SEAL) Benson and are entitled to recover for the damages SOC (SEAL) Benson sustained.

258.    Plaintiff Specialist Maggie Mae Bilyeu, a U.S. national, served in Afghanistan as

a member of the U.S. Army. On November 12, 2016, SPC Bilyeu was injured in a suicide

bombing attack in Parwan Province, Afghanistan. The attack severely wounded SPC Bilyeu,

who suffered severe injuries from shrapnel, requiring 22 surgeries to her legs and torso,

amputation of her left leg, and hearing loss that now requires wearing hearing aids. As a result of

66

the November 12, 2016 attack and her injuries, SPC Bilyeu has experienced severe physical and emotional pain and suffering. The attack was committed by the Taliban.

259.    Major David L. Brodeur, a U.S. national, served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, Maj Brodeur was injured in an insider attack in Kabul Province, Afghanistan. Maj Brodeur died on April 27, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Brodeur Family are the survivors and/or heirs of Maj Brodeur and are entitled to recover for the damages Maj Brodeur sustained.

260.    Staff Sergeant Christopher L. Brown, a U.S. national, served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SSG Brown was injured in an IED attack in Kunar Province, Afghanistan. SSG Brown died on April 3, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Christopher L. Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

261.    Master Sergeant Tara R. Brown, a U.S. national, served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, MSgt Brown was injured in an insider attack in Kabul Province, Afghanistan. MSgt Brown died on April 27, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Tara Brown Family are the survivors and/or heirs of MSgt Brown and are entitled to recover for the damages MSgt Brown sustained.

262.    Lieutenant Colonel Frank D. Bryant Jr., a U.S. national, served in Afghanistan as a member of the U.S. Air Force. On April 27, 2011, Lt Col Bryant was injured in an insider attack in Kabul Province, Afghanistan. Lt Col Bryant died on April 27, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Bryant Family are the survivors and/or heirs of Lt Col Bryant and are entitled to recover for the damages Lt Col Bryant sustained.

263.    Lieutenant Colonel David E. Cabrera, a U.S. national, served in Afghanistan as a member of the U.S. Army. On October 29, 2011, LTC Cabrera was injured in a suicide bombing attack in Kabul Province, Afghanistan. LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

264.    Sergeant Karl A. Campbell, a U.S. national, served in Afghanistan as a member of the U.S. Army. On October 4, 2010, SGT Campbell was injured in an IED attack in Kabul Province, Afghanistan. SGT Campbell died on October 4, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Karl Campbell Family are the survivors and/or heirs of SGT Campbell and are entitled to recover for the damages SGT Campbell sustained.

265.    Chief Petty Officer Christopher G. Campbell, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Campbell was injured in an

attack on a helicopter in Wardak Province, Afghanistan. CPO Campbell died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Christopher Campbell Family are the survivors and/or heirs of CPO Campbell and are entitled to recover for the damages CPO Campbell sustained.

266.    Private First Class Benjamen G. Chisholm, a U.S. national, served in Afghanistan as a member of the U.S. Army. On August 17, 2010, PFC Chisholm was injured in an IED attack in Kunar Province, Afghanistan. PFC Chisholm died on August 17, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Chisholm Family are the survivors and/or heirs of PFC Chisholm and are entitled to recover for the damages PFC Chisholm sustained.

267.    Sergeant James M. Darrough, a U.S. national, served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SGT Darrough was injured in a suicide bombing attack in Kabul Province, Afghanistan. SGT Darrough died on October 29, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

268.    Corey J. Dodge, a U.S. national, served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. Dodge was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Dodge died on August 22, 2015 as a result

of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

269. Petty Officer 1st Class John Douangdara, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Douangdara was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Douangdara died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Douangdara Family are the survivors and/or heirs of PO1 Douangdara and are entitled to recover for the damages PO1 Douangdara sustained.

270. Plaintiff Captain Cary Greggory DuVal, a U.S. national, served in Afghanistan as a member of the U.S. Army. On August 24, 2014, CPT DuVal was injured in a vehicle-borne IED attack in Nangarhar Province, Afghanistan. The attack severely wounded CPT DuVal, who suffered the amputation of his right hand, several broken bones (including a broken right ulna, elbow, humerus, and right femur), and loss of 20% of his right quadricep. As a result of the August 24, 2014 attack and his injuries, CPT DuVal has experienced severe physical and emotional pain and suffering. The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda/Taliban cell.

271. Private First Class Vincent J. Ellis, a U.S. national, served in Afghanistan as a member of the U.S. Army. On June 1, 2012, PFC Ellis was injured in a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost

Province, Afghanistan. PFC Ellis died on June 4, 2012 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell. The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

272.    Specialist Michael D. Elm, a U.S. national, served in Afghanistan as a member of the U.S. Army. On October 14, 2011, SPC Elm was injured in an IED attack in Khost Province, Afghanistan. SPC Elm died on October 14, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda/Taliban cell. The Plaintiff members of the Elm Family are the survivors and/or heirs of SPC Elm and are entitled to recover for the damages SPC Elm sustained.

273.    Sergeant Richard A. Essex, a U.S. national, served in Afghanistan as a member of the U.S. Army. On August 16, 2012, SGT Essex was injured in an attack on a helicopter in Kandahar Province, Afghanistan. SGT Essex died on August 16, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Essex Family are the survivors and/or heirs of SGT Essex and are entitled to recover for the damages SGT Essex sustained.

274.    First Lieutenant Demetrius M. Frison, a U.S. national, served in Afghanistan as a member of the U.S. Army. On May 10, 2011, 1LT Frison was injured in an IED attack in Khost Province, Afghanistan. 1LT Frison died on May 10, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda/Taliban

cell. The Plaintiff members of the Frison Family are the survivors and/or heirs of 1LT Frison and are entitled to recover for the damages 1LT Frison sustained.

275.    Captain Joel C. Gentz, a U.S. national, served in Afghanistan as a member of the U.S. Air Force. On June 9, 2010, Capt Gentz was injured in an attack on a helicopter in Helmand Province, Afghanistan. Capt Gentz died on June 9, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Gentz Family are the survivors and/or heirs of Capt Gentz and are entitled to recover for the damages Capt Gentz sustained.

276.    Paul Goins Jr., a U.S. national, served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Goins was injured in an IED attack in Kabul Province, Afghanistan. Mr. Goins died on February 10, 2014 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

277.    Sergeant Jonathan A. Gollnitz, a U.S. national, served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SGT Gollnitz was injured in a suicide bombing attack in Logar Province, Afghanistan. SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff

members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

278.    Command Sergeant Major Kevin J. Griffin, a U.S. national, served in Afghanistan as a member of the U.S. Army. On August 8, 2012, CSM Griffin was injured in a suicide bombing attack in Kunar Province, Afghanistan. CSM Griffin died on August 8, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack), acting together in a joint al-Qaeda-Taliban-LeT cell, with al-Qaeda providing, indoctrinating, and training the suicide bomber. The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

279.    Sergeant William Gross Paniagua, a U.S. national, served in Afghanistan as a member of the U.S. Army. On July 31, 2011, SGT Gross Paniagua was injured in an IED attack in Kunar Province, Afghanistan. SGT Gross Paniagua died on July 31, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Gross Paniagua Family are the survivors and/or heirs of SGT Gross Paniagua and are entitled to recover for the damages SGT Gross Paniagua sustained.

280.    Corporal Frank Robert Gross, a U.S. national, served in Afghanistan as a member of the U.S. Army. On July 16, 2011, CPL Gross was injured in an IED attack in Khost Province, Afghanistan. CPL Gross died on July 16, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda/Taliban cell. The

Plaintiff members of the Gross Family are the survivors and/or heirs of CPL Gross and are entitled to recover for the damages CPL Gross sustained.

281.    Sergeant Jeremy F. Hardison, a U.S. national, served in Afghanistan as a member of the U.S. Army National Guard. On October 1, 2012, SGT Hardison was injured in a suicide bombing attack by an individual wearing an Afghan police uniform in Khost Province, Afghanistan. SGT Hardison died on October 1, 2012 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell. The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

282.    Jay Henigan, a U.S. national, served in Afghanistan as a civilian government contractor working for the Central Intelligence Agency. On September 25, 2011, Mr. Henigan was injured in an insider attack in Kabul Province, Afghanistan. Mr. Henigan died on September 25, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Henigan Family are the survivors and/or heirs of Mr. Henigan and are entitled to recover for the damages Mr. Henigan sustained.

283.    Michael Anthony Hughes, a U.S. national, served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Hughes was injured in an IED attack in Kabul Province, Afghanistan. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a

designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover the damages Mr. Hughes sustained.

284.    Private First Class Tyler Ray Iubelt, a U.S. national, served in Afghanistan as a member of the U.S. Army. On November 12, 2016, PFC Iubelt was injured in a suicide bombing attack in Parwan Province, Afghanistan. PFC Iubelt died on November 12, 2016 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Iubelt Family are the survivors and/or heirs of PFC Iubelt and are entitled to recover for the damages PFC Iubelt sustained.

285.    Manoharan "Paul" Kamaleson, a U.S. national, served in Afghanistan as the civilian chief operating officer of the First MicroFinance Bank. On January 14, 2019, Mr. Kamaleson was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Kamaleson died on January 14, 2019 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Kamaleson Family are the survivors and/or heirs of Mr. Kamaleson and are entitled to recover for the damages Mr. Kamaleson sustained.

286.    Alexis Leigh Kamerman, a U.S. national, served in Afghanistan as a civilian educator with the American University of Afghanistan. On January 17, 2014, Ms. Kamerman was injured in a complex attack involving a suicide bomber and gunmen in Kabul Province, Afghanistan. Ms. Kamerman died on January 17, 2014 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated

FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Kamerman Family are the survivors and/or heirs of Ms. Kamerman and are entitled to recover the damages Ms. Kamerman sustained.

287.    Plaintiff Professor Kevin King, a U.S. national, served in Afghanistan as a civilian professor teaching at American University of Afghanistan. On August 7, 2016, Mr. King was kidnapped at gunpoint just outside the front gates of American University of Afghanistan in Kabul Province, Afghanistan. Mr. King was held hostage under deplorable conditions, beaten regularly, and denied adequate medical care for over three years before being released in a prisoner exchange on November 19, 2019. The attack severely wounded Mr. King, and he has suffered from severe caloric malnutrition, muscle atrophy, peripheral neuropathy, hypocalcemia, vitamin D deficiency, low bone mineral density, hyperparathyroidism, frostbite on feet and ankles, a weak bladder, and other physical injuries due to repeated beatings. As a result of the August 7, 2016 attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering. The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban. As a result of the August 7, 2016 attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

288.    Sergeant Michael J. Knapp, a U.S. national, served in Afghanistan as a member of the U.S. Army. On May 18, 2012, SGT Knapp was injured in an indirect fire attack in Kunar Province, Afghanistan. SGT Knapp died on May 18, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint

al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Knapp Family are the survivors and/or heirs of SGT Knapp and are entitled to recover for the damages SGT Knapp sustained.

289.    Jason D. Landphair, a U.S. national, served in Afghanistan as a civilian government contractor working for Praetorian Standard Inc. On January 29, 2015, Mr. Landphair was injured in an insider attack in Kabul Province, Afghanistan. Mr. Landphair died on January 29, 2015 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Landphair Family are the survivors and/or heirs of Mr. Landphair and are entitled to recover for the damages Mr. Landphair sustained.

290.    Plaintiff Sergeant First Class David William Haalilio Lau, a U.S. national, served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, SFC Lau was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings. As a result of the April 4, 2012 attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering. The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber. As a result of the April 4, 2012 attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

291.    Sergeant Andrew R. Looney, a U.S. national, served in Afghanistan as a member of the U.S. Army. On June 21, 2010, SGT Looney was injured in a suicide bombing attack in Kunar Province, Afghanistan. SGT Looney died on June 21, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Looney Family are the survivors and/or heirs of SGT Looney and are entitled to recover for the damages SGT Looney sustained.

292.    Staff Sergeant Chester J. McBride III, a U.S. national, served in Afghanistan as a member of the U.S. Air Force. On December 21, 2015, SSgt McBride was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSgt McBride died on December 21, 2015 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

293.    Staff Sergeant Mecolus C. McDaniel, a U.S. national, served in Afghanistan as a member of the U.S. Army. On March 19, 2011, SSG McDaniel was injured in an IED attack in Khost Province, Afghanistan. SSG McDaniel died on March 19, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda/Taliban cell. The Plaintiff members of the McDaniel Family are the survivors and/or heirs of SSG McDaniel and are entitled to recover the damages SSG McDaniel sustained.

294.    Richard P. McEvoy, a U.S. national, served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. McEvoy was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. McEvoy died on

August 22, 2015 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

295.    Staff Sergeant Shaun M. Mittler, a U.S. national, served in Afghanistan as a member of the U.S. Army. On July 10, 2010, SSG Mittler was injured in a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan. SSG Mittler died on July 10, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Mittler Family are the survivors and/or heirs of SSG Mittler and are entitled to recover for the damages SSG Mittler sustained.

296.    Specialist Carlos J. Negron Sr., a U.S. national, served in Afghanistan as a member of the U.S. Army. On July 10, 2010, SPC Negron was injured in a complex attack involving a rocket propelled grenade and small arms fire in Kunar Province, Afghanistan. SPC Negron died on July 10, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Negron Family are the survivors and/or heirs of SPC Negron and are entitled to recover for the damages SPC Negron sustained.

297.    Staff Sergeant Christopher R. Newman, a U.S. national, served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SSG Newman was injured in a suicide

bombing attack in Kabul Province, Afghanistan. SSG Newman died on October 29, 2011 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

298.    Chief Warrant Officer 2 Bryan J. Nichols, a U.S. national, served in Afghanistan as a member of the U.S. Army Reserve. On August 6, 2011, CW2 Nichols was injured in an attack on a helicopter in Wardak Province, Afghanistan. CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Nichols Family are the survivors and/or heirs of CW2 Nichols and are entitled to recover for the damages CW2 Nichols sustained.

299.    Staff Sergeant John William Perry, a U.S. national, served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SSG Perry was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSG Perry died on November 12, 2016 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Perry Family are the survivors and/or heirs of SSG Perry and are entitled to recover for the damages SSG Perry sustained.

300.    Petty Officer 1st Class Jesse Daryl Pittman, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Pittman was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Pittman died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of

the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Pittman Family are the survivors and/or heirs of PO1 Pittman and are entitled to recover for the damages PO1 Pittman sustained.

301.    Specialist Jared C. Plunk, a U.S. national, served in Afghanistan as a member of the U.S. Army. On June 25, 2010, SPC Plunk was injured in a complex attack involving small arms fire and rocket propelled grenades in Kunar Province, Afghanistan. SPC Plunk died on June 25, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Plunk Family are the survivors and/or heirs of SPC Plunk and are entitled to recover for the damages SPC Plunk sustained.

302.    Peter Louis Provost, a U.S. national, served in Afghanistan as a civilian contractor working for Fluor Corporation. On November 12, 2016, Mr. Provost was injured in a suicide bombing attack in Parwan Province, Afghanistan. Mr. Provost died on November 12, 2016 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Provost Family are the survivors and/or heirs of Mr. Provost and are entitled to recover for the damages Mr. Provost sustained.

303.    Specialist Blaine E. Redding, a U.S. national, served in Afghanistan as a member of the U.S. Army. On June 7, 2010, SPC Redding was injured in an IED attack in Kunar Province, Afghanistan. SPC Redding died on June 7, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban, al-Qaeda (a designated FTO at the time of the attack), and LeT (a designated FTO at the time of the attack) acting together in a joint

al-Qaeda-Taliban-LeT cell. The Plaintiff members of the Redding Family are the survivors and/or heirs of SPC Redding and are entitled to recover for the damages SPC Redding sustained.

304.    Mr. Jarrold M. Reeves Jr., a U.S. national, served in Afghanistan as a civilian contractor working for Fluor Corporation. On November 12, 2016, Mr. Reeves was injured in a suicide bombing attack in Parwan Province, Afghanistan. Mr. Reeves died on November 12, 2016 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the Reeves Family are the survivors and/or heirs of Mr. Reeves and are entitled to recover for the damages Mr. Reeves sustained.

305.    Specialist Joseph William Riley, a U.S. national, served in Afghanistan as a member of the U.S. Army. On November 24, 2014, SPC Riley was injured in a vehicle-borne IED attack in Kabul Province, Afghanistan. SPC Riley died on November 24, 2014 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

306.    Senior Chief Petty Officer Heath M. Robinson, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Robinson was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Robinson died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Robinson Family are the survivors and/or heirs of SCPO Robinson and are entitled to recover for the damages SCPO Robinson sustained.

307.    Angel Roldan Jr., a U.S. national, served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On May 16, 2013, Mr. Roldan was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

308.    Plaintiff Captain Christopher J. Rosebrock, a U.S. national, served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rosebrock was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded CPT Rosebrock, who suffers from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums. As a result of the April 4, 2012 attack and his injuries, CPT Rosebrock has experienced severe physical and emotional pain and suffering. The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber.

309.    Captain Nicholas J. Rozanski, a U.S. national, served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack in Faryab Province, Afghanistan. CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) with al-Qaeda providing, indoctrinating, and training the suicide bomber. The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

310.    Staff Sergeant Mark Henry Schoonhoven, a U.S. national, served in Afghanistan as a member of the U.S. Army. On December 15, 2012, SSG Schoonhoven was injured in an IED attack in Kabul Province, Afghanistan. SSG Schoonhoven died on January 20, 2013 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Schoonhoven Family are the survivors and/or heirs of SSG Schoonhoven and are entitled to recover for the damages SSG Schoonhoven sustained.

311.    U.S. Foreign Service officer Anne T. Smedinghoff, a U.S. national, served in Afghanistan as a member of the U.S. State Department. On April 6, 2013, Ms. Smedinghoff was injured in a suicide bombing attack in Zabul Province, Afghanistan. Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

312.    Staff Sergeant Orion N. Sparks, a U.S. national, served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SSG Sparks was injured in a suicide bombing attack in Logar Province, Afghanistan. SSG Sparks died on September 26, 2012 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff

members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

313.    Petty Officer 2nd Class Nicholas P. Spehar, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO2 Spehar was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO2 Spehar died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Spehar Family are the survivors and/or heirs of PO2 Spehar and are entitled to recover for the damages PO2 Spehar sustained.

314.    Petty Officer 1st Class Michael J. Strange, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Strange was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Strange died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Strange Family are the survivors and/or heirs of PO1 Strange and are entitled to recover for the damages PO1 Strange sustained.

315.    Barry Sutton, a U.S. national, served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. Sutton was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the attack. The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack) and al-Qaeda (a designated FTO at the time of the attack) acting together in the Kabul Attack Network. The Plaintiff members of the

Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

316.     Plaintiff Captain Ryan Gregory Timoney, a U.S. national, served in Afghanistan as a member of the U.S. Army. On May 20, 2012, CPT Timoney was injured in a suicide bomber attack in Uruzgan Province, Afghanistan. The attack severely wounded CPT Timoney, who lost his left leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty. As a result of the May 20, 2012 attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering. The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban with al-Qaeda providing and training the suicide bomber. As a result of the May 20, 2012 attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

317.     Chief Petty Officer Aaron C. Vaughn, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Vaughn was injured in an attack on a helicopter in Wardak Province, Afghanistan. CPO Vaughn died on August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Vaughn Family are the survivors and/or heirs of CPO Vaughn and are entitled to recover for the damages CPO Vaughn sustained.

318.     Senior Chief Petty Officer Kraig Michael Kaleolani Vickers, a U.S. national, served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Vickers was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Vickers died on

86

August 6, 2011 as a result of injuries sustained during the attack. The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack). The Plaintiff members of the Vickers Family are the survivors and/or heirs of SCPO Vickers and are entitled to recover for the damages SCPO Vickers sustained

319.    Senior Airman Benjamin D. White, a U.S. national, served in Afghanistan as a member of the U.S. Air Force. On June 9, 2010, SrA White was injured in an attack on a helicopter in Helmand Province, Afghanistan. SrA White died on June 9, 2010 as a result of injuries sustained during the attack. The attack was committed by the Taliban. The Plaintiff members of the White Family are the survivors and/or heirs of SrA White and are entitled to recover for the damages SrA White sustained.

320.    For those Plaintiffs with family members who died as a result, each Plaintiff has experienced severe mental anguish, emotional pain and suffering, and the loss of their family member's society, companionship, and counsel.

321.    A full list of the Plaintiffs, their nationality, and relationship to the injured persons above (if applicable), is attached hereto as Exhibit A.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Civil Liability Under 18 U.S.C. § 2333(d)
### *for Aiding and Abetting Foreign Terrorist Organizations*

322.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

323.    Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331(1).

324. All of the attacks that injured Plaintiffs were committed, planned, and/or authorized by al-Qaeda, an organization that had been designated an FTO as of the date of the attacks.

325. Some of the attacks that injured Plaintiffs were also committed, planned, and/or authorized by the Haqqani Network after its designation as an FTO in 2012. Some were committed by LeT after its designation as an FTO in 2001.

326. NBP aided and abetted the person(s) who committed the attacks by knowingly providing illicit financial services that facilitated large funds transfers from Kahn, McLintock, RWO, Murtaza, and/or others to the members of the Syndicate in the lead-up to the terrorist attacks.

327. NBP was generally aware that by unlawfully providing funds to the Syndicate, it was playing a role in the Syndicate's violent or life-endangering terrorist and tortious activities.

328. As alleged above, NBP provided this assistance knowingly.

329. The assistance NBP provided was substantial, *inter alia*, because the amount of money provided to the Syndicate was significant, NBP had a culpable state of mind, and the duration of the assistance was multiple years, evincing a deliberate intention by NBP to participate in, and further, the ongoing illicit enterprise.

330. The attacks at issue were a reasonably foreseeable result of the Syndicate's violent or life-endangering terrorist and tortious activities.

331. NBP should accordingly be held liable for civil aiding and abetting under 18 U.S.C. § 2333(d).

**Second Claim for Relief**

**Civil Liability Under 18 U.S.C. § 2333(d)**
***for Conspiring with Foreign Terrorist Organizations***

332. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

333. NBP entered into a conspiracy with its customers (Khan, McLintock/RWO, and Murtaza/ART—as well as the transferees who received these customers' money in Afghanistan and Pakistan), as well as al-Qaeda, the Haqqani Network, the Pakistani Taliban, LeT, and JeM to join the Syndicate's terrorist campaign.

334. As explained above, the Syndicate members conspired to carry out a terror campaign targeting American servicemembers and civilians in Afghanistan. Khan and his transferees joined that conspiracy by providing funds, terrorist operatives, and a safehouse to the TTP and al-Qaeda, both members of the conspiracy. McLintock, RWO, and their transferees were fronts for al-Qaeda, which was the leader of the conspiracy, and also provided funds and resources to LeT, a member of the conspiracy. Murtaza, ART, and JeM were likewise members of the conspiracy.

335. NBP knew that the objective of the conspiracy between these sophisticated terrorist organizations was to carry out terrorist attacks, including attacks against American servicemembers and civilians.

336. NBP joined the conspiracy by knowingly agreeing to facilitate the financial services and fund transfers that provided members of the Syndicate with resources to fulfill their roles in the conspiracy.

337. The attacks were foreseeable acts in furtherance of this conspiracy that caused Plaintiffs' injuries.

338. NBP should accordingly be held liable for conspiracy under 18 U.S.C. § 2333(d).

**Third Claim for Relief**

**Civil Liability Under 18 U.S.C. § 2333(a) for**
***Providing Material Support to Terrorists in Violation of 18 U.S.C. § 2339A***

339.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

340.    NBP provided material support or resources to members of the Syndicate in violation of 18 U.S.C. § 2339A by transferring, *inter alia*, funds (including a significant number of U.S. dollars from the U.S.) to these terrorist organizations knowing that those funds would be used in preparation for or in carrying out one or more violations of enumerated predicate offenses, including 18 U.S.C. §§ 844(f) (destroying federal property), 930(c) (homicide in the course of attacking a federal facility), 956 (conspiracy to kill, kidnap, maim, or injure individuals, or to damage property, in a foreign country), 1114 (killing a federal officer, employee, or member of the armed forces), 1361 (destruction of federal property), and 2332 (killing or assaulting a U.S. national outside the U.S.).

341.    NBP's provision of material support in the form of funds (including a significant number of U.S. dollars from the U.S.) and financial services to notorious terrorists in the manner and with the knowledge alleged herein constitutes acts of international terrorism, because they involve acts that are violent or dangerous to human life, that violated the criminal laws of the laws of the United States, and objectively appeared to be intended to influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping, and transcends national boundaries.

342.    NBP's actions caused Plaintiffs' injuries by providing the Syndicate with funds and financial services necessary and sufficient to carry out the terrorist attacks implicated in this case.

343.    NBP should accordingly be held liable under 18 U.S.C. § 2333(a).

**Fourth Claim for Relief**

**Civil Liability Under 18 U.S.C. § 2333(a) for**
**Providing Material Support to Terrorist Organizations**
*in Violation of 18 U.S.C. § 2339B*

344.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

345.    As stated above, NBP provided funds and financial services to the TTP, a designated FTO and member of the Syndicate. It also provided funds and financial services to RWO, a front organization for the FTO al-Qaeda, and a supporter of the FTO LeT and of al-Qaeda's ally in the Syndicate, the Taliban. And it provided funds and financial services to ART, an FTO and the alter-ego of FTO JeM, through the Murtaza/ART account.

346.    NBP knew, or was deliberately indifferent to the fact, that the members of the Syndicate shared resources as a matter of course, so that by providing resources to any of these terrorist customers, NBP was providing material support to al-Qaeda and the other FTOs in the Syndicate. Specifically, NBP knew that the TTP and al-Qaeda were closely allied and shared resources. And it knew that ART was an alter-ego of FTO JeM, and that Murtaza was an agent of both ART and JeM.

347.    Before any of the events in this case transpired, al-Qaeda, LeT, and JeM had already been designated FTOs by the U.S. State Department. NBP accordingly knew, or was deliberately indifferent to the fact, that it was providing material support and resources to a designated FTO by providing the banking services alleged in this Amended Complaint.

348.    Other FTOs, including the TTP, ART, and the Haqqani Network, were so designated during the events that gave rise to this case. Upon their designation, NBP knew, or

was deliberately indifferent to the fact, that they were so designated. With respects to payments occurring after the dates of designation, NBP accordingly knew, or was deliberately indifferent to the fact, that it was providing material support and resources to a designated FTO by providing the banking services alleged herein.

349.   By knowingly providing material support in the form of funds and financial services to individuals and entities it knew were FTOs, or were agents, fronts, or alter-egos of FTOs, NBP violated 18 U.S.C. § 2339B, which prohibits knowingly providing any material support or resources to a designated FTO.

350.   NBP's knowing provision of material support to FTOs constitutes acts of international terrorism, because that conduct involved acts that are violent or dangerous to human life, violated the criminal laws of the United States, and objectively appeared to be intended to influence the policy of a government by intimidation or coercion or affect the conduct of a government by mass destruction, assassination, or kidnapping, and transcends national boundaries.

351.   NBP's actions caused Plaintiffs' injuries by providing the members of the al-Qaeda Terror Syndicate, including al-Qaeda, the TTP, LeT, ART, and the Haqqani Network with funds necessary and sufficient to carry out the terrorist attacks implicated in this case.

352.   NBP should accordingly be held liable under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against NBP and in favor of all Plaintiffs for compensatory damages (including for physical and emotional pain and suffering, loss of society, companionship, comfort, advice, and counsel, and economic loss) in amounts to be determined at trial;

(c) Enter judgment against NBP and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

(d) Enter judgment against NBP and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorney's fees, pursuant to 18 U.S.C. § 2333;

(e) Grant pre-judgment interest, as authorized by law; and

(f) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: February 16, 2021                    Respectfully submitted,

                                            */s/Tejinder Singh*

Ryan R. Sparacino                           Tejinder Singh
 (pro hac vice)                             (SDNY Bar No. TS0613)
SPARACINO PLLC                              GOLDSTEIN & RUSSELL, P.C.
1920 L Street, NW, Suite 535                7475 Wisconsin Ave., Suite 850
Washington, DC 20036                        Bethesda, MD 20814
Tel: 202.629.3530                           Tel: 202.362.0636
Ryan.sparacino@sparacinopllc.com            Fax: 866.574.2033
                                            tsingh@goldsteinrussell.com

                                            Gary M. Osen
                                            Ari Ungar
                                            Michael J. Radine
                                            Osen LLC
                                            2 University Plaza, Suite 402
                                            Hackensack, NJ 07601
                                            Tel: 201.265.6400
                                            gosen@osenlaw.com
                                            aungar@osenlaw.com
                                            mradine@osenlaw.com

93